1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

Ramon RODRIGUEZ VAZQUEZ, et al.,

                Plaintiffs,

     v.

Drew BOSTOCK, et al.,

                Defendants.

Case No. 25-cv-5240

**NAMED PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

Noting Date: April 17, 2025

ORAL ARGUMENT REQUESTED

NAMED PL.'S MOT.
FOR PRELIM. INJ.
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

## INTRODUCTION

Named Plaintiff Ramon Rodriguez Vazquez (Mr. Rodriguez or Plaintiff) seeks a preliminary injunction that requires Defendants to provide him an individualized custody hearing to determine whether he should remain detained at the Northwest Immigration and Customs Enforcement (ICE) Processing Center (NWIPC) in Tacoma, Washington. Although he has lived in the United States for over nearly fifteen years, the Tacoma Immigration Court has determined that Mr. Rodriguez and others similarly situated should be treated as recent arrivals seeking admission who are subject to mandatory detention under 8 U.S.C. § 1225(b)(2). In doing so, the immigration court has denied Plaintiff and others a bond solely because they are subject to the grounds of inadmissibility for having entered the United States without inspection. But § 1226(a)'s discretionary detention scheme—and not § 1225(b)(2)'s detention authority—governs Mr. Rodriguez's detention, and thus Mr. Rodriguez is entitled to hearing where a judge must consider his request for bond.

Section 1226's plain language makes this clear. Under that statute, the Department of Homeland Security (DHS) may detain a noncitizen pending a hearing on that person's admissibility. In fact, the statute explicitly extends to people who are inadmissible because they entered unlawfully. Despite this unambiguous language, the Tacoma Immigration Court has adopted a unique and draconian interpretation, holding that Mr. Rodriguez and proposed class members are subject to mandatory detention under § 1225(b)(2). But § 1225(b)(2)'s mandatory detention scheme applies "at the Nation's borders and ports of entry, where the Government must determine whether a[] [noncitizen] seeking to enter the country is admissible." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). Indeed, in contrast to § 1226(a), the whole purpose of § 1225 is to define how DHS should inspect, process, and detain various classes of people

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 1
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

arriving at the border or who have just entered the country. Section 1225(b)(2) thus does not apply to people like Mr. Rodriguez, who are "already in the country" and are detained "pending the outcome of removal proceedings." *Id.* at 289.

The consequences of not receiving an opportunity to post bond are devastating. Without a hearing, Mr. Rodriguez and members of the proposed class lose the chance to rejoin their families, communities, and jobs here in Washington and the Pacific Northwest. They also face the prospect of having to fight their cases while being subject to prolonged detention, making it much more difficult to retain counsel, gather evidence, and prepare for their case. In some instances, detention also poses serious problems for their health, especially where NWIPC staff fail to provide required medication, as is the case with Mr. Rodriguez.

Finally, the Court should not require administrative exhaustion. The record in this case demonstrates that the Tacoma Immigration Court has a policy of categorically denying bond. Appeals to the Board of Immigration Appeals (BIA or the Board) inflict the very harm Mr. Rodriguez seeks to avoid, as they often take six months or more to resolve. Moreover, others have attempted to address this very issue through individual appeals, to no avail. Even after the BIA ordered a bond hearing in two similarly situated cases, all but one of the immigration judges (IJs) of the Tacoma Immigration Court have continued to deny bond to people like Mr. Rodriguez. Only this Court can provide meaningful relief.

## STATEMENT OF FACTS

### I.    The Tacoma Immigration Court's Practice of Denying Bond Hearings

This case concerns the detention authority for people who entered the United States without inspection, are not apprehended upon arrival, and are not subject to some other detention authority, like the detention authority for people in expedited removal, *see* 8 U.S.C. § 1225(b)(1),

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 2
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    or withholding-only proceedings, *see id.* § 1231(a)(6). For decades, people in Mr. Rodriguez's

2    situation—people who have been residing in the United States, often for years—received bond

3    hearings. Indeed, similarly situated people continue to be released on bond by IJs in other

4    immigration courts around the country.

5           Prior to passage of the Illegal Immigration Reform and Immigrant Responsibility Act of

6    1996 (IIRIRA), the statutory authority for such hearings was found at 8 U.S.C. § 1252(a). That

7    statute provided for a noncitizen's detention during deportation proceedings, as well as authority

8    to release the noncitizen on bond. *See* 8 U.S.C. § 1252(a) (1994). Such proceedings governed the

9    detention of anyone in the United States, regardless of manner of entry. *Id.*[1] IIRIRA maintained

10   the same basic detention authority in the new § 1226(a). Indeed, when passing IIRIRA, Congress

11   explained that the new § 1226(a) merely "restates the current provisions in [8 U.S.C. § 1252(a)]

12   regarding the authority of the Attorney General to arrest, detain, and release on bond a[]

13   [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229

14   (1996); *see also* H.R. Rep. No. 104-828, at 210 (1996) (Conf. Rep.) (same). Separately,

15   Congress enacted new detention authorities for people arriving in or who recently entered the

16   United States, including a new expedited removal scheme for those arriving or who recently

17   entered. *See* 8 U.S.C. § 1225(b)(1)–(2). In implementing this new detention authority, the former

18   Immigration and Naturalization Service clarified that people who entered the United States

19   without inspection and who were not in expedited removal would continue to be detained under

20

21

22   _____

23   [1]    Separately, "exclusion" proceedings covered those who arrived at U.S. ports of entries and
     had never entered the United States. *See* 8 U.S.C. § 1225 (1994) (providing for inspection and
     detention of noncitizens "arriving at ports of the United States"); *id.* § 1226 (1994) (providing for
24   exclusion proceedings of "arriving" noncitizens detained for further inquiry).

the same detention they always had been: § 1226(a) (previously § 1252(a)). *See* Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

The distinction between § 1226(a) detention and § 1225(b) detention is important. Detention under § 1226(a) includes the right to a bond hearing before a neutral decisionmaker—specifically, an IJ. *See* 8 C.F.R. § 1236.1(d). At that hearing, the noncitizen may present evidence of their ties to the United States, lack of criminal history, and other factors that show they are not a flight risk or danger to the community. *See generally Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). By contrast, people determined to be detained under § 1225(b) are subject to mandatory detention and receive no bond hearing. *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV), (b)(2). They may only be released at the discretion of the arresting agency via humanitarian parole. *See Jennings*, 583 U.S. at 288; *see also* 8 U.S.C. § 1182(d)(5)(A).

