UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RAMON RODRIGUEZ VAZQUEZ, on
behalf of himself as an individual and on
behalf of others similarly situated,
                              Plaintiff,

          v.

DREW BOSTOCK, et al,

                              Defendant.

Case No. 3:25-cv-05240-TMC

ORDER GRANTING PRELIMINARY
INJUNCTION

## I.    INTRODUCTION

This case arises from a practice by the Tacoma Immigration Court of interpreting the

Immigration and Nationality Act ("INA") to mandate detention without the possibility of bond

for noncitizens who entered the United States without inspection, even if they have lived here for

years. Plaintiff Ramon Rodriguez Vazquez ("Rodriguez") is a resident of Grandview,

Washington who has lived in the United States and worked in agriculture for over 15 years.

Dkt. 9 ¶¶ 3, 7. On February 5, 2025, Rodriguez was apprehended by Immigration and Customs

Enforcement ("ICE"). Dkt. 26-2 at 4. He is detained at the Northwest Immigration and Customs

Enforcement Processing Center ("NWIPC"). Dkt. 9 ¶ 6. Rodriguez is married, has four adult

children, and is the "proud grandfather of ten United States citizen children[,]" all of whom live

"just a few minutes from [his] house." *Id.* ¶ 4. Before ICE's arrest, he had "never been arrested

by the police, charged with a crime, or convicted of any type of crime anywhere." *Id.* ¶ 8; Dkt. 26-2 at 5.

Rodriguez sought a bond hearing under 8 U.S.C. § 1226(a), the statute that typically applies to noncitizens[1] who are "arrested and detained" on "a warrant issued by the Attorney General" for potential removal from the United States. Section 1226(a) gives the government discretion to release these detainees on bond while their removal case is pending. A noncitizen subject to Section 1226(a) is entitled to a bond hearing before an Immigration Judge ("IJ"), who may release the individual if the noncitizen shows they are not dangerous or a flight risk. The longstanding practice of the Executive Branch agencies charged with interpreting and enforcing the INA considered noncitizens like Rodriguez who had entered without inspection, and were apprehended while residing in the United States, as subject to Section 1226(a).

But around November 2022, the Tacoma Immigration Court began denying bond hearings for that group of noncitizens. The Tacoma IJs reasoned that these individuals should be treated as "applicants for admission" who were "seeking admission" to the United States and subject to mandatory detention under Section 1225(b)(2)(A). In contrast to Section 1226(a), a noncitizen that falls under Section 1225(b) is typically detained without the possibility of release throughout their removal proceedings. Section 1225(b)(1) authorizes expedited removal for some noncitizens unless they are deemed to have a credible fear of persecution. Section 1225(b)(2) mandates detention for an "applicant for admission, if the examining immigration officer determines that a [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]" 8 U.S.C. § 1225(b)(2)(a). But in either track, the individual is not afforded a bond

---

[1] This order uses the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578, n.2 (2020); *see* 8 U.S.C. § 1101(a)(3).

ORDER GRANTING PRELIMINARY INJUNCTION - 2

hearing. Instead, they have only the possibility of temporary, discretionary parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

On March 12, 2025, Rodriguez's request for a bond hearing and redetermination of his custody status was denied. *See* Dkt. 4-5 at 2. Pursuant to the practice of most Tacoma IJs since 2022, the Tacoma IJ ruled that the court had no jurisdiction to consider the merits of his bond request because Rodriguez was mandatorily detained under Section 1225(b)(2)(A). *Id.*

Rodriguez has appealed the IJ's denial to the Board of Immigration Appeals ("BIA" or "Board"). Dkt. 9 ¶ 12. The BIA has in fact remanded two similar bond denials issued by Tacoma IJs, stating that noncitizens like Rodriguez are subject to Section 1226(a) discretionary detention, not Section 1225(b)(2) mandatory detention. Dkt. 4-2; Dkt. 4-3. But the Board has declined to issue a precedential decision, Dkt. 4-4, and the nonpublished decisions have had limited impact. Most Tacoma IJs still consider noncitizens who entered without inspection but were apprehended while living in the United States subject to Section 1225(b), denying these individuals any possibility of release on bond. Bond denial appeals, meanwhile, typically take six months or more to be resolved at the BIA. Dkt. 7 ¶ 5. While Rodriguez waits for his appeal to be decided, he will remain in custody—with significant consequences for his health, family, and ability to prepare his defense to removal—when he would otherwise be a strong candidate for release on bond.

Rodriguez challenges Defendants' denial of a bond hearing as unlawful under Section 1226(a) of the INA and the Administrative Procedure Act ("APA"). Dkt. 1 at 19. Rodriguez also asserts that the BIA's chronically delayed adjudication of bond appeals violates the Due Process Clause of the Fifth Amendment and the APA. *Id.* at 19–20. Rodriguez brings this action on behalf of himself and all other persons who are similarly situated, seeking to represent a "Bond Denial Class" and a "Bond Appeals Class." *Id.* at 17–18. At the same time he filed this lawsuit

and moved to certify the classes, Rodriguez moved for preliminary injunctive relief on his statutory claim that he is detained under Section 1226(a) and not subject to mandatory detention under Section 1225(b)(2). Dkt. 3. Rodriguez asks the Court to enjoin Defendants from denying bond because he is detained under Section 1225(b)(2). *Id.* Rodriguez requests release, or in the alternative, that Defendants provide him with a bond hearing under Section 1226(a). Dkt. 3; Dkt. 25.

While recognizing that there is no precedential decision on point, this Court concludes that Rodriguez is likely to succeed on the merits, or at least has raised serious questions, that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and instead should be governed under Section 1226(a)'s discretionary detention scheme. Because he has also shown irreparable harm, that the balance of hardships tips sharply in his favor, and that he need not exhaust administrative remedies, the Court GRANTS Rodriguez's motion for a preliminary injunction. Defendants are ordered to provide Rodriguez with a bond hearing under 8 U.S.C. § 1226(a) within fourteen days of this Order. Defendants are enjoined from denying bond to Rodriguez on the basis that he is detained pursuant to 8 U.S.C. § 1225(b)(2).

## II.     BACKGROUND

Plaintiff Rodriguez, a noncitizen resident of Grandview, Washington who has lived in the United States since 2009, is detained at NWIPC after an IJ denied him a bond. Dkt. 1 ¶ 17, 74. Defendants are Drew Bostock, Seattle Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement ("ICE"); Bruce Scott, Warden at NWIPC; Kristi Noem, Secretary of the United States Department of Homeland Security ("DHS"); the United States Department of Homeland Security; Pamela Bondi, Attorney General of the United States; the Executive Office of Immigration Review ("EOIR"); Sirce Owen,

Director of EOIR; and the Tacoma Immigration Court. *Id.* ¶¶ 18–25. The facts below are undisputed by the parties.

**A.    Sections 1226 and 1225.**

    Plaintiff Rodriguez alleges that he is unlawfully detained under Section 1225(b)(2), which mandates his detention, instead of under Section 1226(a)'s discretionary detention scheme where he could be eligible for release on bond.

    The INA "authorizes the detention of [noncitizens] awaiting removal from the United States." *De Paz Sales v. Barr*, No. 19-CV-07221-KAW, 2020 WL 353465, at *4 (N.D. Cal. Jan. 21, 2020) (quoting *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1000 (N.D. Cal. 2018)). Section 1226 "provides the general process for arresting and detaining [noncitizens] who are present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citation omitted). Section 1226(a) "sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of a[] [noncitizen] 'pending a decision on whether the [noncitizen] is to be removed from the United States.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting § 1226(a)). Except as provided in Section 1226(c), "the Attorney General 'may release' a[] [noncitizen] detained under § 1226(a) 'on . . . bond' or "conditional parole.'" *Id.* (quoting § 1226(a)(1)–(2)).

