1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8   RAMON RODRIGUEZ VAZQUEZ, on             Case No. 3:25-cv-05240-TMC
    behalf of himself as an individual and on
9   behalf of others similarly situated,         ORDER GRANTING IN PART AND
                                                 DENYING IN PART MOTION FOR CLASS
10                            Plaintiff,          CERTIFICATION

11          v.

12  DREW BOSTOCK, et al,

13                            Defendants.

14

15                                  **I.    INTRODUCTION**

16          This case arises from a practice by the Tacoma Immigration Court of interpreting the

17  Immigration and Nationality Act ("INA"). The practice mandates detention without the

18  possibility of bond for noncitizens who entered the United States without inspection, even if they

19  have lived here for years. Plaintiff Ramon Rodriguez Vazquez ("Rodriguez") is a noncitizen

20  resident of Grandview, Washington who is currently detained at the Northwest Ice Processing

21  Center ("NWIPC"). Rodriguez seeks to challenge, on behalf of himself and classes of similarly

22  situated noncitizens, the bond denial practice at the Tacoma Immigration Court and chronic

23  delays in administrative appellate review of bond denials by the Board of Immigration Appeals.

24  *See* Dkt. 1. On April 24, 2025, the Court granted Rodriguez's individual motion for a

preliminary injunction and ordered Defendants to provide him a bond hearing within 14 days. Dkt. 29. The Court now considers Rodriguez's motion for class certification. Dkt. 2. For the reasons explained below, the Court GRANTS in part and DENIES in part the motion for class certification.

## II.    FACTUAL BACKGROUND

Plaintiff Ramon Rodriguez Vasquez is detained at the Northwest Ice Processing Center ("NWIPC"). Dkt. 1 ¶¶ 1, 17; Dkt. 9 ¶ 2. Defendants are various immigration officials, including Drew Bostock, Seattle Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement ("ICE"); Bruce Scott, Warden at NWIPC; Kristi Noem, Secretary of the United States Department of Homeland Security ("DHS"); the United States Department of Homeland Security; Pamela Bondi, Attorney General of the United States; the Executive Office of Immigration Review ("EOIR"); Sirce Owen, Acting Director, EOIR; and the Tacoma Immigration Court. Dkt. 1 ¶¶ 18–25.

On behalf of himself and the classes that he seeks to represent, Rodriguez has challenged Defendants' policy on bond hearings and related appeals. *Id.* ¶¶ 1, 10–12. Specifically, Rodriguez claims that he is detained at NWIPC because of a policy adopted by the immigration judges (IJs) at the Tacoma Immigration Court. *Id.* ¶ 1. He alleges that the Tacoma Immigration Court IJs, save for one, have "adopted a practice of denying all requests for release on bond by noncitizens in removal proceedings who entered the United States without inspection, including . . . those who have lived here for decades." *Id.* ¶ 2. Rodriguez maintains that the policy prevents him and others from being released on bond during civil immigration proceedings. *Id.* ¶ 1. Further, he alleges that delays in consideration of the bond denials by the Board of Immigration Appeals ("BIA") deprive detainees of meaningful review of those denials. *Id.* ¶ 6–8.

1

2

### A.    The INA's Statutory Structure for Bond Hearings

The Tacoma Immigration Court IJs apply and enforce the Immigration and Nationality Act ("INA"). The INA "authorizes the detention of [noncitizens][1] awaiting removal from the United States." *De Paz Sales v. Barr*, No. 19-CV-07221-KAW, 2020 WL 353465, at *4 (N.D. Cal. Jan. 21, 2020) (quoting *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1000 (N.D. Cal. 2018)). The INA prescribes several bases for detention of noncitizens in removal proceedings. Dkt. 1 ¶ 26.

First, Section 1226 "provides the general process for arresting and detaining [noncitizens] who are present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022). Section 1226(a) "sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of a[] [noncitizen] 'pending a decision on whether the [noncitizen] is to be removed from the United States.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting 8 U.S.C. § 1226(a)). Except as provided in Section 1226(c),[2] "the Attorney General 'may release' a[] [noncitizen] detained under § 1226(a) 'on . . . bond' or "conditional parole.'" *Id.* (quoting 8 U.S.C. § 1226(a)(1)–(2)).

"When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." *Rodriguez Diaz*, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). "[A] detainee may [then] request a bond hearing before an IJ at any time before a removal order becomes final." *Id.* at 1197 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). An IJ "must consider whether the

---

[1] "This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

[2] Section 1226(c) "carves out a statutory category" of noncitizens for whom detention is mandatory, comprised of individuals who have committed certain "enumerated . . . criminal offenses [or] terrorist activities." *Jennings,* 583 U.S. at 289 (citing 8 U.S.C. § 1226(c)(1)). Among the individuals carved out and subject to mandatory detention are certain categories of "inadmissible" noncitizens. § 1226(c)(1)(A), (D), (E).

detainee 'is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk.'" *Delgado v. Sessions*, No. C17-1031-RSL-JPD, 2017 WL 4776340, at *2 (W.D. Wash. Sept. 15, 2017), *report and recommendation adopted*, No. C17-1031-RSL, 2017 WL 4700360 (W.D. Wash. Oct. 19, 2017) (citing *In re Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). The IJ "considers various factors in making [a bond] determination, including the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country." *Rodriguez Diaz*, 53 F.4th at 1197 (citing *Guerra*, 24 I. & N. Dec. at 40). In sum, under Section 1226(a) detention, an individual is entitled to a bond hearing if they have not been arrested, charged with, or convicted of certain crimes that require mandatory detention under Section 1226(c). And a detainee can also appeal an adverse decision to the BIA. *Id.* (citing 8 C.F.R. § 236.1(d)(3)).

Section 1225(b) "supplement[s] § 1226's detention scheme." *Rodriguez Diaz*, 53 F.4th at 1197. Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297; *see* § 1225(b) ("Inspection of applicants for admission"). Section 1225 defines an "applicant for admission" as a "[noncitizen] present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1); *see Jennings*, 583 U.S. at 287. As the Supreme Court has noted, "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." *Jennings*, 583 U.S. at 287 (quoting § 1225(a)(3)).

Section 1225(b)(1) concerns the "[i]nspection of [noncitizens] arriving in the United States and certain other [noncitizens] who have not been admitted or paroled." Specifically, "Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible" based on Sections 1182(a)(6)(C) (misrepresentation) and 1182(a)(7) (lack of valid documentation) and

"certain other [noncitizens] designated by the Attorney General[.]" *Jennings*, 583 U.S. at 287 (citing § § 1225(b)(1)(A)(i), (iii)). Individuals that fall under Section 1225(b)(1) are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process" unless claiming asylum or fear of persecution. *Id.* (first quoting § 1225(b)(1)(A)(i)); then citing § 1225(b)(1)(A)(ii)).

Section 1225(b)(2) concerns the "[i]nspection of other [noncitizens]." Section 1225(b)(2) "mandates detention 'if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]'" *Rodriguez Diaz*, 53 F.4th at 1197 (quoting § 1225(b)(2)(A)). In sum, noncitizens detained under Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time before entry of a final removal order.

**B.    The Tacoma Immigration Court's Interpretation of the INA and Denial of Bond Hearings**

As noted above, the most relevant portions of the INA here are Sections 1226(a) and 1225(b)(2). Dkt. 1 ¶ 30. After the provisions at 1226(a) and 1225(b)(2) were enacted, EOIR promulgated guidance that, "in general, people who entered the country without inspection were not considered detained under § 1225 and . . . were instead detained under § 1226(a)." *Id.* ¶ 32 (citing 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997)). Subsequently, "most people who entered without inspection—unless they were subject to some other detention authority—received bond hearings." *Id.* ¶ 33. Rodriguez claims that this practice reflected "many more decades of prior practice, in which noncitizens who were not deemed 'arriving' were entitled to a custody hearing before an IJ or other hearing officer." *Id.* (first citing 8 U.S.C. § 1225(a); and then citing H.R. Rep. No. 104-469, pt. 1 at 229 (1996)).

But, Rodriguez alleges, in 2022 the IJs at the Tacoma Immigration Court "abruptly departed from their policy of holding bond hearings for individuals who entered the United States without inspection." *Id.* ¶ 34. The IJs "began holding that they lacked jurisdiction to hold bond hearings for all such individuals," reasoning that "the mandatory detention provision of § 1225(b)(2)(A) applies to people who enter without inspection because that subparagraph of the statute references 'applicant[s] for admission.'" *Id.* ¶¶ 34–35. The IJs thus applied the mandatory detention provisions to all individuals subject to grounds for inadmissibility. Consequently, "all noncitizens detained at NWIPC who have entered the United States without inspection and are subject to the grounds of inadmissibility, including long-time U.S. residents, are now considered to be in mandatory detention under § 1225(b) and ineligible for bond." *Id.* ¶ 36.

