# EXHIBIT B

K. Larkin VanDerhoef                                    **DETAINED**
Higuera & VanDerhoef PLLC
705 Second Avenue, Suite 610
Seattle, Washington  98104
(206) 267-0233


## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## TACOMA, WASHINGTON

In the Matter of:                           )
                                            )
                                            )
**Alfredo JUAREZ ZEFERINO**                 )     **File No:** ▮▮▮▮▮▮▮
**AKA: Alfredo JUAREZ-CEFERINO**            )
                                            )
       In bond proceedings.                 )
_____ )


Immigration Judge: Scala              Next Hearing: May 8, 2025 at 10:30am


**RESPONDENT'S SUPPLEMENTAL BOND EVIDENCE**

Respondent, Alfredo Juarez Zeferino, by and through undersigned counsel, respectfully requests that this court schedule him for a bond hearing. Respondent is eligible for a bond hearing pursuant to INA § 236(a).

Enclosed please find the following evidence in support of this request:

| Document | Page |
|---|---|
| *Ramon Rodriguez Vazquez v. Drew Bostock, et al,* Case No. 3:25-cv-05240-TMC Order Granting Preliminary Injunction, including: | 1 |

**Plain reading of the statute:**

"Section 1226(a) authorizes that "on a warrant issued by the Attorney General, a[] [noncitizen] may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." "Except as provided in subsection (c)," when a noncitizen is arrested under Section 1226(a), the Attorney General may detain him or release him on bond or conditional parole. 8 U.S.C. § 1226(a)(1)–(2). This process includes the right to a bond hearing before an immigration judge. See 8 C.F.R. § 1236.1(d). At that hearing, the noncitizen may present evidence of their ties to the United States, lack of criminal history, and other factors that show they are not a flight risk or danger to the community. See generally In re Guerra, 24 I. & N. Dec. at 40; see also Martinez v. Clark, 124 F.4th 775, 783 (9th Cir. 2024) (discussing Guerra factors).

Section 1226(c) then "carves out a statutory category of [noncitizens] who may not be released under § 1226(a)." Jennings, 583 U.S. at 289. This subsection mandates detention for a noncitizen "who falls into one of several enumerated categories involving criminal offenses and terrorist activities." Id. Importantly, the plain text of Section 1226(c) includes noncitizens who are "inadmissible" (meaning they have not been admitted to the United States) as well as those who are "deportable" (meaning they were previously admitted to the United States).2 See §§ 1226(c)(1)(A), (D), (E)." At p. 23

**Congressional intent:**

"*First*, if the Court were to adopt the reading of Section 1225 advanced by the Tacoma IJs, it would render significant portions of Section 1226(c) meaningless. *See* Dkt. 22 at 20 (justifying Rodriguez's bond denial based on the IJ's interpretation that Section 1225 "applies to applicants for admission" and Section 1226 "applies only to those who have been admitted."). Under "one of the most basic interpretive canons . . . [a]

statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up); *Shulman*, 58 F.4th at 410–11 ("a court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (cleaned up). "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).

Here, if the immigration court's interpretation of Section 1225 is correct and its mandatory detention provisions apply to "all noncitizens who have not been admitted," Dkt. 5-4 at 2–3, then it would render superfluous provisions of Section 1226 that apply to certain categories of inadmissible noncitizens. *See* § 1226(c)(1)(A), (D), (E); *Shulman*, 58 F.4th at 410–11; *see also Torres*, 976 F.3d at 930 (noting in the context of interpreting inadmissibility grounds "that a contrary reading would render other provisions of the immigration code superfluous."). **Put another way, Section 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless since "all noncitizens who have not been admitted" would already be governed by 1225's mandatory detention authority.** *See* §1225(a)(1); § 1182(a)(6)(A)(i); Dkt. 5-4 at 2–3; *Shulman*, 58 F.4th at 410–11; *see also Corley*, 556 U.S. at 314, n.5 (explaining that seemingly conflicting statutes read in isolation can be reconciled if read in their broader context, which includes observing the antisuperflousness canon)." At P. 26-27.

*Ramon Rodriguez Vazquez v. Drew Bostock, et al,* Case No. 3:25-cv-05240-TMC    37
Order Granting in Part and Denying in Part Motion for Class Certification entered May 2, 2025, ordering the following classes be certified:

> <u>Bond Denial Class</u>: All noncitizens without lawful status detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

> <u>Bond Appeal Class</u>: All detained noncitizens who have a pending appeal, or will file an appeal, of an immigration judge's bond hearing ruling to the Board of Immigration Appeals. At p. 80

Respectfully submitted this 7th day of May of 2025,


_____
K. Larkin VanDerhoef
Attorney for Respondent

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RAMON RODRIGUEZ VAZQUEZ, on behalf of himself as an individual and on behalf of others similarly situated,<br>Plaintiff,<br><br>v.<br><br>DREW BOSTOCK, et al,<br><br>Defendant. | Case No. 3:25-cv-05240-TMC<br><br>ORDER GRANTING PRELIMINARY INJUNCTION |

## I.    INTRODUCTION

This case arises from a practice by the Tacoma Immigration Court of interpreting the Immigration and Nationality Act ("INA") to mandate detention without the possibility of bond for noncitizens who entered the United States without inspection, even if they have lived here for years. Plaintiff Ramon Rodriguez Vazquez ("Rodriguez") is a resident of Grandview, Washington who has lived in the United States and worked in agriculture for over 15 years. Dkt. 9 ¶¶ 3, 7. On February 5, 2025, Rodriguez was apprehended by Immigration and Customs Enforcement ("ICE"). Dkt. 26-2 at 4. He is detained at the Northwest Immigration and Customs Enforcement Processing Center ("NWIPC"). Dkt. 9 ¶ 6. Rodriguez is married, has four adult children, and is the "proud grandfather of ten United States citizen children[,]" all of whom live "just a few minutes from [his] house." *Id.* ¶ 4. Before ICE's arrest, he had "never been arrested

by the police, charged with a crime, or convicted of any type of crime anywhere." *Id.* ¶ 8; Dkt. 26-2 at 5.

Rodriguez sought a bond hearing under 8 U.S.C. § 1226(a), the statute that typically applies to noncitizens[1] who are "arrested and detained" on "a warrant issued by the Attorney General" for potential removal from the United States. Section 1226(a) gives the government discretion to release these detainees on bond while their removal case is pending. A noncitizen subject to Section 1226(a) is entitled to a bond hearing before an Immigration Judge ("IJ"), who may release the individual if the noncitizen shows they are not dangerous or a flight risk. The longstanding practice of the Executive Branch agencies charged with interpreting and enforcing the INA considered noncitizens like Rodriguez who had entered without inspection, and were apprehended while residing in the United States, as subject to Section 1226(a).

But around November 2022, the Tacoma Immigration Court began denying bond hearings for that group of noncitizens. The Tacoma IJs reasoned that these individuals should be treated as "applicants for admission" who were "seeking admission" to the United States and subject to mandatory detention under Section 1225(b)(2)(A). In contrast to Section 1226(a), a noncitizen that falls under Section 1225(b) is typically detained without the possibility of release throughout their removal proceedings. Section 1225(b)(1) authorizes expedited removal for some noncitizens unless they are deemed to have a credible fear of persecution. Section 1225(b)(2) mandates detention for an "applicant for admission, if the examining immigration officer determines that a [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]" 8 U.S.C. § 1225(b)(2)(a). But in either track, the individual is not afforded a bond

---

[1] This order uses the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578, n.2 (2020); *see* 8 U.S.C. § 1101(a)(3).

2

hearing. Instead, they have only the possibility of temporary, discretionary parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

On March 12, 2025, Rodriguez's request for a bond hearing and redetermination of his custody status was denied. *See* Dkt. 4-5 at 2. Pursuant to the practice of most Tacoma IJs since 2022, the Tacoma IJ ruled that the court had no jurisdiction to consider the merits of his bond request because Rodriguez was mandatorily detained under Section 1225(b)(2)(A). *Id.*

Rodriguez has appealed the IJ's denial to the Board of Immigration Appeals ("BIA" or "Board"). Dkt. 9 ¶ 12. The BIA has in fact remanded two similar bond denials issued by Tacoma IJs, stating that noncitizens like Rodriguez are subject to Section 1226(a) discretionary detention, not Section 1225(b)(2) mandatory detention. Dkt. 4-2; Dkt. 4-3. But the Board has declined to issue a precedential decision, Dkt. 4-4, and the nonpublished decisions have had limited impact. Most Tacoma IJs still consider noncitizens who entered without inspection but were apprehended while living in the United States subject to Section 1225(b), denying these individuals any possibility of release on bond. Bond denial appeals, meanwhile, typically take six months or more to be resolved at the BIA. Dkt. 7 ¶ 5. While Rodriguez waits for his appeal to be decided, he will remain in custody—with significant consequences for his health, family, and ability to prepare his defense to removal—when he would otherwise be a strong candidate for release on bond.

Rodriguez challenges Defendants' denial of a bond hearing as unlawful under Section 1226(a) of the INA and the Administrative Procedure Act ("APA"). Dkt. 1 at 19. Rodriguez also asserts that the BIA's chronically delayed adjudication of bond appeals violates the Due Process Clause of the Fifth Amendment and the APA. *Id.* at 19–20. Rodriguez brings this action on behalf of himself and all other persons who are similarly situated, seeking to represent a "Bond Denial Class" and a "Bond Appeals Class." *Id.* at 17–18. At the same time he filed this lawsuit

3

and moved to certify the classes, Rodriguez moved for preliminary injunctive relief on his statutory claim that he is detained under Section 1226(a) and not subject to mandatory detention under Section 1225(b)(2). Dkt. 3. Rodriguez asks the Court to enjoin Defendants from denying bond because he is detained under Section 1225(b)(2). *Id.* Rodriguez requests release, or in the alternative, that Defendants provide him with a bond hearing under Section 1226(a). Dkt. 3; Dkt. 25.

While recognizing that there is no precedential decision on point, this Court concludes that Rodriguez is likely to succeed on the merits, or at least has raised serious questions, that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and instead should be governed under Section 1226(a)'s discretionary detention scheme. Because he has also shown irreparable harm, that the balance of hardships tips sharply in his favor, and that he need not exhaust administrative remedies, the Court GRANTS Rodriguez's motion for a preliminary injunction. Defendants are ordered to provide Rodriguez with a bond hearing under 8 U.S.C. § 1226(a) within fourteen days of this Order. Defendants are enjoined from denying bond to Rodriguez on the basis that he is detained pursuant to 8 U.S.C. § 1225(b)(2).

## II.    BACKGROUND

Plaintiff Rodriguez, a noncitizen resident of Grandview, Washington who has lived in the United States since 2009, is detained at NWIPC after an IJ denied him a bond. Dkt. 1 ¶ 17, 74. Defendants are Drew Bostock, Seattle Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement ("ICE"); Bruce Scott, Warden at NWIPC; Kristi Noem, Secretary of the United States Department of Homeland Security ("DHS"); the United States Department of Homeland Security; Pamela Bondi, Attorney General of the United States; the Executive Office of Immigration Review ("EOIR"); Sirce Owen,

Director of EOIR; and the Tacoma Immigration Court. *Id.* ¶¶ 18–25. The facts below are undisputed by the parties.

A.    **Sections 1226 and 1225.**

Plaintiff Rodriguez alleges that he is unlawfully detained under Section 1225(b)(2), which mandates his detention, instead of under Section 1226(a)'s discretionary detention scheme where he could be eligible for release on bond.

The INA "authorizes the detention of [noncitizens] awaiting removal from the United States." *De Paz Sales v. Barr*, No. 19-CV-07221-KAW, 2020 WL 353465, at *4 (N.D. Cal. Jan. 21, 2020) (quoting *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1000 (N.D. Cal. 2018)). Section 1226 "provides the general process for arresting and detaining [noncitizens] who are present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citation omitted). Section 1226(a) "sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of a[] [noncitizen] 'pending a decision on whether the [noncitizen] is to be removed from the United States.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting § 1226(a)). Except as provided in Section 1226(c), "the Attorney General 'may release' a[] [noncitizen] detained under § 1226(a) 'on . . . bond' or 'conditional parole.'" *Id.* (quoting § 1226(a)(1)–(2)).

Section 1226(c) "carves out a statutory category" of noncitizens for whom detention is mandatory, comprised of individuals who have committed certain "enumerated . . . criminal offenses [or] terrorist activities." *Id.* at 289 (citing § 1226(c)(1)). Among the individuals carved out and subject to mandatory detention are certain categories of "inadmissible" noncitizens. § 1226(c)(1)(A), (D), (E). In January 2025, the Laken Riley Act added one such category subject to mandatory detention. Laken Riley Act ("LRA"), Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E). The LRA amendments mandate detention for noncitizens charged as

5

inadmissible under Sections 1182(a)(6)(A) (the inadmissibility ground for a noncitizen "present in the United States without being admitted or paroled"), 1182(a)(6)(C) (the inadmissibility ground for misrepresentation), or 1182(a)(7) (the inadmissibility ground for lacking valid documentation) *and* if the noncitizen has been arrested for, charged with, or convicted of certain crimes. *Id.*

Turning back to the default rule, "[w]hen a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." *Rodriguez Diaz*, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). If the detainee objects to the initial determination, they "may request a bond hearing before an IJ at any time before a removal order becomes final." *Id.* at 1197 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). At this stage, "the burden is on the non-citizen to 'establish to the satisfaction of the Immigration Judge . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight.'" *Hernandez v. Sessions*, 872 F.3d 976, 982 (9th Cir. 2017) (quoting *In re Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006)). A noncitizen detainee can appeal an adverse decision to the BIA. *Id.* at 983 (citing § 236.1(d)(3)).

Section 1225(b) "supplement[s] § 1226's detention scheme." *Rodriguez Diaz*, 53 F.4th at 1197. Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297; *see* § 1225(b) ("Inspection of applicants for admission"). Section 1225 defines an "applicant for admission" as "[a][] [noncitizen] present in the United States who has not been admitted or who arrives in the United States[.]" § 1225(a)(1); *see Jennings*, 583 U.S. at 287. As the Supreme Court notes, "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." *Jennings*, 583 U.S. at 287 (quoting § 1225(a)(3)).

Section 1225(b)(1) concerns the "[i]nspection of [noncitizens] arriving in the United States and certain other [noncitizens] who have not been admitted or paroled." Specifically, "Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible" based on Sections 1182(a)(6)(C) (misrepresentation) and 1182(a)(7) (lack of valid documentation) and "certain other [noncitizens] designated by the Attorney General[.]" *Jennings*, 583 U.S. at 287 (citing §§ 1225(b)(1)(A)(i), (iii)). Individuals that fall into Section 1225(b)(1) are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process" unless claiming asylum or a fear of persecution. *Id.* (first quoting § 1225(b)(1)(A)(i); then citing § 1225(b)(1)(A)(ii)).

Section 1225(b)(2) concerns the "[i]nspection of other [noncitizens]." Section 1225(b)(2) "mandates detention 'if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]'" *Rodriguez Diaz*, 53 F.4th at 1197 (quoting § 1225(b)(2)(A)).

Summarizing the relevant distinctions to this case, noncitizens detained under Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time before entry of a final removal order.

**B.    The Tacoma Immigration Court's denial of bond hearings for lack of jurisdiction under Section 1225(b)(2).**

Beginning around November 2022, the Tacoma Immigration Court started denying bond hearings for noncitizens "who entered without inspection and who have since resided in the United States." Dkt. 5 ¶ 3; *see also* Dkt. 6 ¶ 3. According to the Tacoma IJ's bond memo in Rodriguez's case, all noncitizens that enter the United States "without inspection or parole"— and who are not placed on the expedited removal or credible fear tracks of Section 1225(b)(1)—

7

are "inadmissible [noncitizens] who are 'applicants for admission'" under Section 1225. Dkt. 22 at 16; *see also* Dkt. 5 ¶ 5; Dkt. 6 ¶ 3. The immigration court has further held that an "applicant for admission" is also "'seeking admission' as that phrase is used" in Section 1225(b)(2)(A). Dkt. 22 at 20; *see* § 1225(b)(2)(A) ("[I]n the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229a of this title."). Thus, the Tacoma Immigration Court has reasoned, "[b]ecause Congress requires the detention of all applicants for admission, [it] does not have jurisdiction to review . . . bond determination[s] made by DHS" for noncitizens like Rodriguez. Dkt. 22 at 21; Dkt. 5 ¶ 5.

The Tacoma Immigration Court's change in policy has significantly impacted the likelihood that noncitizens apprehended while living in the United States may be released on bond. Rodriguez alleges that "[h]undreds of people have been denied bond as a result" and "[m]any, if not most, of these individuals have resided in the United States for years, or even decades." Dkt. 3 at 6; *see* Dkt. 5 ¶¶ 4–5; Dkt. 6 ¶ 3. According to national data, Tacoma IJs have granted bond in only three percent of the cases in which bond was requested in Fiscal Year 2023, a period that roughly aligns with the immigration court's change in policy. *See* Transactional Records Access Clearinghouse ("TRAC"), *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*, https://tracreports.org/reports/722/ (July 19, 2023); Dkt. 5 ¶ 3. During this period, the Tacoma Immigration Court's bond grant rate was the lowest grant rate among immigration courts in the United States. *See* TRAC, *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*.

