1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| Ramon RODRIGUEZ VAZQUEZ, et al., | Case No. 3:25-cv-05240-TMC |
| Plaintiffs, | **MOTION FOR PARTIAL SUMMARY JUDGEMENT** |
| v. | Noting Date: June 30, 2025 |
| Drew BOSTOCK, et al., | ORAL ARGUMENT REQUESTED |
| Defendants. | |

MOT. FOR PARTIAL SUMM. J.
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

# INTRODUCTION

The Bond Denial Class (Plaintiffs) challenges a policy of the Tacoma Immigration Court that denies them bond solely because the Department of Homeland Security (DHS) alleges they entered the United States without inspection. As the Court recognized in its preliminary injunction for the named plaintiff, this policy is illegal, because it defies the plain text of 8 U.S.C. § 1226, applicable canons of statutory construction, the legislative history, and the Executive Office for Immigration Review's (EOIR) long history of providing individuals in this situation with bond hearings. *See* Dkt. 29.

Plaintiffs now move for partial summary judgment to ensure that Defendants do not unlawfully continue to deny bond to class members. Defendants continue to subject class members to mandatory detention under 8 U.S.C. § 1225(b)(2), despite the fact that many have lived here for years and even decades. In light of this ongoing, unlawful detention, Plaintiffs respectfully request that the Court act expeditiously to resolve this matter and confirm that § 1226(a), not § 1225(b), applies to them, and to clarify that any bond orders holding otherwise are invalid insofar as they deny bond based on § 1225(b).

Along with this motion, Plaintiffs present individual claims for four class members who, despite having lived here for much of their lives, have been found to be subject to § 1225(b)(2) as recent arrivals. But for the Tacoma Immigration Court's policy, these class members would qualify for release under bond, as evidenced by the alternative bond finding in their cases. Each day that individuals like these class members remain detained is one that constitutes unlawful detention, and one that separates them from their communities and loved ones. Accordingly, Plaintiffs also request that the Court grant individual injunctions for each of the identified class members and require that DHS honor the alternative bond finding in their cases.

MOT. FOR PARTIAL SUMM. J. - 1
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

**STATEMENT OF FACTS**

**I.    The Tacoma Immigration Court's Practice of Denying Bond Hearings**

This case concerns the detention authority for people who entered the United States without inspection, were not apprehended upon arrival, and are not subject to some other detention authority, like the detention authority for people in expedited removal, *see* 8 U.S.C. § 1225(b)(1), or withholding-only proceedings, *see id.* § 1231(a)(6). For decades, people in this situation—people who have been residing in the United States, often for years—received bond hearings before an Immigration Judge (IJ). Indeed, similarly situated people continue to be released on bond by IJs in other immigration courts around the country.

Prior to passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), the statutory authority for such hearings was found at 8 U.S.C. § 1252(a). That statute provided for a noncitizen's detention during deportation proceedings, as well as authority to release them on bond. *See* 8 U.S.C. § 1252(a) (1994). Such proceedings governed the detention of anyone in the United States, regardless of manner of entry. *Id.*[1] IIRIRA maintained the same basic detention authority in the provision codified at 8 U.S.C. § 1226(a). Indeed, when passing IIRIRA, Congress explained that the new § 1226(a) merely "restates the current provisions in [8 U.S.C. § 1252(a)] regarding the authority of the Attorney General to arrest, detain, and release on bond a[] [noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229 (1996); *see also* H.R. Rep. No. 104-828, at 210 (1996) (Conf. Rep.) (same). Separately, Congress enacted new detention authorities for people arriving in or who recently entered the United States, including a new expedited removal scheme for those arriving

---

[1]    Separately, "exclusion" proceedings covered those who arrived at U.S. ports of entry and had never entered the United States. *See* 8 U.S.C. § 1225 (1994); *id.* § 1226 (1994).

MOT. FOR PARTIAL SUMM. J. - 2
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1  or who recently entered. *See* 8 U.S.C. § 1225(b)(1)–(2). In implementing this new detention

2  authority, the former Immigration and Naturalization Service clarified that people who entered

3  the United States without inspection and who were not in expedited removal would continue to

4  be detained under the same detention they always had been: § 1226(a) (previously § 1252(a)).

5  *See* Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

6       The distinction between § 1226(a) and § 1225(b) detention is important. Detention under

7  § 1226(a) includes the right to a bond hearing before an IJ. *See* 8 C.F.R. § 1236.1(d). At that

8  hearing, the noncitizen may present evidence of their ties to the United States, lack of criminal

9  history, and other factors showing they are not a flight risk or danger to the community. *See*

10  *generally Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). By contrast, people detained

11  under § 1225(b) are subject to mandatory detention and receive no bond hearing. *See* 8 U.S.C.

12  § 1225(b)(1)(B)(ii), (iii)(IV), (b)(2)(A). They may only be released under parole at the discretion

13  of the arresting agency. *See Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018); *see also* 8 U.S.C.

14  § 1182(d)(5)(A).

15       For the first 25 years after IIRIRA was enacted, local immigration courts, like

16  immigration courts across the country, applied § 1226(a) to the detention of people who were

17  apprehended within the United States after having entered without inspection. But in the past few

18  years, the Tacoma Immigration Court began to apply the mandatory detention provisions of 8

19  U.S.C. § 1225(b)(2) to all persons who entered the United States without inspection, regardless

20  of how long those persons have resided here. *See* Dkt. 5 ¶ 3; Dkt. 6 ¶ 3; *see also* Maltese Decl.

21  Ex. B at 4. According to the immigration court, all people who enter the United States without

22  inspection are deemed "applicants for admission" and are therefore subject to § 1225(b)(2). *See,*

23  *e.g.*, Dkt. 4-5 (custody order of named plaintiff concluding no jurisdiction to issue a bond and

24

MOT. FOR PARTIAL SUMM. J. - 3
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

applying § 1225(b)(2)); Dkts. 5-1–5-11 (custody orders of similarly situated individuals); Dkt. 6-1 (same); Dkt. 34-6 (same for current class member); Maltese Decl. Exs. E, I, K (same for additional class members). Defendants have not disputed that the Tacoma Immigration Court's bond denial policy exists. Dkt. 29 at 7–8, 16.