For the first 25 years after IIRIRA was enacted, local immigration courts, like immigration courts across the country, applied § 1226(a) to the detention of people who were apprehended within the United States after having entered without inspection. But in the past few years, the Tacoma Immigration Court began to apply the mandatory detention provisions of 8 U.S.C. § 1225(b)(2) to all persons who entered the United States without inspection, regardless of how long those persons have resided here. *See* Stanislowski Decl. ¶ 3; Boyd Decl. ¶ 3. According to the immigration court, all people who enter the United States without inspection are now considered "applicants for admission" who are "seeking admission" to the United States, and are therefore subject to § 1225(b)(2). *See, e.g.*, Stanislowski Decl. Exs. A–L (IJ orders concluding no jurisdiction to issue a bond and applying the mandatory detention provisions of § 1225(b)(2)); Boyd Decl. Ex. A (same).

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 4
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

The results of this policy shift have been catastrophic for noncitizens detained at NWIPC, many of whom are longtime residents of Washington and other Pacific Northwest states. Hundreds of people have been denied bond as a result, forcing them to litigate their cases from detention or to give up altogether. Stanislowski Decl. ¶¶ 4–6; Boyd Decl. ¶ 3. Many, if not most, of these individuals have resided in the United States for years, or even decades. *See, e.g.*, Stanislowski Decl. ¶ 4 (summarizing stories of individual clients); Boyd Decl. ¶ 6 (same). These individuals have families, jobs, and communities here in the United States. The harm suffered here is thus not only the noncitizens' deprivation of liberty, but also the fallout on U.S. citizen, LPR, and other noncitizen family members, employers, colleagues, and friends.

Notably, national statistics reflects that IJs in Tacoma are denying bond hearings at extraordinary rates—a fact that appeals have done nothing to fix. For example, in FY2023, Tacoma IJs granted bond in a mere 3% of the cases where bonds were requested—far less than most courts, and by far the lowest grant rate in the United States for any immigration court. *See* Transactional Records Access Clearinghouse, Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes, https://tracreports.org/reports/722/ (July 19, 2023). As the IJs' rulings began to result in denials for nearly all noncitizens during this time, advocates attempted to rectify this problem by appealing cases to the BIA. But this strategy had only very limited success. As an initial matter, appeals take several months, and sometimes even a year or more, to complete. *See* Korthuis Decl. ¶ 5 (reporting FOIA data from the BIA reflecting that the average case processing time for BIA appeals was 204 days in FY 2024); *see also* Stanislowski Decl. ¶ 5(d) (noting that an appeal has been pending for over a year and a half in one case). Such delays in civil detention cases do not provide an individual with a meaningful chance to seek their release. As advocates recount, nearly all cases become moot by this point. Many noncitizens

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 5
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    cannot afford an appeal, and others may lose their case in the meantime and face removal. *See*

2    Stanislowski Decl. ¶ 10; *see also id.* ¶ 5 (recounting reasons why appeals never reached a

3    decision); Boyd Decl. ¶ 5. Still others give up their case because of the guarantee of prolonged

4    detention. Stanislowski Decl. ¶ 10; Boyd Decl. ¶ 5. For example, one recent client of the

5    Northwest Immigrant Rights Project recounts how she was "devastated," and "felt terrible and

6    desperate" after an IJ denied her any bond because the IJ concluded she was mandatorily

7    detained under § 1225(b)(2). Torres Medina Decl. ¶ 6. The prospect of having to remain in the

8    "nightmare" of detention deterred this person from fighting their case and appealing the bond

9    decision. *Id.* ¶¶ 6, 10–11. Finally, still other noncitizens receive a discretionary release from ICE

10   or win their case. *See* Stanislowski Decl. ¶ 10; Boyd Decl. ¶ 5. In short, BIA appeals do not

11   provide any meaningful relief.

12           Critically, advocates have tried—and failed—to change this practice through appeals. In

13   addition to the problem of having nearly all cases mooted out, most of the Tacoma IJs have

14   engaged in a shocking disregard for appellate authority. Counsel for Mr. Rodriguez is aware of

15   two unpublished BIA cases in which the Board has reversed the Tacoma IJs' refusal to grant

16   bond in cases like those of Mr. Rodriguez and proposed class members. *See* Maltese Decl. Exs.

17   A–B. In one instance, advocates requested that the Board publish the decision, but the agency

18   refused. Maltese Decl. Exs. C–D. In requests for bond hearings since these unpublished

19   decisions, advocates have submitted one or more of the BIA decisions to support the request.

20   *See, e.g.*, Stanislowski Decl. ¶ 11; Braker Decl. ¶ 4. Yet only one IJ has shifted her approach in

21   response to these decisions. The other IJs have ignored this appellate authority and continued to

22   deny bond hearings for people like Mr. Rodriguez, *see* Stanislowski Decl. ¶ 8; Braker Decl. ¶ 5,

23

24

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 6
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1  depriving them of any opportunity to reunite with family and friends and return to their work and

2  communities.

3  **II.    Plaintiff Ramon Rodriguez Vazquez**

4       Plaintiff Ramon Rodriguez Vazquez (Mr. Rodriguez) is currently detained at NWIPC and

5  has been denied a bond hearing pursuant to the policy described above. Rodriguez Decl. ¶¶ 2, 11.

6  Mr. Rodriguez is a resident of Grandview, Washington, where he has lived since 2009 and where

7  he owns a home. *Id.* ¶ 3. He is married to his wife of 40 years, and has four children and ten

8  grandchildren, all of whom live within minutes of him. *Id.* ¶ 4. Mr. Rodriguez has no criminal

9  history, and he has long worked in Washington's agricultural sector. *Id.* ¶¶ 7–8.