    Section 1226(c) "carves out a statutory category" of noncitizens for whom detention is mandatory, comprised of individuals who have committed certain "enumerated . . . criminal offenses [or] terrorist activities." *Id.* at 289 (citing § 1226(c)(1)). Among the individuals carved out and subject to mandatory detention are certain categories of "inadmissible" noncitizens. § 1226(c)(1)(A), (D), (E). In January 2025, the Laken Riley Act added one such category subject to mandatory detention. Laken Riley Act ("LRA"), Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E). The LRA amendments mandate detention for noncitizens charged as

inadmissible under Sections 1182(a)(6)(A) (the inadmissibility ground for a noncitizen "present in the United States without being admitted or paroled"), 1182(a)(6)(C) (the inadmissibility ground for misrepresentation), or 1182(a)(7) (the inadmissibility ground for lacking valid documentation) *and* if the noncitizen has been arrested for, charged with, or convicted of certain crimes. *Id.*

Turning back to the default rule, "[w]hen a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." *Rodriguez Diaz*, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). If the detainee objects to the initial determination, they "may request a bond hearing before an IJ at any time before a removal order becomes final." *Id.* at 1197 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). At this stage, "the burden is on the non-citizen to 'establish to the satisfaction of the Immigration Judge . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight.'" *Hernandez v. Sessions*, 872 F.3d 976, 982 (9th Cir. 2017) (quoting *In re Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006)). A noncitizen detainee can appeal an adverse decision to the BIA. *Id.* at 983 (citing § 236.1(d)(3)).

Section 1225(b) "supplement[s] § 1226's detention scheme." *Rodriguez Diaz*, 53 F.4th at 1197. Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297; *see* § 1225(b) ("Inspection of applicants for admission"). Section 1225 defines an "applicant for admission" as "[a]][] [noncitizen] present in the United States who has not been admitted or who arrives in the United States[.]" § 1225(a)(1); *see Jennings*, 583 U.S. at 287. As the Supreme Court notes, "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." *Jennings*, 583 U.S. at 287 (quoting § 1225(a)(3)).

Section 1225(b)(1) concerns the "[i]nspection of [noncitizens] arriving in the United States and certain other [noncitizens] who have not been admitted or paroled." Specifically, "Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible" based on Sections 1182(a)(6)(C) (misrepresentation) and 1182(a)(7) (lack of valid documentation) and "certain other [noncitizens] designated by the Attorney General[.]" *Jennings*, 583 U.S. at 287 (citing §§ 1225(b)(1)(A)(i), (iii)). Individuals that fall into Section 1225(b)(1) are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process" unless claiming asylum or a fear of persecution. *Id.* (first quoting § 1225(b)(1)(A)(i); then citing § 1225(b)(1)(A)(ii)).

Section 1225(b)(2) concerns the "[i]nspection of other [noncitizens]." Section 1225(b)(2) "mandates detention 'if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]'" *Rodriguez Diaz*, 53 F.4th at 1197 (quoting § 1225(b)(2)(A)).

Summarizing the relevant distinctions to this case, noncitizens detained under Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time before entry of a final removal order.

**B.     The Tacoma Immigration Court's denial of bond hearings for lack of jurisdiction under Section 1225(b)(2).**

Beginning around November 2022, the Tacoma Immigration Court started denying bond hearings for noncitizens "who entered without inspection and who have since resided in the United States." Dkt. 5 ¶ 3; *see also* Dkt. 6 ¶ 3. According to the Tacoma IJ's bond memo in Rodriguez's case, all noncitizens that enter the United States "without inspection or parole"— and who are not placed on the expedited removal or credible fear tracks of Section 1225(b)(1)—

are "inadmissible [noncitizens] who are 'applicants for admission'" under Section 1225. Dkt. 22 at 16; *see also* Dkt. 5 ¶ 5; Dkt. 6 ¶ 3. The immigration court has further held that an "applicant for admission" is also "'seeking admission' as that phrase is used" in Section 1225(b)(2)(A). Dkt. 22 at 20; *see* § 1225(b)(2)(A) ("[I]n the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229a of this title."). Thus, the Tacoma Immigration Court has reasoned, "[b]ecause Congress requires the detention of all applicants for admission, [it] does not have jurisdiction to review . . . bond determination[s] made by DHS" for noncitizens like Rodriguez. Dkt. 22 at 21; Dkt. 5 ¶ 5.

The Tacoma Immigration Court's change in policy has significantly impacted the likelihood that noncitizens apprehended while living in the United States may be released on bond. Rodriguez alleges that "[h]undreds of people have been denied bond as a result" and "[m]any, if not most, of these individuals have resided in the United States for years, or even decades." Dkt. 3 at 6; *see* Dkt. 5 ¶¶ 4–5; Dkt. 6 ¶ 3. According to national data, Tacoma IJs have granted bond in only three percent of the cases in which bond was requested in Fiscal Year 2023, a period that roughly aligns with the immigration court's change in policy. *See* Transactional Records Access Clearinghouse ("TRAC"), *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*, https://tracreports.org/reports/722/ (July 19, 2023); Dkt. 5 ¶ 3. During this period, the Tacoma Immigration Court's bond grant rate was the lowest grant rate among immigration courts in the United States. *See* TRAC, *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*.

**C.    Appeals to the BIA**

The BIA is an appellate body within the EOIR. 8 C.F.R. § 1003.1(d)(1). The Board is "charged with the review of those administrative adjudications under the [INA] that the Attorney General may by regulation assign to it." *Id.* By regulation, it can review IJ custody determinations. § 236.1(d)(3); § 1236.1(d)(3). Besides adjudicating individual cases, "the Board, through precedent decisions, shall provide clear and uniform guidance to DHS, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations." § 1003.1(d)(1).

Noncitizens like Rodriguez, who have been denied bond hearings by Tacoma IJs because they are allegedly subject to mandatory detention, have appealed their cases to the BIA with limited success. The BIA appeals process is long and generally moots pending bond appeals before they are adjudicated. *See* Dkt. 5 ¶ 5; Dkt. 7 ¶¶ 5–6. In 2024, EOIR data showed an average processing time of 204 days for bond appeals. Dkt. 7 ¶ 5. EOIR data also showed that 200 bond appeal cases "took a year or longer to resolve." *Id.* ¶ 6. During the time it takes the BIA to resolve an appeal, most detainees' claims are mooted. Dkt. 5 ¶ 5. Some detainees are released because ICE exercises its own authority to place detainees on bond. *See id.* ¶ 5(a),(d),(g). Other detainees are ordered removed from the United States during their bond appeal. *Id.* ¶ 5(b), (c), (f). And still others not captured in the EOIR data elect not to appeal a negative bond determination. *Id.* ¶ 5(e); *see also id.* ¶ 7 (declining representation for a bond hearing "based on the Tacoma Immigration Court practice of finding such individuals subject to mandatory detention.").