Rodriguez argues that the differences between the Tacoma Immigration Court's bond granting rates and those of other immigration courts highlight the IJs' disparate interpretation of the law. Statistics show that IJs in Tacoma deny bond hearings at higher rates than their counterparts in other immigration courts. *Id.* ¶ 54; Dkt. 7. In 2023, for example, the rate of granted bonds was just three percent. Dkt. 1 ¶ 54; *see also* Transactional Records Access Clearinghouse ("TRAC"), *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*, https://tracreports.org/reports/722/ (July 19, 2023). So far in 2025, 13 bond cases were granted, 126 were denied, and 65 were withdrawn. Dkt. 1 ¶ 55. This is 6 percent of bonds. *Id.* Rodriguez alleges that "many of the 'withdrawn' decisions occur in cases where the IJ indicates he or she will deny on jurisdiction because 8 U.S.C. § 1225(b)(2) applies." *Id.* And, Rodriguez claims, "these numbers likely mask the true rate of denial, as many noncitizens likely forgo seeking bond in the first place because they know the IJ will conclude there is no jurisdiction to set bond." *Id.*

Thus, Rodriguez concludes, "[o]ver the past few years, IJs at the Tacoma Immigration Court have deprived dozens and likely hundreds of noncitizens detained at NWIPC of their right to be released on bond[.]" *Id.* ¶ 5.

Attorneys for other similarly situated detainees have attested that they "had around twenty-five clients who were subject to the Tacoma Immigration court's practice" of requiring "mandatory detention of individuals who entered without inspection and who have since resided in the United States." Dkt. 6 ¶ 3; *see also* Dkt. 5 ¶ 4 ("Since November 2022, NWIRP attorneys focused on representing individuals detained at the Northwest ICE Processing Center in Tacoma, Washington have represented individuals in at least 12 cases where an IJ denied a bond, citing § 1225(b)(2)'s mandatory detention provision. In all of these cases, the person was denied a bond even though the individual was present in the United States, was not identified as 'arriving,' was not apprehended shortly after entering, and was placed in standard removal proceedings under 8 U.S.C. § 1229a.").

Thus, these attorneys' "clients have not been able to get bonds set by the immigration judges in [T]acoma. All of these clients were placed in regular removal proceedings under 8 U.S.C. § 1229(a) and were not in expedited removal proceedings, reinstatement proceedings, or withholding only proceedings." Dkt. 6 ¶ 3. And those attorneys have also attested that they had "many other clients or potential clients decline to hire [them] or decline to seek a bond hearing because they knew there was no hope to obtain release." *Id.* ¶ 4.

## C.    The BIA's Review of Bond Denials

Rodriguez also argues that the appeals process affords little relief for those wrongfully denied bond. *See, e.g.*, Dkt. 1 ¶ 56–60. The BIA handles appeals from immigration courts. *See id.* ¶ 6. "According to the agency's own data, during FY 2024, the agency's average processing

time for a bond appeal was 204 days, or nearly seven months." *Id.* ¶ 57; Dkt. 7 at 1. Appeals

often remain unheard for a year or more. Dkt. 1 ¶ 59; Dkt. 7 at 1.

In this time, Rodriguez alleges that "a detained noncitizen will be forced to defend

themselves against their removal on the merits, depriving them of a meaningful chance to

assemble evidence outside detention, coordinate with family, or communicate with potential

witnesses in other countries." *Id.* ¶ 66. Detention itself may reduce "their likelihood of obtaining

legal representation." *Id.* ¶ 67. "Those detained while in removal proceedings face significant

challenges to accessing and communicating with counsel or other forms of legal assistance." *Id.*

And the "lack of legal representation in turn dramatically reduces the potential for successful

outcomes in their underlying removal proceedings." *Id.* ¶ 68; *see also* Dkt. 6 ¶ 5 ("Some clients

cannot afford an appeal of the decision denying bond, others are deterred by the many months of

waiting that an appeal entails, and still others are removed before any appeal can be completed.

Often times [individuals'] main cases are resolved prior to receiving a decision on a bond appeal

and therefore it is a waste of resources to try and file an appeal of a finding that the court lacks

jurisdiction. As a result, and as a practical matter, review by the Board of Immigration Appeals is

unable to fix this problem for my clients.").

**D.     Rodriguez's Detention at NWIPC**

As noted above, Rodriguez is detained at NWIPC. Dkt. 1 ¶ 73; Dkt. 9 ¶ 2. Rodriguez has

been living in Grandview, Washington with his family since 2009. Dkt. 9 ¶ 3. He owns a home

there. *Id.* He has several children and is the "proud grandfather of ten United States citizen

children[.]" *Id.* ¶ 4. He also has eight siblings who live in California—all of whom are citizens.

*Id.* On February 5, 2025, Rodriguez was arrested at his home and transferred to NWIPC, where

he was placed in removal proceedings. *Id.* ¶¶ 5–6. He has been charged as removable because he

entered the United States without inspection. *Id.* ¶ 6. He has now been detained for more than a

month. *Id.* And he has never been arrested for, charged with, or convicted of a crime anywhere. *Id.* ¶ 8.

On March 12, 2025, Rodriguez had a bond hearing before a Tacoma Immigration Court IJ. *Id.* ¶ 11. He was represented by an attorney. *Id.* At the hearing, the IJ "said that he could not consider" Rodriguez's case. *Id.* Rodriguez's "understanding is that [he] was denied a bond because the immigration judge concluded [he] had entered the United States without inspection and therefore [he is] subject to mandatory detention, meaning [he is] not eligible for release under any bond. That was the only reason of why the immigration judge denied [his] bond." *Id.*

An amended memorandum by the IJ supports this contention. Dkt. 26-1. The IJ explained in the memorandum that "[t]he critical issue here is whether this court has jurisdiction to redetermine the custody status an inadmissible alien who is an 'applicant for admission.' . . . the court finds that [Rodriguez] is an applicant for admission detained under INA section 235 and it does not have jurisdiction to redetermine [Rodriguez's] bond." *Id.* at 3. The IJ continued, "a plain reading of the statutes undergirding immigration detention, along with current caselaw from the Supreme Court of the United States and Attorney General, makes clear to this court that Congress did not give immigration judges jurisdiction to redetermine bond for inadmissible aliens who are 'applicants for admission' under INA section 235." *Id.* at 4.

Rodriguez filed an appeal on March 13, 2025. Dkt. 1 ¶ 12. The appeal is pending. *Id.* Rodriguez explains that being detained has been "extremely" difficult. *Id.* ¶ 13. He has faced difficulties with both his physical and mental health. *Id.* He does not yet have a lawyer to defend him from deportation, and being detained has made this harder logistically and financially. *Id.* ¶ 14. His family "cannot afford to hire an attorney so [he has] no possibility of being represented while detained." *Id.* ¶ 15.

**E.      The Motion for Class Certification**

On March 20, 2025, Rodriguez filed his complaint and moved to certify two classes.

Dkt. 1; Dkt. 2. Rodriguez seeks to represent two classes:

> Bond Denial Class: All noncitizens detained at the Northwest ICE Processing
> Center who (1) have entered or will enter the United States without inspection,
> (2) are not apprehended upon arrival, and (3) are not or will not be subject to
> detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the
> noncitizen is scheduled for or requests a bond hearing.

> Bond Appeal Class: All detained noncitizens who have a pending appeal, or will
> file an appeal, of an immigration judge's bond hearing ruling to the Board of
> Immigration Appeals.

Dkt. 2 at 3. Both proposed classes seek only declaratory relief under Federal Rule of Civil

Procedure 23(b)(2). Dkt. 1 at 22. Rodriguez brings four causes of action: (1) violation of 8

U.S.C. §1226(a) for unlawful denial of bond hearings; (2) violation of the Administrative

Procedure Act (APA) for unlawful denial of bond hearings; (3) violation of the Due Process

Clause of the Fifth Amendment for delayed adjudication of bond appeals; and (4) violation of the

APA for delayed adjudication of bond appeals. *Id.* ¶¶ 99–115. He requests two forms of

declaratory relief:[3]

> 1. A declaratory judgment finding Defendants' policy and practice denying bonds
> for lack of jurisdiction to Named Plaintiff Ramon Rodriguez Vazquez and Bond
> Denial class members to violate the INA and the APA;

> . . .

> 3. A declaratory judgment finding that the Due Process Clause or the APA
> provides that the Named Plaintiff and the Bond Appeal Class Members have a
> right to timely adjudication of their bond appeal by receiving a decision within 60
> days of filing the notice of appeal so long as the noncitizen remains detained[.]

*Id.* at 22. Neither class seeks monetary relief. *Id.*

---

[3] Rodriguez also requested individual injunctive relief. *Id.* A preliminary injunction was issued
for Rodriguez. Dkt. 29.

1    The parties met with the Court on April 2, 2025 and agreed on a briefing schedule.

2    Dkt. 19. Defendants responded on April 14. Dkt. 23. Rodriguez replied on April 17. Dkt. 24. In

3    his reply, Rodriguez amended the Bond Denial Class definition to address some of the concerns

4    raised by Defendants in their response. Dkt. 24 at 4–5. The amended proposed Bond Denial

5    Class definition is:

6        Bond Denial Class: All noncitizens *without lawful status* detained at the
         Northwest ICE Processing Center who (1) have entered or will enter the United
7        States without inspection, (2) are not apprehended upon arrival, (3) are not or will
         not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at
8        the time the noncitizen is scheduled for or requests a bond hearing.