8

C.      **Appeals to the BIA**

The BIA is an appellate body within the EOIR. 8 C.F.R. § 1003.1(d)(1). The Board is "charged with the review of those administrative adjudications under the [INA] that the Attorney General may by regulation assign to it." *Id.* By regulation, it can review IJ custody determinations. § 236.1(d)(3); § 1236.1(d)(3). Besides adjudicating individual cases, "the Board, through precedent decisions, shall provide clear and uniform guidance to DHS, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations." § 1003.1(d)(1).

Noncitizens like Rodriguez, who have been denied bond hearings by Tacoma IJs because they are allegedly subject to mandatory detention, have appealed their cases to the BIA with limited success. The BIA appeals process is long and generally moots pending bond appeals before they are adjudicated. *See* Dkt. 5 ¶ 5; Dkt. 7 ¶¶ 5–6. In 2024, EOIR data showed an average processing time of 204 days for bond appeals. Dkt. 7 ¶ 5. EOIR data also showed that 200 bond appeal cases "took a year or longer to resolve." *Id.* ¶ 6. During the time it takes the BIA to resolve an appeal, most detainees' claims are mooted. Dkt. 5 ¶ 5. Some detainees are released because ICE exercises its own authority to place detainees on bond. *See id.* ¶ 5(a),(d),(g). Other detainees are ordered removed from the United States during their bond appeal. *Id.* ¶ 5(b), (c), (f). And still others not captured in the EOIR data elect not to appeal a negative bond determination. *Id.* ¶ 5(e); *see also id.* ¶ 7 (declining representation for a bond hearing "based on the Tacoma Immigration Court practice of finding such individuals subject to mandatory detention.").

The few cases to reach the BIA, even when they have resolved a bond appeal in favor of the detainees, have also had limited impact. *See id.* ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. In April 2023, the BIA issued an unpublished decision involving a noncitizen "present in the United States, [that]

ha[d] not been admitted, and that an immigration officer found . . . [was] not clearly and beyond

a doubt entitled to be admitted." Dkt. 4-2 at 3. The Tacoma IJ determined that the individual was

subject to mandatory detention under Section 1225(b)(2)(A). *Id.* at 2. The Board remanded the

case to the IJ, concluding that if the individual was issued a warrant of arrest with a notice to

appear, "he would be subject to detention under" Section 1226. *Id.* at 3–4. Then in September

2023, the BIA issued a second unpublished decision for a person who had entered the United

States "without being admitted or paroled." Dkt. 4-1 at 4. The BIA remanded the case to the IJ,

writing that it was "unaware of any precedent stating that an Immigration Judge lacks authority

to redetermine the custody conditions of a respondent in removal proceedings under the

circumstances here." *Id.*

Despite these decisions, three of the four Tacoma IJs continue to deny bond to

individuals apprehended while residing in the country and treated as "present in the United States

without inspection." Dkt. 5 ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. The BIA has also denied a request by

advocates to publish one of these decisions as precedent. Dkt. 4-4 at 2.

### D.     Plaintiff Ramon Rodriguez Vazquez

Plaintiff Rodriguez is a resident of Grandview, Washington, where he has lived since

2009. Dkt. 9 ¶ 3. He works in the agricultural sector and owns his home, which he lives in with

his family. *Id.*  Rodriguez is married, has four adult children, and is the "proud grandfather of ten

United States citizen children[,]" all of whom live "just a few minutes from [his] house." *Id.* ¶ 4.

He also has eight siblings who live in California and who are all U.S. citizens. *Id.* Rodriguez has

"never been arrested by the police, charged with a crime, or convicted of any type of crime

anywhere." *Id.* ¶ 8; Dkt. 26-2 at 5.

On February 5, 2025, Rodriguez was arrested at his home and transferred to NWIPC. *Id.*

¶¶ 5–6; Dkt. 26-2 at 5. Rodriguez was placed in removal proceedings under Section 240 of the

INA (Section 1229a, as amended) and issued a Notice to Appear ("NTA") in front of an IJ. Dkt. 4-6 at 2. The NTA alleged that Rodriguez is a "[noncitizen] present in the United States who has not been admitted or paroled." *Id.* Following his arrest, Rodriguez requested a bond hearing. Dkt. 1 ¶ 79; *see* Dkt. 26-3. In support of his request, he included information about his ties to the U.S. "to demonstrate that he is not a flight risk or a danger." Dkt. 1 ¶ 79; *see generally* Dkt. 26-3. On March 12, 2025, Rodriguez's request for a bond redetermination hearing was denied for lack of jurisdiction. Dkt 4-5 at 2. The Tacoma IJ concluded that Rodriguez was subject to mandatory detention under § 1225(b)(2)(A) because he entered the United States "without inspection or parole and has not been through the expedited removal or credible fear process." Dkt. 22 at 16; Dkt. 4-5 at 2. Rodriguez appealed the IJ's denial on March 13, 2025. Dkt. 9 ¶ 12; *see generally* Dkt. 22 at 7–13. The appeal is pending before the BIA. Dkt. 9 ¶ 12.

Rodriguez has now been detained for over two and a half months. *See id.* ¶ 6. He has faced challenges to his mental and physical health. *Id.* ¶ 9–10. Being away from his family "has been extremely difficult." *Id.* ¶ 9. Rodriguez "has been a reliable and consistent help in the care provided to his grandchildren." Dkt. 26-3 at 38 (letter from pediatrician). Rodriguez assumes a particular role in the life of one of his grandchildren, a six-year-old diagnosed with Epstein's Anomaly, a congenital heart valve defect. *Id.*; Dkt. 9 ¶ 9. Rodriguez is responsible for taking her to appointments in Spokane, where her condition has required several surgeries and follow-up appointments. Dkt. 26-3 at 38. Rodriguez explains that his granddaughter has been "very affected by [his] absence." *Id.* ¶ 9.

Rodriguez also has "a number of health issues, making detention especially hard." *Id.* ¶ 10. He has high blood pressure and "take(s) a number of medications daily." *Id.* After he detained at NWIPC, he "was not given [his] medication for over a week," resulting in "horrible headaches," inflammation of his feet, and "significant pain in [his] stomach." *Id.* Although he

eventually received his medication, his "health has declined significantly" since he has been detained. *Id.* ¶ 13; *see id.* ¶ 10.

Rodriguez does not have a lawyer to defend him from deportation yet. *Id.* ¶ 14. His family "cannot afford to hire an attorney" and he is "extremely worried . . . that being detained will make it much harder to gather evidence and prepare [his] case." *Id.* ¶ 14–15. Rodriguez notes the burden this will place on his wife to help him who "is already doing so much to help keep [their] family afloat without [him]." *Id.* ¶ 14.

### E.      Procedural History

On March 20, 2025, Rodriguez filed his complaint, moved to certify two classes, and moved for a preliminary injunction. Dkt. 1; Dkt. 2; Dkt. 3. As related to the preliminary injunction, Rodriguez asks the Court to enjoin Defendants from denying bond on the basis that he is detained under § 1225(b)(2) and to release him unless Defendants provide him with a bond hearing under § 1226(a) within fourteen days of the Court's order. Dkt. 3.

The parties met with the Court on April 2, 2025 and agreed on a briefing schedule. Dkt. 19. Defendants responded on April 14. Dkt 21. Plaintiff replied on April 17. Dkt. 25. The Court held oral argument on April 21, 2025. Dkt. 27.

Having considered the parties' briefs, the record, applicable law, and oral argument, the Court GRANTS Rodriguez's motion for preliminary injunction.

### III.      DISCUSSION

Defendants argue that Rodriguez's individual claims are unlikely to succeed on the merits, and thus his motion for preliminary injunction should be denied, because he has not exhausted his administrative remedies. Dkt. 21 at 13–19, 22. Rodriguez asserts that exhaustion is not required and that even if it were, the Court should waive exhaustion in his case. Dkt. 3 at 21–26; Dkt. 25 at 5–12.

The Court first addresses the parties' exhaustion arguments and finds that waiver of the prudential exhaustion requirement is warranted. The Court then addresses Rodriguez's preliminary injunction motion and concludes that Rodriguez has met the requirements for preliminary injunctive relief.

## A.    Exhaustion

The government contends that Rodriguez failed to exhaust his administrative remedies before pursuing relief in federal court. The parties agree that the exhaustion requirement for habeas claims brought under 28 U.S.C. § 2241 applies to this case. *See* Dkt. 3 at 21; Dkt. 21 at 13. For such claims, "[t]he exhaustion requirement is prudential, rather than jurisdictional[.]" *Hernandez*, 872 F.3d at 988 (citations omitted). In the Ninth Circuit, courts may require prudential exhaustion when:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Id.* (quoting *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007)). If a petitioner does not exhaust administrative remedies, "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies[.]" *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). However, "even if the three *Puga* factors weigh in favor of prudential exhaustion, a court may waive the prudential exhaustion requirement if 'administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'" *Hernandez*, 872 F.3d at 988 (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004)). "The party moving the court to waive prudential exhaustion requirements bears the burden of demonstrating that at least one of these *Laing* factors applies." *Aden v. Nielsen*, No.

C18-1441RSL, 2019 WL 5802013, at *2 (W.D. Wash. Nov. 7, 2019) (citing *Ortega-Rangel*, 313 F. Supp. 3d at 1003).

Here, the three *Puga* factors do not weigh in favor of requiring prudential exhaustion. On the first factor, Defendants argue that this case does not involve a "routine matter of statutory interpretation" because Rodriguez's argument that Section 1226 governs his detention relies at least in part on DHS's "longstanding practice." Dkt. 21 at 13–14 (citing Dkt. 3 at 15–16). Therefore, Defendants reason, the Court would benefit from the BIA's expertise. *See id.* Although the Court acknowledges the BIA's subject-matter expertise for individual immigration bond decisions, *see Aden*, 2019 WL 5802013, at *2, "an administrative appellate record is not necessary to resolve . . . purely legal questions," *Hernandez*, 872 F.3d at 989 (9th Cir. 2017). Here, Rodriguez's "claim[] raise[s] purely legal questions: namely, whether [Rodriguez] is entitled to a bond hearing under . . . 8 U.S.C. § 1226(a)[.]" *Birru v. Barr*, No. 20-CV-01285-LHK, 2020 WL 1905581, at *3–4 (N.D. Cal. Apr. 17, 2020); *see Jimenez v. Wolf*, No. 19-CV-07996-NC, 2020 WL 1082648, at *2 (N.D. Cal. Mar. 6, 2020) (finding that prudential exhaustion does not bar habeas petition in part because "[a]ll that remains is [a] legal question").

The task of resolving this question of statutory interpretation belongs to the independent judgment of the courts. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("When the meaning of a statute [is] at issue, the judicial role [is] to interpret the act of Congress, in order to ascertain the rights of the parties.") (internal quotation marks and citation omitted). Contrary to Defendants' arguments, consideration of agency practice does not take that task outside the realm of "routine" statutory interpretation. Instead, as the Supreme Court explained in *Loper Bright*, cases dating back centuries have considered "the longstanding practice of government" as they would "any other interpretive aid." *Id.* at 386 (quotation marks and citations omitted).

14

Regarding the second factor, Defendants argue that not requiring exhaustion would "encourage other detainees to bypass the BIA and directly appeal their no-bond determinations from the IJ to federal district court." Dkt. 21 at 14 (quoting *Aden*, 2019 WL 5802013, at *2) (internal quotations omitted). But *Aden* concerned a challenge to the application of an evidentiary standard to an individual bond determination. *Aden*, 2019 WL 5802013, at *2. Here, in contrast, Rodriguez seeks resolution of a legal question that will provide concrete guidance for future administrative proceedings. Although the instant motion is for individual injunctive relief, Dkt. 25 at 10, Rodriguez also seeks to certify a class of similarly situated detainees to obtain declaratory relief that they are not subject to mandatory detention under Section 1225(b)(2). *See generally* Dkt. 2. "[T]he discreteness of the legal question presented and plaintiff's request for classwide relief suggest that relaxing the exhaustion requirement in this case will not encourage future habeas petitioners to bypass the administrative scheme, as the issue here will not arise again (at least in this District) once the Court rules on it[.]" *Rivera v. Holder*, 307 F.R.D. 539, 551 (W.D. Wash. 2015); *see also Hernandez*, 872 F.3d at 989 (waiving prudential exhaustion requirement in part "because, once the questions presented here are decided, they should cease to arise") (cleaned up). The Court similarly finds that, rather than encouraging other detainees to bypass the administrative process, adjudicating Rodriguez's case may answer a recurring legal question and thus reduce the number of future habeas petitions.

The third factor, whether the BIA is "likely . . . to correct its own mistakes," is a closer call. *See Hernandez*, 872 F.3d at 989. Defendants point out that the outcome Rodriguez desires— overturning the IJ's mandatory detention ruling and receiving an individualized bond determination—has occurred twice through the BIA appeals process for similarly situated noncitizens. Dkt. 21 at 15; *see* Dkt. 4-1 at 4–5; Dkt. 4-2 at 2–4. Defendants argue that the BIA reversals show that "[t]he BIA is capable of correcting the error that [Rodriguez] alleges

15

occurred in h[is] bond hearing." *Reyes v. Wolf*, No. C20-0377JLR, 2021 WL 662659, at *3 (W.D. Wash. Feb. 19, 2021), *aff'd sub nom. Diaz Reyes v. Mayorkas*, No. 21-35142, 2021 WL 3082403 (9th Cir. July 21, 2021); Dkt. 21 at 15; *cf. Hernandez*, 872 F.3d at 988 (finding that the third *Puga* factor weighed in favor of petitioner because "the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to administrative remedies would be[.]") (cleaned up).

Rodriguez does not dispute that the BIA could overturn the Tacoma IJ's determination in his individual appeal. But the *Puga* factors ask whether "administrative review is likely to allow the agency to correct its own mistakes *and* to preclude the need for judicial review." *Hernandez*, 872 F.3d at 988 (quoting *Puga*, 488 F.3d at 815) (emphasis added). Throughout his briefing, Rodriguez explains why the BIA's previous efforts to correct its own mistakes have not eliminated the need for judicial review of the question presented. Dkt. 3 at 7–8, 23–27. Although the BIA has issued two unpublished decisions reversing similar mandatory detention orders, the record submitted by Rodriguez—and not disputed by the government—shows that the challenged practice of the Tacoma IJs has continued. Dkt. 5 ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. And the BIA has denied a request to publish one of those decisions as precedent. Dkt. 4-4 at 2. As a result, even if the BIA corrects the alleged error in Rodriguez's individual case, it likely will not preclude the need for further judicial review, whether in this putative class action or future cases. *See* Dkt 5 ¶ 11 ("The IJs' disregard for the BIA's order only further demonstrates that appeals to the BIA are not a viable mechanism in this particular circumstance to ensure that Tacoma IJs adhere to the law."). Although the application of this *Puga* factor is admittedly unclear in the context of a recurring legal question for which classwide relief is sought, the Court finds that on the record here, this factor is neutral. On balance, the *Puga* factors do not support requiring prudential exhaustion.

16

Even if the *Puga* factors weighed in favor of prudential exhaustion, the Court can still waive the requirement if "'administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void.'" *Hernandez* 872 F.3d at 988 (quoting *Laing*, 370 F.3d at 1000). "The party moving the court to waive prudential exhaustion requirements bears the burden of demonstrating that at least one of these *Laing* factors applies." *Aden*, 2019 WL 5802013, at *2. Rodriguez has done so here by showing irreparable injury.

Rodriguez argues that requiring exhaustion will result in irreparable injury because he will not have a meaningful opportunity to show his entitlement to bond under Section 1226 if he is forced to wait for BIA review of the IJ's mandatory detention ruling. Dkt. 3 at 22–23; Dkt. 25 at 5–8. Rodriguez contends that the BIA appeals process typically "takes over half a year" for bond appeals, which he supports with EOIR data showing an average processing time of 204 days for bond appeals in 2024. Dkt. 3 at 24; Dkt. 7 ¶ 5. Rodriguez also submits evidence based on EOIR data that 200 bond appeal cases "took a year or longer to resolve." Dkt. 7 ¶ 6. And the record demonstrates that in the time it takes for the BIA to resolve an appeal, many detainees' claims are mooted—sometimes because ICE exercises its own authority to place a detainee on bond, but sometimes because the detainee is ordered removed while the bond appeal is pending. Dkt. 5 ¶ 5.