The results of this policy shift have been catastrophic for noncitizens detained at the Northwest ICE Processing Center (NWIPC), many of whom are longtime residents of Washington and neighboring states. Hundreds have been denied bond as a result, forcing them to defend their removal cases while detained or to give up altogether. Dkt. 5 ¶¶ 4–6; Dkt. 6 ¶ 3; *see also supra* pp. 3–4 (citing orders denying bond). Many, if not most, of these individuals have resided in the country for years, or even decades. *See, e.g.*, Dkt. 5 ¶ 4 (summarizing stories of individual clients); Dkt. 6 ¶ 6 (same); Dkt. 35 ¶ 3; Nunez Decl. ¶¶ 3, 5; Contreras-Baca Decl. ¶ 3; Mateo Decl. ¶ 3. These individuals have families, jobs, and communities here in the United States. The harm inflicted is thus not only to them, but also to their family members, employers, colleagues, and friends. *See, e.g.*, Dkt. 9 ¶¶ 4, 9–10, 14 (named plaintiff testifying to U.S. connections and harm of detention on himself and family); Dkt. 35 ¶¶ 3–5, 15 (similar); Nunez Decl. ¶¶ 3–5, 14 (similar); Contreras-Baca Decl. ¶ 4–5, 17 (similar, including testimony as to separation from seven-year-old child with cancer); Mateo Decl. ¶ ¶4–5, 14 (similar); *see also, e.g.*, Dkt. 34-1 (numerous community members attesting to contributions made by class member); Maltese Decl. Ex. J at 41–61 (similar).

Notably, national statistics reflect that Tacoma IJs are denying bond hearings at extraordinary rates—a fact that appeals have done nothing to fix. For example, in FY2023, Tacoma IJs granted bond in a mere 3% of the cases where bonds were requested, far less than most courts, and by far the lowest grant rate in the entire country. *See* Transactional Records

Access Clearinghouse (TRAC), Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes, https://tracreports.org/reports/722/ (July 19, 2023). Recent statistics reflect similarly low rates, with bond continuing to be denied in around 90% of cases. *See* TRAC, Immigration Court Bond Hearings and Related Case Decisions, https://tracreports.org/phptools/ immigration/bond/ (last accessed May 31, 2025) (fields selected: Bond Hearing Fiscal Year – FY 2025, Bond Hearing Immigration Court State – Washington, and Bond Hearing Outcome) (showing that out of 288 bond hearings in FY 2025, bond was granted in only 29 cases—just over 10%); *see also* Maltese Decl. Ex. A (PDF of same TRAC website data).

Critically, advocates have tried—and failed—to change this practice through individual administrative appeals. Appeals take several months, and sometimes even a year or more, to complete. *See* Dkt. 7 ¶¶ 5–6 (reporting that the average case processing time for BIA appeals was 204 days in FY 2024); *see also* Dkt. 5 ¶ 5(d) (noting that an appeal has been pending for over a year and a half in one case). Such delays in civil detention cases do not provide an individual with a meaningful chance to seek their release. As advocates recount, nearly all cases become moot by this point. Many noncitizens cannot afford an appeal, and some may lose their case in the meantime and face removal. *See* Dkt. 5 ¶ 10 (recounting reasons why appeals never reached a decision); Dkt. 6 ¶ 5. Others give up their case because of prolonged detention. Dkt. 5 ¶ 10; Dkt. 6 ¶ 5. Still others receive a discretionary release from ICE or win their case before any decision on appeal is issued. *See* Dkt. 5 ¶ 10; Dkt. 6 ¶ 5. In short, BIA appeals do not provide any meaningful relief for the vast majority of class members.

Even after two rare cases where the BIA did issue decisions granting relief for the detained individuals, Tacoma IJs have subsequently disregarded such appellate authority. In these two unpublished BIA cases, the Board has reversed the Tacoma IJs' refusal to grant bond

MOT. FOR PARTIAL SUMM. J. - 5
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

in cases like those of Bond Denial Class members. *See* Dkts. 4-1, 4-2. In one instance, advocates requested that the Board publish the decision, but the agency refused. Dkt. 4-3, 4-4. In requests for bond hearings since these unpublished decisions, advocates have submitted one or both decisions to support the request. *See, e.g.*, Dkt. 5 ¶ 11; Dkt. 8 ¶ 4. Yet with the exception of one IJ, the Tacoma Immigration Court—including the Assistant Chief Immigration Judge—has ignored this appellate authority and continued to deny bond hearings for people like Plaintiffs, *see* Dkt. 5 ¶ 11; Dkt. 8 ¶ 5, depriving them of any opportunity to reunite with loved ones and return to their communities.

## II.     The Tacoma Immigration Court Has Continued to Deny Bond to Class Members Since This Court Issued a Preliminary Injunction on Behalf of the Named Plaintiff.

Even after this Court issued its preliminary injunction order, Tacoma IJs have denied bond to class members based on the IJs' interpretation of § 1225(b)(2) in at least four instances. In those cases, the IJ issued an order denying bond under § 1225(b)(2) and ordering that in the alternative, and but for the immigration court's mandatory detention finding, the individual be released on bond. These individuals are currently suffering unlawful detention and have no means of release in the near future except through the Court's resolution of this motion. *See infra* Argument Sec. II; *see also* Dkt. 38 (denying motion for a temporary restraining order (TRO)).

First, as class counsel previously detailed, *see* Dkt. 38, class member Alfredo Juarez Zeferino is a twenty-five-year-old longtime Washington State resident and civic leader. *See generally* Dkt. 34-1; Dkt. 35 ¶¶ 3, 5, 12. He has lived around the Skagit Valley and Whatcom County area since 2012. Dkt. 35 ¶ 3. He grew up in a farmworker family and attended Burlington High School. *Id.* He has seven siblings and is an important source of support to his five youngest siblings, all of whom are U.S. citizens. *Id.* ¶¶ 4–5; Dkt. 34-1 at 4–10, 20, 31, 36, 42. Mr. Juarez is a valued member of his community. He is a well-known farmworkers' rights activist, *see, e.g.*,

1   Dkt. 34-1 at 19, 24, 27, having founded an independent farmworker union called Familias

2   Unidas por la Justicia (Families United For Justice) when he was a teenager, Dkt. 34-1 at 11, 14;

3   Dkt. 35 ¶ 12. He is also an indigenous leader, acting as a voice for the Mixteco and Triqui

4   communities of the Skagit Valley and Whatcom County areas, both as an interpreter and in

5   political advocacy and outreach at the local and state levels. *See, e.g.*, Dkt. 34-1 at 11–43.