10       Mr. Rodriguez was detained by immigration authorities at his home on February 5, 2025,

11  after immigration agents invaded his home virtually unannounced. *Id.* ¶ 5. Following his arrest,

12  Mr. Rodriguez requested a bond hearing. *Id.* ¶ 11. At a hearing on March 12, 2025, Immigration

13  Judge John Odell denied Mr. Rodriguez a bond hearing, holding that he was subject to

14  mandatory detention under 8 U.S.C. § 1225(b)(2) because DHS alleged he entered the United

15  States without inspection. *Id.* Mr. Rodriguez has since appealed the IJ's order, and that appeal is

16  pending. *Id.* ¶ 12.

17                                    **ARGUMENT**

18       To obtain a preliminary injunction, Mr. Rodriguez must demonstrate that (1) he is likely

19  to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary

20  relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.

21  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Even if Mr. Rodriguez raises only

22  "serious questions going to the merits," the Court can nevertheless grant relief if the balance of

23  hardships tips "sharply" in his favor, and the remaining equitable factors are satisfied. *All. for the*

24

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 7
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**I.    Mr. Rodriguez satisfies all the factors required for a preliminary injunction.**

    **A.  Mr. Rodriguez is likely to succeed on the merits of his argument that he is detained under § 1226(a), not § 1225(b)(2).**

Mr. Rodriguez is likely to succeed on his claims that he is detained under 8 U.S.C. § 1226(a). He has been residing in the United States for years and has not sought admission. The text, context, and legislative and statutory history of the INA all demonstrate that § 1226(a) therefore governs his detention.

    1.  <u>The text of § 1226 and § 1225 demonstrate that Mr. Rodriguez is not subject to mandatory detention</u>.

First, the plain text of § 1226 demonstrates that its subsection (a) applies to Mr. Rodriguez. By its own terms, § 1226(a) applies to anyone who is detained "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). Section 1226 goes on to explicitly confirm that this authority includes not just persons who are deportable, but also noncitizens who are inadmissible.[2] While § 1226(a) provides the right to seek release, § 1226(c) carves out specific categories of noncitizens from being released— including certain categories of inadmissible noncitizens—and subjects them instead to mandatory detention. *See, e.g.*, *id.* § 1226(c)(1)(A), (C). But if the Tacoma Immigration Court policy were correct—i.e., if § 1226(a) did not cover inadmissible noncitizens—there would be no reason to specify that § 1226(c) governs certain persons who are inadmissible; instead, it would have only needed to address people who are deportable for certain offenses.

---

[2]    Generally speaking, grounds of deportability (found in 8 U.S.C. § 1227) apply to people who have previously been admitted, such as lawful permanent residents and certain visa holders, while grounds of inadmissibility (found in § 1182) apply to those who have not been admitted to the United States. *See, e.g.*, *Barton v. Barr*, 590 U.S. 222, 234 (2020).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Notably, recent amendments to § 1226 dramatically reinforce that this section covers people like Mr. Rodriguez, whom DHS alleges to have entered without inspection. The Laken Riley Act added language to § 1226 that directly references people who have entered without inspection or who are present without authorization. *See* Laken Riley Act (LRA), Pub. L. No. 119-1, 139 Stat. 3 (2025). Specifically, pursuant to the LRA amendments, people charged as inadmissible pursuant to § 1182(a)(6) (the inadmissibility ground for entry without inspection) or (a)(7) (the inadmissibility ground for lacking valid documentation to enter the United States) *and* who have been arrested, charged with, or convicted of certain crimes are subject to § 1226(c)'s mandatory detention provisions. *See* 8 U.S.C. § 1226(c)(1)(E). By including such individuals under § 1226(c), Congress further clarified that, by default, § 1226(a) covers persons charged under § 1182(a)(6) or (a)(7). In other words, if someone is *only* charged as inadmissible under § 1182(a)(6) or (a)(7) and the additional crime-related provisions of § 1226(c)(1)(E) do not apply, then § 1226(a) governs that person's detention. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) (observing that a statutory exception would be unnecessary if the statute at issue did not otherwise cover the excepted conduct).

The Tacoma Immigration Court has nevertheless held that § 1225 "mandate[s] the detention of all aliens inadmissible under [§ 1182]." Maltese Decl. Ex. B at 2, *see also id.* Ex. D at 2 (holding that § 1225 "include[s] all noncitizens who have not been admitted regardless of where they are encountered or how long they have been in the United States"). In support of this conclusion, the IJs have reasoned that "Congress drafted [§ 1225] through the context of exclusion and [§ 1226] with an understanding of deportability," and thus § 1225 must apply to people like Mr. Rodriguez. *Id.* Ex. D at 5. Not do this interpretation fly in the face of the § 1226(a)'s plain text including inadmissible persons, but it also runs up against the canon against

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 9
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

superfluities. Under this "most basic [of] interpretive canons, . . . '[a] statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (third alteration in original) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Shulman v. Kaplan*, 58 F.4th 404, 410–11 (9th Cir. 2023) ("[C]ourt[s] 'must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" (citation omitted)). But by concluding that the mandatory detention provision of § 1225(b)(2) applies to people like Mr. Rodriguez, the Tacoma Immigration Court violates this rule. That is because if § 1225(b)(2) covers all people charged as inadmissible under § 1182(a)(6) or (a)(7) (and who are not in expedited removal), then § 1226(c)(1)(E) would be meaningless, as such people would already be subject to mandatory detention under § 1225(b)(2).

In sum § 1226's plain text demonstrates that § 1225(b)(2) should not be read to apply to everyone who is in the United States "who has not been admitted," 8 U.S.C. § 1225(a)(1). Section 1226(a) covers those who are not now seeking admission but instead are already residing in the United States—including those who are charged with inadmissibility—while § 1225(b)(2) covers only those "seeking admission," i.e., those who are apprehended upon arrival in the United States (and who are not subject to the procedures of § 1225(b)(1)). A contrary interpretation would ignore § 1226(a)'s plain text and structure and render meaningless § 1226's language that specifically addresses individuals who have entered without inspection.