The few cases to reach the BIA, even when they have resolved a bond appeal in favor of the detainees, have also had limited impact. *See id.* ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. In April 2023, the BIA issued an unpublished decision involving a noncitizen "present in the United States, [that]

ha[d] not been admitted, and that an immigration officer found . . . [was] not clearly and beyond a doubt entitled to be admitted." Dkt. 4-2 at 3. The Tacoma IJ determined that the individual was subject to mandatory detention under Section 1225(b)(2)(A). *Id.* at 2. The Board remanded the case to the IJ, concluding that if the individual was issued a warrant of arrest with a notice to appear, "he would be subject to detention under" Section 1226. *Id.* at 3–4. Then in September 2023, the BIA issued a second unpublished decision for a person who had entered the United States "without being admitted or paroled." Dkt. 4-1 at 4. The BIA remanded the case to the IJ, writing that it was "unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the custody conditions of a respondent in removal proceedings under the circumstances here." *Id.*

Despite these decisions, three of the four Tacoma IJs continue to deny bond to individuals apprehended while residing in the country and treated as "present in the United States without inspection." Dkt. 5 ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. The BIA has also denied a request by advocates to publish one of these decisions as precedent. Dkt. 4-4 at 2.

### D.    Plaintiff Ramon Rodriguez Vazquez

Plaintiff Rodriguez is a resident of Grandview, Washington, where he has lived since 2009. Dkt. 9 ¶ 3. He works in the agricultural sector and owns his home, which he lives in with his family. *Id.* Rodriguez is married, has four adult children, and is the "proud grandfather of ten United States citizen children[,]" all of whom live "just a few minutes from [his] house." *Id.* ¶ 4. He also has eight siblings who live in California and who are all U.S. citizens. *Id.* Rodriguez has "never been arrested by the police, charged with a crime, or convicted of any type of crime anywhere." *Id.* ¶ 8; Dkt. 26-2 at 5.

On February 5, 2025, Rodriguez was arrested at his home and transferred to NWIPC. *Id.* ¶¶ 5–6; Dkt. 26-2 at 5. Rodriguez was placed in removal proceedings under Section 240 of the

INA (Section 1229a, as amended) and issued a Notice to Appear ("NTA") in front of an IJ. Dkt. 4-6 at 2. The NTA alleged that Rodriguez is a "[noncitizen] present in the United States who has not been admitted or paroled." *Id.* Following his arrest, Rodriguez requested a bond hearing. Dkt. 1 ¶ 79; *see* Dkt. 26-3. In support of his request, he included information about his ties to the U.S. "to demonstrate that he is not a flight risk or a danger." Dkt. 1 ¶ 79; *see generally* Dkt. 26-3. On March 12, 2025, Rodriguez's request for a bond redetermination hearing was denied for lack of jurisdiction. Dkt 4-5 at 2. The Tacoma IJ concluded that Rodriguez was subject to mandatory detention under § 1225(b)(2)(A) because he entered the United States "without inspection or parole and has not been through the expedited removal or credible fear process." Dkt. 22 at 16; Dkt. 4-5 at 2. Rodriguez appealed the IJ's denial on March 13, 2025. Dkt. 9 ¶ 12; *see generally* Dkt. 22 at 7–13. The appeal is pending before the BIA. Dkt. 9 ¶ 12.

Rodriguez has now been detained for over two and a half months. *See id.* ¶ 6. He has faced challenges to his mental and physical health. *Id.* ¶ 9–10. Being away from his family "has been extremely difficult." *Id.* ¶ 9. Rodriguez "has been a reliable and consistent help in the care provided to his grandchildren." Dkt. 26-3 at 38 (letter from pediatrician). Rodriguez assumes a particular role in the life of one of his grandchildren, a six-year-old diagnosed with Epstein's Anomaly, a congenital heart valve defect. *Id.*; Dkt. 9 ¶ 9. Rodriguez is responsible for taking her to appointments in Spokane, where her condition has required several surgeries and follow-up appointments. Dkt. 26-3 at 38. Rodriguez explains that his granddaughter has been "very affected by [his] absence." *Id.* ¶ 9.

Rodriguez also has "a number of health issues, making detention especially hard." *Id.* ¶ 10. He has high blood pressure and "take(s) a number of medications daily." *Id.* After he detained at NWIPC, he "was not given [his] medication for over a week," resulting in "horrible headaches," inflammation of his feet, and "significant pain in [his] stomach." *Id.* Although he

eventually received his medication, his "health has declined significantly" since he has been detained. *Id.* ¶ 13; *see id.* ¶ 10.

Rodriguez does not have a lawyer to defend him from deportation yet. *Id.* ¶ 14. His family "cannot afford to hire an attorney" and he is "extremely worried . . . that being detained will make it much harder to gather evidence and prepare [his] case." *Id.* ¶ 14–15. Rodriguez notes the burden this will place on his wife to help him who "is already doing so much to help keep [their] family afloat without [him]." *Id.* ¶ 14.

**E.    Procedural History**

On March 20, 2025, Rodriguez filed his complaint, moved to certify two classes, and moved for a preliminary injunction. Dkt. 1; Dkt. 2; Dkt. 3. As related to the preliminary injunction, Rodriguez asks the Court to enjoin Defendants from denying bond on the basis that he is detained under § 1225(b)(2) and to release him unless Defendants provide him with a bond hearing under § 1226(a) within fourteen days of the Court's order. Dkt. 3.

The parties met with the Court on April 2, 2025 and agreed on a briefing schedule. Dkt. 19. Defendants responded on April 14. Dkt 21. Plaintiff replied on April 17. Dkt. 25. The Court held oral argument on April 21, 2025. Dkt. 27.

Having considered the parties' briefs, the record, applicable law, and oral argument, the Court GRANTS Rodriguez's motion for preliminary injunction.

## III.    DISCUSSION

Defendants argue that Rodriguez's individual claims are unlikely to succeed on the merits, and thus his motion for preliminary injunction should be denied, because he has not exhausted his administrative remedies. Dkt. 21 at 13–19, 22. Rodriguez asserts that exhaustion is not required and that even if it were, the Court should waive exhaustion in his case. Dkt. 3 at 21–26; Dkt. 25 at 5–12.

The Court first addresses the parties' exhaustion arguments and finds that waiver of the prudential exhaustion requirement is warranted. The Court then addresses Rodriguez's preliminary injunction motion and concludes that Rodriguez has met the requirements for preliminary injunctive relief.

**A.    Exhaustion**

The government contends that Rodriguez failed to exhaust his administrative remedies before pursuing relief in federal court. The parties agree that the exhaustion requirement for habeas claims brought under 28 U.S.C. § 2241 applies to this case. *See* Dkt. 3 at 21; Dkt. 21 at 13. For such claims, "[t]he exhaustion requirement is prudential, rather than jurisdictional[.]" *Hernandez*, 872 F.3d at 988 (citations omitted). In the Ninth Circuit, courts may require prudential exhaustion when:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Id.* (quoting *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007)). If a petitioner does not exhaust administrative remedies, "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies[.]" *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). However, "even if the three *Puga* factors weigh in favor of prudential exhaustion, a court may waive the prudential exhaustion requirement if 'administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'" *Hernandez*, 872 F.3d at 988 (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004)). "The party moving the court to waive prudential exhaustion requirements bears the burden of demonstrating that at least one of these *Laing* factors applies." *Aden v. Nielsen*, No.

C18-1441RSL, 2019 WL 5802013, at *2 (W.D. Wash. Nov. 7, 2019) (citing *Ortega-Rangel*, 313 F. Supp. 3d at 1003).