9    *Id.* at 5. The briefing is complete, and the motion is ripe for the Court's consideration.

10                        ### III.    LEGAL STANDARD

11        The class action is "an exception to the usual rule that litigation is conducted by and on

12   behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

13   (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979)). To justify a departure from

14   that rule, "a class representative must be part of the class and 'possess the same interest and

15   suffer the same injury' as the class members." *Id.* at 348–49 (quoting *East Tex. Motor Freight*

16   *System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

17        Federal Rule of Civil Procedure 23 is designed to protect the interests of those class

18   members. *Id.* at 345. Rule 23(a) "ensures that the named plaintiffs are appropriate representatives

19   of the class whose claims they wish to litigate." *Id.* at 349. Under Rule 23(a), the party seeking

20   certification must show that "(1) the class is so numerous that joinder of all members is

21   impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

22   defenses of the representative parties are typical of the claims or defenses of the class; and

23   (4) the representative parties will fairly and adequately protect the interests of the class." *Mansor*

24   *v. United States Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 202–03 (W.D. Wash. 2023)

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION - 11

(quoting Fed. R. Civ. P. 23(a)). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Dukes*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

If a proposed class satisfies Rule 23(a), the class must then also meet "at least one of the three requirements listed in 23(b)." *Id.* at 345; *see Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Plaintiffs seek to certify a class under Rule 23(b)(2), which demands that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

The Court's examination of these requirements is not cursory. Rule 23 "does not set forth a mere pleading standard." *Id.* at 350. Rather, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 350–51 (cleaned up). "[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160. This is because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (cleaned up).

"'[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . .' and must carry their burden of proof 'before class certification.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014)). Plaintiffs must "prove the facts necessary to

carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence" through any admissible evidence. *Id.* at 665.

Finally, "at least one named plaintiff" must satisfy Article III's standing requirements. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)). The named plaintiff "bears the burden of showing that the Article III standing requirements are met." *Id.* (citing *Armstrong*, 275 F.3d at 860–61). Standing requires that (1) the plaintiff suffered an injury in fact—one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (cleaned up). "Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Bates*, 511 F.3d at 985 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

## IV.    DISCUSSION

**A.    Rodriguez has standing as named Plaintiff to pursue the requested relief.**

Because Rodriguez is the sole named Plaintiff, the Court begins by assessing his standing. Rodriguez alleges (1) that he was wrongfully denied bond by the IJ under the challenged policy and (2) that the inevitable delay of a decision on appeal from this denial violates the Due Process Clause and the APA. Dkt. 1 ¶¶ 1, 17, 73–87, 99–115. The Court takes each of Rodriguez's claims in turn. *See Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Rodriguez's claim that he was wrongfully denied bond because of the IJs' policy meets the standing requirement. The Ninth Circuit has held that "[r]emaining confined in jail when one should otherwise be free is an Article III injury plain and simple[.]" *Gonzalez v. United States*

*Immigr. & Customs Enf't*, 975 F.3d 788, 804 (9th Cir. 2020) (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014)). Rodriguez claims that, but for the IJs' policy, he would have been released from custody. *See* Dkt. 1 ¶ 1, 73–81. Defendants do not challenge his standing to represent the bond denial class. *See* Dkt. 23 at 14–16.

Rodriguez's claim that the timeline for a hearing on his appeal violates the Due Process Clause and the APA also satisfies the standing requirement. "The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (citation omitted); *Friends of the Earth*, 528 U.S. at 180–81 ("[T]he threat of . . . 'injury in fact'" is enough to confer standing.). "The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan's* requirements." *Bates*, 511 F.3d at 985. The plaintiff must show that he has suffered or is threatened with a "concrete and particularized" legal harm. *Id.* (quoting *Lujan*, 504 U.S. at 560).

To show that he is threatened with such legal harm, a "party facing prospective injury" must show "the threatened injury is real, immediate, and direct[.]" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Thorsted v. Gregoire*, 841 F. Supp. 1068, 1083 (W.D. Wash. 1994), *aff'd sub nom. Thorsted v. Munro*, 75 F.3d 454 (9th Cir. 1996) ("Threatened harm that has not yet occurred, but that will occur unless judicial relief is afforded, is enough to support a civil rights claim.") (citing *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 431–32 (1987)). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). But "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). "In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief."

*Bates*, 511 F.3d at 985 (quoting *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998)).

Defendants do not expressly dispute Rodriguez's standing. Defendants do, however, contest typicality (below), and argue that Rodriguez has not suffered the same injury as the proposed Bond Appeal Class.[4] They explain that "Plaintiff alleges that the Bond Appeal class is subject to prolonged delays in adjudication of their appeals"—defining prolonged delay as more than sixty days. Dkt. 23 at 21. But, they argue, "Plaintiff does not share the same or similar injury as the proposed class members he seeks to represent. Indeed, as of the time of this filing, Plaintiff's bond denial appeal will have been pending for about one month. . . . This falls short of Plaintiff's assertion that the BIA ought to render an appeal decision within 60 days." *Id.*

Defendants are correct that Rodriguez filed his appeal less than two months ago. Dkt. 23 at 21; Dkt. 9 ¶ 12 ("I filed an appeal of the immigration judge's decision denying me a bond hearing on March 13, 2025. The appeal is pending."). But, Rodriguez replies, "Defendants conflate the remedy sought with the fact that [he], like all proposed class members, faces a custody appeals system that fails to implement timelines or safeguards to ensure a timely decision." Dkt. 25 at 10. And "Defendants' counterarguments depend on their confusion between the *injury*—which is continued detention without a timely, meaningful opportunity to seek

---

[4] At oral argument, the Court asked Defendants' counsel if Defendants were making a standing argument, rather than a typicality argument, regarding Rodriguez's ability to represent the proposed class. Defendants responded that standing could be addressed through a Motion to Dismiss, and so here, they had addressed the issue under the typicality requirement of Rule 23. But standing is a "threshold issue" concerning an "essential and unchanging part of the case-or-controversy requirement of Article III." *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Lujan*, 504 U.S. at 560). If Rodriguez lacks standing, there is no Article III case or controversy over which this Court may exercise jurisdiction. *See id.* Thus, the Court addresses the standing question now.

review of a custody determination —and the *remedy*—which the complaint proposes as a requirement of adjudication within sixty days of filing a notice of appeal." *Id.* at 11.

Rodriguez thus argues that, because he faces the same imminent injury as the other class members, he may challenge the same practice that harms them all. *Id.*

Without delving too deeply into the typicality analysis here, the Court finds that Rodriguez has sufficiently alleged standing. In his complaint, Rodriguez alleges that he is detained at NWIPC. Dkt. 1 ¶ 73. He was arrested at his home by police and immigration authorities on February 5, 2025. *Id.* ¶ 77. He has been detained at NWIPC since. *See id.* ¶¶ 73, 77. Rodriguez requested a bond hearing, but was denied bond by an IJ who held that Rodriguez was subject to mandatory detention under the challenged provision, 8 U.S.C. § 1225(b)(2). *Id.* ¶ 80. Rodriguez has appealed the IJ's order to the BIA and the appeal is pending. *Id.* ¶ 81. According to the complaint, and based on the BIA's own data, during fiscal year 2024, the agency's average processing time for a bond appeal was 204 days. *Id.* ¶ 57; *see* Dkt. 7 ¶ 5. Rodriguez has alleged, based on EOIR's data, that some appeals take a year or more. Dkt. 1 ¶ 59.

First, as noted above, wrongful confinement is an Article III injury. *See, e.g.*, *Gonzalez*, 975 F.3d at 804; *Mendia*, 768 F.3d at 1012 ("[I]t's difficult to imagine an injury that could affect one more personally and individually than a deprivation of one's liberty. That's presumably why no one questions the existence of Article III injury when a civil rights plaintiff sues on the theory that the actions of the defendants . . . resulted in wrongful confinement[.]"). Rodriguez's allegations show that he faced "an ongoing and a prospective detention injury when he commenced suit." *Gonzalez*, 975 F.3d at 804; Dkt. 1 ¶¶ 57, 59, 73, 80.

Second, though Rodriguez has not yet waited sixty days for his appeal to the BIA to be heard, he has alleged that he faces a "prospective injury" that is "real, immediate, and direct." *Davis*, 554 U.S. at 734; *see Cent. Delta Water Agency*, 306 F.3d at 948. His allegations

demonstrate a very real and immediate threat of being confined at NWIPC for far longer while waiting for a decision on appeal. Dkt. 1 ¶¶ 57, 59.

The two other elements of Article III standing—causation and redressability—are met here as well. "[F]or Article III purposes causation requires a showing that his injury is 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Mendia*, 768 F.3d at 1012 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Rodriguez has satisfied causation. He has pleaded that his ongoing detention stems from the IJ's actions, Dkt. 1 ¶ 2, and the BIA's delayed review of his appeal. *Id.* ¶¶ 6–9.