Although Defendants point out that the BIA set an April 17, 2025 deadline for the parties' appeal briefs, they do not dispute Rodriguez's evidence of the protracted nature of BIA appeals. *See* Dkt. 21 at 17–18; Dkt. 22 at 23. Defendants argue instead that the Court should reject Rodriguez's claim that "detention alone creates irreparable harm," Dkt. 21 at 15, "[b]ecause all immigration habeas petitioners could raise the same argument[.]" *Delgado v. Sessions*, No. C17-1031-RSL-JPD, 2017 WL 4776340, at *2 (W.D. Wash. Sept. 15, 2017),

*report and recommendation adopted*, No. C17-1031-RSL, 2017 WL 4700360 (W.D. Wash. Oct. 19, 2017).

This argument is unpersuasive for two reasons. First, the Ninth Circuit has previously held that irreparable harm is demonstrated when "at least some individuals who would be detained if not provided a bond hearing will be granted conditional release under [the proposed] injunction." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Here, the uncontested evidence provided by Rodriguez shows it is very likely he will be granted conditional release if given a bond hearing. Rodriguez has lived in Washington state and worked in the agriculture sector since 2009. Dkt. 9 ¶¶ 3, 7. He owns his own home, and has strong family ties to his Grandview community, where his wife, four children, and ten U.S. citizen grandchildren all live. *Id.* ¶¶ 3–4. He has never been arrested for, charged with, or convicted of a crime. *Id.* 9 ¶ 8. His bond request was supported by his employer and the pediatrician for one of his grandchildren, who has a complex medical condition and for whom Rodriguez is a caregiver. Dkt. 26-3 at 37–38, 46. Like the plaintiffs in *Rodriguez v. Robbins*, it is very likely that the only thing preventing Rodriguez from conditional release pending the outcome of the removal proceedings is the alleged statutory violation. *See also Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018) (waiving exhaustion where detainee "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention") (citation omitted).

Second, the Court finds that "although some of the effects of detention on [Rodriguez] are 'the same type of harm any person who is detained may suffer, they are [nonetheless] irreparable in nature.'" *Marroquin Ambriz v. Barr*, 420 F. Supp. 953, 962 (N.D. Cal. 2019) (quoting *Lopez Reyes v. Bonnar*, No. 18-CV-07429-SK, 2018 WL 7474861, at *7 (N.D. Cal. Dec. 24, 2018). The Ninth Circuit has recognized "the irreparable harms imposed on anyone

18

subject to immigration detention." *Hernandez*, 872 F.3d at 995 ("For example . . . subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained."). And district courts in this circuit have routinely waived prudential exhaustion requirements for noncitizens like Rodriguez facing prolonged detention while awaiting administrative appeals. *See, e.g., Montoya Echeverria v. Barr*, No. 20-CV-02917-JSC, 2020 WL 2759731, at *6 (N.D. Cal. May 27, 2020), *Marroquin Ambriz*, 420 F. Supp. 3d at 961–62 (N.D. Cal. 2019), *Ortega-Rangel*, 313 F. Supp. 3d at 1003–04, *Cortez*, 318 F. Supp. 3d at 1138–39; *Villalta v. Sessions*, No. 17-CV-05390-LHK, 2017 WL 4355182, at *3–4 (N.D. Cal. Oct. 2, 2017); *Lopez Reyes*, 2018 WL 7474861, at *6–7, *Rios-Troncoso v. Sessions*, No. CV1701492PHXDGCMHB, 2017 WL 3838686, at *3 (D. Ariz. Sept. 1, 2017), *Birru v. Barr*, No. 20-CV-01285-LHK, 2020 WL 1905581, at *3–4 (N.D. Cal. Apr. 17, 2020).

Rodriguez has also presented uncontested evidence of unique harm to him. He has several health issues that require daily medication, which he did not receive for over a week after being detained. Dkt. 9 ¶ 10. This resulted in "horrible headaches," inflammation of his feet, and "significant pain in [his] stomach." *Id*. Rodriguez states that since his detention, his "health has declined significantly." *Id.* ¶ 13. He also describes the "extreme difficult[y]" of being away from his wife, four children, and ten grandchildren. *Id.* ¶ 9. Rodriguez has lived in the United States for over 15 years without a criminal record and being detained for the first time has been "incredibly tough" for him and his family. *Id.* ¶¶ 3, 8, 9. As discussed above, Rodriguez is a significant caregiver to one of his grandchildren, whose congenital heart valve defect requires him to drive her to regular medical appointments in Spokane. *Id.* ¶ 9; *see also* Dkt. 26-3 at 37–38. Finally, Rodriguez states that because his family "cannot afford to hire an attorney" to defend him from deportation, he is "extremely worried . . . that being detained will make it much

harder to gather evidence and prepare [his] case." Dkt. 9 ¶¶ 14–15. He notes that the burden is particularly felt by his wife who is "already doing so much to help keep [their] family afloat without [him]." *Id.* ¶ 14.

Defendants attempt to distinguish case law in this circuit that supports a finding of irreparable injury by emphasizing that petitioners in those cases faced longer periods of detention before waiver was granted. Dkt. 21 at 17–18. Although Defendants are generally correct, district courts have waived exhaustion based on irreparable injury for petitioners similarly situated to Rodriguez. *See, e.g., Ortega-Rangel*, 313 F. Supp. 3d at 1003–04 (irreparable injury where petitioner had lived in the United States for 18 years with no criminal record, had been detained for three months, was a caregiver to her 9-year-old child, and alleged that detention would harm her upcoming defense). And district courts in this circuit have consistently emphasized that waiver of exhaustion is appropriate where there is "the potential for irreparable harm to Petitioner, in the form of continued unlawful denial of bond hearings for potentially four months or more[.]" *Villalta*, 2017 WL 4355182, at *3–4 (cleaned up); *Cortez*, 318 F. Supp. 3d at 1138–39 (same);  *Ortega-Rangel*, 313 F. Supp. 3d at 1003–04 (same); *Lopez Reyes*, 2018 WL 7474861, at *6–7 (similar).

Here, Rodriguez appealed the IJ's bond denial on March 13, 2025. Dkt. 9 ¶ 12. Based on Rodriguez's undisputed allegations and supported by evidence in the record, Rodriguez can reasonably expect to wait another five months or more for his appeal to be decided, at which time he will have been detained for over seven months. *See id.* ¶ 6. Although the Court acknowledges that the BIA could eventually grant his requested relief, Rodriguez "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention." *Cortez*, 318 F. Supp. 3d at 1139. Accordingly, this Court "follows the vast majority of other cases which have waived exhaustion based on

irreparable injury when an individual has been detained for months without a bond hearing, and where several additional months may pass before the BIA renders a decision on a pending appeal." *Marroquin Ambriz*, 420 F. Supp. 3d at 962 (citing cases).

## B.    Preliminary Injunction

The Court now turns to Rodriguez's motion for preliminary injunction. Dkt. 3. A preliminary injunction "is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (cleaned up).

"To obtain a preliminary injunction, a plaintiff must establish: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the public interest." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The movant must make a showing on each element of the *Winter* test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). However, "where the 'balance of hardships . . . tips sharply towards the plaintiff,' a plaintiff need only show 'serious questions going to the merits,' rather than likelihood of success on the merits[.]" *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135)).

"[T]he mere allegations of a complaint" do not suffice to obtain a preliminary injunction, *Takiguchi v. MRI Int'l, Inc.*, 611 F. App'x 919, 921 (9th Cir. 2015) (citing *Winter*, 555 U.S. at 20), but the evidence submitted in support "need not strictly comply with the Federal Rules of Evidence." *CI Games S.A. v. Destination Films*, No. 2:16-cv-05719-SVW-JC, 2016 WL

9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Neither party here has challenged the evidence submitted in support or opposition to the motion and the underlying facts are undisputed. The parties' arguments focus instead on questions of law.

        *1.     Rodriguez is likely to succeed, or at least has shown serious questions, on the merits.*

Rodriguez is likely to succeed on the merits, or at the very least has raised "serious questions," of his claims that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and should instead be subject to Section 1226(a)'s discretionary detention scheme. *See Roman*, 977 F.3d at 941.

Rodriguez contests the immigration court's decision, pursuant to its ongoing practice or policy, that it lacks jurisdiction to redetermine his custody because he is an "inadmissible [noncitizen] who [is] an 'applicant[] for admission'" under Section 1225. *See* Dkt. 22 at 16; *see also* Dkt. 5-2 at 3 (denying bond to a noncitizen similarly situated to Rodriguez on jurisdictional grounds and stating that Section 1225(b)(2)(A) "mandates the detention of all inadmissible noncitizens."); Dkt. 5 ¶¶ 3–5 (describing history of practice at Tacoma Immigration Court). Rodriguez first argues that both Section 1226's plain text and recent amendments make clear that he is subject to its provisions, not Section 1225(b). Dkt. 3 at 9–14.

As the Ninth Circuit has observed, "divining [the] meaning . . . of [t]he complex provisions of the INA . . . is ordinarily not for the faint of heart." *Torres v. Barr*, 976 F.3d 918, 923 (9th Cir. 2020). Yet even when a statute is ambiguous or internally contradictory, courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright*, 603 U.S. at 400. The Court begins its analysis with the statute's plain text. *See Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017) ("Our analysis begins with the language of the

22

statute."); *Shulman v. Kaplan*, 58 F.4th 404, 410 (9th Cir. 2023) ("As always, we begin with the

statute.").

> ### a)     The plain text of Section 1226(a) applies to inadmissible noncitizens like Rodriguez.

As described above, Section 1226(a) authorizes that "on a warrant issued by the Attorney

General, a[] [noncitizen] may be arrested and detained pending a decision on whether the

[noncitizen] is to be removed from the United States." "Except as provided in subsection (c),"

when a noncitizen is arrested under Section 1226(a), the Attorney General may detain him or

release him on bond or conditional parole. 8 U.S.C. § 1226(a)(1)–(2). This process includes the

right to a bond hearing before an immigration judge. *See* 8 C.F.R. § 1236.1(d). At that hearing,

the noncitizen may present evidence of their ties to the United States, lack of criminal history,

and other factors that show they are not a flight risk or danger to the community. *See generally*

*In re Guerra*, 24 I. & N. Dec. at 40; *see also Martinez v. Clark*, 124 F.4th 775, 783 (9th Cir.

2024) (discussing *Guerra* factors).

Section 1226(c) then "carves out a statutory category of [noncitizens] who may *not* be

released under § 1226(a)." *Jennings*, 583 U.S. at 289. This subsection mandates detention for a

noncitizen "who falls into one of several enumerated categories involving criminal offenses and

terrorist activities." *Id.* Importantly, the plain text of Section 1226(c) includes noncitizens who

are "inadmissible" (meaning they have not been admitted to the United States) as well as those

who are "deportable" (meaning they were previously admitted to the United States).[2] *See* §§

1226(c)(1)(A), (D), (E). For example, Section 1226(c) requires detention for a noncitizen who is

---

[2] Generally, grounds for "deportability" (found in 8 U.S.C. § 1227) apply to people who have previously been admitted, such as lawful permanent residents, while grounds of inadmissibility (found in 8 U.S.C. § 1182) apply to those who have not been admitted to the United States. *See Barton v. Barr*, 590 U.S. 222, 234 (2020).

both inadmissible because he is "present in the United States without being admitted or paroled" *and* "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements" of certain crimes. §§ 1226(c)(1)(E); 1182(a)(6)(A)(i).

A plain reading of this exception implies that the default discretionary bond procedures in Section 1226(a) apply to a noncitizen who, like Rodriguez, is present without being admitted or paroled but *has not been* implicated in any crimes as set forth in Section 1226(c). *See* § 1226(a) (Attorney General may release noncitizen on bond "except as provided in subsection (c)"). As the Supreme Court has recognized, when Congress creates "specific exceptions" to a statute's applicability, it "proves" that absent those exceptions, the statute generally applies. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010). This lends strong textual support to Rodriguez's position that "inadmissible" noncitizens like himself are included within Section 1226. *See id*; Dkt. 5-2 at 3.

But this plain reading of Section 1226 conflicts with the IJ's plain reading of Section 1225. Section 1225(a)(1) states that "a[] [noncitizen] present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." Section 1225(b)(2)(A) then states that "in the case of a[] [noncitizen] who is an applicant for admission, if the examining immigration officer determines that a[] [noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] shall be detained for a proceeding under section 1229a of this title." According to the IJ, a plain reading of this text requires that all inadmissible noncitizens present in the United States be subject to mandatory detention pending removal proceedings. *See* Dkt. 22 at 17 (Section 1225(b)(2)(A) "is quite clear that anyone who meets the definition of an applicant for admission and is not covered

24

under another provision of [Section 1225] shall be detained[.]") (internal quotation marks omitted).

How then to resolve this potential conflict between the plain text of Sections 1225 and 1226? Rodriguez argues that the phrase "a[] [noncitizen] seeking admission" in Section 1225(b)(2)(A) should be read to narrow mandatory detention under that subsection to noncitizens who are apprehended while seeking to enter the country, and that noncitizens "already residing in the United States," including "those who are charged with inadmissibility," continue to fall under the discretionary detention scheme in Section 1226. Dkt. 3 at 11. In support of this argument, Rodriguez points to traditional canons of statutory construction, the recent Laken Riley Act amendments to Section 1226, the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), and the longstanding practice of the agency. For its part, the government's opposition to the motion for preliminary injunction does not take a substantive position on how to interpret the statute, instead arguing only that "[a]ny ambiguity in the statute that may place Plaintiff's detention authority outside of § 1225 should be determined first by the BIA" while recognizing that Plaintiff has at least raised "serious questions" going to the merits. Dkt. 21 at 19, 20.[3] At this stage of the case, Rodriguez has the better argument.

---

[3] At oral argument, counsel for the government stated for the first time that they believe "the IJs in Tacoma got the law right" and suggested they could address the merits in supplemental briefing. *See* Dkt. 27. To the extent Defendants wished to brief the merits of the statutory argument for this motion, they had the opportunity to do so in their response. Because they did not, the Court will not grant Defendants another opportunity to do so at this juncture. *See West v. State Farm Mut. Auto. Ins. Co.*, 489 F. App'x 153, 154 (9th Cir. 2012) (observing "that [i]ssues not raised in the opening brief usually are deemed waived.") (cleaned up). As this order grants only preliminary relief to Mr. Rodriguez, however, the government will have a full opportunity to brief the statutory interpretation question as the case proceeds.

### b)      Canons of statutory construction support Rodriguez's interpretation of Sections 1226 and 1225.

Rodriguez argues that his interpretation is supported by two traditional canons of statutory construction: that statutes should be construed as a whole, giving effect to all their provisions; and that recent amendments to a statute should be read in harmony with an agency's longstanding construction. *See* Dkt. 3 at 10–13. The Court agrees that both canons support applying Section 1226 to Rodriguez.

*First*, if the Court were to adopt the reading of Section 1225 advanced by the Tacoma IJs, it would render significant portions of Section 1226(c) meaningless. *See* Dkt. 22 at 20 (justifying Rodriguez's bond denial based on the IJ's interpretation that Section 1225 "applies to applicants for admission" and Section 1226 "applies only to those who have been admitted."). Under "one of the most basic interpretive canons . . . [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up); *Shulman*, 58 F.4th at 410–11 ("a court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (cleaned up). "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).

Here, if the immigration court's interpretation of Section 1225 is correct and its mandatory detention provisions apply to "all noncitizens who have not been admitted," Dkt. 5-4 at 2–3, then it would render superfluous provisions of Section 1226 that apply to certain categories of inadmissible noncitizens. *See* § 1226(c)(1)(A), (D), (E); *Shulman*, 58 F.4th at 410–11; *see also Torres*, 976 F.3d at 930 (noting in the context of interpreting inadmissibility grounds

"that a contrary reading would render other provisions of the immigration code superfluous."). Put another way, Section 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless since "all noncitizens who have not been admitted" would already be governed by 1225's mandatory detention authority. *See* § 1225(a)(1); § 1182(a)(6)(A)(i); Dkt. 5-4 at 2–3; *Shulman*, 58 F.4th at 410–11; *see also Corley*, 556 U.S. at 314, n.5 (explaining that seemingly conflicting statutes read in isolation can be reconciled if read in their broader context, which includes observing the antisuperfluousness canon).

Although it does not directly address the question presented, the Supreme Court's opinion in *Jennings* also lends some support to Rodriguez's proposal for harmonizing Sections 1225 and 1226. In *Jennings*, the Court framed its discussion of Section 1225 as part of a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether a [noncitizen] seeking to enter the country is admissible." 583 U.S. at 287. Then, when discussing Section 1226, *Jennings* describes it as governing "the process of arresting and detaining" noncitizens who are living "inside the United States" but "may still be removed," including noncitizens "who were inadmissible at the time of entry." *Id.* at 288. The Court then summarizes the distinction as follows: "In sum, U.S. immigration law authorizes the Government to detain certain [noncitizens] *seeking* admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289 (emphasis added); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (a noncitizen "who *tries to enter* the country illegally is treated as an applicant for admission . . .