6           Mr. Juarez was arrested by immigration officers on March 25, 2025, and sent to the

7   NWIPC, where he is currently detained. Dkt. 34-5 at DHS-2, 4. On May 6, Mr. Juarez requested

8   a bond hearing. *See* Dkt. 34-1. In support of his request, he presented Assistant Chief

9   Immigration Judge (ACIJ) Scala with a copy of this Court's preliminary injunction, Dkt. 34-2,

10  which found that the bond denial policy is likely illegal, *see* Dkt. 29 at 22–32. He also presented

11  letters of support from more than 20 friends, family, and community leaders, including various

12  elected officials, attesting to his moral character and invaluable community contributions. *See,*

13  *e.g.*, Dkt. 34-1 at 11–43 (letters from, inter alia, U.S. Senator Maria Cantwell, U.S.

14  representatives Rick Larsen, Pramila Jayapal, and Emily Randall, and other state and local

15  leaders).

16          On May 8, after receiving and considering this Court's decision, *see* Dkt. 34-2, ACIJ

17  Scala denied Mr. Juarez release on bond pursuant to the Tacoma Immigration Court's bond

18  denial policy. *See* Dkt. 34-6; Dkt. 35 ¶¶ 10–11. She alternatively found that if he was not subject

19  to mandatory detention, he could be released on a $5,000 bond. Dkt. 34-6. Mr. Juarez filed a

20  notice of appeal challenging the ACIJ's jurisdictional finding. Dkt. 35 ¶ 13. Subsequently, on

21  May 30, 2025, the ACIJ provided a written decision describing her reasoning. Maltese Decl. Ex.

22  B.

23

24

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    Another class member—Bellingham, WA resident David Nunez Hernandez—was

2  similarly denied bond. Mr. Nunez has lived in the United States since 1996, and in Washington

3  since 2000. Nunez Decl. ¶ 3; Maltese Decl. Ex. C at 100, 106, 108 (letters testifying to knowing

4  Mr. Nunez for 15 and 20 years). He has five U.S. citizen children, Nunez Decl. ¶ 4, Maltese

5  Decl. Ex. C at 14–18, one of whom suffers from significant mental health issues, Nunez Decl.

6  ¶ 4; Maltese Decl. Ex. C at 84–98. Members of his extended family also live in the United

7  States. Nunez Decl. ¶ 4; Maltese Decl. Ex. C at 103–05.

8    Mr. Nunez was arrested at a worksite raid in Whatcom County on April 2, 2025. Maltese

9  Decl. Ex. D at 4. He was subsequently transported to the NWIPC, where he has since remained

10  detained. *Id.* at 6; *see also* Nunez Decl. ¶ 7. On May 14, he requested a bond hearing, which was

11  held on May 19. Nunez Decl.¶ 9. In support of his request, Mr. Nunez provided evidence of his

12  children's citizenship, Maltese Decl. Ex. C at 14–18, over a decade's worth of tax returns, *id.* at

13  22–83, proof of the mental health challenges one of his daughters is experiencing, *id.* at 84–100,

14  and support letters from family and friends, *id.* at 11–13, 100–111. Mr. Nunez has no criminal

15  history. *Id.* Ex. D at 5.

16    At the bond hearing, the ACIJ denied Mr. Nunez bond, ruling that he is detained under

17  § 1225(b)(2). *Id.* Ex. E. In addition, she ruled that but for her mandatory detention finding, Mr.

18  Nunez could be released on a $10,000 bond. *Id.* Mr. Nunez filed a notice of appeal of the IJ's

19  decision on May 19. Nunez Decl. ¶ 12; *see also* Maltese Decl. Ex. F.

20    A third class member would also be free on bond but for the Tacoma Immigration

21  Court's challenged policy. Class member Yesica Contreras-Baca is a noncitizen who has lived in

22  the United States since 2008—over seventeen years. Contreras-Baca Decl. ¶ 3. She has six U.S.

23  citizen children, the oldest of whom was born in 2009. *See id.*¶ 4; Maltese Decl. Ex. G at 16–20.

24

One of Ms. Contreras-Baca's children was previously diagnosed with terminal cancer. Contreras-Baca Decl. ¶ 5; *see also* Maltese Decl. Ex. G at 29–48. As she explains in her declaration, she wants to "spend as much time with [her] child as [she] can, because it is unknown when his condition will worsen and when he will no longer be in this world." Contreras-Baca Decl. ¶ 5.

On May 8, 2025, Ms. Contreras-Baca requested a bond hearing before the Tacoma Immigration Court. Maltese Decl. Ex. G at 2–4. In support of her request, she submitted a sponsor letter from a U.S.-citizen family member, *id.* at 8–10, proof of her children's U.S. citizenship, *id.* at 16–20, tax returns, *id.* at 11–12, 49–109, proof of residence, *id.* at 21–22, letters from family and friends attesting to her character, *id.* at 23–28, and documents showing that the one criminal charge she was faced with was dismissed, *id.* at 110. Nevertheless, the IJ denied Ms. Contreras-Baca bond under § 1225(b)(2), but provided a $3,000 bond in the alternative. *Id.* Ex. I. Following the hearing, she reserved appeal. Contreras-Baca Decl. ¶ 15.

Finally, Mr. Jose Mateo—a resident of Lynden, WA—is similarly unlawfully detained because of the Tacoma Immigration Court's bond denial policy. Mr. Mateo first entered the United States around 2010, and has lived here for the past fifteen years. Mateo Decl. ¶ 3. He was detained at the same worksite raid as Mr. Nunez on April 2, 2025. *Id.* ¶¶ 5, 7. Mr. Mateo has three U.S. citizen children who are five years old, three years old, and eight months old. *Id.* ¶ 4; Maltese Ex. J at 17–19. He is an active and loved member of his church and community, and works hard to provide for his family. *See id.* at 20–61.

On May 13, 2025, Mr. Mateo requested a bond hearing before the immigration judge. *See* Maltese Decl. Ex. J at 2–5. In support of his request for bond, he included proof of his children's citizenship, *id.* at 17–19, employment and tax records, *id.* at 26–27, 31–39, support letters from

1   church members and other community members, *id.* at 42–61, proof of his filings of application

2   for relief from removal, *id.* at 71–101, and lack of criminal history, *id.* at 103.