The text of § 1225 reinforces this interpretation. As the Supreme Court has recognized, § 1225 is concerned "primarily [with those] seeking entry," *Jennings*, 583 U.S. at 297, i.e., cases "at the Nation's borders and ports of entry, where the Government must determine whether a[]

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 10
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

[noncitizen] seeking to enter the country is admissible," *id.* at 287. Paragraphs (b)(1) and (b)(2)

in § 1225 reflect this understanding. To begin, paragraph (b)(1)—which concerns "expedited

removal of inadmissible arriving [noncitizens]"—encompasses only the "inspection" of certain

"arriving" noncitizens and other recent entrants the Attorney General designates, and only those

who are "inadmissible under section 1182(a)(6)(C) or § 1182(a)(7)." 8 U.S.C. § 1225(b)(1),

(A)(i). These grounds of inadmissibility are for those who misrepresent information to an

examining immigration officer or do not have adequate documents to enter the United States.

Thus, subsection (b)(1)'s text demonstrates that it is focused only on people arriving at a port of

entry or who have recently entered the United States and not those already residing here.

   Paragraph (b)(2) is similarly limited to people applying for admission when they arrive in

the United States. The title explains that this paragraph addresses the "[i]nspection of other

[noncitizens]," i.e., those noncitizens who are "seeking admission," but who (b)(1) does not

address. *Id.* § 1225(b)(2), (b)(2)(A). By limiting (b)(2) to those "seeking admission," Congress

confirmed that it did not intend to sweep into this section individuals like Mr. Rodriguez, who

have already entered and are now residing in the United States. An individual submits an

"application for admission" only at "the moment in time when the immigrant actually applies for

admission into the United States." *Torres v. Barr*, 976 F.3d 918, 927 (9th Cir. 2020) (en banc).

Indeed, in *Torres*, the en banc Court of Appeals rejected the idea that § 1225(a)(1) means that

anyone who is presently in the United States without admission or parole is someone "deemed to

have made an actual application for admission." *Id.* (emphasis omitted). That holding is

instructive here too, as only those who take affirmative acts, like submitting an "application for

admission," are those that can be said to be "seeking admission" within § 1225(b)(2)(A).

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 11
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1   Otherwise, that language would serve no purpose, violating a key rule of statutory construction.

2   *See Shulman*, 58 F.4th at 410–11.

3       Furthermore, subparagraph (b)(2)(C) addresses the "[t]reatment of [noncitizens] *arriving*

4   from contiguous territory," i.e. those who are "*arriving* on land." 8 U.S.C. § 1225(b)(2)(C)

5   (emphasis added). This language further underscores Congress's focus in § 1225 on those who

6   are arriving into the United States—not those already residing here. Similarly, the title of § 1225

7   refers to the "inspection" of "inadmissible *arriving*" noncitizens. *See Dubin v. United States*, 599

8   U.S. 110, 120–21 (2023) (emphasis added) (relying on section title to help construe statute).

9   Finally, the entire statute is premised on the idea that an inspection occurs near the border and

10  shortly after arrival, as the statute repeatedly refers to "examining immigration officer[s]," 8

11  U.S.C. § 1225(b)(2)(A), (b)(4), or officers conducting "inspection[s]" of people "arriving in the

12  United States," *id.* § 1225(a)(3), (b)(1), (b)(2), (d); *see also King v. Burwell*, 576 U.S. 473, 492

13  (2015) (looking to an Act's "broader structure . . . to determine [the statute's] meaning").

14      The Tacoma Immigration Court's policy ignores all this and instead focuses on the

15  definition of applicant for admission at § 1225(a)(1), *see, e.g.*, Stanislowski Decl. Ex. B at 1–2,

16  *id.* Ex. C at 2–4; *id.* Ex. D at 2, 5, which defines an "applicant for admission" as a person who is

17  "present in the United States who has not been admitted or who arrives in the United States," 8

18  U.S.C. § 1225(a)(1). But as the Ninth Circuit has explained, "when deciding whether language is

19  plain, [courts] must read the words in their context and with a view to their place in the overall

20  statutory scheme." *San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1240 (9th Cir. 2022)

21  (internal quotation marks omitted). Here, that context underscores that the definition in (a)(1) is

22  limited by other aspects of the statute to those who undergo an initial inspection at or near a port

23

24

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 12
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

of entry shortly after arrival—and that it does not apply to those who are arrested in the interior of the United States months or years later.

Moreover, in finding that all noncitizens who entered without inspection are necessarily encompassed by the mandatory detention provision at § 1225(b)(2), the Tacoma Immigration Court policy ignores that the provision does not simply address applicants for admission. Instead, the language "applicant for admission" in (b)(2)(A) is further qualified by clarifying the subparagraph applies only to those "seeking admission"—in other words, those who have applied to be admitted or paroled. The Tacoma Immigration Court policy simply ignores this text, just as it ignores the statutory language in § 1226 that expressly encompasses persons who have entered the United States without inspection.

2. The legislative history further supports the application of § 1226(a) to Mr. Rodriguez's detention.

The legislative history of IIRIRA also supports a limited construction of § 1225 and instead concluding that § 1226(a) applies to Mr. Rodriguez. In passing the Act, Congress was focused on the perceived problem of recent arrivals to the United States who do not have documents to remain. *See* H.R. Rep. No. 104-469, pt. 1, at 157–58, 228–29; H.R. Rep. No. 104-828, at 209. Notably, Congress did not say anything about subjecting all people present in the United States after an unlawful entry to mandatory detention if arrested. This is important, as prior to IIRIRA, people like Mr. Rodriguez were not subject to mandatory detention. *See* 8 U.S.C. § 1252(a)(1) (1994) (authorizing Attorney General to arrest noncitizens for deportability proceedings, which applied to all persons within the United States). Had Congress intended to make such a monumental shift in immigration law (potentially subjecting millions of people to mandatory detention), it would have explained so or spoken more clearly. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468–69 (2001). But to the extent it addressed the matter,

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 13
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Congress explained precisely the opposite, noting that the new § 1226(a) merely "restates the

current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest,

detain, and release on bond a[] [noncitizen] *who is not lawfully in the United States*." H.R. Rep.