Here, the three *Puga* factors do not weigh in favor of requiring prudential exhaustion. On the first factor, Defendants argue that this case does not involve a "routine matter of statutory interpretation" because Rodriguez's argument that Section 1226 governs his detention relies at least in part on DHS's "longstanding practice." Dkt. 21 at 13–14 (citing Dkt. 3 at 15–16). Therefore, Defendants reason, the Court would benefit from the BIA's expertise. *See id.* Although the Court acknowledges the BIA's subject-matter expertise for individual immigration bond decisions, *see Aden*, 2019 WL 5802013, at *2, "an administrative appellate record is not necessary to resolve . . . purely legal questions," *Hernandez*, 872 F.3d at 989 (9th Cir. 2017). Here, Rodriguez's "claim[] raise[s] purely legal questions: namely, whether [Rodriguez] is entitled to a bond hearing under . . . 8 U.S.C. § 1226(a)[.]" *Birru v. Barr*, No. 20-CV-01285-LHK, 2020 WL 1905581, at *3–4 (N.D. Cal. Apr. 17, 2020); *see Jimenez v. Wolf*, No. 19-CV-07996-NC, 2020 WL 1082648, at *2 (N.D. Cal. Mar. 6, 2020) (finding that prudential exhaustion does not bar habeas petition in part because "[a]ll that remains is [a] legal question").

The task of resolving this question of statutory interpretation belongs to the independent judgment of the courts. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress, in order to ascertain the rights of the parties.") (internal quotation marks and citation omitted). Contrary to Defendants' arguments, consideration of agency practice does not take that task outside the realm of "routine" statutory interpretation. Instead, as the Supreme Court explained in *Loper Bright*, cases dating back centuries have considered "the longstanding practice of government" as they would "any other interpretive aid." *Id.* at 386 (quotation marks and citations omitted).

Regarding the second factor, Defendants argue that not requiring exhaustion would "encourage other detainees to bypass the BIA and directly appeal their no-bond determinations from the IJ to federal district court." Dkt. 21 at 14 (quoting *Aden*, 2019 WL 5802013, at *2) (internal quotations omitted). But *Aden* concerned a challenge to the application of an evidentiary standard to an individual bond determination. *Aden*, 2019 WL 5802013, at *2. Here, in contrast, Rodriguez seeks resolution of a legal question that will provide concrete guidance for future administrative proceedings. Although the instant motion is for individual injunctive relief, Dkt. 25 at 10, Rodriguez also seeks to certify a class of similarly situated detainees to obtain declaratory relief that they are not subject to mandatory detention under Section 1225(b)(2). *See generally* Dkt. 2. "[T]he discreteness of the legal question presented and plaintiff's request for classwide relief suggest that relaxing the exhaustion requirement in this case will not encourage future habeas petitioners to bypass the administrative scheme, as the issue here will not arise again (at least in this District) once the Court rules on it[.]" *Rivera v. Holder*, 307 F.R.D. 539, 551 (W.D. Wash. 2015); *see also Hernandez*, 872 F.3d at 989 (waiving prudential exhaustion requirement in part "because, once the questions presented here are decided, they should cease to arise") (cleaned up). The Court similarly finds that, rather than encouraging other detainees to bypass the administrative process, adjudicating Rodriguez's case may answer a recurring legal question and thus reduce the number of future habeas petitions.

The third factor, whether the BIA is "likely . . . to correct its own mistakes," is a closer call. *See Hernandez*, 872 F.3d at 989. Defendants point out that the outcome Rodriguez desires—overturning the IJ's mandatory detention ruling and receiving an individualized bond determination—has occurred twice through the BIA appeals process for similarly situated noncitizens. Dkt. 21 at 15; *see* Dkt. 4-1 at 4–5; Dkt. 4-2 at 2–4. Defendants argue that the BIA reversals show that "[t]he BIA is capable of correcting the error that [Rodriguez] alleges

occurred in h[is] bond hearing." *Reyes v. Wolf*, No. C20-0377JLR, 2021 WL 662659, at *3 (W.D. Wash. Feb. 19, 2021), *aff'd sub nom. Diaz Reyes v. Mayorkas*, No. 21-35142, 2021 WL 3082403 (9th Cir. July 21, 2021); Dkt. 21 at 15; *cf. Hernandez*, 872 F.3d at 988 (finding that the third *Puga* factor weighed in favor of petitioner because "the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to administrative remedies would be[.]") (cleaned up).

Rodriguez does not dispute that the BIA could overturn the Tacoma IJ's determination in his individual appeal. But the *Puga* factors ask whether "administrative review is likely to allow the agency to correct its own mistakes *and* to preclude the need for judicial review." *Hernandez*, 872 F.3d at 988 (quoting *Puga*, 488 F.3d at 815) (emphasis added). Throughout his briefing, Rodriguez explains why the BIA's previous efforts to correct its own mistakes have not eliminated the need for judicial review of the question presented. Dkt. 3 at 7–8, 23–27. Although the BIA has issued two unpublished decisions reversing similar mandatory detention orders, the record submitted by Rodriguez—and not disputed by the government—shows that the challenged practice of the Tacoma IJs has continued. Dkt. 5 ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. And the BIA has denied a request to publish one of those decisions as precedent. Dkt. 4-4 at 2. As a result, even if the BIA corrects the alleged error in Rodriguez's individual case, it likely will not preclude the need for further judicial review, whether in this putative class action or future cases. *See* Dkt 5 ¶ 11 ("The IJs' disregard for the BIA's order only further demonstrates that appeals to the BIA are not a viable mechanism in this particular circumstance to ensure that Tacoma IJs adhere to the law."). Although the application of this *Puga* factor is admittedly unclear in the context of a recurring legal question for which classwide relief is sought, the Court finds that on the record here, this factor is neutral. On balance, the *Puga* factors do not support requiring prudential exhaustion.

Even if the *Puga* factors weighed in favor of prudential exhaustion, the Court can still waive the requirement if "'administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'" *Hernandez* 872 F.3d at 988 (quoting *Laing*, 370 F.3d at 1000). "The party moving the court to waive prudential exhaustion requirements bears the burden of demonstrating that at least one of these *Laing* factors applies." *Aden*, 2019 WL 5802013, at *2. Rodriguez has done so here by showing irreparable injury.

Rodriguez argues that requiring exhaustion will result in irreparable injury because he will not have a meaningful opportunity to show his entitlement to bond under Section 1226 if he is forced to wait for BIA review of the IJ's mandatory detention ruling. Dkt. 3 at 22–23; Dkt. 25 at 5–8. Rodriguez contends that the BIA appeals process typically "takes over half a year" for bond appeals, which he supports with EOIR data showing an average processing time of 204 days for bond appeals in 2024. Dkt. 3 at 24; Dkt. 7 ¶ 5. Rodriguez also submits evidence based on EOIR data that 200 bond appeal cases "took a year or longer to resolve." Dkt. 7 ¶ 6. And the record demonstrates that in the time it takes for the BIA to resolve an appeal, many detainees' claims are mooted—sometimes because ICE exercises its own authority to place a detainee on bond, but sometimes because the detainee is ordered removed while the bond appeal is pending. Dkt. 5 ¶ 5.

Although Defendants point out that the BIA set an April 17, 2025 deadline for the parties' appeal briefs, they do not dispute Rodriguez's evidence of the protracted nature of BIA appeals. *See* Dkt. 21 at 17–18; Dkt. 22 at 23. Defendants argue instead that the Court should reject Rodriguez's claim that "detention alone creates irreparable harm," Dkt. 21 at 15, "[b]ecause all immigration habeas petitioners could raise the same argument[.]" *Delgado v. Sessions*, No. C17-1031-RSL-JPD, 2017 WL 4776340, at *2 (W.D. Wash. Sept. 15, 2017),

*report and recommendation adopted*, No. C17-1031-RSL, 2017 WL 4700360 (W.D. Wash. Oct. 19, 2017).