Because Rodriguez faced ongoing and prospective detention injuries when he commenced suit, his "injury was at that moment capable of being redressed through injunctive relief." *Gonzalez*, 975 F.3d at 806 (first quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991); and then citing *Cent. Delta Water Agency*, 306 F.3d at 947). A court order determining that the IJ's policy misreads the law and that the BIA's delayed review deprives Rodriguez of his due process rights could permit him to receive a bond hearing or have his appeal decided promptly by the BIA. Such an order would address the ongoing injury he faced when he commenced suit. *See Gonzalez*, 975 F.3d at 806 (similar).

Thus, Rodriguez has standing to seek declaratory relief on behalf of the Bond Denial Class and on behalf of the Bond Appeal Class.

**B.    Rodriguez has satisfied the requirements of Rule 23(a).**

*1.    Numerosity*

The first requirement of Rule 23(a) is numerosity. Numerosity is satisfied if "the class is so large that joinder of all members is impracticable." *Mansor*, 345 F.R.D. at 203 (W.D. Wash. 2023) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "The

numerosity requirement requires the examination of the specific facts of each case, though 'in general, courts find the numerosity requirement satisfied when a class includes at least 40 members.'" *Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *12 (W.D. Wash. June 21, 2017) (quoting *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010)).

Defendants do not dispute that Rodriguez has satisfied numerosity. *See generally* Dkt. 23. And the Court finds that both classes are sufficiently numerous.

First, the Bond Denial Class is "currently comprised of at least dozens of individuals currently detained at NWIPC." Dkt. 2 at 12. Counsel explains that, over the last few years, they have "had around twenty-five clients who were subject to the Tacoma Immigration Court's practice of concluding that 8 U.S.C. § 1225(b)(2) provides for the mandatory detention of individuals who entered without inspection and who have since resided in the United States." Dkt. 6 ¶ 3. And this number fails to account for the "many other clients or potential clients [who] decline to hire [counsel] or decline to seek a bond hearing because they knew there was no hope to obtain release." *Id.* ¶ 4; *see also* Dkt. 5 ¶ 9. Further, recently, the number of people detained at NWIPC—the number of people potentially subject to the IJs policy—has ballooned. *Id.* at 5.

The Court may still certify the class even if it contains fewer than 40 members. "Relatively small class sizes have been found to satisfy this requirement where joinder is still found impractical." *Rivera v. Holder*, 307 F.R.D. 539, 550 (W.D. Wash. 2015) (citing *McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Trust*, 268 F.R.D. 670, 673 (W.D. Wash. 2010)). In assessing the impracticability of joinder, courts may consider "judicial economy, geographic dispersal of the class members, the ability of individual claimants to bring separate suits, and whether plaintiffs seek prospective relief affecting future class members." *Id.* (citing *McCluskey*, 268 F.R.D. at 673).

Rodriguez has explained that bringing, and sustaining, a case challenging the IJs policy is exceedingly difficult. Plaintiffs are all detained and face "numerous barriers to accessing counsel, imposing a significant barrier for any individual seeking to challenge" the policy. Dkt. 2 at 13. For example, given that many of the putative plaintiffs have limited resources, *id.*, they often decline counsel "because they kn[o]w there [is] no hope to obtain release." Dkt. 6 ¶ 4.

Further, Rodriguez seeks prospective relief affecting future class members: all those who may be subject to the policy. Dkt. 2 at 12–13. When faced with a class of "unnamed, unknown future members," joinder is impracticable and numerosity may be met. *Ali v. Ashcroft*, 213 F.R.D. 390, 408–09 (W.D. Wash. 2003); *see also Rivera*, 307 F.R.D. at 550 ("[E]specially given the transient nature of the class and the inclusion of future class members, the Court finds the class sufficiently numerous and joinder impractical.").

The same is true for the Bond Appeal Class. This class, Rodriguez alleges, is "likely comprised of hundreds or thousands of individuals who appeal the outcome of their bond hearings to the BIA each year." Dkt. 2 at 12. Similarly, counsel for the proposed class attests that it is hard to estimate the number of members of the class. Dkt. 6 ¶ 5. (While "[s]ome clients cannot afford an appeal of the decision denying bond, others are deterred by the many months of waiting that an appeal entails, and still others are removed before any appeal can be completed."). And many of these cases are resolved before the BIA resolves the bond appeal "and therefore it is a waste of resources to try and file an appeal of a finding that the court lacks jurisdiction." *Id.* ¶ 5; *see also* Dkt. 5 ¶ 9.

Thus, the numerosity requirement is met for both classes.

2.    *Commonality*

The second Rule 23(a) requirement is commonality. This prong requires "a plaintiff [] show that 'there are questions of law or fact common to the class.'" *Dukes*, 564 U.S. at 349

(quoting Fed. R. Civ. P 23(a)(2)). The proposed class's claims must "depend upon a common contention[.]" *Id.* And the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Accordingly, "what matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (cleaned up).

The commonality requirement is "construed permissively." *Hanlon*, 150 F.3d at 1019. Thus, "[a]ll questions of fact and law need not be common to satisfy the rule." *Id.*; *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."). Rather, the "standard is "readily met" when plaintiffs seek prospective relief "challeng[ing] a system-wide practice or policy that affects all of the putative class members." *Mansor*, 345 F.R.D. at 204 (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)). Indeed, the Ninth Circuit has held that "in a civil-rights suit . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Gonzalez*, 975 F.3d at 808 (citations omitted).

### a)     The Bond Denial Class

Rodriguez argues that the proposed Bond Denial Class members "all suffer from the same injury caused by the Tacoma Immigration Court's policy: the denial of an individualized custody determination by the IJ." Dkt. 2 at 15. He claims the issue is "capable of classwide resolution through declaratory judgment[] making clear that . . . [c]lass members are entitled to a bond hearing before the IJ[.]" *Id.*

The Court agrees. The Ninth Circuit's decision in *Rodriguez v. Hayes* is instructive.[5] The petitioner, a lawful permanent resident, was arrested and charged with being removable based on past drug and theft convictions. 591 F.3d 1105, 1111–12 (9th Cir. 2010). He was later detained by DHS. *Id.* at 1112. The petitioner contested his removability before an IJ, who determined that he was subject to mandatory removal based on these past offenses. *Id.* The BIA reversed the IJ's finding for the drug offense but upheld the IJ's finding about the theft conviction. *Id.* The petitioner appealed to the Ninth Circuit, and while awaiting review, filed a writ of habeas corpus and sought relief for himself and a class of other noncitizens who "1) are or will be detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, and 2) have not been afforded a hearing to determine whether their prolonged detention is justified." *Id.* The petitioner claimed the detention of the proposed class members was not authorized by statute, and, in the alternative, that their detention violated the Fifth Amendment's due process clause. *Id.*

Respondents challenged certification of the proposed class. *Id.* at 1122. On commonality, respondents argued that, because class members suffered detention "for different reasons and under the authority of different statutes[,]" "the question of whether individual class members' detention may be continued without a bond hearing turns on divergent questions of statutory interpretation and consideration of different factual circumstances." *Id.* The court acknowledged that respondents were "undoubtedly correct that members of the proposed class do not share every fact in common or completely identical legal issues." *Id.* But, the court explained, Rule

---

[5] *Rodriguez v. Hayes* was abrogated on other grounds, as recognized in *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1200 (9th Cir. 2022) ("In *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 200 L.Ed.2d 122 (2018), the Supreme Court reversed our decision in *Rodriguez III*, and with it, some of the prior circuit precedent on which *Rodriguez III* was based."). The Court does not rely on portions that have been abrogated. The discussion of the class action factors remains good law.

23(a)(1) does not demand uniformity. *Id.* Rather, "the commonality requirements ask[] [the court] to look only for some shared legal issue or a common core of facts," which "the proposed members of the class certainly have." *Id.* at 1122–23.

*Mansor v. United States Citizenship & Immigration Services* is also instructive. There, the plaintiffs had applied for Temporary Protected Status ("TPS") and authorization to work in the United States but had not received notices from USCIS confirming their submission of complete applications. 345 F.R.D. at 200. The plaintiffs claimed that they met the prima facie eligibility criteria for TPS but had yet to receive temporary employment authorization. *Id.* The court concluded that the proposed class met the commonality requirement. *Id.* at 204. The court explained that the class posed "a common contention: namely, that USCIS's practice of not issuing temporary employment authorization upon receipt of a complete TPS application that establishes prima facie eligibility violates the TPS statute." *Id.* (citing *Dukes*, 564 U.S. at 350). And the "class's common contention is capable of classwide resolution because Plaintiffs challenge 'a system-wide practice or policy that affects all of the putative class members.'" *Id.* (citing cases). Thus, USCIS could address all of the proposed class members' injuries by "changing its practice 'in one stroke.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

The facts and legal questions of the Bond Denial Class echo those in *Rodriguez v. Hayes* and *Mansor*. Here, the Bond Denial Class asks the Court to consider one common legal question: whether Defendants' "policy and practice denying bonds for lack of jurisdiction" violates the INA and the APA. Dkt. 1 at 22. Of course, as Defendants point out, some circumstances of the individual class members will differ in ways that could affect individualized bond determinations. *See* Dkt. 23 at 16. But such differences are not enough to destroy commonality— and the common answer that drives the litigation. Each person was found subject to mandatory detention under the IJs Section 1225(b)(2) policy. *See id.* ¶¶ 5(a), (d).