27

and a [noncitizen] who is detained *shortly after unlawful entry* cannot be said to have effected an entry") (emphasis added) (cleaned up).

    *Second*, it is important that some of the exceptions in Section 1226(c) that would be made superfluous by the IJ's reading were enacted by Congress just months ago. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) (citations omitted) (giving effect to a congressional amendment of the INA). Congress passed the LRA in January 2025 amending several provisions of the INA, including Sections 1226 and 1225. *See* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025). Relevant to this case, the LRA carved out an additional category of noncitizens from Section 1226(a)'s discretionary detention scheme who will now fall under Section 1226(c)'s mandatory detention authority. *Id*; *see Jennings*, 583 U.S. at 289. This category includes those noncitizens who are deemed inadmissible, including for being "present in the United States without being admitted or paroled," *and* who have been arrested, charged with, or convicted of certain crimes. § 1226(c)(1)(E); *see* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025); §1182(a)(6)(A)(i). These "specific exceptions" for inadmissible noncitizens who are arrested, charged with, or convicted of the enumerated crimes logically leaves those inadmissible noncitizens *not* criminally implicated under Section 1226(a)'s default rule for discretionary detention. *See Shady Grove Orthopedic Assocs., P.A.*, 559 U.S. at 400; *Jennings*, 583 U.S. at 289; *see also* Dkt. 4-6 at 2 (NTA issued to Rodriguez stating that he is a noncitizen "present in the United States who has not been admitted or paroled.").

    And as explained further below, *see infra* Section III.B.1.d, Congress enacted the LRA against the backdrop of longstanding agency practice applying Section 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative

construction,'" courts "generally presume the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 604 U.S. ___, Slip Op. at 12 (2025) (quoting *Haig v. Agee*, 453 U.S. 280, 297–298 (1981)). In *Monsalvo Velazquez*, while recognizing that "[i]n truth, the statute is susceptible to both understandings," the Supreme Court interpreted a deadline expressed in terms of "days" in Section 1229c of the INA to "extend deadlines falling on a weekend or legal holiday to the next business day," rather than counting "every calendar day." *Id.* at Slip Op. 11–12. The Court adopted this interpretation because Congress enacted the relevant subsection "against the backdrop of [a] consistent, longstanding administrative construction" giving this specialized meaning to the term "day." *Id.* at Slip Op. 13. Similarly, here, Congress adopted the new amendments to Section 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under Section 1226(a) to inadmissible noncitizens such as Rodriguez. It is therefore presumed that Congress intended "the same understanding." *See id.*

### c) *Legislative history from IIRIRA supports Rodriguez's interpretation of Section 1226.*

The legislative history behind Section 1226 also tends to support Rodriguez's argument that it governs noncitizens like himself that reside in the United States but previously entered without inspection.

Before IIRIRA passed, the predecessor statute to Section 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability . . . any [noncitizen] . . . may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the 'usual means of proceeding against a[] [noncitizen] already physically in the United States[.]'"). This predecessor statute, like Section

29

1226(a), included discretionary release on bond. *See* § 1252(a)(1) (1994) ("[A]ny such [noncitizen] taken into custody may, in the discretion of the Attorney General . . . be continued in custody . . . [or] be released under bond[.]"). Upon passing IIRIRA, Congress declared that the new Section 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond a[] [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; *see also* H.R. Rep. No. 104-828, at 210 (same). Because noncitizens like Rodriguez were entitled to discretionary detention under Section 1226(a)'s predecessor statute and Congress declared its scope unchanged by IIRIRA, this background supports Rodriguez's position that he too is subject to discretionary detention.

> **d)** *Longstanding agency practice supports Rodriguez's interpretation of Section 1226.*

The same is true for DHS's "longstanding practice" of treating noncitizens arrested while living in the United States, including those who entered without inspection, as detained under Section 1226(a). *See Loper Bright*, 603 U.S. at 386. "[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* (cleaned up). The Supreme Court has observed that respect for Executive Branch interpretations of federal statutes is "especially warranted when [it] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* (citing cases).

Rodriguez contends that "[f]or decades, and across administrations, DHS has acknowledged that § 1226(a) applies to individuals who entered the United States unlawfully, but who were later apprehended within the borders of the United States long after their entry." Dkt. 3 at 15. As an initial matter, Defendants did not oppose this assertion, either in their

response or at oral argument. *See generally* Dkt. 21; Dkt. 27. Rodriguez points to contemporaneous Executive Branch regulations issued to interpret and apply IIRIRA. *See* Dkt. 3 at 15–16; Dkt. 25 at 4. In a 1997 interim rule issued "to implement the provisions of [IIRIRA]," which had passed six months earlier, the Executive Branch agencies charged with enforcing the Nation's immigration laws directly addressed the detention scheme noncitizens like Rodriguez would be held under. *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Under the heading of "Apprehension, Custody, and Detention of [Noncitizens]," the agencies first stated that IIRIRA dictated a new $1,500 minimum bond amount for "non-criminal [noncitizens]." *Id*; *see also* § 1226(a)(2) (directing that the Attorney General "may release the [noncitizen] on . . . bond of at least $1,500[.]"). Then in the following sentence, the agencies explain that "[d]espite being applicants for admission, [noncitizens] who are present without having been admitted or paroled (formerly referred to as [noncitizens] who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997); *see also* Dkt. 4-6 at 2 (NTA stating that Rodriguez is a "[noncitizen] present in the United States who has not been admitted or paroled."). This guidance reflects the Executive Branch's attempt to reconcile the ambiguous and seemingly conflicting provisions of Section 1225 and 1226. *See Corley*, 556 U.S. at 314, n.5. While not subject to deference, the Court finds that this guidance and the agency's subsequent years of unchanged practice is persuasive. *See Loper Bright*, 603 U.S. at 386.

The two BIA cases overturning the Tacoma IJs' bond determinations, though limited, also support Rodriguez's position that the immigration court's approach conflicts with longstanding agency practice. The first unpublished decision involved a noncitizen "present in the United States, [that] ha[d] not been admitted, and that an immigration officer found . . . [was] not clearly and beyond a doubt entitled to be admitted." Dkt. 4-2 at 3. The Tacoma IJ determined that the individual was subject to mandatory detention under Section 1225(b)(2)(A). *Id.* at 2. The

Board remanded the case to the IJ, concluding that if the person was issued a warrant of arrest with a notice to appear, "he would be subject to detention under" Section 1226. *Id.* at 3; *see* Dkt. 26-2 at 4 (Rodriguez's I-213 identifying the "Disposition" as "Warrant of Arrest/Notice to Appear"). In the second unpublished decision concerning an individual who had entered the United States "without being admitted or paroled," the BIA stated that it was "unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the custody conditions of a respondent in removal proceedings under the circumstances here." Dkt. 4-1 at 4.

While the BIA has thus far not issued a precedential decision involving noncitizens present in the United States who have not been admitted, *see* Dkt. 4-4 at 2, the individual cases indicate that the Executive Branch agency tasked with interpreting immigration law would uphold "longstanding practice" that Rodriguez is detained under Section 1226(a), not Section 1225(b)(2). *See Loper Bright*, 603 U.S. at 386*; see also Biden v. Texas*, 597 U.S. 785, 805 (2022) (supporting its analysis of the statutory text and context behind a subsection of Section 1225(b)(2) by noting that "[s]ince IIRIRA's enactment 26 years ago, every Presidential administration has interpreted" it the same).

Rodriguez has shown that the text of Section 1226, canons of interpretation, legislative history, and longstanding agency practice indicate that he is governed under Section 1226(a)'s "default" rule for discretionary detention. *See Jennings*, 583 U.S. at 289. The Court is persuaded that Rodriguez is likely to succeed on the merits that he is unlawfully detained under Section 1225(b)(2)'s mandatory detention provision. At the very least, Rodriguez has raised "serious questions going to the merits," *see Roman*, 977 F.3d at 941, a point even Defendants concede. Dkt. 21 at 14 ("Where, as here, the moving party only raises 'serious questions going to the merits . . . .'") (citation omitted). Accordingly, Rodriguez is entitled to injunctive relief if he can prove the other *Winter* elements. *See Roman*, 977 F.3d at 941 (9th Cir. 2020).

32

2. *Rodriguez has established a likelihood of irreparable harm.*

Rodriguez faces irreparable harm in the absence of a preliminary injunction. As discussed in the context of Defendants' opposition to an injunction on exhaustion grounds, *see supra* Section III.A, Rodriguez "suffers potentially irreparable harm every day that he remains in custody without a hearing, which could ultimately result in his release from detention." *Cortez*, 318 F. Supp. 3d at 1139. This is amplified by the Ninth Circuit's recognition that irreparable harm is present when "at least some individuals who would be detained if not provided a bond hearing will be granted conditional release under [the proposed] injunction." *Rodriguez v. Robbins*, 715 F.3d at 1145. The record shows that Rodriguez is very likely to be granted conditional release if afforded a bond hearing. *See generally* Dkt. 26-3; *Rodriguez Diaz*, 53 F.4th at 1197 (noting that an IJ will order a detainee released on bond if the person is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk[.]") (quoting *In re Guerra*, 24 I. & N. Dec. at 40). Because Defendants are denying Rodriguez a hearing that would likely result in his release, he has established irreparable harm absent injunctive relief.

3. *The balance of equities and public interest favor granting a preliminary injunction.*

The remaining two factors for a preliminary injunction—the balance of equities and public interest—"merge" when the government is the opposing party. *Baird*, 81 F.4th at 1040 (quoting *Nken*, 556 U.S. at 435). When "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)). "[I]n addition to [evaluating] the potential hardships facing Plaintiff[] in the absence of the injunction, the court

33

'may consider . . . the indirect hardship to their friends and family members.'" *Id.* (quoting *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). Finally, the Ninth Circuit has recognized that "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022) (holding that the district court did not abuse its discretion that the balance of hardships weighed in favor of plaintiffs who credibly alleged that the government was violating the INA).

The harm to the government here is minimal. Defendants contend that the balance of equities tips in their favor because "the government has a compelling interest in the steady enforcement of its immigration laws" and that "[j]udicial intervention would only disrupt the status quo." Dkt. 21 at 21 (citation omitted). This includes, Defendants argue, the opportunity for the BIA to review and correct IJ decisions. *Id.* at 21–22. But this argument ignores the undisputed record that the practice Rodriguez seeks to enjoin is an outlier to the government's longstanding interpretation and enforcement of its immigration laws. *See supra* Sec. III.B.1.d. Further, "[a]n interpretation of status quo as the moment before filing a lawsuit but after alleged misconduct began 'would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun.'" *Doe v. Noem*, No. 2:25-CV-00633-DGE, 2025 WL 1141279, at *9 (W.D. Wash. Apr. 17, 2025) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)) (cleaned up). And as Rodriguez's undisputed evidence demonstrates, BIA review has failed to provide meaningful relief to noncitizens like Rodriguez subject to mandatory detention under the Tacoma IJs' interpretation. *See* Dkt. 5 ¶¶ 3, 5, 11; Dkt. 8 ¶¶ 4–5.

In contrast, the hardships faced by Rodriguez and the public interest in granting injunctive relief weigh strongly in his favor. Detention has separated Rodriguez from his family,

34

harmed his physical and mental health, and made it harder to access legal representation to defend against removal. Dkt. 9 ¶¶ 9–10, 13–15. In addition to Rodriguez's own hardships, his family has experienced increased financial, caregiving, and emotional burdens in the wake of his detention. *Id.* ¶¶ 9, 14–15; Dkt. 26-3 at 38; *see Hernandez*, 872 F.3d at 996. Because the Court has also found it likely that the Tacoma IJ has unlawfully detained Rodriguez under Section 1225(b)(2), "neither equity nor the public's interest are furthered" by detaining Rodriguez without the opportunity for release on bond. *See Galvez*, 52 F.4th at 832. Here, the balance of equities "tips sharply towards" Rodriguez. *See Roman*, 977 F.3d at 941 (citation omitted). Thus, even under a lesser showing that Rodriguez has raised only "serious questions going to the merits" of his statutory argument, injunctive relief is warranted. *See id.* Accordingly, the Court finds that Rodriguez is entitled to a preliminary injunction.

4.   *A bond hearing will redress Plaintiff's specific harm.*

The Court will grant Rodriguez's requested relief for a bond hearing. Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (cleaned up). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown[.]" *Id.* (citation omitted). Rodriguez argues in his reply for the first time that this Court should order his immediate release. Dkt. 25 at 2. The Court finds that the specific harm Rodriguez alleges—that he is unlawfully barred from receiving a bond hearing on the merits—is remedied by granting his request for a bond hearing under Section 1226(a) and enjoining Defendants from denying bond on the basis that he is detained under Section 1225(b)(2).

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that Rodriguez is likely to succeed on the merits, or at least has raised serious questions, that he is unlawfully detained under Section 1225(b)'s mandatory detention authority and instead should be governed under Section 1226(a)'s discretionary detention scheme. Because he has also shown irreparable harm, that the balance of hardships tips sharply in his favor, and that he need not exhaust administrative remedies, the Court GRANTS Rodriguez's motion for preliminary injunction (Dkt. 3). The Court further ORDERS that:

(1) Defendants must provide Rodriguez with a bond hearing under 8 U.S.C. § 1226(a) within fourteen days of this Order;

(2) Defendants are enjoined from denying bond to Rodriguez on the basis that he is detained pursuant to 8 U.S.C. § 1225(b)(2);

(3) Defendants must record the hearing provided in connection with this Order.

Dated this 24th day of April, 2025.

Tiffany M. Cartwright
United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RAMON RODRIGUEZ VAZQUEZ, on behalf of himself as an individual and on behalf of others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>DREW BOSTOCK, et al,<br><br>        Defendants. | Case No. 3:25-cv-05240-TMC<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION |

## I.    INTRODUCTION

This case arises from a practice by the Tacoma Immigration Court of interpreting the Immigration and Nationality Act ("INA"). The practice mandates detention without the possibility of bond for noncitizens who entered the United States without inspection, even if they have lived here for years. Plaintiff Ramon Rodriguez Vazquez ("Rodriguez") is a noncitizen resident of Grandview, Washington who is currently detained at the Northwest Ice Processing Center ("NWIPC"). Rodriguez seeks to challenge, on behalf of himself and classes of similarly situated noncitizens, the bond denial practice at the Tacoma Immigration Court and chronic delays in administrative appellate review of bond denials by the Board of Immigration Appeals. *See* Dkt. 1. On April 24, 2025, the Court granted Rodriguez's individual motion for a

37

preliminary injunction and ordered Defendants to provide him a bond hearing within 14 days. Dkt. 29. The Court now considers Rodriguez's motion for class certification. Dkt. 2. For the reasons explained below, the Court GRANTS in part and DENIES in part the motion for class certification.

## II.    FACTUAL BACKGROUND

Plaintiff Ramon Rodriguez Vasquez is detained at the Northwest Ice Processing Center ("NWIPC"). Dkt. 1 ¶¶ 1, 17; Dkt. 9 ¶ 2. Defendants are various immigration officials, including Drew Bostock, Seattle Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement ("ICE"); Bruce Scott, Warden at NWIPC; Kristi Noem, Secretary of the United States Department of Homeland Security ("DHS"); the United States Department of Homeland Security; Pamela Bondi, Attorney General of the United States; the Executive Office of Immigration Review ("EOIR"); Sirce Owen, Acting Director, EOIR; and the Tacoma Immigration Court. Dkt. 1 ¶¶ 18–25.

On behalf of himself and the classes that he seeks to represent, Rodriguez has challenged Defendants' policy on bond hearings and related appeals. *Id.* ¶¶ 1, 10–12. Specifically, Rodriguez claims that he is detained at NWIPC because of a policy adopted by the immigration judges (IJs) at the Tacoma Immigration Court. *Id.* ¶ 1. He alleges that the Tacoma Immigration Court IJs, save for one, have "adopted a practice of denying all requests for release on bond by noncitizens in removal proceedings who entered the United States without inspection, including . . . those who have lived here for decades." *Id.* ¶ 2. Rodriguez maintains that the policy prevents him and others from being released on bond during civil immigration proceedings. *Id.* ¶ 1. Further, he alleges that delays in consideration of the bond denials by the Board of Immigration Appeals ("BIA") deprive detainees of meaningful review of those denials. *Id.* ¶ 6–8.

38

## A.    The INA's Statutory Structure for Bond Hearings

The Tacoma Immigration Court IJs apply and enforce the Immigration and Nationality Act ("INA"). The INA "authorizes the detention of [noncitizens][1] awaiting removal from the United States." *De Paz Sales v. Barr*, No. 19-CV-07221-KAW, 2020 WL 353465, at *4 (N.D. Cal. Jan. 21, 2020) (quoting *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1000 (N.D. Cal. 2018)). The INA prescribes several bases for detention of noncitizens in removal proceedings. Dkt. 1 ¶ 26.