3        On May 14, 2025, the ACIJ denied him bond under § 1225(b)(2), but provided a $7,500

4   bond in the alternative. *Id.* Ex. K. Mr. Mateo intends to appeal the bond denial. Mateo Decl. ¶ 13.

5   **III.    Procedural History.**

6        Plaintiffs filed this lawsuit on March 20, 2025. Dkt. 1. That same day, they filed a motion

7   for class certification, Dkt. 2, and a motion for a preliminary injunction of behalf of Named

8   Plaintiff Ramon Rodriguez Vazquez, Dkt. 3, along with extensive supporting evidence detailing

9   Defendants' policy and its effects, *see* Dkts. 4–10. On April 24, 2025, this Court granted Mr.

10  Rodriguez's motion for a preliminary injunction, ordering that he receive a bond hearing. Dkt.

11  29. A week later, on May 2, the Court granted class certification as to the Bond Denial Class and

12  a separate Bond Appeal Class. Dkt. 32.[2] Specifically, the Court certified the following class:

> All noncitizens without lawful status detained at the Northwest ICE Processing
> Center who (1) have entered or will enter the United States without inspection, (2)
> are not apprehended upon arrival, (3) are not or will not be subject to detention
> under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is
> scheduled for or requests a bond hearing.

16  *Id.* at 43.

17       Following class certification, class counsel filed a motion for a TRO on behalf of Mr.

18  Juarez, seeking an order that required Defendants to honor the alternative bond amount set at the

19  bond hearing. Dkt. 33. This Court denied the TRO motion, reasoning that it was unclear it had

20  the authority to issue injunctive relief for an unnamed class member and concluding that granting

21  the motion would change the status quo. Dkt. 38 at 6–9.

---

[2]   The Bond Appeal Class does not seek summary judgment at this time.

MOT. FOR PARTIAL SUMM. J. - 10
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

# ARGUMENT

Summary judgment must be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1152 (9th Cir. 2012). Here, the materials facts are not in dispute: the Tacoma Immigration Court IJs are denying bond by applying § 1225(b)(2) to Bond Denial Class members. Whether class members are detained under § 1225(b)(2) or whether they are instead detained under § 1226(a) presents a "pure question of law" that can be resolved on summary judgment. *Swoger v. Rare Coin Wholesalers*, 803 F.3d 1045, 1048 (9th Cir. 2015).

As detailed below, Plaintiffs are entitled to classwide declaratory relief on this issue. The plain text of the Immigration and Nationality Act (INA), canons of statutory construction, legislative history, and decades of practice all support this conclusion. In addition, this Court has the power to award individual injunctive relief to individual class members. To receive permanent injunctive relief, "the party seeking [such] relief [must] demonstrate[] that: (1) it is likely to suffer irreparable injury that cannot be redressed by an award of damages; (2) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (3) that the public interest would not be disserved by a permanent injunction." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (internal quotation marks omitted). Notably, absent individual injunctive relief, Defendants may continue to unlawfully detain these individual class members pending any appeal of an order granting declaratory relief to the class.

MOT. FOR PARTIAL SUMM. J. - 11
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

## I.    Defendants' Bond Denial Policy Is Unlawful.

### A.  The text of § 1226(a) and applicable canons of statutory construction demonstrate Plaintiffs are entitled to bond hearings under this section.

The plain text of § 1226 demonstrates that its subsection (a) applies to class members. Subsection 1226(a) is the INA's default detention authority, and it applies to anyone who is detained "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). It applies not just to persons who are deportable, but also to noncitizens who are inadmissible.[3] Specifically, while § 1226(a) provides the general right to seek release, § 1226(c) carves out discrete categories of noncitizens from being released— including certain categories of inadmissible noncitizens—and subjects them instead to mandatory detention. *See, e.g.*, *id.* § 1226(c)(1)(A), (C).

Recent amendments to § 1226 reinforce that it covers class members. The Laken Riley Act (LRA) added language to § 1226 that directly references people who have entered without inspection or who are present without authorization. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Pursuant to these amendments, people charged as inadmissible under § 1182(a)(6)(A) (the inadmissibility ground for entry without inspection) or (a)(7)(A) (the inadmissibility ground for lacking valid documentation to enter the United States) *and* who have been arrested, charged with, or convicted of certain crimes are subject to § 1226(c)'s mandatory detention provisions. *See* 8 U.S.C. § 1226(c)(1)(E). By including such individuals under § 1226(c), Congress reaffirmed that § 1226 covers persons charged under § 1182(a)(6)(A) or (a)(7). As this Court observed in its preliminary injunction decision, "when Congress creates

---

[3]    Generally speaking, grounds of deportability (found in 8 U.S.C. § 1227) apply to people like lawful permanents residents, who have been lawfully admitted and continue to have lawful status, while grounds of inadmissibility (found in § 1182) apply to those who have not yet been admitted to the United States. *See, e.g.*, *Barton v. Barr*, 590 U.S. 222, 234 (2020).

MOT. FOR PARTIAL SUMM. J. - 12
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

'specific exceptions' to a statute's applicability, it 'proves' that absent those exceptions, the statute generally applies." Dkt. 29 at 24 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010)).[4]

Several canons of interpretation support this understanding. First, the canon against rendering text superfluous or meaningless applies with significant force here. *See, e.g.*, *Shulman v. Kaplan*, 58 F.4th 404, 410–11 (9th Cir. 2023) (declaring that courts "must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous" (citation omitted)). Notwithstanding the plain text noted above, the Tacoma Immigration Court has repeatedly held that § 1225(b)(2)(A) "mandates the detention of all inadmissible noncitizens." Dkt. 5-2 at 2; *see also* Dkt. 5-4 at 2 (holding that § 1225 "include[s] all noncitizens who have not been admitted regardless of where they are encountered or how long they have been in the United States"). This interpretation "would render significant portions of Section 1226(c) meaningless." Dkt. 29 at 26. As the Court explained before, this is so because if "Section 1225 . . . and its mandatory detention provisions apply to all noncitizens who have not been admitted, then it would render superfluous provisions of Section 1226 that apply to certain categories of inadmissible noncitizens." *Id.* (internal citation and quotation marks omitted).