No. 104-469, pt. 1, at 229 (emphasis added); *see also* H.R. Rep. No. 104-828, at 210 (same).

3.  The record and longstanding practice reflect that § 1226 governs Mr. Rodriguez's detention.

DHS's long practice of considering people like Mr. Rodriguez as detained under §

1226(a) further supports this reading of the statute. Typically, in cases like that of Mr.

Rodriguez, DHS issues a Form I-286, Notice of Custody Determination or Form I-200 stating

that the person is detained under § 1226(a) or has been arrested under that statute. *See, e.g.*,

Stanislowski Decl. Ex. C at 5–6; *id.* Ex. D at 2–3. This decision to invoke § 1226(a) is consistent

with longstanding practice. For decades, and across administrations, DHS has acknowledged that

§ 1226(a) applies to individuals who entered the United States unlawfully, but who were later

apprehended within the borders of the United States long after their entry. Such a longstanding

and consistent interpretation "is powerful evidence that interpreting the Act in [this] way is

natural and reasonable." *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J.,

dissenting); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983) (relying in

part on "over 60 years" of government interpretation and practice to reject government's new

proposed interpretation of the law at issue).

Indeed, agency regulations have long recognized that people like Mr. Rodriguez are

subject to detention under § 1226(a). Nothing in 8 C.F.R. § 1003.19(h)—the regulatory basis for

the immigration court's jurisdiction—provides otherwise. In fact, the Executive Office for

Immigration Review (EOIR) confirmed that § 1226(a) applies to Mr. Rodriguez and proposed

class members' cases when it promulgated the regulations governing immigration courts and

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 14
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

implementing § 1226 decades ago. Specifically, EOIR explained that "[d]espite being applicants for admission, [noncitizens] who are present without having been admitted or paroled (formerly referred to as [noncitizens] who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. at 10323.[3]

In sum, § 1226 governs this case. Section 1225 applies only to individuals arriving in the United States as specified in the statute, while § 1226 applies to those who have previously entered without admission and are now residing in the United States.

**B.  Mr. Rodriguez will suffer irreparable harm absent an injunction.**

Parties seeking preliminary injunctive relief must also show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm is the type of harm for which there is "no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Here, the Tacoma Immigration Court has unlawfully denied Mr. Rodriguez the opportunity to seek a bond and release during the pendency of his immigration proceedings. This detention constitutes "a loss of liberty that is . . . irreparable." *Moreno Galvez v. Cuccinelli*, 492 F. Supp. 3d 1169, 1181 (W.D. Wash. 2020) (*Moreno II*), *aff'd in part, vacated in part on other grounds, remanded sub nom. Moreno Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (irreparable harm is met where

---

[3]    Notably, in at least two cases, the IJs cited as authority 8 C.F.R. § 1235.3(b)(1)(ii), claiming that the "clear language" of that regulation required mandatory detention for anyone who entered without inspection. Maltese Decl. Ex. C at 4; *id.* Ex. D at 4. The citation to this regulation was egregious. At the time, that regulation was (and still is) enjoined. *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966 (N.D. Cal. 2021) (enjoining relevant rule); *see also* Joint Status Report, *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-09258-JD, ECF No. 71 (N.D. Cal. Oct. 20, 2021) (last available filing on ECF, showing that the preliminary injunction remained in effect while settlement negotiations were ongoing).

1    "preliminary injunction is necessary to ensure that individuals . . . are not needlessly detained"

2    because they are neither a danger nor a flight risk); *see also infra* pp. 21–22.

3          That Mr. Rodriguez's detention constitutes such a harm should come as no surprise, as

4    "civil commitment for any purpose constitutes a significant deprivation of liberty that requires

5    due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Indeed, "[f]reedom from

6    imprisonment—from government custody, detention, or other forms of physical restraint—lies at

7    the heart of the liberty" that the Due Process Clause protects. *Zadvydas v. Davis*, 533 U.S. 678,

8    690 (2001). For this reason, the Supreme Court has repeatedly made clear that prolonged

9    deprivations of liberty—like those that noncitizens regularly experience—require a timely

10   hearing to test the legality of detention before a "neutral and detached magistrate." *Gerstein v.*

11   *Pugh*, 420 U.S. 103, 112 (1975); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 55–56

12   (1991) (similar); *Gonzalez v. United States Immigr. & Customs Enft*, 975 F.3d 788, 823–26 (9th

13   Cir. 2020) (holding that *Gerstein* applies to the detention of noncitizens on a detainer); *Zadvydas*,

14   533 U.S. at 690 (detention requires a hearing before an independent decisionmaker to assess

15   whether the detention "bear[s] [a] reasonable relation" to a valid government purpose, such as

16   preventing flight or protecting the community against dangerous individuals (alterations in

17   original) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *United States v. Salerno*, 481

18   U.S. 739, 750 (1987) (upholding Bail Reform Act's pre-trial civil detention scheme precisely

19   because it required the government to justify detention in a "full-blown adversary hearing"

20   before a "neutral decisionmaker"—a federal judge).

21         Although here Mr. Rodriguez primarily asserts statutory rather than constitutional claims,

22   his claims raise constitutional concerns, for civil detention "violates due process outside of

23   'certain special and narrow nonpunitive circumstances.'" *Rodriguez v. Marin*, 909 F.3d 252, 257

24

NAMED PL.'S MOT.               NORTHWEST IMMIGRANT RIGHTS PROJECT
FOR PRELIM. INJ. - 16           615 Second Ave., Ste. 400
Case No. 25-cv-5240             Seattle, WA  98104
                                  (206) 957-8611

(9th Cir. 2018) (citation omitted). These constitutional concerns also counsel in favor of finding that Mr. Rodriguez has demonstrated irreparable harm, for he has demonstrated a strong likelihood of success on his claim that he is being held under § 1226(a) and not § 1225(b)(2). *See Baird v. Bonta*, 81 F.4th 1036, 1048 (9th Cir. 2023) (declaring that "in cases involving a constitutional claim, a likelihood of success on the merits usually establishes irreparable harm").