This argument is unpersuasive for two reasons. First, the Ninth Circuit has previously held that irreparable harm is demonstrated when "at least some individuals who would be detained if not provided a bond hearing will be granted conditional release under [the proposed] injunction." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Here, the uncontested evidence provided by Rodriguez shows it is very likely he will be granted conditional release if given a bond hearing. Rodriguez has lived in Washington state and worked in the agriculture sector since 2009. Dkt. 9 ¶¶ 3, 7. He owns his own home, and has strong family ties to his Grandview community, where his wife, four children, and ten U.S. citizen grandchildren all live. *Id.* ¶¶ 3–4. He has never been arrested for, charged with, or convicted of a crime. *Id.* 9 ¶ 8. His bond request was supported by his employer and the pediatrician for one of his grandchildren, who has a complex medical condition and for whom Rodriguez is a caregiver. Dkt. 26-3 at 37–38, 46. Like the plaintiffs in *Rodriguez v. Robbins*, it is very likely that the only thing preventing Rodriguez from conditional release pending the outcome of the removal proceedings is the alleged statutory violation. *See also Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018) (waiving exhaustion where detainee "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention") (citation omitted).

Second, the Court finds that "although some of the effects of detention on [Rodriguez] are 'the same type of harm any person who is detained may suffer, they are [nonetheless] irreparable in nature.'" *Marroquin Ambriz v. Barr*, 420 F. Supp. 953, 962 (N.D. Cal. 2019) (quoting *Lopez Reyes v. Bonnar*, No. 18-CV-07429-SK, 2018 WL 7474861, at *7 (N.D. Cal. Dec. 24, 2018). The Ninth Circuit has recognized "the irreparable harms imposed on anyone

subject to immigration detention." *Hernandez*, 872 F.3d at 995 ("For example . . . subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained."). And district courts in this circuit have routinely waived prudential exhaustion requirements for noncitizens like Rodriguez facing prolonged detention while awaiting administrative appeals. *See, e.g., Montoya Echeverria v. Barr*, No. 20-CV-02917-JSC, 2020 WL 2759731, at *6 (N.D. Cal. May 27, 2020), *Marroquin Ambriz*, 420 F. Supp. 3d at 961–62 (N.D. Cal. 2019), *Ortega-Rangel*, 313 F. Supp. 3d at 1003–04, *Cortez*, 318 F. Supp. 3d at 1138–39; *Villalta v. Sessions*, No. 17-CV-05390-LHK, 2017 WL 4355182, at *3–4 (N.D. Cal. Oct. 2, 2017); *Lopez Reyes*, 2018 WL 7474861, at *6–7, *Rios-Troncoso v. Sessions*, No. CV1701492PHXDGCMHB, 2017 WL 3838686, at *3 (D. Ariz. Sept. 1, 2017), *Birru v. Barr*, No. 20-CV-01285-LHK, 2020 WL 1905581, at *3–4 (N.D. Cal. Apr. 17, 2020).

Rodriguez has also presented uncontested evidence of unique harm to him. He has several health issues that require daily medication, which he did not receive for over a week after being detained. Dkt. 9 ¶ 10. This resulted in "horrible headaches," inflammation of his feet, and "significant pain in [his] stomach." *Id.* Rodriguez states that since his detention, his "health has declined significantly." *Id.* ¶ 13. He also describes the "extreme difficult[y]" of being away from his wife, four children, and ten grandchildren. *Id.* ¶ 9. Rodriguez has lived in the United States for over 15 years without a criminal record and being detained for the first time has been "incredibly tough" for him and his family. *Id.* ¶¶ 3, 8, 9. As discussed above, Rodriguez is a significant caregiver to one of his grandchildren, whose congenital heart valve defect requires him to drive her to regular medical appointments in Spokane. *Id.* ¶ 9; *see also* Dkt. 26-3 at 37–38. Finally, Rodriguez states that because his family "cannot afford to hire an attorney" to defend him from deportation, he is "extremely worried . . . that being detained will make it much

harder to gather evidence and prepare [his] case." Dkt. 9 ¶¶ 14–15. He notes that the burden is particularly felt by his wife who is "already doing so much to help keep [their] family afloat without [him]." *Id.* ¶ 14.

Defendants attempt to distinguish case law in this circuit that supports a finding of irreparable injury by emphasizing that petitioners in those cases faced longer periods of detention before waiver was granted. Dkt. 21 at 17–18. Although Defendants are generally correct, district courts have waived exhaustion based on irreparable injury for petitioners similarly situated to Rodriguez. *See, e.g., Ortega-Rangel*, 313 F. Supp. 3d at 1003–04 (irreparable injury where petitioner had lived in the United States for 18 years with no criminal record, had been detained for three months, was a caregiver to her 9-year-old child, and alleged that detention would harm her upcoming defense). And district courts in this circuit have consistently emphasized that waiver of exhaustion is appropriate where there is "the potential for irreparable harm to Petitioner, in the form of continued unlawful denial of bond hearings for potentially four months or more[.]" *Villalta*, 2017 WL 4355182, at *3–4 (cleaned up); *Cortez*, 318 F. Supp. 3d at 1138–39 (same);  *Ortega-Rangel*, 313 F. Supp. 3d at 1003–04 (same); *Lopez Reyes*, 2018 WL 7474861, at *6–7 (similar).

Here, Rodriguez appealed the IJ's bond denial on March 13, 2025. Dkt. 9 ¶ 12. Based on Rodriguez's undisputed allegations and supported by evidence in the record, Rodriguez can reasonably expect to wait another five months or more for his appeal to be decided, at which time he will have been detained for over seven months. *See id.* ¶ 6. Although the Court acknowledges that the BIA could eventually grant his requested relief, Rodriguez "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention." *Cortez*, 318 F. Supp. 3d at 1139. Accordingly, this Court "follows the vast majority of other cases which have waived exhaustion based on

irreparable injury when an individual has been detained for months without a bond hearing, and where several additional months may pass before the BIA renders a decision on a pending appeal." *Marroquin Ambriz*, 420 F. Supp. 3d at 962 (citing cases).

**B.    Preliminary Injunction**

The Court now turns to Rodriguez's motion for preliminary injunction. Dkt. 3. A preliminary injunction "is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (cleaned up).

"To obtain a preliminary injunction, a plaintiff must establish: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The movant must make a showing on each element of the *Winter* test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, "where the 'balance of hardships . . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits[.]" *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135)).

"[T]he mere allegations of a complaint" do not suffice to obtain a preliminary injunction, *Takiguchi v. MRI Int'l, Inc.*, 611 F. App'x 919, 921 (9th Cir. 2015) (citing *Winter*, 555 U.S. at 20), but the evidence submitted in support "need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, No. 2:16-cv-05719-SVW-JC, 2016 WL

9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Neither party here has challenged the evidence submitted in support or opposition to the motion and the underlying facts are undisputed. The parties' arguments focus instead on questions of law.

     *1.    Rodriguez is likely to succeed, or at least has shown serious questions, on the merits.*

Rodriguez is likely to succeed on the merits, or at the very least has raised "serious questions," of his claims that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and should instead be subject to Section 1226(a)'s discretionary detention scheme. *See Roman*, 977 F.3d at 941.