Yet this is exactly what Defendants argue. Defendants respond that the proposed class cannot satisfy the commonality requirement because some class members may still be subject to discretionary detention. Dkt. 23 at 16. They explain that the Bond Denial Class includes individuals who have received bond decisions that "already include alternative findings under § 1226." *Id.* at 15. Defendants argue that, because some of these class members "are subject to *both* an § 1225(b)(2) holding and an alternative § 1226(a) review, . . . a judgment affirming their right to a bond hearing under § 1226(a) would afford them no further answers or measurable relief from detention." *Id.* at 16 (emphasis in original). This argument is unavailing.

As Rodriguez points out in reply, even if the IJ made alternative findings that someone is a flight risk or too dangerous for bond, that individual would still have to overcome both holdings to prevail on an appeal to the BIA. Dkt. 24 at 5 ("Those individuals must still overcome the unlawful policy in order to address flight or danger findings."). The Tacoma IJs first find such persons ineligible for bond under the INA, and then offer alternative findings to support the bond denial. *See, e.g.*, Dkt. 5-1 at 2; Dkt. 5-2 at 4–5; Dkt. 5-3 at 2. These individuals are thus still injured by the IJ's finding that they are subject to mandatory detention. And a decision by this Court could redress that injury for all class members. *See, e.g.*, *Gonzalez*, 975 F.3d at 808 ("[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.") (citations omitted); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) ("All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient[.]").

Even if one could characterize alternative findings in support of detention as a lack of injury (as opposed to a separate injury), "the fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from" being

certified. *Rodriguez*, 591 F.3d at 1125. Courts in this circuit have consistently held that the presence of some uninjured, or differently injured, parties will not destroy commonality. *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("[A]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm[.]"); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.") (citation omitted); *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct."). Rather, "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters*, 145 F.3d at 1047.

Defendants also argue that "Plaintiff's proposed Bond Denial Class lacks typicality and commonality because it is overbroad." Dkt. 23 at 14. They maintain that the Bond Denial Class is "overbroad because it sweeps in individuals who have not suffered the same injury that Plaintiff has pleaded, i.e., an allegation of being detained by ICE under § 1226(a), but determined by an IJ to be ineligible for a custody redetermination hearing as an applicant for admission, citing § 1225(b)(2)." *Id.* at 14–15. They explain, "Plaintiff's proposed class is defined by carving out those detained under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231. . . . The proposed class, however, includes [noncitizens] who are *not* applicants for admission, and therefore will not experience the same injury that Plaintiff alleges." *Id.* at 15.

But this challenge is easily resolved by Rodriguez's proposed revision to the class definition.[6] Dkt. 24 at 4–5. In reply, Rodriguez addresses this concern by adjusting the class definition as follows:

> Bond Denial Class: All noncitizens *without lawful status* detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

*Id.* at 5. By adding the italicized language, Rodriguez limits the class definition to those whom the IJs would consider "applicants for admission." *Id.*

The Court finds that the revised definition will close the class to certain individuals who do not suffer any potential injury from the allegedly harmful policy. Even if a *de minimis* number of uninjured individuals are still swept into the class, this does not destroy commonality. *See Ruiz Torres*, 835 F.3d at 1136; *Walters*, 145 F.3d at 1047. Adopting the revised definition, the Court finds that commonality is satisfied for the Bond Denial Class.

### b)    The Bond Appeal Class

For the Bond Appeal Class, Defendants also argue that the proposed class "is far too vast" to "generate common answers apt to" resolve Plaintiff's allegations of the BIA's alleged "systematic failure to issue timely decisions." Dkt. 23 at 17. The "question" here is whether the BIA systematically fails to timely adjudicate bond appeals. *Id.* Defendants claim that "no such

---

[6] At oral argument, Defendants requested that the Court allow supplemental briefing prior to adopting the revised language. But Defendants never offered any reason why the Court should do so. And the Court retains authority to *sua sponte* amend the class definition to address concerns of overbreadth. *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 211–12 (N.D. Cal. 2012) ("Where the class definition proposed is overly broad or unascertainable, the court has the discretion to narrow it."); *Mansor*, 345 F.R.D. at 201 (adopting proposed revised definition that narrows an "otherwise impermissibly broad class definition"); *Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018) ("[D]istrict courts have the inherent power to modify overbroad class definitions.").

'common answer' can be distilled from Plaintiff's immense class of individuals whose circumstances and procedural statuses wildly differ, and where determination of whether a bond appeal is timely adjudicated is best analyzed on a case-by-case basis." *Id.*

Defendants also argue that commonality "cannot be met because the proposed class members do not suffer from the same injury." *Id.* at 20. Because "the time elapsed following the filing of an appeal differs from individual to individual" the injury arising from "detention will change from person to person." *Id.* at 20–21; *see id.* at 21 ("An individual who is detained for 29 days cannot be said to suffer the same injury as an individual detained for seven months. Similarly, an individual who is released from detention while DHS appeals an IJ's order to grant bond cannot be said to suffer the same injury as an individual who remains in custody while appealing an IJ's order to deny bond. Plaintiff admits as much when he alleges that a delay only becomes unreasonably prolonged after 60 days."). Thus, Defendants conclude, "the Bond Appeal class is fatally overbroad because it 'sweeps within it persons who could not have been injured by the defendant's conduct.'" *Id.* at 21 (citing *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017)).

The Ninth Circuit has expressly foreclosed such an argument. For example, in *Rodriguez v. Hayes*, the court explained that members of a proposed class need "not share every fact in common[.]" 591 F.3d at 1122; *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (Commonality "does not . . . mean that *every* question of law or fact must be common to the class."). "This is not required by Rule 23(a)(1)." *Id.* Rather, "the commonality requirements ask[] us to look only for some shared legal issue or a common core of facts." *Id.*; *see Jane Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 989 (N.D. Cal. 2018) ("The Ninth Circuit has found '[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.'") (quoting

*Hanlon*, 150 F.3d at 1019). And courts "regularly resolve procedural due process claims"—like those raised by Rodriguez here—"on a class-wide basis when addressing the constitutionality of immigration agencies' policies and practices." *Padilla v. United States Immigr. & Customs Enf't*, No. C18-928 MJP, 2019 WL 1056466, at *4 (W.D. Wash. Mar. 6, 2019) (citing cases).

The proposed Bond Appeal class brings two claims—one under the Due Process Clause and the other under the APA. Dkt. 1 ¶¶ 107–15. First, the Due Process claim raises a common question with a common answer: whether the Due Process clause imposes an outer limit on the time for deciding a bond appeal. *Id.* ¶¶ 56–60, 65, 96. And the answer to that question should be the same for everyone, even if the question of whether the agency has acted reasonably under the statutory framework differs based on individual circumstances. It thus comes as no surprise that the Ninth Circuit, and courts throughout the circuit, have repeatedly certified classes of detainees challenging ICE practices under the Due Process Clause. *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 344 (9th Cir. 2020) ("We further hold that the district court did not err by provisionally certifying a class of all Adelanto detainees. The alleged due process violations exposed *all* Adelanto detainees to an unnecessary risk of harm, not just those who are release-eligible or uniquely vulnerable to COVID-19.") (emphasis in original); *Walters*, 145 F.3d at 1036 (affirming 23(b)(2) class certification when the plaintiffs sought "declaratory and injunctive relief on the ground that the administrative procedures used by the INS . . . violated their rights to procedural due process"); *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257 (C.D. Cal. 2008) ("[C]laims of due process violations and unreasonable delay also are common legal claims directed at Defendants' specific consent policy. Where Plaintiffs raise a common question of law, Defendants' concerns about multiple legal issues and factual variation do not defeat commonality."); *Mansor*, 345 F.R.D. at 207 (certifying class alleging that defendants' "failure to

implement a process to afford Plaintiffs evidence of employment authorization while their TPS applications are pending violates their due process rights").