First, Section 1226 "provides the general process for arresting and detaining [noncitizens] who are present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022). Section 1226(a) "sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of a[] [noncitizen] 'pending a decision on whether the [noncitizen] is to be removed from the United States.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting 8 U.S.C. § 1226(a)). Except as provided in Section 1226(c),[2] "the Attorney General 'may release' a[] [noncitizen] detained under § 1226(a) 'on . . . bond' or 'conditional parole.'" *Id.* (quoting 8 U.S.C. § 1226(a)(1)–(2)).

"When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." *Rodriguez Diaz*, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). "[A] detainee may [then] request a bond hearing before an IJ at any time before a removal order becomes final." *Id.* at 1197 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). An IJ "must consider whether the

---

[1] "This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

[2] Section 1226(c) "carves out a statutory category" of noncitizens for whom detention is mandatory, comprised of individuals who have committed certain "enumerated . . . criminal offenses [or] terrorist activities." *Jennings,* 583 U.S. at 289 (citing 8 U.S.C. § 1226(c)(1)). Among the individuals carved out and subject to mandatory detention are certain categories of "inadmissible" noncitizens. § 1226(c)(1)(A), (D), (E).

detainee 'is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk.'" *Delgado v. Sessions*, No. C17-1031-RSL-JPD, 2017 WL 4776340, at *2 (W.D. Wash. Sept. 15, 2017), *report and recommendation adopted*, No. C17-1031-RSL, 2017 WL 4700360 (W.D. Wash. Oct. 19, 2017) (citing *In re Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). The IJ "considers various factors in making [a bond] determination, including the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country." *Rodriguez Diaz*, 53 F.4th at 1197 (citing *Guerra*, 24 I. & N. Dec. at 40). In sum, under Section 1226(a) detention, an individual is entitled to a bond hearing if they have not been arrested, charged with, or convicted of certain crimes that require mandatory detention under Section 1226(c). And a detainee can also appeal an adverse decision to the BIA. *Id.* (citing 8 C.F.R. § 236.1(d)(3)).

Section 1225(b) "supplement[s] § 1226's detention scheme." *Rodriguez Diaz*, 53 F.4th at 1197. Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297; *see* § 1225(b) ("Inspection of applicants for admission"). Section 1225 defines an "applicant for admission" as a "[noncitizen] present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1); *see Jennings*, 583 U.S. at 287. As the Supreme Court has noted, "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." *Jennings*, 583 U.S. at 287 (quoting § 1225(a)(3)).

Section 1225(b)(1) concerns the "[i]nspection of [noncitizens] arriving in the United States and certain other [noncitizens] who have not been admitted or paroled." Specifically, "Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible" based on Sections 1182(a)(6)(C) (misrepresentation) and 1182(a)(7) (lack of valid documentation) and

"certain other [noncitizens] designated by the Attorney General[.]" *Jennings*, 583 U.S. at 287

(citing § § 1225(b)(1)(A)(i), (iii)). Individuals that fall under Section 1225(b)(1) are "normally

ordered removed 'without further hearing or review' pursuant to an expedited removal process"

unless claiming asylum or fear of persecution. *Id.* (first quoting § 1225(b)(1)(A)(i)); then citing

§ 1225(b)(1)(A)(ii)).

Section 1225(b)(2) concerns the "[i]nspection of other [noncitizens]." Section 1225(b)(2)

"mandates detention 'if the examining immigration officer determines that a[] [noncitizen]

seeking admission is not clearly and beyond a doubt entitled to be admitted[.]'" *Rodriguez Diaz*,

53 F.4th at 1197 (quoting § 1225(b)(2)(A)). In sum, noncitizens detained under

Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while

those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time

before entry of a final removal order.

**B.    The Tacoma Immigration Court's Interpretation of the INA and Denial of Bond
Hearings**

As noted above, the most relevant portions of the INA here are Sections 1226(a) and

1225(b)(2). Dkt. 1 ¶ 30. After the provisions at 1226(a) and 1225(b)(2) were enacted, EOIR

promulgated guidance that, "in general, people who entered the country without inspection were

not considered detained under § 1225 and . . . were instead detained under § 1226(a)." *Id.* ¶ 32

(citing 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997)). Subsequently, "most people who entered

without inspection—unless they were subject to some other detention authority—received bond

hearings." *Id.* ¶ 33. Rodriguez claims that this practice reflected "many more decades of prior

practice, in which noncitizens who were not deemed 'arriving' were entitled to a custody hearing

before an IJ or other hearing officer." *Id.* (first citing 8 U.S.C. § 1225(a); and then citing H.R.

Rep. No. 104-469, pt. 1 at 229 (1996)).

41

But, Rodriguez alleges, in 2022 the IJs at the Tacoma Immigration Court "abruptly departed from their policy of holding bond hearings for individuals who entered the United States without inspection." *Id.* ¶ 34. The IJs "began holding that they lacked jurisdiction to hold bond hearings for all such individuals," reasoning that "the mandatory detention provision of § 1225(b)(2)(A) applies to people who enter without inspection because that subparagraph of the statute references 'applicant[s] for admission.'" *Id.* ¶¶ 34–35. The IJs thus applied the mandatory detention provisions to all individuals subject to grounds for inadmissibility. Consequently, "all noncitizens detained at NWIPC who have entered the United States without inspection and are subject to the grounds of inadmissibility, including long-time U.S. residents, are now considered to be in mandatory detention under § 1225(b) and ineligible for bond." *Id.* ¶ 36.

Rodriguez argues that the differences between the Tacoma Immigration Court's bond granting rates and those of other immigration courts highlight the IJs' disparate interpretation of the law. Statistics show that IJs in Tacoma deny bond hearings at higher rates than their counterparts in other immigration courts. *Id.* ¶ 54; Dkt. 7. In 2023, for example, the rate of granted bonds was just three percent. Dkt. 1 ¶ 54; *see also* Transactional Records Access Clearinghouse ("TRAC"), *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*, https://tracreports.org/reports/722/ (July 19, 2023). So far in 2025, 13 bond cases were granted, 126 were denied, and 65 were withdrawn. Dkt. 1 ¶ 55. This is 6 percent of bonds. *Id.* Rodriguez alleges that "many of the 'withdrawn' decisions occur in cases where the IJ indicates he or she will deny on jurisdiction because 8 U.S.C. § 1225(b)(2) applies." *Id.* And, Rodriguez claims, "these numbers likely mask the true rate of denial, as many noncitizens likely forgo seeking bond in the first place because they know the IJ will conclude there is no jurisdiction to set bond." *Id.*

42

Thus, Rodriguez concludes, "[o]ver the past few years, IJs at the Tacoma Immigration Court have deprived dozens and likely hundreds of noncitizens detained at NWIPC of their right to be released on bond[.]" *Id.* ¶ 5.

Attorneys for other similarly situated detainees have attested that they "had around twenty-five clients who were subject to the Tacoma Immigration court's practice" of requiring "mandatory detention of individuals who entered without inspection and who have since resided in the United States." Dkt. 6 ¶ 3; *see also* Dkt. 5 ¶ 4 ("Since November 2022, NWIRP attorneys focused on representing individuals detained at the Northwest ICE Processing Center in Tacoma, Washington have represented individuals in at least 12 cases where an IJ denied a bond, citing § 1225(b)(2)'s mandatory detention provision. In all of these cases, the person was denied a bond even though the individual was present in the United States, was not identified as 'arriving,' was not apprehended shortly after entering, and was placed in standard removal proceedings under 8 U.S.C. § 1229a.").

Thus, these attorneys' "clients have not been able to get bonds set by the immigration judges in [T]acoma. All of these clients were placed in regular removal proceedings under 8 U.S.C. § 1229(a) and were not in expedited removal proceedings, reinstatement proceedings, or withholding only proceedings." Dkt. 6 ¶ 3. And those attorneys have also attested that they had "many other clients or potential clients decline to hire [them] or decline to seek a bond hearing because they knew there was no hope to obtain release." *Id.* ¶ 4.

## C.    The BIA's Review of Bond Denials

Rodriguez also argues that the appeals process affords little relief for those wrongfully denied bond. *See, e.g.*, Dkt. 1 ¶ 56–60. The BIA handles appeals from immigration courts. *See id.* ¶ 6. "According to the agency's own data, during FY 2024, the agency's average processing

time for a bond appeal was 204 days, or nearly seven months." *Id.* ¶ 57; Dkt. 7 at 1. Appeals

often remain unheard for a year or more. Dkt. 1 ¶ 59; Dkt. 7 at 1.

In this time, Rodriguez alleges that "a detained noncitizen will be forced to defend

themselves against their removal on the merits, depriving them of a meaningful chance to

assemble evidence outside detention, coordinate with family, or communicate with potential

witnesses in other countries." *Id.* ¶ 66. Detention itself may reduce "their likelihood of obtaining

legal representation." *Id.* ¶ 67. "Those detained while in removal proceedings face significant

challenges to accessing and communicating with counsel or other forms of legal assistance." *Id.*

And the "lack of legal representation in turn dramatically reduces the potential for successful

outcomes in their underlying removal proceedings." *Id.* ¶ 68; *see also* Dkt. 6 ¶ 5 ("Some clients

cannot afford an appeal of the decision denying bond, others are deterred by the many months of

waiting that an appeal entails, and still others are removed before any appeal can be completed.

Often times [individuals'] main cases are resolved prior to receiving a decision on a bond appeal

and therefore it is a waste of resources to try and file an appeal of a finding that the court lacks

jurisdiction. As a result, and as a practical matter, review by the Board of Immigration Appeals is

unable to fix this problem for my clients.").

**D.      Rodriguez's Detention at NWIPC**

As noted above, Rodriguez is detained at NWIPC. Dkt. 1 ¶ 73; Dkt. 9 ¶ 2. Rodriguez has

been living in Grandview, Washington with his family since 2009. Dkt. 9 ¶ 3. He owns a home

there. *Id.* He has several children and is the "proud grandfather of ten United States citizen

children[.]" *Id.* ¶ 4. He also has eight siblings who live in California—all of whom are citizens.

*Id.* On February 5, 2025, Rodriguez was arrested at his home and transferred to NWIPC, where

he was placed in removal proceedings. *Id.* ¶¶ 5–6. He has been charged as removable because he

entered the United States without inspection. *Id.* ¶ 6. He has now been detained for more than a

44

month. *Id.* And he has never been arrested for, charged with, or convicted of a crime anywhere. *Id.* ¶ 8.

On March 12, 2025, Rodriguez had a bond hearing before a Tacoma Immigration Court IJ. *Id.* ¶ 11. He was represented by an attorney. *Id.* At the hearing, the IJ "said that he could not consider" Rodriguez's case. *Id.* Rodriguez's "understanding is that [he] was denied a bond because the immigration judge concluded [he] had entered the United States without inspection and therefore [he is] subject to mandatory detention, meaning [he is] not eligible for release under any bond. That was the only reason of why the immigration judge denied [his] bond." *Id.*

An amended memorandum by the IJ supports this contention. Dkt. 26-1. The IJ explained in the memorandum that "[t]he critical issue here is whether this court has jurisdiction to redetermine the custody status an inadmissible alien who is an 'applicant for admission.' . . . the court finds that [Rodriguez] is an applicant for admission detained under INA section 235 and it does not have jurisdiction to redetermine [Rodriguez's] bond." *Id.* at 3. The IJ continued, "a plain reading of the statutes undergirding immigration detention, along with current caselaw from the Supreme Court of the United States and Attorney General, makes clear to this court that Congress did not give immigration judges jurisdiction to redetermine bond for inadmissible aliens who are 'applicants for admission' under INA section 235." *Id.* at 4.

Rodriguez filed an appeal on March 13, 2025. Dkt. 1 ¶ 12. The appeal is pending. *Id.* Rodriguez explains that being detained has been "extremely" difficult. *Id.* ¶ 13. He has faced difficulties with both his physical and mental health. *Id.* He does not yet have a lawyer to defend him from deportation, and being detained has made this harder logistically and financially. *Id.* ¶ 14. His family "cannot afford to hire an attorney so [he has] no possibility of being represented while detained." *Id.* ¶ 15.

45

### E.     The Motion for Class Certification

On March 20, 2025, Rodriguez filed his complaint and moved to certify two classes.

Dkt. 1; Dkt. 2. Rodriguez seeks to represent two classes:

> Bond Denial Class: All noncitizens detained at the Northwest ICE Processing
> Center who (1) have entered or will enter the United States without inspection,
> (2) are not apprehended upon arrival, and (3) are not or will not be subject to
> detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the
> noncitizen is scheduled for or requests a bond hearing.

> Bond Appeal Class: All detained noncitizens who have a pending appeal, or will
> file an appeal, of an immigration judge's bond hearing ruling to the Board of
> Immigration Appeals.

Dkt. 2 at 3. Both proposed classes seek only declaratory relief under Federal Rule of Civil

Procedure 23(b)(2). Dkt. 1 at 22. Rodriguez brings four causes of action: (1) violation of 8

U.S.C. §1226(a) for unlawful denial of bond hearings; (2) violation of the Administrative

Procedure Act (APA) for unlawful denial of bond hearings; (3) violation of the Due Process

Clause of the Fifth Amendment for delayed adjudication of bond appeals; and (4) violation of the

APA for delayed adjudication of bond appeals. *Id.* ¶¶ 99–115. He requests two forms of

declaratory relief:[3]

> 1. A declaratory judgment finding Defendants' policy and practice denying bonds
> for lack of jurisdiction to Named Plaintiff Ramon Rodriguez Vazquez and Bond
> Denial class members to violate the INA and the APA;

> . . .

> 3. A declaratory judgment finding that the Due Process Clause or the APA
> provides that the Named Plaintiff and the Bond Appeal Class Members have a
> right to timely adjudication of their bond appeal by receiving a decision within 60
> days of filing the notice of appeal so long as the noncitizen remains detained[.]

*Id.* at 22. Neither class seeks monetary relief. *Id.*

---

[3] Rodriguez also requested individual injunctive relief. *Id.* A preliminary injunction was issued
for Rodriguez. Dkt. 29.

46

The parties met with the Court on April 2, 2025 and agreed on a briefing schedule.

Dkt. 19. Defendants responded on April 14. Dkt. 23. Rodriguez replied on April 17. Dkt. 24. In

his reply, Rodriguez amended the Bond Denial Class definition to address some of the concerns

raised by Defendants in their response. Dkt. 24 at 4–5. The amended proposed Bond Denial

Class definition is:

> Bond Denial Class: All noncitizens *without lawful status* detained at the
> Northwest ICE Processing Center who (1) have entered or will enter the United
> States without inspection, (2) are not apprehended upon arrival, (3) are not or will
> not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at
> the time the noncitizen is scheduled for or requests a bond hearing.

*Id.* at 5. The briefing is complete, and the motion is ripe for the Court's consideration.

### III.    LEGAL STANDARD

The class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

(2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979)). To justify a departure from

that rule, "a class representative must be part of the class and 'possess the same interest and

suffer the same injury' as the class members." *Id.* at 348–49 (quoting *East Tex. Motor Freight

System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).

Federal Rule of Civil Procedure 23 is designed to protect the interests of those class

members. *Id.* at 345. Rule 23(a) "ensures that the named plaintiffs are appropriate representatives

of the class whose claims they wish to litigate." *Id.* at 349. Under Rule 23(a), the party seeking

certification must show that "(1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class." *Mansor

v. United States Citizenship & Immigr. Servs.*, 345 F.R.D. 193, 202–03 (W.D. Wash. 2023)

(quoting Fed. R. Civ. P. 23(a)). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Dukes*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

If a proposed class satisfies Rule 23(a), the class must then also meet "at least one of the three requirements listed in 23(b)." *Id.* at 345; *see Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Plaintiffs seek to certify a class under Rule 23(b)(2), which demands that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

The Court's examination of these requirements is not cursory. Rule 23 "does not set forth a mere pleading standard." *Id.* at 350. Rather, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 350–51 (cleaned up). "[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160. This is because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (cleaned up).

"'[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . .' and must carry their burden of proof 'before class certification.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014)). Plaintiffs must "prove the facts necessary to

carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence" through any admissible evidence. *Id.* at 665.

Finally, "at least one named plaintiff" must satisfy Article III's standing requirements. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)). The named plaintiff "bears the burden of showing that the Article III standing requirements are met." *Id.* (citing *Armstrong*, 275 F.3d at 860–61). Standing requires that (1) the plaintiff suffered an injury in fact—one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (cleaned up). "Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Bates*, 511 F.3d at 985 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

## IV. DISCUSSION

### A. Rodriguez has standing as named Plaintiff to pursue the requested relief.

Because Rodriguez is the sole named Plaintiff, the Court begins by assessing his standing. Rodriguez alleges (1) that he was wrongfully denied bond by the IJ under the challenged policy and (2) that the inevitable delay of a decision on appeal from this denial violates the Due Process Clause and the APA. Dkt. 1 ¶¶ 1, 17, 73–87, 99–115. The Court takes each of Rodriguez's claims in turn. *See Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Rodriguez's claim that he was wrongfully denied bond because of the IJs' policy meets the standing requirement. The Ninth Circuit has held that "[r]emaining confined in jail when one should otherwise be free is an Article III injury plain and simple[.]" *Gonzalez v. United States*

49

*Immigr. & Customs Enf't*, 975 F.3d 788, 804 (9th Cir. 2020) (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014)). Rodriguez claims that, but for the IJs' policy, he would have been released from custody. *See* Dkt. 1 ¶ 1, 73–81. Defendants do not challenge his standing to represent the bond denial class. *See* Dkt. 23 at 14–16.