---

[4] In her written decision regarding class member Alfredo Juarez Zeferino, the ACIJ dismisses the LRA with a policy argument, reasoning that the LRA reiterates the importance of subjecting people like "Laken Riley's killer" to mandatory detention and that the Act does not say anything about detention under § 1226(a). Maltese Decl. Ex. B at 7–8. For the same reasons articulated here and below, this argument defies the statute's text, its history of implementation, and canons of statutory construction. Such "naked policy appeals" reveal that the Tacoma IJs' interpretation has abandoned "any pretense of statutory interpretation." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680 (2020).

MOT. FOR PARTIAL SUMM. J. - 13
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

Second, "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Gieg v. Howarth*, 244 F.3d 775, 776 (9th Cir. 2001) (citation omitted). That presumption applies here, given the LRA's recent amendments to § 1226. *See* Dkt. 29 at 28 (quoting *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995)). Indeed, as noted above, and as the Court explained before, these amendments explicitly provide that § 1226(a) covers class members. This is because the "'specific exceptions' [in the LRA] for inadmissible noncitizens who are arrested, charged with, or convicted of the enumerated crimes logically leaves those inadmissible noncitizens not criminally implicated under Section 1226(a)'s default rule for discretionary detention." *Id.*

Finally, "[w]hen Congress adopts a new law against the backdrop of a longstanding administrative construction," courts "generally presume[] the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 145 S. Ct. 1232, 1242 (2025) (internal quotation marks omitted). As the Court has observed, this canon also supports the class's understanding of the statute, because "Congress adopted the new amendments to Section 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under Section 1226(a) to inadmissible noncitizens such as [the Named Plaintiff]." Dkt. 29 at 29; *see also infra* pp. 18–19.

**B.  The statutory structure further demonstrates that § 1226(a), not § 1225, applies to Bond Denial Class members.**

The statutory structure also supports understanding § 1226(a) to apply to class members. As the Supreme Court has explained, an act's "broader structure" can be a useful tool "to determine [a statute's] meaning." *King v. Burwell*, 576 U.S. 473, 492 (2015); *see also Biden v. Texas*, 597 U.S. 785, 799–800 (2022) (looking to statutory structure to inform interpretation of INA provision). This is particularly true where "a provision . . . may seem ambiguous in

isolation." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988). In such situations, the statute's meaning "is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Id.* To the extent there is ambiguity here, these principles apply with particular force.

The Supreme Court has previously discussed the structure of § 1226 and § 1225 in a way that supports Plaintiffs' reading. As the Court explained, § 1226(a) applies to those who are "already in the country" and are detained "pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). By contrast, § 1225(b)(2)'s mandatory detention scheme applies "at the Nation's borders and ports of entry, where the Government must determine whether a[] [noncitizen] seeking to enter the country is admissible." *Id.* at 287. Indeed, in contrast to § 1226(a), the whole purpose of § 1225 is to define how DHS should inspect, process, and detain various classes of people arriving at the border or who have just entered the country. *See id.* at 297 ("§ 1225(b) applies primarily to [noncitizens] seeking entry into the United States.").

The text of § 1225 reinforces this understanding of the two sections' structure and application. To begin, § 1225 concerns "expedited removal of inadmissible arriving [noncitizens]." 8 U.S.C. § 1225. Its paragraph (b)(1) encompasses only the "inspection" of certain "arriving" noncitizens and other recent entrants the Attorney General designates, and only those who are "inadmissible" for having misrepresented information to an inspecting officer or for lacking documents to enter the United States. Paragraph (b)(2) is similarly limited to people applying for admission when they arrive in the United States. The title explains that this paragraph addresses the "[i]nspection of other [noncitizens]," i.e., those noncitizens who are

MOT. FOR PARTIAL SUMM. J. - 15
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    "seeking admission," but whom (b)(1) does not address. *Id.* § 1225(b)(2), (b)(2)(A). By limiting

2    (b)(2) to those "seeking admission," Congress confirmed that it did not intend to sweep into this

3    section individuals like class members, who have already entered and are now residing in the

4    United States. An individual submits an "application for admission" only at "the moment in time

5    when the immigrant actually applies for admission into the United States." *Torres v. Barr*, 976

6    F.3d 918, 927 (9th Cir. 2020) (en banc). Indeed, in *Torres*, the en banc Court of Appeals rejected

7    the idea that § 1225(a)(1) means that anyone who is presently in the United States without

8    admission or parole is someone "deemed to have made an actual application for admission." *Id.*

9    (emphasis omitted). That holding is instructive here too, as only those who take affirmative acts,

10   like submitting an "application for admission," are those that can be said to be "seeking

11   admission" within § 1225(b)(2)(A). Otherwise, that language would serve no purpose, as the

12   statute specifies that it is addressing a person who is both an "applicant for admission" and who

13   is determined to be "seeking admission." *Id*.

14       Furthermore, subparagraph (b)(2)(C) addresses the "[t]reatment of [noncitizens] *arriving*

15   from contiguous territory," i.e., "the case of [a noncitizen] . . . who *is arriving* on land." 8 U.S.C.

16   § 1225(b)(2)(C) (emphasis added). This language further underscores Congress's temporal

17   requirements in § 1225 and focus on those who are arriving into the United States. Similarly, the

18   title of § 1225 refers to the "inspection" of "inadmissible *arriving*" noncitizens. *See, e.g.*, *Dubin*

19   *v. United States*, 599 U.S. 110, 120–21 (2023) (emphasis added) (relying on section title to help

20   construe statute). Finally, the entire statute is premised on the idea that an inspection occurs near

21   the border and shortly after arrival, as the statute repeatedly refers to "examining immigration

22   officer[s]," 8 U.S.C. § 1225(b)(2)(A), (b)(4), and sets out procedures for "inspection[s]" of

23   people "arriving in the United States," *id.* § 1225(a)(3), (b)(1), (b)(2), (d).

24

MOT. FOR PARTIAL SUMM. J. - 16
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

A recent BIA decision, published in May 2025, further supports reading § 1225(b) as applying only to arriving individuals and recent entrants. In *Matter of Q. Li*, the BIA held that a noncitizen who was apprehended "approximately 5.4 miles away from a designated port of entry and 100 yards north of the border" was detained under § 1225(b) and not § 1226(a). 29 I. & N. Dec. 66, 67 (BIA 2025). In other words, they were someone "apprehended upon arrival." Dkt. 32 at 43. The Board then explained that such persons are properly treated as "arriv[ing] in the United States," given that they are "detained shortly after unlawful entry," and "'[are] apprehended' just inside 'the southern border, and not at a point of entry, on the same day [they] crossed into the United States.'" *Matter of Q. Li*, 29 I. & N. Dec. at 68 (alternations in original) (quoting *Matter of M-D-C-V-*, 28 I. &. N. Dec. 18, 23 (BIA 2020)). Notably, in so holding, the BIA's analysis closely tracked the arguments Plaintiffs have made here: that § 1226(a) "applies to [noncitizens] already present in the United States," while § 1225(b) "applies primarily to [noncitizens] seeking entry into the United States and authorizes DHS to detain a[] [noncitizen] without a warrant at the border." *Id.* at 70 (internal quotation marks omitted).