Detention also inflicts substantial harm by separating family members, including U.S. citizen family members. Indeed, absent an injunction, Mr. Rodriguez has no hope of being reunited with his wife, children, and grandchildren, all of whom live near him. Rodriguez Decl. ¶¶ 4, 9, 13. As he describes, "[t]here is no day that I do not cry just thinking about [my family]." *Id.* ¶ 9. Such "separation from family members" is an important irreparable harm factor. *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (per curiam) (citation omitted); *see also, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (per curiam) ("separated families" are a "substantial injur[y] and even irreparable harm[]"); *cf. Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("government-compelled [family] separation" causes family members "trauma" and "other burdens").

Moreover, Mr. Rodriguez also testifies that because of his detention, his wife must "keep our family afloat without me." Rodriguez Decl. ¶ 14. But his wife is now without his steady income as an agricultural worker, which he has used to provide for the family and buy their home. *Id.* ¶ 3, 7. His inability to work and help provide for his family is also the type of "potential economic hardship" that supports a finding of irreparable harm. *Leiva-Perez*, 640 F.3d at 969–70; *see also Gonzalez Rosario v USCIS*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018) (recognizing a "negative impact on human welfare" when noncitizens "are unable to financially support themselves or their loved ones").

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 17
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611

Detention has also taken an emotional and mental toll on Mr. Rodriguez, who reports significant emotional trauma and physical struggles. *See* Rodriguez Decl. ¶ 13 ("I feel desperate and extremely depressed" because of separation from family and medical issues). Such "emotional stress, depression and reduced sense of well-being" further support a finding of irreparable harm. *Chalk v. U.S. Dist. Ct*., 840 F.2d 701, 709 (9th Cir. 1988); *see also Moreno II*, 492 F. Supp. 3d at 1181–82 ("[S]tress, devastation, fear, and depression" arising from unlawful immigration policy are the type of "harms [that] will not be remedied by an award of damages.").

Moreover, Mr. Rodriguez suffers from high blood pressure and requires several daily medications. Rodriguez Decl. ¶ 10. Yet NWIPC failed to provide him that medicine for at least a week, resulting in headaches, stomach pains, trouble sleeping, and swollen feet. *Id.* Such obvious "evidence of subpar medical . . . care in [an] ICE detention facilit[y]" is also evidence of irreparable harm. *Hernandez*, 872 F.3d at 995.

Finally, the special challenges detention presents to defending an immigration case also compound Mr. Rodriguez's harm. For example, as Mr. Rodriguez explains, because he cannot work, he cannot afford a lawyer and thus faces a serious impediment to mounting a defense to removal. Rodriguez Decl. ¶ 14. Studies on representation in removal proceedings show that representation by an attorney dramatically improves case outcomes, but also that it is particularly difficult to secure representation if a person is detained. *See* Ingrid Eagly & Steven Shafter, A National Study of Access to Counsel in Immigration Court, 164 U. Penn. L. Rev. 1, 32, 48–51 (2015).

In sum, Mr. Rodriguez will suffer numerous and irreparable harms absent an injunction: separation from his family, difficulty defending his immigration case, and emotional harm and

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 18
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

stress stemming from both from the fact of physical confinement and the specific conditions of detention at the NWIPC.

### C. The balance of hardships and public interest weigh heavily in Mr. Rodriguez's favor.

The final two factors for a preliminary injunction—the balance of hardships and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Mr. Rodriguez faces weighty hardships: loss of liberty, separation from family, significant stress and anxiety, and difficulty in obtaining an attorney. *See supra* Sec. I.B. The government, by contrast, faces minimal hardship: the administrative costs associated with three bond hearings. "[T]he balance of hardships tips decidedly in plaintiffs' favor" when "[f]aced with such a conflict between financial concerns and preventable human suffering." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

What is more, because the policy preventing Mr. Rodriguez from obtaining bond "is inconsistent with federal law, . . . the balance of hardships and public interest factors weigh in favor of a preliminary injunction." *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019) (*Moreno I*); *see also Moreno Galvez*, 52 F.4th at 832 (affirming in part permanent injunction issued in *Moreno II* and quoting approvingly district judge's declaration that "it is clear that neither equity nor the public's interest is furthered by allowing violations of federal law to continue"). This is because "it would not be equitable or in the public's interest to allow the [government] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (second alteration in original) (citation omitted). Indeed, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez*, 715 F.3d at 1145. "The public interest benefits from an injunction that ensures that individuals are not deprived of their

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 19
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1  liberty and held in immigration detention because of . . . a likely [illegal bond] process."

2  *Hernandez*, 872 F.3d at 996.[4]

3      Accordingly, the balance of hardships and the public interest overwhelmingly favor

4  injunctive relief to ensure that Defendants comply with federal law and afford Mr. Rodriguez a

5  bond hearing untainted by the Tacoma Immigration Court's unlawful bond denial policy.

6  **II.    Prudential exhaustion is not required.**

7      Respondents are likely to ask this Court to require Mr. Rodriguez to first appeal his

8  decision denying bond to the BIA. However, prudential exhaustion does not require that Mr.

9  Rodriguez be forced to endure the very harm he is seeking to avoid in filing this case and this

10  motion by waiting many months for a decision from the BIA. "[T]here are a number of

11  exceptions to the general rule requiring exhaustion, covering situations such as where

12  administrative remedies are inadequate or not efficacious, . . . [or] irreparable injury will result . .

13  . ." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (citation omitted). In addition, a court

14  may waive an exhaustion requirement when "requiring resort to the administrative remedy may

15  occasion undue prejudice to subsequent assertion of a court action." *McCarthy v. Madigan*, 503

16  U.S. 140, 146–47 (1992), *superseded by statute on other grounds as stated in Booth v. Churner*,

17  532 U.S. 731, 739–41 (2001). "Such prejudice may result . . . from an unreasonable or indefinite

18  timeframe for administrative action." *Id.* at 147 (citing cases). Here, the exceptions regarding

19  irreparable injury and agency delay apply and warrant waiving any prudential exhaustion

20  requirement.