Rodriguez contests the immigration court's decision, pursuant to its ongoing practice or policy, that it lacks jurisdiction to redetermine his custody because he is an "inadmissible [noncitizen] who [is] an 'applicant[] for admission'" under Section 1225. *See* Dkt. 22 at 16; *see also* Dkt. 5-2 at 3 (denying bond to a noncitizen similarly situated to Rodriguez on jurisdictional grounds and stating that Section 1225(b)(2)(A) "mandates the detention of all inadmissible noncitizens."); Dkt. 5 ¶¶ 3–5 (describing history of practice at Tacoma Immigration Court). Rodriguez first argues that both Section 1226's plain text and recent amendments make clear that he is subject to its provisions, not Section 1225(b). Dkt. 3 at 9–14.

As the Ninth Circuit has observed, "divining [the] meaning . . . of [t]he complex provisions of the INA . . . is ordinarily not for the faint of heart." *Torres v. Barr*, 976 F.3d 918, 923 (9th Cir. 2020). Yet even when a statute is ambiguous or internally contradictory, courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright*, 603 U.S. at 400. The Court begins its analysis with the statute's plain text. *See Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017) ("Our analysis begins with the language of the

statute."); *Shulman v. Kaplan*, 58 F.4th 404, 410 (9th Cir. 2023) ("As always, we begin with the statute.").

> a)    **The plain text of Section 1226(a) applies to inadmissible noncitizens like Rodriguez.**

As described above, Section 1226(a) authorizes that "on a warrant issued by the Attorney General, a[] [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." "Except as provided in subsection (c)," when a noncitizen is arrested under Section 1226(a), the Attorney General may detain him or release him on bond or conditional parole. 8 U.S.C. § 1226(a)(1)–(2). This process includes the right to a bond hearing before an immigration judge. *See* 8 C.F.R. § 1236.1(d). At that hearing, the noncitizen may present evidence of their ties to the United States, lack of criminal history, and other factors that show they are not a flight risk or danger to the community. *See generally In re Guerra*, 24 I. & N. Dec. at 40; *see also Martinez v. Clark*, 124 F.4th 775, 783 (9th Cir. 2024) (discussing *Guerra* factors).

Section 1226(c) then "carves out a statutory category of [noncitizens] who may *not* be released under § 1226(a)." *Jennings*, 583 U.S. at 289. This subsection mandates detention for a noncitizen "who falls into one of several enumerated categories involving criminal offenses and terrorist activities." *Id.* Importantly, the plain text of Section 1226(c) includes noncitizens who are "inadmissible" (meaning they have not been admitted to the United States) as well as those who are "deportable" (meaning they were previously admitted to the United States).[2] *See* §§ 1226(c)(1)(A), (D), (E). For example, Section 1226(c) requires detention for a noncitizen who is

---

[2] Generally, grounds for "deportability" (found in 8 U.S.C. § 1227) apply to people who have previously been admitted, such as lawful permanent residents, while grounds of inadmissibility (found in 8 U.S.C. § 1182) apply to those who have not been admitted to the United States. *See Barton v. Barr*, 590 U.S. 222, 234 (2020).

1    both inadmissible because he is "present in the United States without being admitted or paroled"

2    *and* "is charged with, is arrested for, is convicted of, admits having committed, or admits

3    committing acts which constitute the essential elements" of certain crimes. §§ 1226(c)(1)(E);

4    1182(a)(6)(A)(i).

5         A plain reading of this exception implies that the default discretionary bond procedures in

6    Section 1226(a) apply to a noncitizen who, like Rodriguez, is present without being admitted or

7    paroled but *has not been* implicated in any crimes as set forth in Section 1226(c). *See* § 1226(a)

8    (Attorney General may release noncitizen on bond "except as provided in subsection (c)"). As

9    the Supreme Court has recognized, when Congress creates "specific exceptions" to a statute's

10   applicability, it "proves" that absent those exceptions, the statute generally applies. *See Shady*

11   *Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 400 (2010). This lends strong

12   textual support to Rodriguez's position that "inadmissible" noncitizens like himself are included

13   within Section 1226. *See id*; Dkt. 5-2 at 3.

14        But this plain reading of Section 1226 conflicts with the IJ's plain reading of Section

15   1225. Section 1225(a)(1) states that "a[] [noncitizen] present in the United States who has not

16   been admitted . . . shall be deemed for purposes of this chapter an applicant for admission."

17   Section 1225(b)(2)(A) then states that "in the case of a[] [noncitizen] who is an applicant for

18   admission, if the examining immigration officer determines that a[] [noncitizen] seeking

19   admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be

20   detained for a proceeding under section 1229a of this title." According to the IJ, a plain reading

21   of this text requires that all inadmissible noncitizens present in the United States be subject to

22   mandatory detention pending removal proceedings. *See* Dkt. 22 at 17 (Section 1225(b)(2)(A) "is

23   quite clear that anyone who meets the definition of an applicant for admission and is not covered

24

under another provision of [Section 1225] shall be detained[.]") (internal quotation marks omitted).

How then to resolve this potential conflict between the plain text of Sections 1225 and 1226? Rodriguez argues that the phrase "a[] [noncitizen] seeking admission" in Section 1225(b)(2)(A) should be read to narrow mandatory detention under that subsection to noncitizens who are apprehended while seeking to enter the country, and that noncitizens "already residing in the United States," including "those who are charged with inadmissibility," continue to fall under the discretionary detention scheme in Section 1226. Dkt. 3 at 11. In support of this argument, Rodriguez points to traditional canons of statutory construction, the recent Laken Riley Act amendments to Section 1226, the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), and the longstanding practice of the agency. For its part, the government's opposition to the motion for preliminary injunction does not take a substantive position on how to interpret the statute, instead arguing only that "[a]ny ambiguity in the statute that may place Plaintiff's detention authority outside of § 1225 should be determined first by the BIA" while recognizing that Plaintiff has at least raised "serious questions" going to the merits. Dkt. 21 at 19, 20.[3] At this stage of the case, Rodriguez has the better argument.

---

[3] At oral argument, counsel for the government stated for the first time that they believe "the IJs in Tacoma got the law right" and suggested they could address the merits in supplemental briefing. *See* Dkt. 27. To the extent Defendants wished to brief the merits of the statutory argument for this motion, they had the opportunity to do so in their response. Because they did not, the Court will not grant Defendants another opportunity to do so at this juncture. *See West v. State Farm Mut. Auto. Ins. Co.*, 489 F. App'x 153, 154 (9th Cir. 2012) (observing "that [i]ssues not raised in the opening brief usually are deemed waived.") (cleaned up). As this order grants only preliminary relief to Mr. Rodriguez, however, the government will have a full opportunity to brief the statutory interpretation question as the case proceeds.

1

2

### b)    *Canons of statutory construction support Rodriguez's interpretation of Sections 1226 and 1225.*

Rodriguez argues that his interpretation is supported by two traditional canons of statutory construction: that statutes should be construed as a whole, giving effect to all their provisions; and that recent amendments to a statute should be read in harmony with an agency's longstanding construction. *See* Dkt. 3 at 10–13. The Court agrees that both canons support applying Section 1226 to Rodriguez.

*First*, if the Court were to adopt the reading of Section 1225 advanced by the Tacoma IJs, it would render significant portions of Section 1226(c) meaningless. *See* Dkt. 22 at 20 (justifying Rodriguez's bond denial based on the IJ's interpretation that Section 1225 "applies to applicants for admission" and Section 1226 "applies only to those who have been admitted."). Under "one of the most basic interpretive canons . . . [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up); *Shulman*, 58 F.4th at 410–11 ("a court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (cleaned up). "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).