Though "numerous individual administrative proceedings may flow" from a declaration that the delays in BIA processing of bond denial appeals violates due process, the Court's decision would still "eliminate[] need for individual litigation regarding the constitutionality of" the delays. *See Walters*, 145 F.3d at 1047. "Absent a class action decision, individual" detainees would be forced to file complaints against the BIA "in federal court, each of them raising precisely the same legal challenge to the constitutionality" of the appeals delays. *Id.* Thus, "class certification in this case is entirely proper in light of the general purposes of Rule 23, avoiding duplicative litigation." *Id.*

The same is not true, however, of the proposed class's APA claims. Defendants argue that "[t]o the extent that Plaintiff argues the Bond Appeal class 'presents the same question of whether . . . the APA entitles them to timely adjudication of their bond hearing appeals,' such inquiry is properly analyzed on a case-by-case basis under the six-factor test set forth in *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*)." Dkt. 23 at 17. In *TRAC*, the District of Columbia Circuit Court of Appeals established a six-factor test, known as the *TRAC* test, for evaluating if an agency's delay in processing a matter is unreasonable. 750 F.2d at 80. These factors include:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," . . . ; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, . . . ; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; . . . ; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, . . . . (5) the court should also take into account the nature and extent of the interests prejudiced by delay, . . . ; and (6) the court need not "find any impropriety lurking

behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*Id.* (cleaned up). The Ninth Circuit has since adopted the *TRAC* test. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997).

Rodriguez's reply focuses largely on the alleged due process violation. *See* Dkt. 24 at 8–9 ("Defendants' unworkable proposal ignores that the Due Process Clause provides a single, uniform answer to this question. The Supreme Court and Ninth Circuit have previously and repeatedly recognized that due process often demands specific timeframes for action to protect the rights of persons seized by the government.") (citing cases). But most of the cases that Rodriguez cites do not actually grapple with an APA claim and the workability of a *TRAC* analysis for a class. *See id.*; *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 58–59 (1991) (plaintiffs sought injunctive and declaratory relief only under 28 U.S.C. § 1983); *Zadvydas v. Davis*, 533 U.S. 678, 700–01 (2001) (resident noncitizens ordered removed but held in custody past a statutory deadline for removal challenged policy, but did not bring an APA claim); *United States v. Fernandez-Alfonso*, 813 F.2d 1571, 1572–73 (9th Cir. 1987) (class challenged delay in district court's review of a magistrate judge's detention order, arguing the delay violated the requirement under the Bail Reform Act of 1984 that the district court determine the motion "promptly"); *Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1981) (finding that certain provisions of the Lanterman-Petris-Short Act allowing state to commit individuals with mental health conditions involuntarily violated due process).

Cases that Rodriguez cites that do confront the applicability of *TRAC*—and which found certification appropriate—found a "rule of reason" in an applicable statute. For example, in *Gonzalez Rosario v. United States Citizenship and Immigrations Services*, the plaintiffs sought to compel USCIS to abide by regulatory deadlines for adjudicating applications for employment

authorization documents filed by noncitizens. 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018). Though a statute did not mandate a timeline for adjudicating applications, INS had issued a regulation that required adjudication within 30 days of receipt. *Id.* at 1160. Defendants argued that *TRAC* would require individualized determinations for each plaintiff, thus destroying commonality. *Rosario v. United States Citizenship & Immigr. Servs.*, No. C15-0813JLR, 2017 WL 3034447, at *9 (W.D. Wash. July 18, 2017). But the Court relied on the regulation to determine that individualized *TRAC* inquiries were not required. *Id.* at *10 ("Here, agency regulations rather than a congressional statute provided a deadline for performance, but the court has already concluded that those regulatory deadlines are mandatory. . . . Accordingly, the court rejects Defendants' argument that the individualized TRAC inquiry undermines commonality.").

The same is true of *Moreno Galvez v. Cuccinelli*, 492 F. Supp. 3d 1169, 1172 (W.D. Wash. 2020). There, applicants for special immigrant juvenile status sued USCIS, alleging that the agency had failed to process their applications in timely manner. *Id.* The court did not consider the *TRAC* factors. Rather, it focused solely on the INA's provisions, which unambiguously required that all applications be adjudicated no later than 180 days after the date on which the application was filed. *Id.* at 1179.

"Indeed, Ninth Circuit authority suggests that where a firm deadline exists, the Court need not undertake [*TRAC's*] six-factor balancing inquiry." *Garcia v. Johnson*, No. 14-CV-01775-YGR, 2014 WL 6657591, at *12 (N.D. Cal. Nov. 21, 2014) (first citing *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002); and then citing *Brower v. Evans*, 257 F.3d 1058, 1068–69 (9th Cir. 2001)). But there is no such statute or regulation that provides a firm deadline in this case. At oral argument, Plaintiff's counsel could not point to any controlling authority dictating a deadline.

Without that authority, "Plaintiffs' missed deadline claim does not raise common issues for the purpose of class certification." *See Casa Libre/Freedom House v. Mayorkas*, No. 222CV01510ODWJPRX, 2023 WL 3649589, at *13 (C.D. Cal. May 25, 2023). "This is so because (1) several of the individual *TRAC* factors require individualized inquiries, and (2) the task of balancing the *TRAC* factors requires an individualized inquiry for each class member." *Id.*; *see also Tony N. v. U.S. Citizenship & Immigr. Servs.*, No. 21-CV-08742-MMC, 2021 WL 6064004, at *7 (N.D. Cal. Dec. 22, 2021) ("In the instant case, the Court, to determine the merits of plaintiffs' claims, as well as those of putative class members, must, as discussed above, balance the *TRAC* factors. Of those factors, the third and fifth factors, namely, harm and prejudice, are subject to determination on an individual basis, and the first factor is, in part, namely, the length of delay, likewise subject to determination on such basis."). Several of the individual *TRAC* factors "require individualized inquiries and cannot be treated on a classwide basis." *Casa Libre/Freedom House*, 2023 WL 3649589, at *13.

Rodriguez argues that the Bond Appeal Class meets the commonality requirement because "[a]ll class members present the same question of whether the . . . APA entitles them to timely adjudication of their bond hearing appeals." Dkt. 1 ¶ 96. But the APA does not alone create any deadlines for compliance, and individual consideration of the *TRAC* factors "create[s] unmanageable rifts in the class." *Casa Libre/Freedom House*, 2023 WL 3649589, at *13. Given that these factors must be balanced in each individual case, the Court concludes that the proposed class's APA delayed adjudication claim does not "raise a question that 'generate[s] common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

1    Thus, the Court finds commonality met for the Bond Appeal Class for the Due Process

2    claim only. The remaining Rule 23(a) and 23(b)(2) factors considered below for the Bond

3    Appeal Class apply only to the Due Process claim.

4        3.    *Typicality*

5        The third requirement of Rule 23(a) is typicality. "The claims of the representative party

6    must be typical of the class claims." *Gonzalez*, 975 F.3d at 809 (citing Fed. R. Civ. P. 23(a)(3)).

7    "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent

8    class members; they need not be substantially identical." *Rosario*, 2017 WL 3034447, at *10

9    (quoting *Hanlon*, 150 F.3d at 1020). "The test of typicality is whether other members have the

10   same or similar injury, whether the action is based on conduct which is not unique to the named

11   plaintiffs, and whether other class members have been injured by the same course of conduct."

12   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up).

13       "Typicality refers to the nature of the claim or defense of the class representative, and not

14   to the specific facts from which it arose or the relief sought." *Rosario*, 2017 WL 3034447, at *10

15   (quoting *Hanon*, 976 F.2d at 508). Typicality is a "permissive standard," *Staton v. Boeing Co.*,

16   327 F.3d 938, 957 (9th Cir. 2003), but class certification is inappropriate "if there is a danger that

17   absent class members will suffer if their representative is preoccupied with defenses unique to

18   it[.]" *Hanon*, 976 F.2d at 508 (cleaned up).

19       Unsurprisingly, the "commonality and typicality requirements of Rule 23(a) tend to

20   merge." *Rosario*, 2017 WL 3034447, at *10 (quoting *Falcon*, 457 U.S. at 157 n.13). "Both serve

21   as guideposts for determining whether under the particular circumstances maintenance of a class

22   action is economical and whether the named plaintiff's claim and the class claims are so

23   interrelated that the interests of the class members will be fairly and adequately protected in their

24   absence." *Id.* (quoting *Falcon*, 457 U.S. at 157 n.13).

Defendants do not contest that Rodriguez's claims are typical of the Bond Denial Class. And the Court finds typicality satisfied. Rodriguez arrived in the United States without inspection. Dkt. 9 ¶ 6 ("ICE has charged me as removable because I entered the United States without inspection."). He was later arrested and detained at NWIPC. *Id.* ¶¶ 3, 5. An IJ refused Rodriguez bond because the IJ claimed that they lacked jurisdiction. *Id.* ¶¶ 11. And Rodriguez remains in custody at NWIPC. *Id.* ¶¶ 2, 15. His claims are typical of the Bond Denial Class. Any minor factual differences do not change this analysis. *See, e.g.*, *Mansor*, 345 F.R.D. at 205–06 (similar).