Rodriguez's claim that the timeline for a hearing on his appeal violates the Due Process Clause and the APA also satisfies the standing requirement. "The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) (citation omitted); *Friends of the Earth*, 528 U.S. at 180–81 ("[T]he threat of . . . 'injury in fact'" is enough to confer standing.). "The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan's* requirements." *Bates*, 511 F.3d at 985. The plaintiff must show that he has suffered or is threatened with a "concrete and particularized" legal harm. *Id.* (quoting *Lujan*, 504 U.S. at 560).

To show that he is threatened with such legal harm, a "party facing prospective injury" must show "the threatened injury is real, immediate, and direct[.]" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *see also Thorsted v. Gregoire*, 841 F. Supp. 1068, 1083 (W.D. Wash. 1994), *aff'd sub nom. Thorsted v. Munro*, 75 F.3d 454 (9th Cir. 1996) ("Threatened harm that has not yet occurred, but that will occur unless judicial relief is afforded, is enough to support a civil rights claim.") (citing *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 431–32 (1987)). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). But "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). "In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief."

*Bates*, 511 F.3d at 985 (quoting *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998)).

Defendants do not expressly dispute Rodriguez's standing. Defendants do, however, contest typicality (below), and argue that Rodriguez has not suffered the same injury as the proposed Bond Appeal Class.[4] They explain that "Plaintiff alleges that the Bond Appeal class is subject to prolonged delays in adjudication of their appeals"—defining prolonged delay as more than sixty days. Dkt. 23 at 21. But, they argue, "Plaintiff does not share the same or similar injury as the proposed class members he seeks to represent. Indeed, as of the time of this filing, Plaintiff's bond denial appeal will have been pending for about one month. . . . This falls short of Plaintiff's assertion that the BIA ought to render an appeal decision within 60 days." *Id.*

Defendants are correct that Rodriguez filed his appeal less than two months ago. Dkt. 23 at 21; Dkt. 9 ¶ 12 ("I filed an appeal of the immigration judge's decision denying me a bond hearing on March 13, 2025. The appeal is pending."). But, Rodriguez replies, "Defendants conflate the remedy sought with the fact that [he], like all proposed class members, faces a custody appeals system that fails to implement timelines or safeguards to ensure a timely decision." Dkt. 25 at 10. And "Defendants' counterarguments depend on their confusion between the *injury*—which is continued detention without a timely, meaningful opportunity to seek

---

[4] At oral argument, the Court asked Defendants' counsel if Defendants were making a standing argument, rather than a typicality argument, regarding Rodriguez's ability to represent the proposed class. Defendants responded that standing could be addressed through a Motion to Dismiss, and so here, they had addressed the issue under the typicality requirement of Rule 23. But standing is a "threshold issue" concerning an "essential and unchanging part of the case-or-controversy requirement of Article III." *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Lujan*, 504 U.S. at 560). If Rodriguez lacks standing, there is no Article III case or controversy over which this Court may exercise jurisdiction. *See id.* Thus, the Court addresses the standing question now.

review of a custody determination —and the *remedy*—which the complaint proposes as a requirement of adjudication within sixty days of filing a notice of appeal." *Id.* at 11.

Rodriguez thus argues that, because he faces the same imminent injury as the other class members, he may challenge the same practice that harms them all. *Id.*

Without delving too deeply into the typicality analysis here, the Court finds that Rodriguez has sufficiently alleged standing. In his complaint, Rodriguez alleges that he is detained at NWIPC. Dkt. 1 ¶ 73. He was arrested at his home by police and immigration authorities on February 5, 2025. *Id.* ¶ 77. He has been detained at NWIPC since. *See id.* ¶¶ 73, 77. Rodriguez requested a bond hearing, but was denied bond by an IJ who held that Rodriguez was subject to mandatory detention under the challenged provision, 8 U.S.C. § 1225(b)(2). *Id.* ¶ 80. Rodriguez has appealed the IJ's order to the BIA and the appeal is pending. *Id.* ¶ 81. According to the complaint, and based on the BIA's own data, during fiscal year 2024, the agency's average processing time for a bond appeal was 204 days. *Id.* ¶ 57; *see* Dkt. 7 ¶ 5. Rodriguez has alleged, based on EOIR's data, that some appeals take a year or more. Dkt. 1 ¶ 59.

First, as noted above, wrongful confinement is an Article III injury. *See, e.g.*, *Gonzalez*, 975 F.3d at 804; *Mendia*, 768 F.3d at 1012 ("[I]t's difficult to imagine an injury that could affect one more personally and individually than a deprivation of one's liberty. That's presumably why no one questions the existence of Article III injury when a civil rights plaintiff sues on the theory that the actions of the defendants . . . resulted in wrongful confinement[.]"). Rodriguez's allegations show that he faced "an ongoing and a prospective detention injury when he commenced suit." *Gonzalez*, 975 F.3d at 804; Dkt. 1 ¶¶ 57, 59, 73, 80.

Second, though Rodriguez has not yet waited sixty days for his appeal to the BIA to be heard, he has alleged that he faces a "prospective injury" that is "real, immediate, and direct." *Davis*, 554 U.S. at 734; *see Cent. Delta Water Agency*, 306 F.3d at 948. His allegations

52

demonstrate a very real and immediate threat of being confined at NWIPC for far longer while waiting for a decision on appeal. Dkt. 1 ¶¶ 57, 59.

The two other elements of Article III standing—causation and redressability—are met here as well. "[F]or Article III purposes causation requires a showing that his injury is 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Mendia*, 768 F.3d at 1012 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). Rodriguez has satisfied causation. He has pleaded that his ongoing detention stems from the IJ's actions, Dkt. 1 ¶ 2, and the BIA's delayed review of his appeal. *Id.* ¶¶ 6–9.

Because Rodriguez faced ongoing and prospective detention injuries when he commenced suit, his "injury was at that moment capable of being redressed through injunctive relief." *Gonzalez*, 975 F.3d at 806 (first quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991); and then citing *Cent. Delta Water Agency*, 306 F.3d at 947). A court order determining that the IJ's policy misreads the law and that the BIA's delayed review deprives Rodriguez of his due process rights could permit him to receive a bond hearing or have his appeal decided promptly by the BIA. Such an order would address the ongoing injury he faced when he commenced suit. *See Gonzalez*, 975 F.3d at 806 (similar).

Thus, Rodriguez has standing to seek declaratory relief on behalf of the Bond Denial Class and on behalf of the Bond Appeal Class.

## B.      Rodriguez has satisfied the requirements of Rule 23(a).

### 1.      *Numerosity*

The first requirement of Rule 23(a) is numerosity. Numerosity is satisfied if "the class is so large that joinder of all members is impracticable." *Mansor*, 345 F.R.D. at 203 (W.D. Wash. 2023) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "The

numerosity requirement requires the examination of the specific facts of each case, though 'in general, courts find the numerosity requirement satisfied when a class includes at least 40 members.'" *Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *12 (W.D. Wash. June 21, 2017) (quoting *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010)).

Defendants do not dispute that Rodriguez has satisfied numerosity. *See generally* Dkt. 23. And the Court finds that both classes are sufficiently numerous.

First, the Bond Denial Class is "currently comprised of at least dozens of individuals currently detained at NWIPC." Dkt. 2 at 12. Counsel explains that, over the last few years, they have "had around twenty-five clients who were subject to the Tacoma Immigration Court's practice of concluding that 8 U.S.C. § 1225(b)(2) provides for the mandatory detention of individuals who entered without inspection and who have since resided in the United States." Dkt. 6 ¶ 3. And this number fails to account for the "many other clients or potential clients [who] decline to hire [counsel] or decline to seek a bond hearing because they knew there was no hope to obtain release." *Id.* ¶ 4; *see also* Dkt. 5 ¶ 9. Further, recently, the number of people detained at NWIPC—the number of people potentially subject to the IJs policy—has ballooned. *Id.* at 5.

The Court may still certify the class even if it contains fewer than 40 members. "Relatively small class sizes have been found to satisfy this requirement where joinder is still found impractical." *Rivera v. Holder*, 307 F.R.D. 539, 550 (W.D. Wash. 2015) (citing *McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Trust*, 268 F.R.D. 670, 673 (W.D. Wash. 2010)). In assessing the impracticability of joinder, courts may consider "judicial economy, geographic dispersal of the class members, the ability of individual claimants to bring separate suits, and whether plaintiffs seek prospective relief affecting future class members." *Id.* (citing *McCluskey*, 268 F.R.D. at 673).

54

Rodriguez has explained that bringing, and sustaining, a case challenging the IJs policy is exceedingly difficult. Plaintiffs are all detained and face "numerous barriers to accessing counsel, imposing a significant barrier for any individual seeking to challenge" the policy. Dkt. 2 at 13. For example, given that many of the putative plaintiffs have limited resources, *id.*, they often decline counsel "because they kn[o]w there [is] no hope to obtain release." Dkt. 6 ¶ 4.

Further, Rodriguez seeks prospective relief affecting future class members: all those who may be subject to the policy. Dkt. 2 at 12–13. When faced with a class of "unnamed, unknown future members," joinder is impracticable and numerosity may be met. *Ali v. Ashcroft*, 213 F.R.D. 390, 408–09 (W.D. Wash. 2003); *see also Rivera*, 307 F.R.D. at 550 ("[E]specially given the transient nature of the class and the inclusion of future class members, the Court finds the class sufficiently numerous and joinder impractical.").

The same is true for the Bond Appeal Class. This class, Rodriguez alleges, is "likely comprised of hundreds or thousands of individuals who appeal the outcome of their bond hearings to the BIA each year." Dkt. 2 at 12. Similarly, counsel for the proposed class attests that it is hard to estimate the number of members of the class. Dkt. 6 ¶ 5. (While "[s]ome clients cannot afford an appeal of the decision denying bond, others are deterred by the many months of waiting that an appeal entails, and still others are removed before any appeal can be completed."). And many of these cases are resolved before the BIA resolves the bond appeal "and therefore it is a waste of resources to try and file an appeal of a finding that the court lacks jurisdiction." *Id.* ¶ 5; *see also* Dkt. 5 ¶ 9.

Thus, the numerosity requirement is met for both classes.

*2.    Commonality*

The second Rule 23(a) requirement is commonality. This prong requires "a plaintiff [] show that 'there are questions of law or fact common to the class.'" *Dukes*, 564 U.S. at 349

(quoting Fed. R. Civ. P 23(a)(2)). The proposed class's claims must "depend upon a common contention[.]" *Id.* And the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Accordingly, "what matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (cleaned up).

The commonality requirement is "construed permissively." *Hanlon*, 150 F.3d at 1019. Thus, "[a]ll questions of fact and law need not be common to satisfy the rule." *Id.*; *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."). Rather, the "standard is "readily met" when plaintiffs seek prospective relief "challeng[ing] a system-wide practice or policy that affects all of the putative class members." *Mansor*, 345 F.R.D. at 204 (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)). Indeed, the Ninth Circuit has held that "in a civil-rights suit . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Gonzalez*, 975 F.3d at 808 (citations omitted).

### a)     The Bond Denial Class

Rodriguez argues that the proposed Bond Denial Class members "all suffer from the same injury caused by the Tacoma Immigration Court's policy: the denial of an individualized custody determination by the IJ." Dkt. 2 at 15. He claims the issue is "capable of classwide resolution through declaratory judgment[] making clear that . . . [c]lass members are entitled to a bond hearing before the IJ[.]" *Id.*

The Court agrees. The Ninth Circuit's decision in *Rodriguez v. Hayes* is instructive.[5] The petitioner, a lawful permanent resident, was arrested and charged with being removable based on past drug and theft convictions. 591 F.3d 1105, 1111–12 (9th Cir. 2010). He was later detained by DHS. *Id.* at 1112. The petitioner contested his removability before an IJ, who determined that he was subject to mandatory removal based on these past offenses. *Id.* The BIA reversed the IJ's finding for the drug offense but upheld the IJ's finding about the theft conviction. *Id.* The petitioner appealed to the Ninth Circuit, and while awaiting review, filed a writ of habeas corpus and sought relief for himself and a class of other noncitizens who "1) are or will be detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, and 2) have not been afforded a hearing to determine whether their prolonged detention is justified." *Id.* The petitioner claimed the detention of the proposed class members was not authorized by statute, and, in the alternative, that their detention violated the Fifth Amendment's due process clause. *Id.*

Respondents challenged certification of the proposed class. *Id.* at 1122. On commonality, respondents argued that, because class members suffered detention "for different reasons and under the authority of different statutes[,]" "the question of whether individual class members' detention may be continued without a bond hearing turns on divergent questions of statutory interpretation and consideration of different factual circumstances." *Id.* The court acknowledged that respondents were "undoubtedly correct that members of the proposed class do not share every fact in common or completely identical legal issues." *Id.* But, the court explained, Rule

---

[5] *Rodriguez v. Hayes* was abrogated on other grounds, as recognized in *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1200 (9th Cir. 2022) ("In *Jennings v. Rodriguez*, ––– U.S. –––, 138 S. Ct. 830, 200 L.Ed.2d 122 (2018), the Supreme Court reversed our decision in *Rodriguez III*, and with it, some of the prior circuit precedent on which *Rodriguez III* was based."). The Court does not rely on portions that have been abrogated. The discussion of the class action factors remains good law.

23(a)(1) does not demand uniformity. *Id.* Rather, "the commonality requirements ask[] [the court] to look only for some shared legal issue or a common core of facts," which "the proposed members of the class certainly have." *Id.* at 1122–23.

*Mansor v. United States Citizenship & Immigration Services* is also instructive. There, the plaintiffs had applied for Temporary Protected Status ("TPS") and authorization to work in the United States but had not received notices from USCIS confirming their submission of complete applications. 345 F.R.D. at 200. The plaintiffs claimed that they met the prima facie eligibility criteria for TPS but had yet to receive temporary employment authorization. *Id.* The court concluded that the proposed class met the commonality requirement. *Id.* at 204. The court explained that the class posed "a common contention: namely, that USCIS's practice of not issuing temporary employment authorization upon receipt of a complete TPS application that establishes prima facie eligibility violates the TPS statute." *Id.* (citing *Dukes*, 564 U.S. at 350). And the "class's common contention is capable of classwide resolution because Plaintiffs challenge 'a system-wide practice or policy that affects all of the putative class members.'" *Id.* (citing cases). Thus, USCIS could address all of the proposed class members' injuries by "changing its practice 'in one stroke.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

The facts and legal questions of the Bond Denial Class echo those in *Rodriguez v. Hayes* and *Mansor*. Here, the Bond Denial Class asks the Court to consider one common legal question: whether Defendants' "policy and practice denying bonds for lack of jurisdiction" violates the INA and the APA. Dkt. 1 at 22. Of course, as Defendants point out, some circumstances of the individual class members will differ in ways that could affect individualized bond determinations. *See* Dkt. 23 at 16. But such differences are not enough to destroy commonality— and the common answer that drives the litigation. Each person was found subject to mandatory detention under the IJs Section 1225(b)(2) policy. *See id.* ¶¶ 5(a), (d).

Yet this is exactly what Defendants argue. Defendants respond that the proposed class cannot satisfy the commonality requirement because some class members may still be subject to discretionary detention. Dkt. 23 at 16. They explain that the Bond Denial Class includes individuals who have received bond decisions that "already include alternative findings under § 1226." *Id.* at 15. Defendants argue that, because some of these class members "are subject to *both* an § 1225(b)(2) holding and an alternative § 1226(a) review, . . . a judgment affirming their right to a bond hearing under § 1226(a) would afford them no further answers or measurable relief from detention." *Id.* at 16 (emphasis in original). This argument is unavailing.

As Rodriguez points out in reply, even if the IJ made alternative findings that someone is a flight risk or too dangerous for bond, that individual would still have to overcome both holdings to prevail on an appeal to the BIA. Dkt. 24 at 5 ("Those individuals must still overcome the unlawful policy in order to address flight or danger findings."). The Tacoma IJs first find such persons ineligible for bond under the INA, and then offer alternative findings to support the bond denial. *See, e.g.*, Dkt. 5-1 at 2; Dkt. 5-2 at 4–5; Dkt. 5-3 at 2. These individuals are thus still injured by the IJ's finding that they are subject to mandatory detention. And a decision by this Court could redress that injury for all class members. *See, e.g.*, *Gonzalez*, 975 F.3d at 808 ("[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.") (citations omitted); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) ("All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient[.]").