### C.  The legislative history further supports Plaintiffs' argument.

IIRIRA's legislative history also supports concluding that § 1226(a) applies to class members. In passing the Act, Congress was focused on the perceived problem of recent arrivals to the United States who do not have documents to remain. *See* H.R. Rep. No. 104-469, pt. 1, at 157–58, 228–29; H.R. Rep. No. 104-828, at 209. Notably, Congress did not say anything about subjecting all people present in the United States after an unlawful entry to mandatory detention if arrested. This is important, as prior to IIRIRA, class members were not subject to mandatory detention. *See* 8 U.S.C. § 1252(a)(1) (1994) (authorizing Attorney General to arrest noncitizens for deportability proceedings, which applied to all persons within the United States). Had Congress intended to make such a monumental shift in immigration law (potentially subjecting

millions of people to mandatory detention), it would have explained so or spoken more clearly. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468–69 (2001). But in fact, Congress explained precisely the opposite, noting that the new § 1226(a) merely "restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond a[] [noncitizen] *who is not lawfully in the United States*." H.R. Rep. No. 104-469, pt. 1, at 229 (emphasis added); *see also* H.R. Rep. No. 104-828, at 210 (same). "Because noncitizens like [Plaintiffs] were entitled to discretionary detention under Section 1226(a)'s predecessor statute and Congress declared its scope unchanged by IIRIRA, this background supports [the class]'s position that [they too are] subject to discretionary detention." Dkt. 29 at 30.

> ### D.  The record and longstanding practice reflect that § 1226 governs Plaintiffs' detention.

Finally, DHS's longstanding practice of considering people like Plaintiffs as detained under § 1226(a) further supports reading the statute to apply to them. Typically, DHS issues class members a Form I-286, Notice of Custody Determination, or Form I-200, Warrant for Arrest of Alien, stating that the person is detained under § 1226(a) (§ 236 of the INA). *See, e.g.*, Dkt. 5-3 at 5–6; Dkt. 5-4 at 2–3; Dkt. 34-5 at DHS-2 (stating Mr. Juarez was arrested pursuant to an I-200); Maltese Decl. Ex. D at 4 (same, regarding Mr. Nunez); *id.* Ex. G at 5 (similar, for Ms. Contreras-Baca); *id.* Ex. L at 1 (sample I-200). As these arrest documents demonstrate, DHS has long acknowledged that § 1226(a) applies to individuals who entered the United States unlawfully, but who were later apprehended within the country's borders long after their entry. Such a longstanding and consistent interpretation "is powerful evidence that interpreting the Act in [this] way is natural and reasonable." *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J., dissenting); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983)

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

(relying in part on "over 60 years" of government's interpretation and practice to reject its new proposed interpretation of the law at issue).

Similarly, EOIR regulations have long recognized that class members are subject to detention under § 1226(a). Nothing in 8 C.F.R. § 1003.19—the regulatory basis for the immigration court's jurisdiction—provides otherwise. In fact, EOIR confirmed that § 1226(a) applies to class members when it promulgated the regulations governing immigration courts and implementing § 1226 decades ago. At that time, EOIR explained that "[d]espite being applicants for admission, [noncitizens] who are present without having been admitted or paroled (formerly referred to as [noncitizens] who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. at 10323; *see also Matter of R-A-V-P-*, 27 I. & N. Dec. 803–04 (BIA 2020) (referencing § 1226(a) as detention authority for a noncitizen who unlawfully entered the United States the prior year and was detained soon thereafter); Maltese Decl. Ex. M at 8, 9 (unpublished BIA decisions explaining the same). The Court previously reasoned that "this guidance and the agency's subsequent years of unchanged practice is persuasive" in further understanding § 1226(a) to apply to class members. Dkt. 29 at 31.

In sum, § 1226 governs class members' detention, and the Court should issue corresponding declaratory relief clarifying their rights.

## II. Individual Class Members Juarez, Nunez, Baca-Contreras, and Mateo warrant injunctive relief.

### A. The Court has authority to issue an injunction.

Apart from classwide declaratory relief, the Court has authority to issue an injunction on behalf of individual class members. This is true for several reasons.

First, in its order denying a TRO for Mr. Juarez, the Court expressed concern about whether an individual class member seeking injunctive relief conflicts with Rule 23(b)(2)'s

MOT. FOR PARTIAL SUMM. J. - 19
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1    requirements. The Court explained that such an injunction might be a "different injunction or

2    declaratory judgment" than what the rest of the class seeks. Dkt. 38 at 8 (emphasis and citation

3    omitted). This is not the case. The individual class members seek the same relief as the class—

4    the declaratory relief—and also simply ask for an additional remedy to ensure they do not

5    needlessly suffer additional unlawful detention. The individual injunctions sought are a means of

6    ensuring prompt relief, consistent with the classwide declaratory relief sought for all class

7    members. The Supreme Court's concern about different injunctions or declaratory relief in

8    *Dukes* concerns relief that differs *in substance*. The Court so explained when it noted that Rule

9    23(b)(2) is not satisfied where the "claims [are ones] for *individualized* relief (like the backpay at

10   issue here)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Such backpay claims

11   require "additional proceedings . . . to determine the scope of individual relief." *Id.* at 366

12   (alteration in original). Here, however, the individual injunctions sought simply require

13   compliance with the same classwide declaratory judgment.