21

22

---

23  4    As with the irreparable harm analysis, "in cases involving a constitutional claim, a likelihood
   of success on the merits . . . strongly tips the balance of equities and public interest in favor of

24  granting a preliminary injunction." *Baird*, 81 F.4th at 1048.

## A.  Irreparable Injury

The first exception to any prudential exhaustion requirement that applies here is that of irreparable injury. Because Mr. Rodriguez was denied bond and ordered mandatorily detained, each day he remains in detention is one in which his statutory rights have been violated and he could be free. Similarly situated district courts have repeatedly recognized this fact. As one court has explained, "because of delays inherent in the administrative process, BIA review would result in the very harm that the bond hearing was designed to prevent: prolonged detention without due process." *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 237 (W.D.N.Y. 2019) (internal quotation marks omitted). Indeed, "if Petitioner is correct on the merits of his habeas petition, then Petitioner has *already* been unlawfully deprived of a [lawful] bond hearing[,] [and] . . . each additional day that Petitioner is detained without a [lawful] bond hearing would cause him harm that cannot be repaired." *Villalta v. Sessions*, No. 17-CV-05390-LHK, 2017 WL 4355182, at *3 (N.D. Cal. Oct. 2, 2017) (internal quotation marks and brackets omitted); *see also Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018) (similar). Other district courts have echoed these points.[5]

The district courts that have recognized that irreparable harm exists here are well-supported by Ninth Circuit case law. At issue in this case is civil detention, which "violates due process outside of 'certain special and narrow nonpunitive circumstances.'" *Rodriguez*, 909 F.3d

---

[5] *See, e.g.*, *Perez v. Wolf*, 445 F. Supp. 3d 275, 286 (N.D. Cal. 2020); *Blandon v. Barr*, 434 F. Supp. 3d 30, 37 (W.D.N.Y. 2020); *Marroquin Ambriz v. Barr*, 420 F. Supp. 3d 953, 961 (N.D. Cal. 2019); *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1003–04 (N.D. Cal. 2018); *Montoya Echeverria v. Barr*, No. 20-CV-02917-JSC, 2020 WL 2759731, at *6 (N.D. Cal. May 27, 2020); *Rodriguez Diaz v. Barr*, No. 4:20-CV-01806-YGR, 2020 WL 1984301, at *5 (N.D. Cal. Apr. 27, 2020); *Birru v. Barr*, No. 20-CV-01285-LHK, 2020 WL 1905581, at *4 (N.D. Cal. Apr. 17, 2020); *Lopez Reyes v. Bonnar*, No. 18-CV-07429-SK, 2018 WL 7474861, at *7 (N.D. Cal. Dec. 24, 2018).

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 21
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

at 257 (quoting *Zadvydas*, 533 U.S. at 690). And while Mr. Rodriguez asserts statutory rather than constitutional claims, he nevertheless has a "fundamental" interest in such a hearing, as "as "freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" *Hernandez*, 872 F.3d at 993 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). This point is "beyond dispute." *Id.*; see also *Marin*, 909 F.3d at 256–57.

Moreover, the irreparable injury Mr. Rodriguez faces extends beyond a chance at physical liberty. There are several "irreparable harms imposed on anyone subject to immigration detention[.]" *Hernandez*, 872 F.3d at 995. These include "subpar medical and psychiatric care in ICE detention facilities," as well as the "collateral harms to children of detainees whose parents are detained." *Id.* Indeed, here, Plaintiff Rodriguez faces separation from his wife, children, and grandchildren because of his detention and has received plainly inadequate medical care. *Supra* Sec. I.B. This separation and inadequate care inflict enormous harm on him and collateral harms on his family. Thus, all these reasons support a waiver of prudential exhaustion based on irreparable harm.

## B. Agency Delay

Second, the BIA's delays in adjudicating bond appeals warrant excusing any exhaustion requirement.[6] The court's ability to waive exhaustion based on delay is especially broad here given the interests at stake. As the Ninth Circuit has explained, Supreme Court precedent "permits a court under certain prescribed circumstances to excuse exhaustion where 'a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment [of a lack of finality] is inappropriate.'" *Klein v. Sullivan*, 978 F.2d 520, 523 (9th Cir.

---

[6]    The complaint also includes constitutional and Administrative Procedure Act claims regarding the BIA's delay in adjudicating bond appeals. However, Mr. Rodriguez does not seek a preliminary injunction as to these claims at this time.

1992) (alteration in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976)). Of

course, as noted above, Mr. Rodriguez's interest here in physical liberty is a "fundamental" one.

*Hernandez*, 872 F.3d at 993. Moreover, the Supreme Court has explained that "[r]elief [when

seeking review of detention] must be speedy if it is to be effective." *Stack v. Boyle*, 342 U.S. 1, 4

(1951).

Despite this fundamental interest and the Supreme Court's admonition that only speedy

relief is meaningful, the BIA takes over half a year in most cases to adjudicate an appeal of a

decision denying bond. Its own data demonstrates this fact. *See* Korthuis Decl. ¶ 5 (reporting

results of Executive Office for Immigration Review (EOIR) FOIA request, which show that

EOIR calculated an average processing time of 204 days for bond appeals in Fiscal Year 2024).

In many cases, the wait is far longer, as the data shows that in "dozens of cases, the BIA even

took multiple years to resolve the matter." *Id.* ¶ 6. In these cases, noncitizens in removal

proceedings often remain locked up in a detention facility with conditions "similar . . . to those in

many prisons and jails" and separated from family. *Rodriguez*, 583 U.S. at 329 (Breyer, J.,

dissenting); *see also, e.g.*, *Hernandez*, 872 F.3d at 996.