Here, if the immigration court's interpretation of Section 1225 is correct and its mandatory detention provisions apply to "all noncitizens who have not been admitted," Dkt. 5-4 at 2–3, then it would render superfluous provisions of Section 1226 that apply to certain categories of inadmissible noncitizens. *See* § 1226(c)(1)(A), (D), (E); *Shulman*, 58 F.4th at 410–11; *see also Torres*, 976 F.3d at 930 (noting in the context of interpreting inadmissibility grounds

"that a contrary reading would render other provisions of the immigration code superfluous."). Put another way, Section 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless since "all noncitizens who have not been admitted" would already be governed by 1225's mandatory detention authority. *See* § 1225(a)(1); § 1182(a)(6)(A)(i); Dkt. 5-4 at 2–3; *Shulman*, 58 F.4th at 410–11; *see also Corley*, 556 U.S. at 314, n.5 (explaining that seemingly conflicting statutes read in isolation can be reconciled if read in their broader context, which includes observing the antisuperflousness canon).

Although it does not directly address the question presented, the Supreme Court's opinion in *Jennings* also lends some support to Rodriguez's proposal for harmonizing Sections 1225 and 1226. In *Jennings*, the Court framed its discussion of Section 1225 as part of a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether a [noncitizen] seeking to enter the country is admissible." 583 U.S. at 287. Then, when discussing Section 1226, *Jennings* describes it as governing "the process of arresting and detaining" noncitizens who are living "inside the United States" but "may still be removed," including noncitizens "who were inadmissible at the time of entry." *Id.* at 288. The Court then summarizes the distinction as follows: "In sum, U.S. immigration law authorizes the Government to detain certain [noncitizens] *seeking* admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289 (emphasis added); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (a noncitizen "who *tries to enter* the country illegally is treated as an applicant for admission . . .

and a [noncitizen] who is detained *shortly after unlawful entry* cannot be said to have effected an entry") (emphasis added) (cleaned up).

*Second*, it is important that some of the exceptions in Section 1226(c) that would be made superfluous by the IJ's reading were enacted by Congress just months ago. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) (citations omitted) (giving effect to a congressional amendment of the INA). Congress passed the LRA in January 2025 amending several provisions of the INA, including Sections 1226 and 1225. *See* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025). Relevant to this case, the LRA carved out an additional category of noncitizens from Section 1226(a)'s discretionary detention scheme who will now fall under Section 1226(c)'s mandatory detention authority. *Id*; *see Jennings*, 583 U.S. at 289. This category includes those noncitizens who are deemed inadmissible, including for being "present in the United States without being admitted or paroled," *and* who have been arrested, charged with, or convicted of certain crimes. § 1226(c)(1)(E); *see* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025); §1182(a)(6)(A)(i). These "specific exceptions" for inadmissible noncitizens who are arrested, charged with, or convicted of the enumerated crimes logically leaves those inadmissible noncitizens *not* criminally implicated under Section 1226(a)'s default rule for discretionary detention. *See Shady Grove Orthopedic Assocs., P.A.*, 559 U.S. at 400; *Jennings*, 583 U.S. at 289; *see also* Dkt. 4-6 at 2 (NTA issued to Rodriguez stating that he is a noncitizen "present in the United States who has not been admitted or paroled.").

And as explained further below, *see infra* Section III.B.1.d, Congress enacted the LRA against the backdrop of longstanding agency practice applying Section 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative

construction,'" courts "generally presume the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 604 U.S. ___, Slip Op. at 12 (2025) (quoting *Haig v. Agee*, 453 U.S. 280, 297–298 (1981)). In *Monsalvo Velazquez*, while recognizing that "[i]n truth, the statute is susceptible to both understandings," the Supreme Court interpreted a deadline expressed in terms of "days" in Section 1229c of the INA to "extend deadlines falling on a weekend or legal holiday to the next business day," rather than counting "every calendar day." *Id.* at Slip Op. 11–12. The Court adopted this interpretation because Congress enacted the relevant subsection "against the backdrop of [a] consistent, longstanding administrative construction" giving this specialized meaning to the term "day." *Id.* at Slip Op. 13. Similarly, here, Congress adopted the new amendments to Section 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under Section 1226(a) to inadmissible noncitizens such as Rodriguez. It is therefore presumed that Congress intended "the same understanding." *See id.*

### c) *Legislative history from IIRIRA supports Rodriguez's interpretation of Section 1226.*

The legislative history behind Section 1226 also tends to support Rodriguez's argument that it governs noncitizens like himself that reside in the United States but previously entered without inspection.

Before IIRIRA passed, the predecessor statute to Section 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability . . . any [noncitizen] . . . may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the 'usual means of proceeding against a[] [noncitizen] already physically in the United States[.]'"). This predecessor statute, like Section

1226(a), included discretionary release on bond. *See* § 1252(a)(1) (1994) ("[A]ny such [noncitizen] taken into custody may, in the discretion of the Attorney General . . . be continued in custody . . . [or] be released under bond[.]"). Upon passing IIRIRA, Congress declared that the new Section 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond a[] [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; *see also* H.R. Rep. No. 104-828, at 210 (same). Because noncitizens like Rodriguez were entitled to discretionary detention under Section 1226(a)'s predecessor statute and Congress declared its scope unchanged by IIRIRA, this background supports Rodriguez's position that he too is subject to discretionary detention.

### d)    *Longstanding agency practice supports Rodriguez's interpretation of Section 1226.*

The same is true for DHS's "longstanding practice" of treating noncitizens arrested while living in the United States, including those who entered without inspection, as detained under Section 1226(a). *See Loper Bright*, 603 U.S. at 386. "[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* (cleaned up). The Supreme Court has observed that respect for Executive Branch interpretations of federal statutes is "especially warranted when [it] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* (citing cases).

Rodriguez contends that "[f]or decades, and across administrations, DHS has acknowledged that § 1226(a) applies to individuals who entered the United States unlawfully, but who were later apprehended within the borders of the United States long after their entry." Dkt. 3 at 15. As an initial matter, Defendants did not oppose this assertion, either in their

response or at oral argument. *See generally* Dkt. 21; Dkt. 27. Rodriguez points to contemporaneous Executive Branch regulations issued to interpret and apply IIRIRA. *See* Dkt. 3 at 15–16; Dkt. 25 at 4. In a 1997 interim rule issued "to implement the provisions of [IIRIRA]," which had passed six months earlier, the Executive Branch agencies charged with enforcing the Nation's immigration laws directly addressed the detention scheme noncitizens like Rodriguez would be held under. *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Under the heading of "Apprehension, Custody, and Detention of [Noncitizens]," the agencies first stated that IIRIRA dictated a new $1,500 minimum bond amount for "non-criminal [noncitizens]." *Id*; *see also* § 1226(a)(2) (directing that the Attorney General "may release the [noncitizen] on . . . bond of at least $1,500[.]"). Then in the following sentence, the agencies explain that "[d]espite being applicants for admission, [noncitizens] who are present without having been admitted or paroled (formerly referred to as [noncitizens] who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997); *see also* Dkt. 4-6 at 2 (NTA stating that Rodriguez is a "[noncitizen] present in the United States who has not been admitted or paroled."). This guidance reflects the Executive Branch's attempt to reconcile the ambiguous and seemingly conflicting provisions of Section 1225 and 1226. *See Corley*, 556 U.S. at 314, n.5. While not subject to deference, the Court finds that this guidance and the agency's subsequent years of unchanged practice is persuasive. *See Loper Bright*, 603 U.S. at 386.