Defendants do, however, argue that Rodriguez has not suffered the same injury as the proposed Bond Appeal Class. Dkt. 23 at 21. As explained above in the standing analysis, *supra* Section IV.A, Defendants argue that "Plaintiff does not share the same or similar injury as the proposed class members he seeks to represent. Indeed, as of the time of this filing, Plaintiff's bond denial appeal will have been pending for about one month. . . . This falls short of Plaintiff's assertion that the BIA ought to render an appeal decision within 60 days." *Id.*

Defendants are correct that Rodriguez filed his appeal less than two months ago. Dkt. 23 at 21; Dkt. 9 ¶ 12 ("I filed an appeal of the immigration judge's decision denying me a bond hearing on March 13, 2025. The appeal is pending."). But, as Rodriguez explains, "Defendants conflate the remedy sought with the fact that [he], like all proposed class members, faces a custody appeals system that fails to implement timelines or safeguards to ensure a timely decision." Dkt. 25 at 10. Accordingly, Rodriguez argues that, because he faces the same imminent injury as the other class members, he may challenge the same practice that harms the others. *Id.*

As explained above, *supra* Section IV.A, Rodriguez has standing to lead the class because he faces immediate threat of direct injury: the alleged due process violation caused by

the delay in BIA review. For similar reasons, his claims are typical of the class. Though

Rodriguez has not yet been detained for sixty days, he faces the immediate threat of ongoing

detention because of delayed review. *See* Dkt. 5 ¶¶ 2–3; *Parsons*, 754 F.3d at 685 (finding

typicality where the named plaintiff alleged "the same or [a] similar injury' as the rest of the

putative class") (alteration in original) (citation omitted). Rodriguez, like the rest of the proposed

Bond Appeal Class, "has allegedly suffered, or will suffer, the same harm as a result of

Defendants' common practice." *Mansor*, 345 F.R.D. at 205 (citation omitted); *see also Parsons*,

754 F.3d at 685 (finding typicality where the injury is the "result of a course of conduct that is

not unique to [the plaintiff]; and [the plaintiff] allege[s] that the injury follows from the course of

conduct at the center of the class claims").

Any minor differences in Rodriguez's circumstances are a nonissue. Here, the Ninth

Circuit's decision in *Gonzalez v. United States Immigration & Customs Enforcement* is

instructive. 975 F.3d at 810. There, the plaintiffs challenged a policy for issuing immigration

detainers. *Id.* at 799. They challenged "ICE's use of biometric information to confirm an

individual's identity and a search of electronic databases to determine whether the individual

lacks lawful immigration status or has such status but is removable." *Id.* The government argued

that several aspects of the named plaintiff's case defeated typicality. *Id.* at 810–11. For example,

the government claimed that Gonzalez was "atypical of noncitizen class members because

evidence of foreign birth—even with citizen-class members—gives rise to a rebuttable

presumption of alienage on which an immigration officer may rely as part of a probable cause

determination, which does not apply to someone who is or who the government should have

known is a citizen." *Id.* at 811 (cleaned up). But, because the challenge "concern[ed] the legality of a policy that applie[d] equally to all class members," the Ninth Circuit rejected the argument.[7]

The government also argued that because "an LAPD officer incorrectly wrote on Gonzalez's booking record that he was born in Mexico . . . [he had] 'unique' circumstances that make him atypical." *Id.* But these errors—factual differences the government argued made the claim "unique"—did not destroy typicality. *Id.* at 811–12. Rather, the court concluded, "Gonzalez's claim is [] no different than any other class member who challenges the Government's issuance of an immigration detainer based solely on a search of electronic databases." *Id.* at 812.

Rodriguez, like Gonzalez, is subject to the same injury as the other class members. *See, e.g.*, *id.*; *see also Rivera*, 307 F.R.D. at 550 ("Plaintiff's claim is typical of her class members', given that the class faces the same injury from the same policy."); *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 641 (D. Ariz. 2016) (holding that where plaintiffs had all been subject to the same conditions at a border patrol facility, even if for different spans of time, typicality was satisfied). And any minor factual differences—such as how long he has been detained, the circumstances of his detention, or his time in the United States—do not make his claims atypical.

Finally, and critically, a named plaintiff is not typical if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024), *cert. denied*, 220 L. Ed. 2d 381 (Jan. 13, 2025) (quoting *Hanon*, 976 F.2d at 508 ). Defendant has not argued that any such defenses exist here. And the record does not suggest any.

---

[7] The Ninth Circuit also considered that the government had waived the argument for failure to raise it in the district court and relied on this in dismissing the argument as well. *Id.* at 811.

The Court thus finds that Rodriguez has satisfied the typicality requirement for both proposed classes.

### 4.    Adequacy

The final requirement of Rule 23(a) is adequacy. "The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Hanlon*, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(4)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). The named plaintiffs and their counsel must have "sufficient 'zeal and competence' to protect the interests of the rest of the class." *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1043 (S.D. Cal. 2020) (quoting *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975)).

### a)    Named Plaintiff's Adequacy

The Court turns first to the adequacy of the named plaintiff, Ramon Rodriguez Vazquez. He is detained at NWIPC. Dkt 9 ¶ 1. Rodriguez entered the United States years ago, and much of his family lives here. *Id.* ¶ 4. On February 5, 2025, Rodriguez was arrested at his home in Grandview, Washington. *Id.* ¶ 5. He was transferred to NWIPC for removal proceedings. *Id.* ¶ 6. ICE charged Rodriguez as "removable because [he] entered the United States without inspection." *Id.* He has never been arrested by the police, charged with a crime, or convicted of a crime in the United States or elsewhere. *Id.* ¶ 8. On March 12, 2025, Rodriguez had a bond hearing before the immigration court, where he was represented by his attorney. *Id.* ¶ 11. "At that hearing, the immigration judge said that he could not consider my case." *Id.* It is Rodriguez's understanding that he "was denied a bond because the immigration judge concluded that [he] had

entered the United States without inspection and therefore [he is] subject to mandatory

detention," ineligible for bond. *Id.* On March 13, 2025, Rodriguez filed an appeal, which remains

pending before the BIA. *Id.* ¶ 12.

      Rodriguez has expressed his interest in representing the class and his understanding of

the responsibilities of doing so. In a declaration submitted to the Court, Rodriguez explains:

> I want to be a named plaintiff in this case and I understand that if the Court grants
> the motion for class certification, I would represent a large number of people who:
> (a) have entered the United States without inspection; and (b) who have been
> denied a bond hearing for that reason. In addition, I also understand that I will
> represent a class of persons who have filed an appeal of their immigration judge
> decision denying bond.

> I also understand that I would represent people who are currently in detention and
> who have been denied a bond hearing for the same reason as me, as well as
> people that will be in detention in the future and denied a bond hearing on this
> basis. In addition, I understand that I will represent people who have a pending
> appeal at the BIA of a bond decision, as well as people who file such appeals in
> the future.

> I understand that, as a class representative, I represent the interests of all class
> members in this lawsuit and that it is my responsibility to represent the interests of
> the whole class and not just my own personal interests.

*Id.* ¶¶ 16–18.

      Rodriguez thus asserts that he is an adequate representative of the class—seeking the

same relief and, as of the filing of the complaint, sharing the same interests as absent class

members. *See Mansor*, 345 F.R.D. at 206. Rodriguez does not have any conflicts of interest

because he has a "mutual goal" with the other class members to challenge the allegedly unlawful

practices and to "obtain declaratory . . . relief that would not only cure this illegality but remedy

the injury suffered by all current and future class member." *Nightingale v. U.S. Citizenship &*

*Immigr. Servs.*, 333 F.R.D. 449, 462 (N.D. Cal. 2019). The Court finds he is an adequate

representative of the Bond Denial Class.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Though Defendants do not dispute that Rodriguez is an adequate representative for the Bond Denial Class, Defendants do contest his adequacy to represent the Bond Appeal Class. Dkt. 23 at 22. Defendants argue that "Plaintiff is unable to fairly and adequately protect the proposed class's interests because, like the discussion in the commonality and typicality requirements, the proposed Bond Appeal class encompasses a broad range of individuals who have differing reasons for detention, and most importantly, whose appeals have been pending with the BIA for different lengths of time." *Id.*

Defendants' claim echoes the standing and typicality arguments discussed—and dismissed—above. Their adequacy argument is unpersuasive for the same reasons. Accordingly, the Court finds that Rodriguez is an adequate class representative of the Bond Appeals Class as well.

> b) *Class Counsel's Adequacy*

Counsel for the proposed class have shown that they have experience litigating class actions on immigration matters. Many of the attorneys have a decade or more of experience working in immigration law. Dkt. 11 ¶ 2 (explaining that Boyd has twenty-four years' experience); *Id.* ¶ 6 (explaining that Madrid has worked for NWIRP since 2013); *Id.* ¶ 7 (explaining that Kang has worked for NWIRP since 2014); *Id.* ¶ 8 (explaining that Korthius has worked for NWIRP since 2018); Dkt. 5 (explaining that Stanislowski has worked at NWIRP for eleven years). One attorney has litigated "hundreds of cases and personally argued on behalf of immigrants before immigration judges, the Board of Immigration Appeals, federal district courts, the Ninth Circuit Court of Appeals, and the United States Supreme Court." Dkt. 11 ¶ 3. And he has "successfully moved for class certification and been approved by federal courts as class counsel in sixteen different class actions on behalf of immigrants[.]" *Id.* ¶ 4. Another serves as or has served as class counsel in six different cases, Dkt. 11 ¶ 8, and NWIRP has represented

classes of immigrants multiple times in this district. *See Mansor*, 345 F.R.D. at 206; *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 325 F.R.D. 671 (W.D. Wash. 2016). The combined experience of class counsel is more than adequate.