Even if one could characterize alternative findings in support of detention as a lack of injury (as opposed to a separate injury), "the fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from" being

certified. *Rodriguez*, 591 F.3d at 1125. Courts in this circuit have consistently held that the presence of some uninjured, or differently injured, parties will not destroy commonality. *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("[A]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm[.]"); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.") (citation omitted); *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct."). Rather, "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters*, 145 F.3d at 1047.

Defendants also argue that "Plaintiff's proposed Bond Denial Class lacks typicality and commonality because it is overbroad." Dkt. 23 at 14. They maintain that the Bond Denial Class is "overbroad because it sweeps in individuals who have not suffered the same injury that Plaintiff has pleaded, i.e., an allegation of being detained by ICE under § 1226(a), but determined by an IJ to be ineligible for a custody redetermination hearing as an applicant for admission, citing § 1225(b)(2)." *Id.* at 14–15. They explain, "Plaintiff's proposed class is defined by carving out those detained under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231. . . . The proposed class, however, includes [noncitizens] who are *not* applicants for admission, and therefore will not experience the same injury that Plaintiff alleges." *Id.* at 15.

But this challenge is easily resolved by Rodriguez's proposed revision to the class definition.[6] Dkt. 24 at 4–5. In reply, Rodriguez addresses this concern by adjusting the class definition as follows:

> Bond Denial Class: All noncitizens *without lawful status* detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

*Id.* at 5. By adding the italicized language, Rodriguez limits the class definition to those whom the IJs would consider "applicants for admission." *Id.*

The Court finds that the revised definition will close the class to certain individuals who do not suffer any potential injury from the allegedly harmful policy. Even if a *de minimis* number of uninjured individuals are still swept into the class, this does not destroy commonality. *See Ruiz Torres*, 835 F.3d at 1136; *Walters*, 145 F.3d at 1047. Adopting the revised definition, the Court finds that commonality is satisfied for the Bond Denial Class.

### b)  The Bond Appeal Class

For the Bond Appeal Class, Defendants also argue that the proposed class "is far too vast" to "generate common answers apt to" resolve Plaintiff's allegations of the BIA's alleged "systematic failure to issue timely decisions." Dkt. 23 at 17. The "question" here is whether the BIA systematically fails to timely adjudicate bond appeals. *Id.* Defendants claim that "no such

---

[6] At oral argument, Defendants requested that the Court allow supplemental briefing prior to adopting the revised language. But Defendants never offered any reason why the Court should do so. And the Court retains authority to *sua sponte* amend the class definition to address concerns of overbreadth. *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 211–12 (N.D. Cal. 2012) ("Where the class definition proposed is overly broad or unascertainable, the court has the discretion to narrow it."); *Mansor*, 345 F.R.D. at 201 (adopting proposed revised definition that narrows an "otherwise impermissibly broad class definition"); *Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018) ("[D]istrict courts have the inherent power to modify overbroad class definitions.").

'common answer' can be distilled from Plaintiff's immense class of individuals whose circumstances and procedural statuses wildly differ, and where determination of whether a bond appeal is timely adjudicated is best analyzed on a case-by-case basis." *Id.*

Defendants also argue that commonality "cannot be met because the proposed class members do not suffer from the same injury." *Id.* at 20. Because "the time elapsed following the filing of an appeal differs from individual to individual" the injury arising from "detention will change from person to person." *Id.* at 20–21; *see id.* at 21 ("An individual who is detained for 29 days cannot be said to suffer the same injury as an individual detained for seven months. Similarly, an individual who is released from detention while DHS appeals an IJ's order to grant bond cannot be said to suffer the same injury as an individual who remains in custody while appealing an IJ's order to deny bond. Plaintiff admits as much when he alleges that a delay only becomes unreasonably prolonged after 60 days."). Thus, Defendants conclude, "the Bond Appeal class is fatally overbroad because it 'sweeps within it persons who could not have been injured by the defendant's conduct.'" *Id.* at 21 (citing *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017)).

The Ninth Circuit has expressly foreclosed such an argument. For example, in *Rodriguez v. Hayes*, the court explained that members of a proposed class need "not share every fact in common[.]" 591 F.3d at 1122; *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (Commonality "does not . . . mean that *every* question of law or fact must be common to the class."). "This is not required by Rule 23(a)(1)." *Id.* Rather, "the commonality requirements ask[] us to look only for some shared legal issue or a common core of facts." *Id.*; *see Jane Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 989 (N.D. Cal. 2018) ("The Ninth Circuit has found '[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.'") (quoting

*Hanlon*, 150 F.3d at 1019). And courts "regularly resolve procedural due process claims"—like those raised by Rodriguez here—"on a class-wide basis when addressing the constitutionality of immigration agencies' policies and practices." *Padilla v. United States Immigr. & Customs Enf't*, No. C18-928 MJP, 2019 WL 1056466, at *4 (W.D. Wash. Mar. 6, 2019) (citing cases).

The proposed Bond Appeal class brings two claims—one under the Due Process Clause and the other under the APA. Dkt. 1 ¶¶ 107–15. First, the Due Process claim raises a common question with a common answer: whether the Due Process clause imposes an outer limit on the time for deciding a bond appeal. *Id.* ¶¶ 56–60, 65, 96. And the answer to that question should be the same for everyone, even if the question of whether the agency has acted reasonably under the statutory framework differs based on individual circumstances. It thus comes as no surprise that the Ninth Circuit, and courts throughout the circuit, have repeatedly certified classes of detainees challenging ICE practices under the Due Process Clause. *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 344 (9th Cir. 2020) ("We further hold that the district court did not err by provisionally certifying a class of all Adelanto detainees. The alleged due process violations exposed *all* Adelanto detainees to an unnecessary risk of harm, not just those who are release-eligible or uniquely vulnerable to COVID-19.") (emphasis in original); *Walters*, 145 F.3d at 1036 (affirming 23(b)(2) class certification when the plaintiffs sought "declaratory and injunctive relief on the ground that the administrative procedures used by the INS . . . violated their rights to procedural due process"); *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257 (C.D. Cal. 2008) ("[C]laims of due process violations and unreasonable delay also are common legal claims directed at Defendants' specific consent policy. Where Plaintiffs raise a common question of law, Defendants' concerns about multiple legal issues and factual variation do not defeat commonality."); *Mansor*, 345 F.R.D. at 207 (certifying class alleging that defendants' "failure to

implement a process to afford Plaintiffs evidence of employment authorization while their TPS applications are pending violates their due process rights").

Though "numerous individual administrative proceedings may flow" from a declaration that the delays in BIA processing of bond denial appeals violates due process, the Court's decision would still "eliminate[] need for individual litigation regarding the constitutionality of" the delays. *See Walters*, 145 F.3d at 1047. "Absent a class action decision, individual" detainees would be forced to file complaints against the BIA "in federal court, each of them raising precisely the same legal challenge to the constitutionality" of the appeals delays. *Id.* Thus, "class certification in this case is entirely proper in light of the general purposes of Rule 23, avoiding duplicative litigation." *Id.*

The same is not true, however, of the proposed class's APA claims. Defendants argue that "[t]o the extent that Plaintiff argues the Bond Appeal class 'presents the same question of whether . . . the APA entitles them to timely adjudication of their bond hearing appeals,' such inquiry is properly analyzed on a case-by-case basis under the six-factor test set forth in *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*)." Dkt. 23 at 17. In *TRAC*, the District of Columbia Circuit Court of Appeals established a six-factor test, known as the *TRAC* test, for evaluating if an agency's delay in processing a matter is unreasonable. 750 F.2d at 80. These factors include:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," . . . ; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, . . . ; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; . . . ; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, . . . . (5) the court should also take into account the nature and extent of the interests prejudiced by delay, . . . ; and (6) the court need not "find any impropriety lurking

behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*Id.* (cleaned up). The Ninth Circuit has since adopted the *TRAC* test. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997).

Rodriguez's reply focuses largely on the alleged due process violation. *See* Dkt. 24 at 8–9 ("Defendants' unworkable proposal ignores that the Due Process Clause provides a single, uniform answer to this question. The Supreme Court and Ninth Circuit have previously and repeatedly recognized that due process often demands specific timeframes for action to protect the rights of persons seized by the government.") (citing cases). But most of the cases that Rodriguez cites do not actually grapple with an APA claim and the workability of a *TRAC* analysis for a class. *See id.*; *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 58–59 (1991) (plaintiffs sought injunctive and declaratory relief only under 28 U.S.C. § 1983); *Zadvydas v. Davis*, 533 U.S. 678, 700–01 (2001) (resident noncitizens ordered removed but held in custody past a statutory deadline for removal challenged policy, but did not bring an APA claim); *United States v. Fernandez-Alfonso*, 813 F.2d 1571, 1572–73 (9th Cir. 1987) (class challenged delay in district court's review of a magistrate judge's detention order, arguing the delay violated the requirement under the Bail Reform Act of 1984 that the district court determine the motion "promptly"); *Doe v. Gallinot*, 657 F.2d 1017, 1025 (9th Cir. 1981) (finding that certain provisions of the Lanterman-Petris-Short Act allowing state to commit individuals with mental health conditions involuntarily violated due process).

Cases that Rodriguez cites that do confront the applicability of *TRAC*—and which found certification appropriate—found a "rule of reason" in an applicable statute. For example, in *Gonzalez Rosario v. United States Citizenship and Immigrations Services*, the plaintiffs sought to compel USCIS to abide by regulatory deadlines for adjudicating applications for employment

authorization documents filed by noncitizens. 365 F. Supp. 3d 1156, 1161 (W.D. Wash. 2018).

Though a statute did not mandate a timeline for adjudicating applications, INS had issued a

regulation that required adjudication within 30 days of receipt. *Id.* at 1160. Defendants argued

that *TRAC* would require individualized determinations for each plaintiff, thus destroying

commonality. *Rosario v. United States Citizenship & Immigr. Servs.*, No. C15-0813JLR, 2017

WL 3034447, at *9 (W.D. Wash. July 18, 2017). But the Court relied on the regulation to

determine that individualized *TRAC* inquiries were not required. *Id.* at *10 ("Here, agency

regulations rather than a congressional statute provided a deadline for performance, but the court

has already concluded that those regulatory deadlines are mandatory. . . . Accordingly, the court

rejects Defendants' argument that the individualized TRAC inquiry undermines commonality.").

The same is true of *Moreno Galvez v. Cuccinelli*, 492 F. Supp. 3d 1169, 1172 (W.D.

Wash. 2020). There, applicants for special immigrant juvenile status sued USCIS, alleging that

the agency had failed to process their applications in timely manner. *Id.* The court did not

consider the *TRAC* factors. Rather, it focused solely on the INA's provisions, which

unambiguously required that all applications be adjudicated no later than 180 days after the date

on which the application was filed. *Id.* at 1179.

"Indeed, Ninth Circuit authority suggests that where a firm deadline exists, the Court

need not undertake [*TRAC's*] six-factor balancing inquiry." *Garcia v. Johnson*, No. 14-CV-

01775-YGR, 2014 WL 6657591, at *12 (N.D. Cal. Nov. 21, 2014) (first citing *Biodiversity*

*Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002); and then citing *Brower v.*

*Evans*, 257 F.3d 1058, 1068–69 (9th Cir. 2001)). But there is no such statute or regulation that

provides a firm deadline in this case. At oral argument, Plaintiff's counsel could not point to any

controlling authority dictating a deadline.

Without that authority, "Plaintiffs' missed deadline claim does not raise common issues for the purpose of class certification." *See Casa Libre/Freedom House v. Mayorkas*, No. 222CV01510ODWJPRX, 2023 WL 3649589, at *13 (C.D. Cal. May 25, 2023). "This is so because (1) several of the individual *TRAC* factors require individualized inquiries, and (2) the task of balancing the *TRAC* factors requires an individualized inquiry for each class member." *Id.*; *see also Tony N. v. U.S. Citizenship & Immigr. Servs.*, No. 21-CV-08742-MMC, 2021 WL 6064004, at *7 (N.D. Cal. Dec. 22, 2021) ("In the instant case, the Court, to determine the merits of plaintiffs' claims, as well as those of putative class members, must, as discussed above, balance the *TRAC* factors. Of those factors, the third and fifth factors, namely, harm and prejudice, are subject to determination on an individual basis, and the first factor is, in part, namely, the length of delay, likewise subject to determination on such basis."). Several of the individual *TRAC* factors "require individualized inquiries and cannot be treated on a classwide basis." *Casa Libre/Freedom House*, 2023 WL 3649589, at *13.

Rodriguez argues that the Bond Appeal Class meets the commonality requirement because "[a]ll class members present the same question of whether the . . . APA entitles them to timely adjudication of their bond hearing appeals." Dkt. 1 ¶ 96. But the APA does not alone create any deadlines for compliance, and individual consideration of the *TRAC* factors "create[s] unmanageable rifts in the class." *Casa Libre/Freedom House*, 2023 WL 3649589, at *13. Given that these factors must be balanced in each individual case, the Court concludes that the proposed class's APA delayed adjudication claim does not "raise a question that 'generate[s] common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

67

Thus, the Court finds commonality met for the Bond Appeal Class for the Due Process claim only. The remaining Rule 23(a) and 23(b)(2) factors considered below for the Bond Appeal Class apply only to the Due Process claim.

### 3.    Typicality

The third requirement of Rule 23(a) is typicality. "The claims of the representative party must be typical of the class claims." *Gonzalez*, 975 F.3d at 809 (citing Fed. R. Civ. P. 23(a)(3)). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rosario*, 2017 WL 3034447, at *10 (quoting *Hanlon*, 150 F.3d at 1020). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up).

"Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Rosario*, 2017 WL 3034447, at *10 (quoting *Hanon*, 976 F.2d at 508). Typicality is a "permissive standard," *Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003), but class certification is inappropriate "if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it[.]" *Hanon*, 976 F.2d at 508 (cleaned up).

Unsurprisingly, the "commonality and typicality requirements of Rule 23(a) tend to merge." *Rosario*, 2017 WL 3034447, at *10 (quoting *Falcon*, 457 U.S. at 157 n.13). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* (quoting *Falcon*, 457 U.S. at 157 n.13).

68

Defendants do not contest that Rodriguez's claims are typical of the Bond Denial Class. And the Court finds typicality satisfied. Rodriguez arrived in the United States without inspection. Dkt. 9 ¶ 6 ("ICE has charged me as removable because I entered the United States without inspection."). He was later arrested and detained at NWIPC. *Id.* ¶¶ 3, 5. An IJ refused Rodriguez bond because the IJ claimed that they lacked jurisdiction. *Id.* ¶¶ 11. And Rodriguez remains in custody at NWIPC. *Id.* ¶¶ 2, 15. His claims are typical of the Bond Denial Class. Any minor factual differences do not change this analysis. *See, e.g.*, *Mansor*, 345 F.R.D. at 205–06 (similar).

Defendants do, however, argue that Rodriguez has not suffered the same injury as the proposed Bond Appeal Class. Dkt. 23 at 21. As explained above in the standing analysis, *supra* Section IV.A, Defendants argue that "Plaintiff does not share the same or similar injury as the proposed class members he seeks to represent. Indeed, as of the time of this filing, Plaintiff's bond denial appeal will have been pending for about one month. . . . This falls short of Plaintiff's assertion that the BIA ought to render an appeal decision within 60 days." *Id.*

Defendants are correct that Rodriguez filed his appeal less than two months ago. Dkt. 23 at 21; Dkt. 9 ¶ 12 ("I filed an appeal of the immigration judge's decision denying me a bond hearing on March 13, 2025. The appeal is pending."). But, as Rodriguez explains, "Defendants conflate the remedy sought with the fact that [he], like all proposed class members, faces a custody appeals system that fails to implement timelines or safeguards to ensure a timely decision." Dkt. 25 at 10. Accordingly, Rodriguez argues that, because he faces the same imminent injury as the other class members, he may challenge the same practice that harms the others. *Id.*

As explained above, *supra* Section IV.A, Rodriguez has standing to lead the class because he faces immediate threat of direct injury: the alleged due process violation caused by

the delay in BIA review. For similar reasons, his claims are typical of the class. Though
Rodriguez has not yet been detained for sixty days, he faces the immediate threat of ongoing
detention because of delayed review. *See* Dkt. 5 ¶¶ 2–3; *Parsons*, 754 F.3d at 685 (finding
typicality where the named plaintiff alleged "the same or [a] similar injury' as the rest of the
putative class") (alteration in original) (citation omitted). Rodriguez, like the rest of the proposed
Bond Appeal Class, "has allegedly suffered, or will suffer, the same harm as a result of
Defendants' common practice." *Mansor*, 345 F.R.D. at 205 (citation omitted); *see also Parsons*,
754 F.3d at 685 (finding typicality where the injury is the "result of a course of conduct that is
not unique to [the plaintiff]; and [the plaintiff] allege[s] that the injury follows from the course of
conduct at the center of the class claims").