14        Second, a Rule 23(b)(2) class is a "mandatory, non-opt-out class[]." *McCluskey v. Trs. of*

15   *Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 677 (W.D. Wash. 2010); *see*

16   *also Dukes*, 564 U.S. at 362 (describing (b)(2) classes as "mandatory"); 2 Newberg and

17   Rubenstein on Class Actions § 4:36 (6th ed. 2024) (explaining that "[t]here is no realistic sense

18   of 'opting out' of such a [civil rights] class" like this one). Once certified, class members are

19   parties to this case. Accordingly, intervention or a separate habeas typically does not make sense,

20   as those individuals are already a party to the case that is determining their legal rights—indeed,

21   federal courts are empowered to deny such requests or dismiss such cases. *See, e.g.*, *Crawford v.*

22   *Bell*, 599 F.2d 890, 892–93 (9th Cir. 1979) (affirming district court's dismissal of individual's

23   allegations which were duplicative of those being litigated by certified (b)(2) class action). Thus,

24

MOT. FOR PARTIAL SUMM. J. - 20
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

by seeking relief on behalf of individual class members, class counsel seeks merely to advocate

zealously on behalf of their clients, as they will be bound by any judgment in this matter. *See*

*Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) ("[N]onnamed class members are parties in the

sense of being bound by [a] settlement.").

Notably, 8 U.S.C. § 1252(f)(1) further supports this approach. Section 1252(f)(1) bars

federal courts from providing injunctive relief with respect to specified statutory provisions

(including §§ 1225 and 1226) "other than with respect to the application of such provisions to an

individual [noncitizen] against whom proceedings under such part have been initiated." *See also*

*Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022) (explaining classwide injunctions

violated § 1252(f)(1) but acknowledging that § 1252(f)(1) contains an "exception for

individualized relief"). While § 1252(f)(1) is directed at classwide injunctive relief, it does not

stand in the way of classwide declaratory relief. *See Nielsen v. Preap*, 586 U.S. 392, 402–03

(2019). And, because 28 U.S.C. § 2202 permits "a declaratory judgment [to] serve as the basis

for issuance of a later injunction," *Alli v. Decker*, 650 F.3d 1007, 1015 (3d Cir. 2011) (quoting

*Steffel v. Thompson*, 415 U.S. 452, 461 n.11 (1974)), courts have understood the interaction

between § 1252(f)(1) and Rule 23(b)(2) as permitting "class members [to] pursue individual

injunctions after issuance of a classwide declaration," *id.*; *see also id.* at 1020 n.2 (Fuentes, J.,

dissenting) ("[E]very single member of the class can, and will, immediately seek an injunction

grounded on the authority of the declaratory judgment."); *J.E.F.M. v. Holder*, 107 F. Supp. 3d

1119, 1143–44 (W.D. Wash. 2015), *aff'd in part, rev'd in part on other grounds sub nom.*

*J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016) ("[A]fter securing a declaratory judgment, each

individual class member would have to separately invoke it as a ground for individual injunctive

relief, which 'is expressly permitted under § 1252(f)(1).'" (quoting *Alli*, 650 F.3d at 1015));

MOT. FOR PARTIAL SUMM. J. - 21
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

*Immigrant Defs. L. Ctr. v. Mayorkas*, No. CV 20-9893 JGB (SHKx), 2023 WL 3149243, at *14

(C.D. Cal. Mar. 15, 2023) ("While it is absurd to imagine that, in lieu of *Brown v. Board of*

*Education*, 349 U.S. 294 (1955) and its progeny, lower courts might have been 'restrained to

issue injunctive relief, schoolchild-by-schoolchild,' that may be the practical effect of . . .

*Aleman Gonzalez* . . . ." (citation omitted)); *Reid v. Donelan*, No. CV 13-30125-PBS, 2018 WL

5269992, at *8 (D. Mass. Oct. 23, 2018) ("[E]ach class member could use a declaratory

judgment announcing a right to an individualized hearing after prolonged detention to secure an

individual injunction requiring one.").

### B.  Mr. Juarez, Mr. Nunez, Ms. Contreras-Baca, and Mr. Mateo will suffer irreparable harm absent an injunction.

Irreparable harm is plainly established here. The alternative bond findings in their cases

demonstrate that but for the Tacoma Immigration Court's policy, Mr. Juarez, Mr. Nunez, Ms.

Contreras-Baca, and Mr. Mateo would be free, living again with their loved ones and

communities. Dkt. 35 ¶ 14; Nunez Decl. ¶ 9; Contreras-Baca Decl. ¶ 16; Mateo Decl. ¶ 12. For

them, the harm is not merely the *potential* to be released following a custody hearing; rather,

they are now "needlessly detained," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013),

and they "suffer[] . . . irreparable harm every day that [they] remain[] in custody" due to the

Tacoma Immigration Court's unlawful policy, Dkt. 29 at 33 (quoting *Cortez v. Sessions*, 318 F.

Supp. 3d 1134, 1139 (N.D. Cal. 2018)).

They are also unable to be with or support their families. Dkt. 35 ¶¶ 4–5, 20; Nunez Decl.

¶¶ 4–5, 14; Contreras-Baca Decl. ¶¶ 4–5, 16–17; Mateo Decl. ¶¶ 4, 14. Such "separation from

family members" is an important irreparable harm factor. *Leiva-Perez v. Holder*, 640 F.3d 962,

969–70 (9th Cir. 2011) (per curiam) (citation omitted); *see also, e.g.*, *Washington v. Trump*, 847

F.3d 1151, 1169 (9th Cir. 2017) (per curiam) (listing "separated families" as a "substantial

MOT. FOR PARTIAL SUMM. J. - 22
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

injur[y] and even irreparable harm[]"); Dkt. 29 at 18–19 (recognizing similar forms of harm are

irreparable in context of exhaustion analysis).