Federal law and treatment of appeals from decisions granting or denying bail in criminal

cases further supports Mr. Rodriguez. In fact, the Supreme Court has upheld that scheme as

constitutional precisely because the statute "provide[s] for immediate appellate review of the

detention decision." *Salerno*, 481 U.S. at 752. In that context—where probable cause that an

individual committed a federal crime already exists—a magistrate judge generally determines

whether detention is justified "immediately upon the person's first appearance." *See* 18 U.S.C. §

3142(f); *Salerno*, 481 U.S. at 747–52 (upholding Bail Reform Act's pre-trial detention scheme

and the "prompt detention hearing[s]" that the statute provides as constitutional). Once a

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 23
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    magistrate judge issues a decision, a person ordered detained may seek review of the order from

2    a federal district judge. 18 U.S.C. § 3145(a)–(b). The district court must review the matter

3    "promptly," and the Ninth Circuit has explained that even 30 days exceeds the timeframe in

4    which a district judge must accomplish this review. *United States v. Fernandez-Alfonso*, 813

5    F.2d 1571, 1572–73 (9th Cir. 1987). And even once this expedited review has occurred, a

6    defendant is still entitled to "prompt[]" consideration of a further appeal before the Ninth Circuit

7    Court of Appeals. 18 U.S.C. § 3145(c); *see also United States v. Walker*, 808 F.2d 1309, 1311

8    (9th Cir. 1986) (noting in footnote that the statute "requires the court to promptly consider

9    appeals"). Indeed, the Court of Appeals' rules reflect that fact, providing for highly expedited

10   briefing on such matters. *See* 9th Cir. R. 9-1.1.

11        The expedited review of orders confining criminal defendants to pre-trial civil detention

12   simply underscores the inadequacy of the BIA's review of the similar civil detention orders here.

13   Waiting several months, half a year, or even a year to review a custody determination (or here,

14   review of a decision denying any opportunity for bond at all) is not reasonable; to the contrary, it

15   exhibits significant disregard for the "fundamental" interests at stake. The Ninth Circuit has

16   signaled that the protections afforded to criminal defendants in pre-trial civil detention should

17   apply in the civil immigration context. In *Gonzales v. U.S. Immigration & Customs Enforcement*,

18   the Court of Appeals held that the Fourth Amendment "requires a prompt probable cause

19   determination by a neutral and detached magistrate to justify continued detention" of a

20   noncitizen facing removal. 975 F.3d at 798; *see also id.* at 823–26. Similar principles

21   demonstrate why the BIA's review here is so patently unreasonable. The protections and quick

22   review of detention orders afforded criminal defendants are rooted in the Fifth Amendment's

23   Due Process Clause, *see Salerno*, 481 U.S. at 746–47, and many of those principles

24

NAMED PL.'S MOT.                                    NORTHWEST IMMIGRANT RIGHTS PROJECT
FOR PRELIM. INJ. - 24                               615 Second Ave., Ste. 400
Case No. 25-cv-5240                                 Seattle, WA 98104
                                                    (206) 957-8611

unquestionably apply to noncitizens, *see, e.g.*, *Zadvydas*, 533 U.S. at 690–91 (repeatedly citing *Salerno* and other Fifth Amendment civil detention caselaw). Thus, as with the rights at issue in *Gonzalez*, the rights of federal criminal defendants facing pretrial civil detention demonstrate that the BIA's months- or even years-long review of a noncitizen's civil detention is an "unreasonable . . . timeframe for administrative action." *McCarthy*, 503 U.S. at 147.

District courts facing situations similar to the one at issue here have again recognized this fact. These courts have acknowledged that the BIA's months-long review is unreasonable and results in ongoing injury to the detained individual. *See, e.g.*, *Perez*, 445 F. Supp. 3d at 286. Indeed, as one district judge observed, "the vast majority of . . . cases . . . have 'waived exhaustion . . . where several additional months may pass before the BIA renders a decision on a pending appeal [of a custody order]." *Montoya Echeverria*, 2020 WL 2759731, at *6 (quoting *Rodriguez Diaz*, 2020 WL 1984301, at *5); *see also Hechavarria*, 358 F. Supp. 3d at 237–38 (citing *McCarthy* and BIA delays as reason to waive prudential exhaustion requirement).

Finally, Mr. Rodriguez notes that under either basis for waiving exhaustion, the history of appeals related to this issue supports him. As noted above, the facts show that the Tacoma IJs have ignored the Board's prior decisions, and the supervisory Defendants have failed to take any action to ensure this failure does not result in the kind of continued unlawful detention taking place here. *See supra* p. 6. Defendants therefore have unclean hands and should not benefit from their failure to abide by appellate authority or to require the Tacoma Immigration Court to do so. This reality only further underscores the need for immediate relief and the propriety of waving any exhaustion requirement.

NAMED PL.'S MOT.
FOR PRELIM. INJ. - 25
Case No. 25-cv-5240

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1

## CONCLUSION

2        For the foregoing reasons, Mr. Rodriguez respectfully requests the Court grant his motion

3  for a preliminary injunction.

4

Respectfully submitted this 20th of March, 2025.

5

6  s/ Matt Adams                                s/ Leila Kang
   Matt Adams, WSBA No. 28287         Leila Kang, WSBA No. 48048
   matt@nwirp.org                               leila@nwirp.org

7

8  s/ Glenda M. Aldana Madrid            s/ Aaron Korthuis
   Glenda M. Aldana Madrid, WSBA No. 46987    Aaron Korthuis, WSBA No. 53974
   glenda@nwirp.org                           aaron@nwirp.org

9

10 NORTHWEST IMMIGRANT
   RIGHTS PROJECT
   615 Second Ave., Suite 400

11 Seattle, WA 98104
   (206) 957-8611

12

   *Counsel for Plaintiff and the*
13 *Proposed Class*

14        ## WORD COUNT CERTIFICATION

15        I certify that this memorandum contains 8,159 words, in compliance with the Local Civil
   Rules.

16                                        s/ Aaron Korthuis
                                          Aaron Korthuis, WSBA No. 53974
17                                        NORTHWEST IMMIGRANT RIGHTS PROJECT
                                          615 Second Ave., Suite 400
18                                        Seattle, WA 98104
                                          (206) 816-3872
19                                        aaron@nwirp.org

20

21

22

23

24