The two BIA cases overturning the Tacoma IJs' bond determinations, though limited, also support Rodriguez's position that the immigration court's approach conflicts with longstanding agency practice. The first unpublished decision involved a noncitizen "present in the United States, [that] ha[d] not been admitted, and that an immigration officer found . . . [was] not clearly and beyond a doubt entitled to be admitted." Dkt. 4-2 at 3. The Tacoma IJ determined that the individual was subject to mandatory detention under Section 1225(b)(2)(A). *Id.* at 2. The

Board remanded the case to the IJ, concluding that if the person was issued a warrant of arrest with a notice to appear, "he would be subject to detention under" Section 1226. *Id.* at 3; *see* Dkt. 26-2 at 4 (Rodriguez's I-213 identifying the "Disposition" as "Warrant of Arrest/Notice to Appear"). In the second unpublished decision concerning an individual who had entered the United States "without being admitted or paroled," the BIA stated that it was "unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the custody conditions of a respondent in removal proceedings under the circumstances here." Dkt. 4-1 at 4.

While the BIA has thus far not issued a precedential decision involving noncitizens present in the United States who have not been admitted, *see* Dkt. 4-4 at 2, the individual cases indicate that the Executive Branch agency tasked with interpreting immigration law would uphold "longstanding practice" that Rodriguez is detained under Section 1226(a), not Section 1225(b)(2). *See Loper Bright*, 603 U.S. at 386*; see also Biden v. Texas*, 597 U.S. 785, 805 (2022) (supporting its analysis of the statutory text and context behind a subsection of Section 1225(b)(2) by noting that "[s]ince IIRIRA's enactment 26 years ago, every Presidential administration has interpreted" it the same).

Rodriguez has shown that the text of Section 1226, canons of interpretation, legislative history, and longstanding agency practice indicate that he is governed under Section 1226(a)'s "default" rule for discretionary detention. *See Jennings*, 583 U.S. at 289. The Court is persuaded that Rodriguez is likely to succeed on the merits that he is unlawfully detained under Section 1225(b)(2)'s mandatory detention provision. At the very least, Rodriguez has raised "serious questions going to the merits," *see Roman*, 977 F.3d at 941, a point even Defendants concede. Dkt. 21 at 14 ("Where, as here, the moving party only raises 'serious questions going to the merits . . . .'") (citation omitted). Accordingly, Rodriguez is entitled to injunctive relief if he can prove the other *Winter* elements. *See Roman*, 977 F.3d at 941 (9th Cir. 2020).

2.     *Rodriguez has established a likelihood of irreparable harm.*

Rodriguez faces irreparable harm in the absence of a preliminary injunction. As discussed in the context of Defendants' opposition to an injunction on exhaustion grounds, *see supra* Section III.A, Rodriguez "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention." *Cortez*, 318 F. Supp. 3d at 1139. This is amplified by the Ninth Circuit's recognition that irreparable harm is present when "at least some individuals who would be detained if not provided a bond hearing will be granted conditional release under [the proposed] injunction." *Rodriguez v. Robbins*, 715 F.3d at 1145. The record shows that Rodriguez is very likely to be granted conditional release if afforded a bond hearing. *See generally* Dkt. 26-3; *Rodriguez Diaz*, 53 F.4th at 1197 (noting that an IJ will order a detainee released on bond if the person is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk[.]") (quoting *In re Guerra*, 24 I. & N. Dec. at 40). Because Defendants are denying Rodriguez a hearing that would likely result in his release, he has established irreparable harm absent injunctive relief.

3.     *The balance of equities and public interest favor granting a preliminary injunction.*

The remaining two factors for a preliminary injunction—the balance of equities and public interest—"merge" when the government is the opposing party. *Baird*, 81 F.4th at 1040 (quoting *Nken*, 556 U.S. at 435). When "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)). "[I]n addition to [evaluating] the potential hardships facing Plaintiff[] in the absence of the injunction, the court

'may consider . . . the indirect hardship to their friends and family members.'" *Id.* (quoting *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). Finally, the Ninth Circuit has recognized that "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022) (holding that the district court did not abuse its discretion that the balance of hardships weighed in favor of plaintiffs who credibly alleged that the government was violating the INA).

The harm to the government here is minimal. Defendants contend that the balance of equities tips in their favor because "the government has a compelling interest in the steady enforcement of its immigration laws" and that "[j]udicial intervention would only disrupt the status quo." Dkt. 21 at 21 (citation omitted). This includes, Defendants argue, the opportunity for the BIA to review and correct IJ decisions. *Id.* at 21–22. But this argument ignores the undisputed record that the practice Rodriguez seeks to enjoin is an outlier to the government's longstanding interpretation and enforcement of its immigration laws. *See supra* Sec. III.B.1.d. Further, "[a]n interpretation of status quo as the moment before filing a lawsuit but after alleged misconduct began 'would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun.'" *Doe v. Noem*, No. 2:25-CV-00633-DGE, 2025 WL 1141279, at *9 (W.D. Wash. Apr. 17, 2025) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)) (cleaned up). And as Rodriguez's undisputed evidence demonstrates, BIA review has failed to provide meaningful relief to noncitizens like Rodriguez subject to mandatory detention under the Tacoma IJs' interpretation. *See* Dkt. 5 ¶¶ 3, 5, 11; Dkt. 8 ¶¶ 4–5.

In contrast, the hardships faced by Rodriguez and the public interest in granting injunctive relief weigh strongly in his favor. Detention has separated Rodriguez from his family,

harmed his physical and mental health, and made it harder to access legal representation to defend against removal. Dkt. 9 ¶¶ 9–10, 13–15. In addition to Rodriguez's own hardships, his family has experienced increased financial, caregiving, and emotional burdens in the wake of his detention. *Id.* ¶¶ 9, 14–15; Dkt. 26-3 at 38; *see Hernandez*, 872 F.3d at 996. Because the Court has also found it likely that the Tacoma IJ has unlawfully detained Rodriguez under Section 1225(b)(2), "neither equity nor the public's interest are furthered" by detaining Rodriguez without the opportunity for release on bond. *See Galvez*, 52 F.4th at 832. Here, the balance of equities "tips sharply towards" Rodriguez. *See Roman*, 977 F.3d at 941 (citation omitted). Thus, even under a lesser showing that Rodriguez has raised only "serious questions going to the merits" of his statutory argument, injunctive relief is warranted. *See id.* Accordingly, the Court finds that Rodriguez is entitled to a preliminary injunction.

4.    *A bond hearing will redress Plaintiff's specific harm.*

The Court will grant Rodriguez's requested relief for a bond hearing. Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (cleaned up). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown[.]" *Id.* (citation omitted). Rodriguez argues in his reply for the first time that this Court should order his immediate release. Dkt. 25 at 2. The Court finds that the specific harm Rodriguez alleges—that he is unlawfully barred from receiving a bond hearing on the merits—is remedied by granting his request for a bond hearing under Section 1226(a) and enjoining Defendants from denying bond on the basis that he is detained under Section 1225(b)(2).

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Rodriguez is likely to succeed on the merits, or at least has raised serious questions, that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and instead should be governed under Section 1226(a)'s discretionary detention scheme. Because he has also shown irreparable harm, that the balance of hardships tips sharply in his favor, and that he need not exhaust administrative remedies, the Court GRANTS Rodriguez's motion for preliminary injunction (Dkt. 3). The Court further ORDERS that:

(1) Defendants must provide Rodriguez with a bond hearing under 8 U.S.C. § 1226(a) within fourteen days of this Order;

(2) Defendants are enjoined from denying bond to Rodriguez on the basis that he is detained pursuant to 8 U.S.C. § 1225(b)(2);

(3) Defendants must record the hearing provided in connection with this Order.

Dated this 24th day of April, 2025.

Tiffany M. Cartwright
United States District Judge