The court finds nothing in the record to suggest that the attorneys have any conflicts of interest with other class members. Accordingly, the Court concludes that counsel meet Rule 23(a)(4)'s adequacy requirement. *See Mansor*, 345 F.R.D. at 206 (similar).

**C.     Rodriguez has satisfied the requirements of Rule 23(b)(2).**

Because the proposed class has met the requirements of Rule 23(a), the court turns to Rule 23(b). Plaintiffs move for class certification under Rule 23(b)(2), "which permits the Court to certify a class if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Jane Doe 1*, 357 F. Supp. 3d at 991 (quoting Fed. R. Civ. P. 23(b)(2)).

"Class certification under Rule 23(b)(2)" requires that "the primary relief sought is declaratory or injunctive." *Rodriguez*, 591 F.3d at 1125 (quoting *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001)). "The rule does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.*; *see also Parsons*, 754 F.3d at 688 (This inquiry "does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries."). Thus, "'it is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Id.* (citations omitted); *see also Mansor*, 345

F.R.D. at 206 ("In a 23(b)(2) class, the court treats predominance and superiority as self-evident, . . . and requires only a showing of cohesiveness of class claims.") (cleaned up).

Rodriguez explains that both proposed classes seek declaratory relief generally applicable to the class. He argues, "Defendants' bond denial policy applies to the members of the proposed Bond Denial Class, rendering them all subject to mandatory detention under § 1225(b)(2) and thus depriving [them] of the bond hearing that they are entitled under § 1226(a)." Dkt. 2 at 19. Thus, the declaratory relief requested—a ruling that the policy violates the INA—would provide the entire class with relief. *Id.*; *see also* Dkt. 1 at 22. Rodriguez claims the same for the Bond Appeal Class and "the BIA's systematic failure to timely adjudicate bond appeals[.]" Dkt. 2 at 20. He explains that "a single declaratory judgment requiring the BIA to issue timely bond appeal decisions would apply to the class as a whole." *Id.*

Courts in this circuit have found the requirements of Rule 23(b)(2) met in similar cases. For example, in *Mansor*, the plaintiffs sought a declaration that (1) the TPS statute required the defendants to provide employment authorization documentation while the plaintiffs' TPS applications were pending, and that (2) Defendants' "alleged failure to implement a process to afford Plaintiffs evidence of employment authorization while their TPS applications are pending violates their due process rights." 345 F.R.D. at 207. The court concluded that the claims were "sufficiently cohesive for treatment in a Rule 23(b)(2) class." *Id.* And in *Rivera*, individuals detained pending payment of bond or final removal determination filed a putative class action, alleging that the immigration courts' policy of denying noncitizens' requests for conditional parole without bond violated the INA. 307 F.R.D. at 551. The court there found that the action "concern[ed] a single policy applicable to the entire class that (if unlawful) subjects class members to unnecessary detention." *Id.* Thus, 23(b)(2) was satisfied. *See also Wagafe*, 2017 WL 2671254, at *16 ("Plaintiffs allege that CARRP is unlawful and ask the Court to enjoin the

Government from submitting putative class members' immigration applications to CARRP. A single ruling would therefore provide relief to each member of the class. Accordingly, Rule 23(b)(2) is satisfied.").

Nonetheless, Defendant argues that "Plaintiff's request for declaratory relief cannot satisfy Rule 23(b)(2) because the text of Rule 23 allows class certification only where a court can grant "*corresponding* declaratory relief." Dkt. 23 at 23 (quoting Fed. R. Civ. P. 23(b)(2)) (emphasis added by Defendants). Relying primarily on advisory committee notes to the 1996 amendments to Rule 23, Defendants argue that "[b]ecause Plaintiff does not request injunctive relief, he is unable to seek 'corresponding' declaratory relief under Rule 23(b)." *Id.*

Defendant's argument is foreclosed by existing caselaw. As noted above, Rule 23(b)(2) permits class actions for declaratory *or* injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The rule uses the word "or," not "and," indicating that a request for declaratory relief alone is adequate to satisfy the rule's requirements. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (the "word 'or' . . . is almost always disjunctive.") (citation omitted). And the Supreme Court has repeatedly described the rule as allowing class actions for both types of relief. *See Amchem*, 521 U.S. at 614 ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief"); *Dukes*, 564 U.S. at 360 ("[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive *or* declaratory remedy warranted—the notion that the conduct is such that it can be enjoined *or* declared unlawful only as to all of the class members or as to none of them.'") (emphasis added) (citation omitted). As recently as 2024, the Ninth Circuit has analyzed the availability of classwide declaratory and injunctive relief separately in cases challenging immigration enforcement policies. *See, e.g.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625–26 (9th Cir. 2024).

Notably, in *Garland v. Aleman Gonzalez*, the Supreme Court held that 8 U.S.C. § 1252(f)(1) prevents federal courts from "entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. 543, 550 (2022). Pre-*Aleman Gonzalez*, the Ninth Circuit in *Rodriguez v. Hayes* analyzed a similar question. There, the defendants asserted that 8 U.S.C. § 1252(f)(1), Section 306(a) of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), barred class certification. 591 F.3d at 1118. Defendants claimed that Section 1252(f) barred "the proposed class from receiving any injunctive relief, thereby requiring denial of class certification." *Id.* at 1119. The Ninth Circuit held that they were "doubly mistaken." *Id.* Though the Ninth Circuit's holding on injunctive relief has since been abrogated by *Aleman Gonzalez*, the Supreme Court "declined to reach the question whether [Section] 1252(f)(1) prohibits classwide declaratory relief." *Al Otro Lado*, 120 F.4th at 625 n.14. "Because the Supreme Court's reservation of a question is not clearly irreconcilable with a precedent of [the Ninth Circuit] that resolves the same question, we follow [the Ninth Circuit's] binding precedent." *Id.* (citing *Mont. Consumer Couns. v. FERC*, 659 F.3d 910, 920 (9th Cir. 2011)).

And the Ninth Circuit did discuss the difference between injunctive and declaratory relief in this context in *Rodriguez v. Hayes*:

> But it is the text of the IIRIRA itself that most clearly shows that Section 1252(f) was not meant to bar classwide declaratory relief. Congress knew how to say "declaratory relief" in enacting the IIRIRA, but it chose not to use it in Section 1252(f). Cf. 8 U.S.C. § 1252(e)(1)(A) (prohibiting courts from entering "declaratory, injunctive, or other equitable relief" in any action to exclude under 8 U.S.C. § 1225(b)(1)). "[E]njoin or restrain" should not be read to include declaratory relief when Congress could easily have included "declaratory relief" explicitly had it chosen to do so. *Cf. Hor v. Gonzales*, 400 F.3d 482, 484 (7th Cir.2005) ("Our legal vocabulary contains distinct words for distinctive judicial actions. Keeping them separate makes it easy to address one, both, or neither, in a statute such as the IIRIRA.").

591 F.3d at 1119.

Still, Defendants there argued "that declaratory relief is as a practical matter equivalent to injunctive relief, and that allowing classwide declaratory relief allows an 'end run' around the scheme Congress designed." *Id.* at 1120. Again, the Ninth Circuit disagreed. First, the court noted that "declaratory relief has long been recognized as distinct in purpose from and 'milder' in remedy than injunctions." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 466–67 (1974)). Second, the court explained, "the issue is not whether declaratory relief might make possible an end run around Section 1252(f), but whether classwide declaratory relief is a congressionally contemplated part of the statutory scheme. As we have explained, we believe that it is." *Id.* This holding makes clear that classwide declaratory relief is available separately from injunctive relief and therefore is a basis for certification under Rule 23(b)(2). The requirements of 23(b)(2) are thus satisfied.

## V.    CONCLUSION

For these reasons, Plaintiff's motion for class certification (Dkt. 2) is GRANTED IN PART and DENIED IN PART. The Court ORDERS that the following classes be certified:

> Bond Denial Class: All noncitizens without lawful status detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

> Bond Appeal Class: All detained noncitizens who have a pending appeal, or will file an appeal, of an immigration judge's bond hearing ruling to the Board of Immigration Appeals.

The Bond Appeal Class is certified only as to Plaintiff's Due Process claims. The motion for class certification is DENIED as to the Bond Appeal Class for claims of unreasonable delay under the APA.

1

2    The Court appoints Ramon Rodriguez Vazquez as the representative for both classes. The

Court appoints attorneys Matt Adams, Glenda M. Aldana Madrid, Leila Kang, and Aaron

3    Korthuis of the Northwest Immigrant Rights Project as class counsel.

4        Dated this 2nd day of May, 2025.

5

6                                    Tiffany M. Cartwright
                                    United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24