Any minor differences in Rodriguez's circumstances are a nonissue. Here, the Ninth
Circuit's decision in *Gonzalez v. United States Immigration & Customs Enforcement* is
instructive. 975 F.3d at 810. There, the plaintiffs challenged a policy for issuing immigration
detainers. *Id.* at 799. They challenged "ICE's use of biometric information to confirm an
individual's identity and a search of electronic databases to determine whether the individual
lacks lawful immigration status or has such status but is removable." *Id.* The government argued
that several aspects of the named plaintiff's case defeated typicality. *Id.* at 810–11. For example,
the government claimed that Gonzalez was "atypical of noncitizen class members because
evidence of foreign birth—even with citizen-class members—gives rise to a rebuttable
presumption of alienage on which an immigration officer may rely as part of a probable cause
determination, which does not apply to someone who is or who the government should have

known is a citizen." *Id.* at 811 (cleaned up). But, because the challenge "concern[ed] the legality of a policy that applie[d] equally to all class members," the Ninth Circuit rejected the argument.[7]

The government also argued that because "an LAPD officer incorrectly wrote on Gonzalez's booking record that he was born in Mexico . . . [he had] 'unique' circumstances that make him atypical." *Id.* But these errors—factual differences the government argued made the claim "unique"—did not destroy typicality. *Id.* at 811–12. Rather, the court concluded, "Gonzalez's claim is [] no different than any other class member who challenges the Government's issuance of an immigration detainer based solely on a search of electronic databases." *Id.* at 812.

Rodriguez, like Gonzalez, is subject to the same injury as the other class members. *See, e.g.*, *id.*; *see also Rivera*, 307 F.R.D. at 550 ("Plaintiff's claim is typical of her class members', given that the class faces the same injury from the same policy."); *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 641 (D. Ariz. 2016) (holding that where plaintiffs had all been subject to the same conditions at a border patrol facility, even if for different spans of time, typicality was satisfied). And any minor factual differences—such as how long he has been detained, the circumstances of his detention, or his time in the United States—do not make his claims atypical.

Finally, and critically, a named plaintiff is not typical if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024), *cert. denied*, 220 L. Ed. 2d 381 (Jan. 13, 2025) (quoting *Hanon*, 976 F.2d at 508 ). Defendant has not argued that any such defenses exist here. And the record does not suggest any.

---

[7] The Ninth Circuit also considered that the government had waived the argument for failure to raise it in the district court and relied on this in dismissing the argument as well. *Id.* at 811.

The Court thus finds that Rodriguez has satisfied the typicality requirement for both proposed classes.

### 4.    Adequacy

The final requirement of Rule 23(a) is adequacy. "The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Hanlon*, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(4)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). The named plaintiffs and their counsel must have "sufficient 'zeal and competence' to protect the interests of the rest of the class." *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1043 (S.D. Cal. 2020) (quoting *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975)).

#### a)    Named Plaintiff's Adequacy

The Court turns first to the adequacy of the named plaintiff, Ramon Rodriguez Vazquez. He is detained at NWIPC. Dkt 9 ¶ 1. Rodriguez entered the United States years ago, and much of his family lives here. *Id.* ¶ 4. On February 5, 2025, Rodriguez was arrested at his home in Grandview, Washington. *Id.* ¶ 5. He was transferred to NWIPC for removal proceedings. *Id.* ¶ 6. ICE charged Rodriguez as "removable because [he] entered the United States without inspection." *Id.* He has never been arrested by the police, charged with a crime, or convicted of a crime in the United States or elsewhere. *Id.* ¶ 8. On March 12, 2025, Rodriguez had a bond hearing before the immigration court, where he was represented by his attorney. *Id.* ¶ 11. "At that hearing, the immigration judge said that he could not consider my case." *Id.* It is Rodriguez's understanding that he "was denied a bond because the immigration judge concluded that [he] had

entered the United States without inspection and therefore [he is] subject to mandatory
detention," ineligible for bond. *Id.* On March 13, 2025, Rodriguez filed an appeal, which remains
pending before the BIA. *Id.* ¶ 12.

Rodriguez has expressed his interest in representing the class and his understanding of
the responsibilities of doing so. In a declaration submitted to the Court, Rodriguez explains:

> I want to be a named plaintiff in this case and I understand that if the Court grants
> the motion for class certification, I would represent a large number of people who:
> (a) have entered the United States without inspection; and (b) who have been
> denied a bond hearing for that reason. In addition, I also understand that I will
> represent a class of persons who have filed an appeal of their immigration judge
> decision denying bond.

> I also understand that I would represent people who are currently in detention and
> who have been denied a bond hearing for the same reason as me, as well as
> people that will be in detention in the future and denied a bond hearing on this
> basis. In addition, I understand that I will represent people who have a pending
> appeal at the BIA of a bond decision, as well as people who file such appeals in
> the future.

> I understand that, as a class representative, I represent the interests of all class
> members in this lawsuit and that it is my responsibility to represent the interests of
> the whole class and not just my own personal interests.

*Id.* ¶¶ 16–18.

Rodriguez thus asserts that he is an adequate representative of the class—seeking the
same relief and, as of the filing of the complaint, sharing the same interests as absent class
members. *See Mansor*, 345 F.R.D. at 206. Rodriguez does not have any conflicts of interest
because he has a "mutual goal" with the other class members to challenge the allegedly unlawful
practices and to "obtain declaratory . . . relief that would not only cure this illegality but remedy
the injury suffered by all current and future class member." *Nightingale v. U.S. Citizenship &
Immigr. Servs.*, 333 F.R.D. 449, 462 (N.D. Cal. 2019). The Court finds he is an adequate
representative of the Bond Denial Class.

73

Though Defendants do not dispute that Rodriguez is an adequate representative for the Bond Denial Class, Defendants do contest his adequacy to represent the Bond Appeal Class. Dkt. 23 at 22. Defendants argue that "Plaintiff is unable to fairly and adequately protect the proposed class's interests because, like the discussion in the commonality and typicality requirements, the proposed Bond Appeal class encompasses a broad range of individuals who have differing reasons for detention, and most importantly, whose appeals have been pending with the BIA for different lengths of time." *Id.*

Defendants' claim echoes the standing and typicality arguments discussed—and dismissed—above. Their adequacy argument is unpersuasive for the same reasons. Accordingly, the Court finds that Rodriguez is an adequate class representative of the Bond Appeals Class as well.

> b)      *Class Counsel's Adequacy*

Counsel for the proposed class have shown that they have experience litigating class actions on immigration matters. Many of the attorneys have a decade or more of experience working in immigration law. Dkt. 11 ¶ 2 (explaining that Boyd has twenty-four years' experience); *Id.* ¶ 6 (explaining that Madrid has worked for NWIRP since 2013); *Id.* ¶ 7 (explaining that Kang has worked for NWIRP since 2014); *Id.* ¶ 8 (explaining that Korthius has worked for NWIRP since 2018); Dkt. 5 (explaining that Stanislowski has worked at NWIRP for eleven years). One attorney has litigated "hundreds of cases and personally argued on behalf of immigrants before immigration judges, the Board of Immigration Appeals, federal district courts, the Ninth Circuit Court of Appeals, and the United States Supreme Court." Dkt. 11 ¶ 3. And he has "successfully moved for class certification and been approved by federal courts as class counsel in sixteen different class actions on behalf of immigrants[.]" *Id.* ¶ 4. Another serves as or has served as class counsel in six different cases, Dkt. 11 ¶ 8, and NWIRP has represented

74

classes of immigrants multiple times in this district. *See Mansor*, 345 F.R.D. at 206; *Nw. Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 325 F.R.D. 671 (W.D. Wash. 2016). The combined experience of class counsel is more than adequate.

The court finds nothing in the record to suggest that the attorneys have any conflicts of interest with other class members. Accordingly, the Court concludes that counsel meet Rule 23(a)(4)'s adequacy requirement. *See Mansor*, 345 F.R.D. at 206 (similar).

## C.    Rodriguez has satisfied the requirements of Rule 23(b)(2).

Because the proposed class has met the requirements of Rule 23(a), the court turns to Rule 23(b). Plaintiffs move for class certification under Rule 23(b)(2), "which permits the Court to certify a class if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Jane Doe 1*, 357 F. Supp. 3d at 991 (quoting Fed. R. Civ. P. 23(b)(2)).

"Class certification under Rule 23(b)(2)" requires that "the primary relief sought is declaratory or injunctive." *Rodriguez*, 591 F.3d at 1125 (quoting *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001)). "The rule does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.*; *see also Parsons*, 754 F.3d at 688 (This inquiry "does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries."). Thus, "'it is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Id.* (citations omitted); *see also Mansor*, 345

F.R.D. at 206 ("In a 23(b)(2) class, the court treats predominance and superiority as self-evident, . . . and requires only a showing of cohesiveness of class claims.") (cleaned up).

Rodriguez explains that both proposed classes seek declaratory relief generally applicable to the class. He argues, "Defendants' bond denial policy applies to the members of the proposed Bond Denial Class, rendering them all subject to mandatory detention under § 1225(b)(2) and thus depriving [them] of the bond hearing that they are entitled under § 1226(a)." Dkt. 2 at 19. Thus, the declaratory relief requested—a ruling that the policy violates the INA—would provide the entire class with relief. *Id.*; *see also* Dkt. 1 at 22. Rodriguez claims the same for the Bond Appeal Class and "the BIA's systematic failure to timely adjudicate bond appeals[.]" Dkt. 2 at 20. He explains that "a single declaratory judgment requiring the BIA to issue timely bond appeal decisions would apply to the class as a whole." *Id.*

Courts in this circuit have found the requirements of Rule 23(b)(2) met in similar cases. For example, in *Mansor*, the plaintiffs sought a declaration that (1) the TPS statute required the defendants to provide employment authorization documentation while the plaintiffs' TPS applications were pending, and that (2) Defendants' "alleged failure to implement a process to afford Plaintiffs evidence of employment authorization while their TPS applications are pending violates their due process rights." 345 F.R.D. at 207. The court concluded that the claims were "sufficiently cohesive for treatment in a Rule 23(b)(2) class." *Id.* And in *Rivera*, individuals detained pending payment of bond or final removal determination filed a putative class action, alleging that the immigration courts' policy of denying noncitizens' requests for conditional parole without bond violated the INA. 307 F.R.D. at 551. The court there found that the action "concern[ed] a single policy applicable to the entire class that (if unlawful) subjects class members to unnecessary detention." *Id.* Thus, 23(b)(2) was satisfied. *See also Wagafe*, 2017 WL 2671254, at *16 ("Plaintiffs allege that CARRP is unlawful and ask the Court to enjoin the

76

Government from submitting putative class members' immigration applications to CARRP. A single ruling would therefore provide relief to each member of the class. Accordingly, Rule 23(b)(2) is satisfied.").

Nonetheless, Defendant argues that "Plaintiff's request for declaratory relief cannot satisfy Rule 23(b)(2) because the text of Rule 23 allows class certification only where a court can grant "*corresponding* declaratory relief." Dkt. 23 at 23 (quoting Fed. R. Civ. P. 23(b)(2)) (emphasis added by Defendants). Relying primarily on advisory committee notes to the 1996 amendments to Rule 23, Defendants argue that "[b]ecause Plaintiff does not request injunctive relief, he is unable to seek 'corresponding' declaratory relief under Rule 23(b)." *Id.*

Defendant's argument is foreclosed by existing caselaw. As noted above, Rule 23(b)(2) permits class actions for declaratory *or* injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The rule uses the word "or," not "and," indicating that a request for declaratory relief alone is adequate to satisfy the rule's requirements. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (the "word 'or' . . . is almost always disjunctive.") (citation omitted). And the Supreme Court has repeatedly described the rule as allowing class actions for both types of relief. *See Amchem*, 521 U.S. at 614 ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief"); *Dukes*, 564 U.S. at 360 ("[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive *or* declaratory remedy warranted—the notion that the conduct is such that it can be enjoined *or* declared unlawful only as to all of the class members or as to none of them.'") (emphasis added) (citation omitted). As recently as 2024, the Ninth Circuit has analyzed the availability of classwide declaratory and injunctive relief separately in cases challenging immigration enforcement policies. *See, e.g.*, *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625–26 (9th Cir. 2024).

77

Notably, in *Garland v. Aleman Gonzalez*, the Supreme Court held that 8 U.S.C.

§ 1252(f)(1) prevents federal courts from "entering injunctions that order federal officials to take

or to refrain from taking actions to enforce, implement, or otherwise carry out the specified

statutory provisions." 596 U.S. 543, 550 (2022). Pre-*Aleman Gonzalez*, the Ninth Circuit in

*Rodriguez v. Hayes* analyzed a similar question. There, the defendants asserted that 8 U.S.C.

§ 1252(f)(1), Section 306(a) of the Illegal Immigration Reform and Immigrant Responsibility

Act ("IIRIRA"), barred class certification. 591 F.3d at 1118. Defendants claimed that Section

1252(f) barred "the proposed class from receiving any injunctive relief, thereby requiring denial

of class certification." *Id.* at 1119. The Ninth Circuit held that they were "doubly mistaken." *Id.*

Though the Ninth Circuit's holding on injunctive relief has since been abrogated by *Aleman*

*Gonzalez*, the Supreme Court "declined to reach the question whether [Section] 1252(f)(1)

prohibits classwide declaratory relief." *Al Otro Lado*, 120 F.4th at 625 n.14. "Because the

Supreme Court's reservation of a question is not clearly irreconcilable with a precedent of [the

Ninth Circuit] that resolves the same question, we follow [the Ninth Circuit's] binding

precedent." *Id.* (citing *Mont. Consumer Couns. v. FERC*, 659 F.3d 910, 920 (9th Cir. 2011)).

And the Ninth Circuit did discuss the difference between injunctive and declaratory relief

in this context in *Rodriguez v. Hayes*:

> But it is the text of the IIRIRA itself that most clearly shows that Section 1252(f)
> was not meant to bar classwide declaratory relief. Congress knew how to say
> "declaratory relief" in enacting the IIRIRA, but it chose not to use it in Section
> 1252(f). Cf. 8 U.S.C. § 1252(e)(1)(A) (prohibiting courts from entering
> "declaratory, injunctive, or other equitable relief" in any action to exclude under 8
> U.S.C. § 1225(b)(1)). "[E]njoin or restrain" should not be read to include
> declaratory relief when Congress could easily have included "declaratory relief"
> explicitly had it chosen to do so. *Cf. Hor v. Gonzales*, 400 F.3d 482, 484 (7th
> Cir.2005) ("Our legal vocabulary contains distinct words for distinctive judicial
> actions. Keeping them separate makes it easy to address one, both, or neither, in a
> statute such as the IIRIRA.").

591 F.3d at 1119.

Still, Defendants there argued "that declaratory relief is as a practical matter equivalent to injunctive relief, and that allowing classwide declaratory relief allows an 'end run' around the scheme Congress designed." *Id.* at 1120. Again, the Ninth Circuit disagreed. First, the court noted that "declaratory relief has long been recognized as distinct in purpose from and 'milder' in remedy than injunctions." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 466–67 (1974)). Second, the court explained, "the issue is not whether declaratory relief might make possible an end run around Section 1252(f), but whether classwide declaratory relief is a congressionally contemplated part of the statutory scheme. As we have explained, we believe that it is." *Id.* This holding makes clear that classwide declaratory relief is available separately from injunctive relief and therefore is a basis for certification under Rule 23(b)(2). The requirements of 23(b)(2) are thus satisfied.

## V.   CONCLUSION

For these reasons, Plaintiff's motion for class certification (Dkt. 2) is GRANTED IN PART and DENIED IN PART. The Court ORDERS that the following classes be certified:

> Bond Denial Class: All noncitizens without lawful status detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

> Bond Appeal Class: All detained noncitizens who have a pending appeal, or will file an appeal, of an immigration judge's bond hearing ruling to the Board of Immigration Appeals.

The Bond Appeal Class is certified only as to Plaintiff's Due Process claims. The motion for class certification is DENIED as to the Bond Appeal Class for claims of unreasonable delay under the APA.

The Court appoints Ramon Rodriguez Vazquez as the representative for both classes. The Court appoints attorneys Matt Adams, Glenda M. Aldana Madrid, Leila Kang, and Aaron Korthuis of the Northwest Immigrant Rights Project as class counsel.

Dated this 2nd day of May, 2025.

Tiffany M. Cartwright
United States District Judge

**CERTIFICATE OF SERVICE**

I, <u>K. Larkin VanDerhoef</u> certify that this document was electronically filed through ECAS on <u>May 7, 2025</u> and that both parties are participating in ECAS. Therefore, no separate service was completed.


_____          <u>05/07/2025</u>
Signature                                                                                Date