Additionally, NWIPC's appalling conditions have placed a great emotional and mental

toll on class members, who attest to undercooked meals or other dietary issues, overcrowding,

understaffing, lack of medical care, and extreme limitations on their ability to be outside. Dkt. 35

¶¶ 15–19; Nunez Decl. ¶ 14; *see also* Dkt. 9 ¶¶ 10, 13. Such "emotional stress, depression and

reduced sense of well-being" further support a finding of irreparable harm. *Chalk v. U.S. Dist.*

*Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988); *see also Moreno Galvez v. Cuccinelli*,

492 F. Supp. 3d 1169, 1181–82 (W.D. Wash. 2020) (explaining that "stress, devastation, fear,

and depression" arising from unlawful immigration policy are the type of "harms [that] will not

be remedied by an award of damages"), *aff'd in part, vacated in part on other grounds,*

*remanded sub nom. Moreno Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022)

### C.  The balance of hardships and public interest favor an injunction.

Finally, as this Court previously recognized, the last two injunction factors favor the class

members. On the one hand, "[t]he harm to the government here is minimal." Dkt. 29 at 34. After

all, "the undisputed record [shows] that the practice [class members] seek[] to enjoin is an outlier

to the government's longstanding interpretation and enforcement of its immigration laws." *Id.*

Defendants, moreover, "cannot suffer harm from an injunction that merely ends an unlawful

practice." *Rodriguez*, 715 F.3d at 1145. Similarly, "it would not be equitable or in the public's

interest to allow the [government] . . . to violate the requirements of federal law, especially when

there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029

(9th Cir. 2013) (omission in original) (citation omitted). Of course, by contrast, the harms that

the class members face are far more significant, and include separation from family, community,

employment, and much more. Dkt. 35 ¶¶ 4–5, 15–20; Nunez Decl. ¶¶ 4, 14; Contreras-Baca

MOT. FOR PARTIAL SUMM. J. - 23
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1  Decl. ¶¶ 4–5, 17; Mateo Decl. ¶¶ 14–17. These facts tilt these final two factors strongly in their

2  favor. Dkt. 29 at 34–35; *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017)

3  (finding "the balance of hardships tips decidedly in plaintiffs' favor" when "[f]aced with such a

4  conflict between financial concerns and preventable human suffering" (citation omitted)).

5  **III.    Prudential Exhaustion Is Not Required.**

6          Prudential exhaustion is not required here. The Court has already found it is not required

7  in the context of the preliminary injunction decision, *see* Dkt. 29 at 13–21, and has since certified

8  a class action challenge to the bond denial policy, *see* Dkt. 30. As the Court previously noted,

9  requiring exhaustion may be appropriate where agency expertise is required, relaxation of the

10  exhaustion requirement might encourage others to also bypass that scheme, or where

11  administrative review might resolve the issue. Dkt. 29 at 13. Even then, factors such as

12  irreparable harm and agency delay can excuse exhaustion. *Id.* These considerations warrant

13  excusing exhaustion here.

14          First, there is no need for agency expertise. "The Framers . . . envisioned that the final

15  'interpretation of the laws' would be 'the proper and peculiar province of the courts.'" *Loper

16  Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (citation omitted). Thus, "[w]hen the

17  meaning of a statute [is] at issue, the judicial role [is] to 'interpret the act of Congress, in order to

18  ascertain the rights of the parties.'" *Id.* (citation omitted); *see also* Dkt. 29 at 14 (similar).

19          Second, addressing this motion on the merits will not encourage other persons to bypass

20  the administrative appeal scheme in making other claims. This is because, once this Court

21  decides the question on summary judgment, "the issue here will not arise again (at least in this

22  District)." *Rivera v. Holder*, 307 F.R.D. 539, 551 (W.D. Wash. 2015); *see also* Dkt. 29 at 15

23  ("[R]esolution of [the] legal question . . . will provide concrete guidance for future administrative

24

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

1 proceedings.").

2       Finally, while the BIA might eventually overturn the Tacoma Immigration Court's bond

3 denial policy, to date, it has refused to issue a published decision clarifying the law and

4 eliminating the ongoing, unlawful denial of bond. Dkt. 29 at 16; *see also* Dkt 4-4. In this

5 context—where the BIA has failed to correct the harm that class members suffer—this factor

6 does not support requiring exhaustion. *See* Dkt. 29 at 16.

7       Even if prudential exhaustion were warranted, exceptions regarding irreparable injury

8 and agency delay apply and merit its waiver. First, in prior briefing, Defendants did not "dispute

9 [the class's] evidence of the protracted nature of BIA appeals." Dkt. 29 at 17. Indeed, "EOIR

10 data show[s] an average processing time of 204 days for bond appeals in 2024." *Id.*; *see also*

11 Dkt. 7 ¶ 5 (EOIR data showing average appeal times). Such times are inconsistent with the

12 requirements of due process, as Plaintiffs previously explained. *See* Dkt. 3 at 23–25.

13       This lengthy process, and detention itself, inflicts irreparable harm on class members.

14 Class members are either denied the opportunity to seek bond, or in some cases—like those of

15 the class members seeking injunctive relief—are being detained based solely on Defendants'

16 bond denial policy. Such ongoing, unlawful detention constitutes irreparable harm. Dkt. 29 at

17 17–18 (rejecting Defendants' argument that "detention alone" cannot result in irreparable harm);

18 *see also id.* at 18–19 (citing cases recognizing irreparable harm in situations akin to this one).

19       Moreover, class members also face other harms, including separation from their families,

20 and the indignities and prison-like conditions of NWIPC. Dkt. 35 ¶¶ 4–5, 20; Nunez Decl. ¶¶ 4,

21 14; Contreras-Baca Decl. ¶¶ 4–5, 17; Mateo Decl. ¶¶ 4, 14–17. This separation can be extremely

22 traumatic for both those detained and for their U.S. citizen family members, like in the case of

23 Ms. Contreras-Baca, who is separated from her three-year-old and her seven-year-old with

24

MOT. FOR PARTIAL SUMM. J. - 25
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611

cancer. Contreras-Baca Decl. ¶¶ 17. Such harms plainly support a finding of irreparable harm and waiving the exhaustion requirement. *See, e.g.*, Dkt 29 at 18–19; Dkt. 3 at 15–17, 21–22.

**CONCLUSION**

Plaintiffs accordingly and respectfully request that the Court declare Defendants' bond denial policy unlawful and issue individual injunctions on behalf of the identified class members who are currently detained solely based on that unlawful policy.

Respectfully submitted this 2nd day of June, 2025.

s/ Matt Adams
Matt Adams, WSBA No. 28287
matt@nwirp.org

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No. 46987
glenda@nwirp.org

s/ Leila Kang
Leila Kang, WSBA No. 48048
leila@nwirp.org

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974
aaron@nwirp.org

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Ave., Suite 400
Seattle, WA 98104
(206) 957-8611

*Counsel for Bond Denial Class*

**WORD COUNT CERTIFICATION**

I certify that this memorandum contains 8,399 words, in compliance with the Local Civil Rules.

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Suite 400
Seattle, WA 98104
(206) 816-3872
aaron@nwirp.org

MOT. FOR PARTIAL SUMM. J. - 26
Case No. 3:25-cv-05240-TMC

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611