1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RAMON RODRIGUEZ VAZQUEZ, on behalf of himself as an individual and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DREW BOSTOCK, et al,<br><br>Defendant. | Case No. 3:25-cv-05240-TMC<br><br>ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS |

## I.    INTRODUCTION

This case arises from a practice by the Tacoma Immigration Court of interpreting the Immigration and Nationality Act ("INA") to require detention without the possibility of bond for noncitizens[1] who entered the United States without inspection, even if they have lived here for years and can prove they present neither a flight risk nor a danger to the community.

On April 24, 2025, the Court granted named Plaintiff Ramon Rodriguez Vazquez's ("Rodriguez") individual motion for a preliminary injunction, concluding that the Tacoma

---

[1] This order uses the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578, n.2 (2020); *see* 8 U.S.C. § 1101(a)(3).

Immigration Court's practice was likely illegal. Although the Defendants opposed granting injunctive relief, they made no substantive arguments at the time regarding the applicable detention authority for noncitizens such as Rodriguez who were apprehended while residing in the United States.

One week later, the Court granted in part and denied in part Rodriguez's class certification motion filed alongside his motion for preliminary injunction. The Court certified two classes of noncitizens. The first class seeks a declaration that the Tacoma Immigration Judges' ("IJs") bond denial policy is unlawful under the INA (the "Bond Denial Class"). The second class seeks a declaration that prolonged detention without timely appellate adjudication of an IJ's bond ruling violates the Due Process Clause (the "Bond Appeal Class").

While this case progressed over the summer, the government—including certain named Defendants here—adopted the Tacoma Immigration Court's interpretation of the INA's detention provisions as its new national policy. The Department of Homeland Security ("DHS") issued a memorandum to all Immigration and Customs Enforcement ("ICE") employees on July 8, 2025 instructing that "[e]ffective immediately," all noncitizens who have not been lawfully admitted, including those already present in the United States, will no longer be eligible for release from ICE custody for the duration of their removal proceedings except by discretionary parole. Dkt. 61-6 at 2. Under this policy, these noncitizens—even those with strong ties to the community and no criminal records—are no longer eligible for a bond hearing before an IJ. *Id.* The government's policy shift has been estimated as requiring the detention of millions of individuals currently living in the United States.[2]

---

[2] Maria Sacchetti & Carol D. Leonnig, *ICE declares millions of undocumented immigrants ineligible for bond hearings*, Washington Post (July 14, 2025), https://www.washingtonpost.com/immigration/2025/07/14/ice-trump-undocumented-immigrants-bond-hearings/.

Since this Court's initial rulings, district courts across the country have now considered the statutory question at the heart of this case: whether noncitizens residing in the United States who are arrested and detained for potential removal are entitled to a bond hearing before an IJ with the possibility of release under 8 U.S.C. § 1226(a), or if, as the government asserts, they are subject to mandatory detention under 8 U.S.C. § 1225(b)(2) throughout their removal proceedings. Every district court to address this question has concluded that the government's position belies the statutory text of the INA, canons of statutory interpretation, legislative history, and longstanding agency practice.[3]

---

[3] *See, e.g.*, *Aceros, v. Kaiser*, et al., 25-CV-06924-EMC (EMC), 2025 WL 2637503 (N.D. Cal. Sept. 12, 2025); *Maldonado Vazquez v. Feeley*, 2:25-CV-01542-RFB-EJY, 2025 WL 2676082 (D. Nev. Sept. 17, 2025)*; Romero v. Hyde*, CV 25-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025); *Martinez v. Hyde*, CV 25-11613-BEM, 2025 WL 2084238 (D. Mass. July 24, 2025) (denying government's motion for reconsideration); *Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299 (D. Mass. July 7, 2025); *dos Santos v. Lyons*, No. 1:25-CV-12052-JEK, 2025 WL 2370988 (D. Mass. Aug. 14, 2025); *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099 (D. Ariz. Aug. 11, 2025), report and recommendation adopted sub nom. *Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB), 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Lopez Benitez v. Francis*, 25 CIV. 5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Leal-Hernandez v. Noem*, 1:25-CV-02428-JRR, 2025 WL 2430025 (D. Md. Aug. 24, 2025); *Aguilar Maldonado v. Olson*, --- F. Supp. 3d ----, 2025 WL 2374411 (D. Minn. Aug. 15, 2025); *Velasquez Salazar v. Dedos*, No. 25-cv-835, 2025 WL 2676729 (D.N.M. Sept. 17, 2025); *Beltran Barrera v. Tindall*, 3:25-CV-541-RGJ, 2025 WL 2690565 (W.D. Ky. Sept. 19, 2025); *Lopez-Campos v. Raycraft*, 2:25-CV-12486, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Reyes v. Raycraft,*, No. 25-CV-12546, 2025 WL 2609425 (E.D. Mich. Sept. 9, 2025); *Jimenez v. FCI Berlin, Warden*, 25-CV-326-LM-AJ, 2025 WL 2639390 (D.N.H. Sept. 8, 2025); *Chogllo Chafla v. Scott*, 2:25-CV-00437-SDN, 2025 WL 2688541 (D. Me. Sept. 21, 2025); *Arrazola-Gonzalez v. Noem*, No. 5:25-CV-01789-ODW (DFMX), 2025 WL 2379285 (C.D. Cal. Aug. 15, 2025) (granting individualized bond hearings on ex parte motion for temporary restraining order after finding likelihood of success); *Mosqueda v. Noem*, 5:25-CV-02304 CAS (BFM), 2025 WL 2591530 (C.D. Cal. Sept. 8, 2025) (same); *Kostak v. Trump*, CV 3:25-1093, 2025 WL 2472136 (W.D. La. Aug. 27, 2025) (same); *Garcia Jimenez v. Kramer*, No. 4:25CV3162, 2025 WL 2374223 (D. Neb. Aug. 14, 2025) (granting relief from stay of bond order pending BIA appeal); *Mayo Anicasio v. Kramer*, 2025 WL 2374224 (D. Neb. Aug. 14, 2025) (same); *But see Pena v. Hyde*, 2025 WL 2108913 (D. Mass. July 28, 2025) (denying habeas petition of noncitizen because he was mandatorily detained under section 1225, but where individual is not similarly situated to Bond Denial Class members because his case was focused on the effect of an approved I-130 petition made on his behalf).

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS - 3

Before the Court is the Bond Denial Class's motion for partial summary judgment and Defendants' cross-motion to dismiss all claims. Dkt. 41; Dkt. 49. First, the Court concludes that it has jurisdiction to reach the merits of Plaintiffs' claims. Second, the Court concludes that the Bond Appeal Class has stated a plausible claim that delays by the Board of Immigration Appeals ("BIA") in hearing appeals from bond denials are so prolonged that they violate due process. Third, after full briefing, oral argument, and consideration of supplemental authority, the Court reaches the same conclusion as in its preliminary injunction: members of the Bond Denial Class are not subject to mandatory detention under 8 U.S.C. § 1225(b)(2), and the Defendants' practice of denying bond hearings to class members based on that provision violates the INA. The Court therefore DENIES Defendants' motion to dismiss (Dkt. 49) and GRANTS Plaintiffs' motion for partial summary judgment (Dkt. 41). Finally, the Court concludes that it should enter its declaratory judgment on the claims brought by the Bond Denial Class immediately so that Defendants may seek prompt appellate review. *See* Fed. R. Civ. P. 54(b).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Rodriguez represents two classes of noncitizens, the Bond Denial Class and Bond Appeal Class, challenging government policies that Plaintiffs allege unlawfully deny them bond hearings and prolong their appeals when bond is denied. *See* Dkt. 1 ¶ 10; Dkt. 54 at 3.

Defendants are Drew Bostock, Seattle Field Office Director, Enforcement and Removal Operations, ICE; Bruce Scott, Warden at NWIPC; Kristi Noem, Secretary of DHS; Pamela Bondi, Attorney General of the United States; the Executive Office of Immigration Review ("EOIR"); Sirce Owen, Director of EOIR; and the Tacoma Immigration Court. Dkt. 1 ¶¶ 18–25. The facts discussed below are undisputed by the parties.

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS - 4

1

**A.    The relationship between 8 U.S.C. §§ 1225 and 1226.**

2      The claims of the Bond Denial Class depend on the relationship between two provisions

3  of the INA: 8 U.S.C. §§ 1225 and 1226. Bond Denial Class members contend they are

4  unlawfully detained under section 1225(b)(2), which requires detention for certain noncitizens,

5  and that instead they should be eligible for release on bond under section 1226(a)'s discretionary

6  detention scheme. Dkt. 41 at 2.

7      The INA authorizes the detention of noncitizens "awaiting removal from the United

8  States." *Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993, 1000 (N.D. Cal. 2018).

9  Section 1226 "provides the general process for arresting and detaining" noncitizens "who are

10  present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189,

11  1196 (9th Cir. 2022) (citation omitted). Section 1226(a) "sets out the default rule: The Attorney

12  General may issue a warrant for the arrest and detention of an alien 'pending a decision on

13  whether the alien is to be removed from the United States.'" *Jennings v. Rodriguez*, 583 U.S.

14  281, 288 (2018) (quoting § 1226(a)). Except as provided in section 1226(c), "the Attorney

15  General 'may release' an alien detained under § 1226(a) 'on . . . bond' or 'conditional parole.'"

16  *Id.* (quoting § 1226(a)(1)–(2)).

17      Section 1226(c) "carves out a statutory category" of noncitizens for whom detention is

18  mandatory, comprised of individuals who have committed certain "enumerated . . . criminal

19  offenses [or] terrorist activities." *Id.* at 289 (citing § 1226(c)(1)). Among the individuals subject

20  to mandatory detention under section 1226(c) are certain categories of "inadmissible"

21  noncitizens. 8 U.S.C. §§ 1226(c)(1)(A), (D), (E). Several of these categories were added to the

22  INA just months ago, in January 2025, by the Laken Riley Act ("LRA"). Pub. L. No. 119-1, 139

23  Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E). The LRA amendments require detention for noncitizens

24  who have been charged as inadmissible under sections 1182(a)(6)(A) (the inadmissibility ground

for a noncitizen "present in the United States without being admitted or paroled"), 1182(a)(6)(C) (misrepresentation), or 1182(a)(7) (lacking valid documentation) *and* have been arrested for, charged with, or convicted of certain crimes. *Id.*

Turning back to the default rule, "[w]hen a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." *Rodriguez Diaz*, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). If the detainee objects to the initial determination, they "may request a bond hearing before an IJ at any time before a removal order becomes final." *Id.* at 1197 (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). At this stage, the noncitizen must "establish to the satisfaction of the Immigration Judge . . . that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight." *Hernandez v. Sessions*, 872 F.3d 976, 982 (9th Cir. 2017) (quoting *In re Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006)). A detainee can appeal an adverse decision to the BIA. *Id.* at 983 (citing § 236.1(d)(3)).

Section 1225(b) "supplement[s] § 1226's detention scheme." *Rodriguez Diaz*, 53 F.4th at 1197. Section 1225(b) "applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." *Jennings*, 583 U.S. at 297; *see* § 1225(b) ("Inspection of applicants for admission"). Section 1225 defines an "applicant for admission" as a noncitizen "present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1); *see Jennings*, 583 U.S. at 287. As the Supreme Court noted, "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." *Jennings*, 583 U.S. at 287 (quoting § 1225(a)(3)).

Section 1225(b)(1) is titled: "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). Specifically, "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud,

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS - 6

1    misrepresentation, or lack of valid documentation," as well as "certain other aliens designated by

2    the Attorney General." *Jennings*, 583 U.S. at 287 (citing §§ 1225(b)(1)(A)(i), (iii)). Individuals

3    that fall into section 1225(b)(1) are "normally ordered removed 'without further hearing or

4    review' pursuant to an expedited removal process" unless claiming asylum or a fear of

5    persecution. *Id.* (first quoting § 1225(b)(1)(A)(i); then citing § 1225(b)(1)(A)(ii)).

6          Section 1225(b)(2) is titled: "Inspection of other aliens." Section 1225(b)(2) "mandates

7    detention 'if the examining immigration officer determines that an alien seeking admission is not

8    clearly and beyond a doubt entitled to be admitted.'" *Rodriguez Diaz*, 53 F.4th at 1197 (quoting

9    § 1225(b)(2)(A)).

10         To summarize the distinctions relevant to this case, noncitizens detained under section

11   1225(b)(2) must remain in custody for the duration of their removal proceedings, while those

12   detained under section 1226(a) are entitled to a bond hearing before an IJ at any time before

13   entry of a final removal order. As the Supreme Court has explained, "[i]n sum, U.S. immigration

14   law authorizes the Government to detain certain aliens seeking admission into the country under

15   §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the

16   country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings*, 583

17   U.S. at 289.

**B.    The Tacoma Immigration Court's denial of bond hearings for lack of jurisdiction
        under section 1225(b)(2).**

18

19         Beginning around November 2022, the Tacoma Immigration Court started denying bond

20   hearings for noncitizens "who entered without inspection and who have since resided in the

21   United States." Dkt. 5 ¶ 3; *see also* Dkt. 6 ¶ 3. According to the Tacoma IJ's bond memo in

22   Rodriguez's case, all noncitizens who enter the United States "without inspection or parole"—

23   and who are not placed on the expedited removal or credible fear tracks of section 1225(b)(1)—

24

are "inadmissible aliens who are 'applicants for admission'" under section 1225. Dkt. 22 at 16; *see also* Dkt. 5 ¶ 5; Dkt. 6 ¶ 3. The immigration court has further held that an "applicant for admission" is also "'seeking admission' as that phrase is used" in section 1225(b)(2)(A). Dkt. 22 at 20; *see* § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."). Thus, the IJ reasoned, "[b]ecause Congress requires the detention of all applicants for admission, [an IJ] does not have jurisdiction to review . . . bond determination[s] made by DHS" for Bond Denial Class members. *See* Dkt. 22 at 21; Dkt. 5 ¶ 5.

The Tacoma Immigration Court's interpretation of the relevant detention authorities has significantly reduced the likelihood that noncitizens apprehended while living in the United States will be released on bond. Plaintiffs contend that "[h]undreds of people have been denied bond as a result" and "[m]any, if not most, of these individuals have resided in the United States for years, or even decades." Dkt. 41 at 5; *see* Dkt. 5 ¶ 5 (summarizing stories of individual detainees similarly situated to Bond Denial Class members); Dkt. 6 ¶¶ 3, 6 (similar); Dkt. 1 ¶¶ 74–76, 80 (describing Rodriguez's circumstances, including that he lived in Washington for sixteen years before he was detained and was denied bond because the IJ held he was subject to mandatory detention under section 1225).

According to national data, Tacoma IJs have granted bond in only three percent of the cases in which bond was requested in Fiscal Year 2023, a period that roughly aligns with the immigration court's change in policy. *See* Transactional Records Access Clearinghouse ("TRAC"), *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*, (July 19, 2023), https://tracreports.org/reports/722/; Dkt. 5 ¶ 3. During this period, the Tacoma Immigration Court's bond grant rate was the lowest among immigration courts in the United

States. *See* TRAC, *Detained Immigrants Seeking Release on Bond Have Widely Different Outcomes*.

**C.    Appeals to the BIA**

The BIA is an appellate body within the EOIR. 8 C.F.R. § 1003.1(d)(1). The Board is "charged with the review of those administrative adjudications under the [INA] that the Attorney General may by regulation assign to it." *Id.* By regulation, the BIA can review IJ custody determinations. 8 C.F.R. §§ 236.1(d)(3),1236.1(d)(3). Besides adjudicating individual cases, "the Board, through precedent decisions, shall provide clear and uniform guidance to DHS, the immigration judges, and the general public on the proper interpretation and administration of the [INA] and its implementing regulations." § 1003.1(d)(1).

At first, detainees denied bond based on the Tacoma Immigration Court's interpretation of the mandatory detention provisions achieved some limited—if slow—success at the BIA. The BIA appeals process is long and often moots pending bond appeals before they are adjudicated. *See* Dkt. 5 ¶ 5; Dkt. 7 ¶¶ 5–6. In 2024, EOIR data showed an average processing time of 204 days for bond appeals. Dkt. 7 ¶ 5. EOIR data between 2015 and 2024 also showed that 200 bond appeal cases "took a year or longer to resolve." *Id.* ¶ 6. During the time it takes the BIA to resolve an appeal, most detainees' claims are mooted. *See* Dkt. 5 ¶ 5. Some detainees are released because ICE exercises its discretionary authority to place detainees on bond. *See id.* ¶ 5(a),(d),(g). Other detainees are ordered removed from the United States during their bond appeal. *Id.* ¶ 5(b), (c), (f). And still others not captured in the EOIR data elect not to appeal a negative bond determination. *Id.* ¶ 5(e); *see also id.* ¶ 7 (declining representation for a bond hearing "based on the Tacoma Immigration Court practice of finding such individuals subject to mandatory detention.").

A few early cases to reach the BIA challenging the Tacoma IJs' practice resolved in the detainee's favor but had limited impact. *See id.* ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5. In April 2023, the BIA issued an unpublished decision involving a noncitizen "present in the United States, [that] ha[d] not been admitted, and that an immigration officer found . . . [was] not clearly and beyond a doubt entitled to be admitted." Dkt. 4-2 at 3. The Tacoma IJ determined that the individual was subject to mandatory detention under section 1225(b)(2)(A). *Id.* at 2. The Board remanded the case to the IJ, concluding that if the individual was issued a warrant of arrest with a notice to appear, "he would be subject to detention under" section 1226. *Id.* at 3–4. Then in September 2023, the BIA issued a second unpublished decision for a person who had entered the United States "without being admitted or paroled." Dkt. 4-1 at 4. The BIA remanded the case to the IJ, writing that it was "unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the custody conditions of a respondent in removal proceedings under the circumstances here." *Id.* But the BIA denied a request by advocates to publish one of these decisions as precedent, Dkt. 4-4 at 2, and three of the four Tacoma IJs continued to deny bond to individuals apprehended while residing in the country and treated as "present in the United States without inspection." Dkt. 5 ¶¶ 3, 11; Dkt. 8 ¶¶ 4–5.

## D.    Developments since the Court's preliminary injunction

As briefing concluded on the parties' dispositive motions, DHS issued a memorandum to all ICE employees on July 8, 2025 which effectively adopts the Tacoma IJs' interpretation of detention authorities under the INA. *See* Dkt. 61-6 at 2. The memo begins by noting that "DHS, in coordination with the Department of Justice (DOJ), has revisited its legal position on detention and release authorities" and has determined "that section 235 of the Immigration and Nationality Act (INA), rather than section 236, is the applicable immigration detention authority for all applicants for admission." *Id.* Section 235 of the INA is the provision codified at 8 U.S.C.

§ 1225, and Section 236 of the INA at 8 U.S.C. § 1226. DHS then defines "applicants for

admission," provides the government's interpretation of its scope, and explains the significance

of the policy change for bond hearing eligibility:

> An "applicant for admission" is an alien present in the United States who has not
> been admitted or who arrives in the United States, whether or not at a designated
> port of arrival. INA § 235(a)(1). **Effective immediately, it is the position of DHS
> that such aliens are subject to detention under INA § 235(b) and may not be
> released from ICE custody except by INA § 212(d)(5) parole.** These aliens are
> also ineligible for a custody redetermination hearing ("bond hearing") before an
> immigration judge and may not be released for the duration of their removal
> proceedings absent a parole by DHS. For custody purposes, these aliens are now
> treated in the same manner that "arriving aliens" have historically been treated.

Dkt. 61-6 at 2 (emphasis in original).

The DHS memo also defines the limited circumstances in which it agrees noncitizens

may still be eligible for bond under 8 U.S.C. § 1226 (section 236 of the INA), the previous

"applicable immigration detention authority":

> **The only aliens eligible for a custody redetermination and release on
> recognizance, bond, or other conditions under INA § 236(a) during removal
> proceedings are aliens admitted to the United States and chargeable with
> deportability under INA, with the exception of those subject to mandatory
> detention under INA § 236(c).**

*Id.* (emphasis in original).

The government's changed position on the detention authority for noncitizens living in

the United States did not immediately translate to a shift at the BIA. In *Matter of Akhmedov*, 29

I. & N. Dec. 166 (BIA 2025), the Board stated that a noncitizen who had entered the United

States unlawfully three years earlier was subject to discretionary detention under section 1226(a)

("The respondent's custody determination is governed by the provisions of section 236(a) of the

Immigration and Nationality Act, 8 U.S.C. § 1226(a)[.]"). On August 4, 2025, nearly one month

after the DHS memo was issued, the Attorney General designated the Board's decision in *Matter

of Akhmedov* "as precedent in all proceedings involving the same issue or issues." 29 I. & N. at

166 n.1. But one month later, on September 5, 2025, the BIA issued another opinion in *Matter of Hurtado*, 29 I. & N. Dec. 216, 220 (BIA 2025), holding for the first time that IJs lack authority to grant bond to noncitizens who are present in the United States without admission because they are "applicants for admission as defined under section 235(b)(2)(A) of the INA, 8 U.S.C. § 1225(b)(2)(A), and must be detained for the duration of their removal proceedings." *Id.*

## E.    Procedural history

On March 20, 2025, named Plaintiff Rodriguez filed his complaint, moved for a preliminary injunction, and moved to certify two classes. Dkt. 1; Dkt. 2; Dkt. 3. Rodriguez challenged the Tacoma IJs' practice of interpreting section 1225(b) as denying the immigration court jurisdiction to grant bond, arguing that he and putative class members are instead entitled to individualized bond hearings under section 1226(a)'s discretionary detention scheme. Dkt. 1 ¶¶ 1–12.

On April 24, 2025, the Court granted Rodriguez's individual request for a preliminary injunction and ordered Defendants to provide Rodriguez a bond hearing within 14 days. Dkt. 29 at 4. Then on May 2, 2025, the Court granted in part and denied in part Plaintiffs' class certification motion. Dkt. 32 at 43. Plaintiffs had moved to certify two classes of similarly situated noncitizens, seeking declaratory relief that the IJs' policy is unlawful under the INA and that prolonged detention without timely adjudication of their bond appeals violates due process. Dkt. 2 at 17. The Court ordered the following classes be certified:

> Bond Denial Class: All noncitizens without lawful status detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

> Bond Appeal Class: All detained noncitizens who have a pending appeal, or will file an appeal, of an immigration judge's bond hearing ruling to the Board of Immigration Appeals.

Dkt. 32 at 43.

On June 2, 2025, the Bond Denial Class moved for partial summary judgment. Dkt. 41. As part of the motion, Plaintiffs requested permanent injunctive relief for four class members who at the time were detained under section 1225(b)(2). *Id.* at 2.

Defendants then filed two motions on June 6, 2025, moving to (1) dismiss all claims, Dkt. 49; and (2) stay Plaintiffs' partial summary judgment motion until the Court considered its motion to dismiss, Dkt. 48. In the alternative, Defendants requested an extension of time to respond to Plaintiffs' partial summary judgment motion. Dkt. 48. The Court denied the motion to stay but granted Defendants' request for an extension. Dkt. 53. The parties responded and replied to each motion. Dkt. 54, Dkt. 56, Dkt. 57, Dkt. 58.

In a Notice of Supplemental Authority filed on August 18, 2025, Plaintiffs updated the Court that three of the four class members for whom they requested individual injunctions had been released from detention or chosen to voluntary depart the country. Dkt. 61 at 2–3. On September 11, 2025, Plaintiffs moved to withdraw their remaining request for individual injunctive relief because an IJ granted the class member's application for cancellation of removal. Dkt. 64; Dkt. 64-1. Because all individual requests for injunctive relief are now moot, the Court declines to reach the parties' arguments as to whether that relief may be granted as part of this class action.

Oral argument on the parties' cross-motions took place on August 22, 2025. Dkt. 62. Both motions are fully briefed and ripe for the Court's review.

### III.    LEGAL STANDARDS

**A.    Motion to dismiss**

### *1.    Rule 12(b)1*

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Such challenges may be either "facial" or "factual." "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* Where, as here, the Court responds to a facial attack, the Court will resolve the challenge "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id.*

### *2.    Rule 12(b)6*

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v.*

*Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## B.   Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Here, the parties agree that the

material facts are not in dispute, and the Court may resolve the claims made by the Bond Denial Class as a matter of law.

## IV.    DISCUSSION

At the outset, the parties agree that Rodriguez's individual claims are moot because he voluntarily departed the country and is no longer in DHS custody. Dkt. 49 at 16–17; Dkt. 54 at 7; *see* Dkt. 50 at 8 (IJ order granting Rodriguez's application for "post-conclusion voluntary departure under INA § 240B(b)"). The Court briefly summarizes the structure of the remaining Order.

First, the Court addresses Defendants' arguments that it lacks jurisdiction to review the claims of both the Bond Denial and Bond Appeal Classes under various provisions of 8 U.S.C. § 1252. It also considers Defendants' related argument that the Bond Denial Class claims do not satisfy Rule 23(b)(2). Finding that none of Defendants' asserted jurisdictional bars prevent reaching the claims on their merits, the Court next rejects Defendants' argument that the Bond Appeal Class fails to state a claim under Rule 12(b)(6). Finally, the Court reviews Defendants' 12(b)(6) motion to dismiss and Plaintiffs' partial motion for summary judgment on the Bond Denial Class together, holding that Bond Denial Class members fall under section 1226(a)'s discretionary detention scheme and are not subject to mandatory detention under section 1225(b)(2).

## A.    The Court has jurisdiction to hear Bond Denial Class and Bond Appeals Class claims.

Defendants argue that various provisions of 8 U.S.C. § 1252 strip this Court of jurisdiction to hear Bond Denial Class and Bond Appeals Class claims. Dkt. 49 at 18–26, 34–35. Defendants also argue that if section 1252(f)(1) does not preclude Bond Denial Class claims,

then the declaratory relief sought by Bond Denial Class members violates Federal Rule of Civil Procedure 23(b)(2). *Id.* at 23. The Court considers each of these arguments in turn.

### 1.    Section 1252(g)

Defendants first argue that section 1252(g) bars the Court from hearing the Bond Denial Class's claims because class members' "detention arises from the decision to 'commence [removal] proceedings.'" Dkt. 49 at 19 (quoting 8 U.S.C. § 1252(g)). Defendants similarly contend that this provision bars Bond Appeal Class claims because they "aris[e] from the Attorney General's decision or action to adjudicate cases—here, the BIA's adjudication of appeals." *Id.* at 34. But both the Supreme Court and the Ninth Circuit have consistently recognized that section 1252(g)'s "narrow" scope does not sweep in non-discretionary, purely legal questions such as those presented by both classes here. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*").

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

The Supreme Court has described section 1252(g)'s application as "narrow." *AADC*, 525 U.S. at 487; *see also Jennings*, 583 U.S. at 294 ("We did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General . . . . [but] [i]nstead . . . read the language to refer to just those three specific actions themselves."). Characterizing section 1252(g) as a "discretion-protecting provision," *AADC*, 525 U.S. at 487, the Court stated that it is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion," *id.* at 485 n.9. As such, "[t]here are . . . many other decisions or actions that may be part of the deportation process" that are not implicated by

section 1252(g). *Id.* at 482; *see Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 14 (2020) ("We have previously rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'") (quoting *AADC*, 525 U.S. at 482). A recent Ninth Circuit decision affirmed that courts "have jurisdiction to decide a 'purely legal question' that 'does not challenge the Attorney General's discretionary authority . . . even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority.'" *Ibarra-Perez v. United States*, --- F.4th ----, 2025 WL 2461663, at *6 (9th Cir. Aug. 27, 2025) (quoting *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004)).

Here, the Bond Denial Class claims raise a discrete, "purely legal question" about the legality of the detention statute applied to the class members. *See Ibarra-Perez*, 2025 WL 2461663, at *6. Defendants' argument largely downplays the weight of authority against its interpretation, focusing instead on the scope of the jurisdictional bar implied by "'any cause or claim' arising from the commencement of removal proceedings." Dkt. 57 at 4. But the Supreme Court has explicitly warned off such an expansive reading of section 1252(g)'s language, describing it as "uncritical literalism leading to results that no sensible person could have intended." *Jennings*, 583 U.S. at 293–94 (citation modified). And although Defendants argue that "detention pending removal proceedings is part and parcel of the government's commencement of proceedings," Dkt. 57 at 4, the Ninth Circuit has "been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders." *Ibarra-Perez*, 2025 WL 2461663, at *7; *see Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023) (holding that plaintiff's claim of improper detention was not barred by section 1252(g) because his "assertions of illegal detention are plainly collateral to ICE's prosecutorial decision to execute [plaintiff's] removal").

The Ninth Circuit has also recognized the narrow application of "adjudicate" under section 1252(g) that would similarly not sweep in Bond Appeal Class claims. In *Barahona-Gomez v. Reno*, the Ninth Circuit explained that "the meaning of a discretionary decision to 'adjudicate' is readily apparent": it refers to the "very decision to either abandon the endeavor or to adjudicate." 236 F.3d 1115, 1120 (9th Cir. 2001) (citation modified); *see also id.* (citing approvingly to *Singh v. Reno*, 182 F.3d 504 (7th Cir. 1999), which denied the government's argument that the court lacked jurisdiction because "the petitioner had stated a reviewable constitutional claim that [ICE] denied his due process rights by failing to timely calendar his deportation hearing"). Here, the Bond Appeal Class alleges a violation of their due process rights based on the BIA's failure to timely consider their bond appeals. Dkt. 1 ¶¶ 107–110. As another court in this district noted, "Congress did not intend Section 1252(g) to 'deny any judicial forum for a colorable constitutional claim.'" *NWDC Resistance v. Immigr. & Customs Enf't*, 493 F. Supp. 3d 1003, 1010 (W.D. Wash. 2020) (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)).

Because "[t]he government's broad reading of § 1252(g) would lead to a result that is not contemplated in the statute and that has been disavowed by the Supreme Court," the Court concludes that neither the Bond Denial Class nor the Bond Appeal Class claims concern discretionary actions barred by section 1252(g). *See Ibarra-Perez*, 2025 WL 2461663, at *7.

### 2.    Section 1252(b)(9)

Defendants next argue that section 1252(b)(9) bars the Court from hearing Bond Denial Class claims because the Class "challenges the decision and action to detain them, which arises from DHS's decision to commence removal proceedings, and is thus an 'action taken . . . to remove [them] from the United States.'" Dkt. 49 at 21. For the same reason, Defendants contend that the Court is precluded from reviewing Bond Appeal Class claims. *Id.* at 34–35 ("The Bond Appeal Claims arise from action taken by DHS to remove them, which forms the basis of their

subsequent appeals to the BIA."). But Defendants' argument, like their assertions regarding

section 1252(g), are foreclosed by Supreme Court and Ninth Circuit precedent.

The Supreme Court has referred to section 1252(b)(9) as an "unmistakable zipper

clause," *AADC*, 525 U.S. at 483 (citation modified), providing that:

> Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, arising from any action taken
> or proceeding brought to remove an alien from the United States under this
> subchapter [including §§ 1225 and 1226] shall be available only in judicial review
> of a final order under this section.

*Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (quoting § 1252(b)(9)).

"This statutory scheme was designed to limit" all noncitizens "to one bite of the apple

with regard to challenging an order of removal." *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th

Cir. 2012) (citation modified). But section "1252(b)(9) does not bar claims that are 'independent

of or collateral to the removal process.'" *Ibarra-Perez*, 2025 WL 2461663, at *9 (quoting

*J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016)). And the Supreme Court has made clear

that challenges to the interpretation of the INA's detention provisions are collateral to the

removal process.

Defendants' argument rests on the premise that Bond Denial Class and Bond Appeal

Class members challenge the government's underlying decision to detain them and seek their

removal. *See* Dkt. 57 at 7 ("Despite what Plaintiffs contend, they *are* challenging the decision to

detain them in the first place because their detention pending removal proceedings is mandatory

under § 1225(b)(2).") (emphasis in original). This argument is unpersuasive for two reasons.

First, Defendants' assertion that Plaintiffs are challenging the government's initial

decision to detain them—as opposed to their entitlement to a bond hearing and timely bond

appeal once detained—is contradicted by the allegations in their Complaint, which the Court

accepts as true on a motion to dismiss. *See Leite*, 749 F.3d at 1121; Dkt. 1 ¶ 100 ("Such [Bond

Denial Class] noncitizens *are detained* under § 1226(a), unless they are subject to another detention provision, such as § 1225(b)(1), § 1226(c), or § 1231.") (emphasis added); *id.* ¶ 58 ("The lengthy delays in bond appeal determinations . . . affect[] all noncitizens *who are detained*, who have a right to a bond hearing, and who have their request for a bond denied[.]") (emphasis added).

Second, the Supreme Court has directly considered and rejected the argument that section 1252(b)(9) bars review of legal questions concerning the detention provisions of sections 1225 and 1226. In *Jennings*, noncitizens brought a class action challenging the legality of indefinite detention without a bond hearing under sections 1225 and 1226, the same provisions at issue here. *See* 583 U.S. at 291–92. In evaluating the scope of section 1252(b)(9) preclusion, the Court considered the same argument Defendants make now: whether "questions of law" as to whether "certain statutory provisions require detention without a bond hearing" can be said to "arise from" actions taken to remove the class members. *Id.* at 292–93. The Court's answer was clear: "[R]espondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar." *Id.* at 294–95; *see also Preap*, 586 U.S. at 396, 402 (rejecting that section 1252(b)(9) bars the Court from considering a class action comprised of noncitizens challenging their mandatory detention for the same reasons).

In reaching that conclusion, the Court also observed that adopting the government's "extreme" interpretation of section 1252(b)(9)—that any claims testing the legality of detention may be raised only in a single challenge to a final removal order—"would also make claims of prolonged detention effectively unreviewable." *Jennings*, 583 U.S. at 293. "By the time a final order of removal was eventually entered, the allegedly excessive detention would have already

taken place. And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review." *Id.* This analysis applies with equal force to the claims here.

Finally, Defendants cannot distinguish *Jennings*' clear holding by citing Justice Thomas's "concurring" opinion. *See* Dkt. 49 at 22 ("The fact that the BDC is challenging the basis upon which they are detained is enough to trigger § 1252(b)(9) because 'detention *is* an action taken . . . to remove an alien.'") (quoting *Jennings*, 583 U.S. at 319 (Thomas, J., concurring in part and concurring in the judgment)) (citation modified).

As another district court pointed out in addressing the government's same use of authority to argue that section 1252(b)(9) creates a jurisdictional bar, "Justice Thomas's opinion is not a 'concurring' opinion . . . but rather a concurrence *in part* and a concurrence in the judgment." *Romero*, 2025 WL 2403827, at *5 (emphasis in original) (citing *Jennings*, 583 U.S. at 314). More importantly, the *Jennings* plurality expressly rejected Justice Thomas's expansive interpretation of section 1252(b)(9):

> [Justice Thomas] contends that "detention *is* an 'action taken ... to remove' an alien" and that therefore "even the narrowest reading of 'arising from' must cover" the claims raised by respondents. *Post*, at 855. (Thomas, J., concurring in part and concurring in judgment). We do not follow this logic . . . The question is not whether detention is an action taken to remove an alien but whether the legal questions in this case arise from such an action. And . . . those legal questions are too remote from the actions taken to fall within the scope of § 1252(b)(9).

*Jennings*, 583 U.S. at 295 n.3. Thus, section 1252(b)(9) does not prevent this Court from hearing the Bond Denial Class or Bond Appeal Class claims.

### 3.  Section 1252(f)(1) and Rule 23(b)(2)

Lastly, Defendants contend that this Court either lacks jurisdiction to grant the Bond Denial Class declaratory relief under section 1252(f)(1) or that seeking only classwide declaratory relief violates Federal Rule of Civil Procedure 23(b)(2). Dkt. 49 at 23–30. The Court

1   has already rejected each of these arguments in granting Plaintiffs' motion for class certification,

2   *see* Dkt. 32 at 41–43, and Defendants raise no new binding authority that precludes the relief

3   sought by the Bond Denial Class. *See* Dkt. 49 at 23–30.

4          Defendants argue that section 1252(f)(1) bars the declaratory relief sought by the Bond

5   Denial Class because the provision "prohibits court orders that 'enjoin or *restrain*' the Executive

6   Branch's operation" of sections 1225(b)(2) and 1226(a). *Id.* at 24 (quoting 8 U.S.C. § 1252(f)(1))

7   (emphasis in Defendants' brief). Defendants assert that "the 'declaratory' relief sought by the

8   [Bond Denial Class] is impermissibly coercive" and in truth "seeks injunctive relief, or at least,

9   relief that would restrain the operation of § 1225(b)(2)," and is thus barred by section 1252(f)(1).

10  *Id.* at 25. If the Court is barred from providing the declaratory relief sought, then Defendants

11  contend that Bond Denial Class members' "injuries are not redressable, and they lack Article III

12  standing." *Id.* at 29–30. But as the Court noted in its prior order, both the Supreme Court and the

13  Ninth Circuit have affirmed that declaratory relief remains available under section 1252(f)(1).

14  Dkt. 32 at 42 (citing *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 n.14 (9th

15  Cir. 2024)).

16         Under the heading "Limit on injunctive relief," section 1252(f) provides that:

17         Regardless of the nature of the action or claim or of the identity of the party or
           parties bringing the action, no court (other than the Supreme Court) shall have
18         jurisdiction or authority to enjoin or restrain the operation of the provisions of part
           IV of this subchapter, as amended by the Illegal Immigration Reform and
19         Immigrant Responsibility Act of 1996, other than with respect to the application of
           such provisions to an individual alien against whom proceedings under such part
20         have been initiated.

21         In *Garland v. Aleman Gonzalez*, the Supreme Court held that section 1252(f)(1) prevents

22  federal courts from "entering injunctions that order federal officials to take or to refrain from

23  taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."

24  596 U.S. 543, 550 (2022). Notably, the Court declined to consider the government's argument

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS - 23

1  that section 1252(f)(1) "not only bars class-wide injunctive relief but also prohibits any other

2  form of relief that is practically similar to an injunction, including class-wide declaratory relief."

3  *Id.* at 552 n.2 (citation modified).

4        Two weeks later in *Biden v. Texas*, the Court reaffirmed the "narrowness of [section

5  1252(f)'s] scope" by analyzing the statutory text and structure. 597 U.S. 785, 798–800 (2022).

6  As the Court noted, reading section 1252(f)(1) to eliminate district courts' ability to hear all but

7  individual claims would functionally eliminate the Supreme Court's jurisdiction as well. *Id.* at

8  799 ("If section 1252(f)(1) deprived lower courts of subject matter jurisdiction to adjudicate any

9  non-individual claims under sections 1221 through 1232, no such claims could ever arrive at this

10 Court, rendering the provision's specific carveout for Supreme Court injunctive relief nugatory.

11 Indeed, that carveout seems directed at precisely the question before us here: whether section

12 1252(f)(1)'s '[l]imit on injunctive relief' has any consequence for the jurisdiction of this Court.

13 Congress took pains to answer that question in the negative."). Finally, the *Biden v. Texas*

14 majority cited with approval the Court's plurality decision in *Preap*, which reviewed a case

15 where the putative class sought declaratory and injunctive relief that they should not be

16 mandatorily detained under section 1226(c) and were awarded only the latter by the district

17 court, in "apparent violation of section 1252(f)(1)." *Id.* at 800; *Preap*, 586 U.S. at 399. Despite

18 the lower court's error, the Supreme Court "proceeded to reach the merits of the suit . . . by

19 reasoning that whether the District Court had jurisdiction to enter such an injunction is irrelevant

20 because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory

21 relief." *Biden v. Texas*, 597 U.S. at 800 (citation modified); *see also id.* at 801 ("By its plain

22 terms, and even by its title, [section 1252(f)(1)] is nothing more or less than a limit on injunctive

23 relief.") (quoting *AADC*, 525 U.S. at 481).

24

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS - 24

1        Likewise, the Ninth Circuit has also recently rejected the government's argument that

2   section 1252(f)'s limitations reach beyond injunctive relief, affirming that classwide declaratory

3   relief remains available. *See Al Otro Lado*, 138 F.4th at 1123–24, n.13  ("The Supreme Court

4   recently declined to reach the question whether § 1252(f)(1) prohibits classwide declaratory

5   relief. . . . Because the Supreme Court's reservation of a question is not clearly irreconcilable

6   with a precedent of our court that resolves the same question, we follow our binding

7   precedent.").

8        This Court must follow the Supreme Court's repeated insistence that section 1252(f)

9   limits only injunctive relief and the Ninth Circuit's specific holding that the provision allows

10   classwide declaratory relief as sought in this case. *See Hart v. Massanari*, 266 F.3d 1155, 1170

11   (9th Cir. 2001) ("Binding authority must be followed unless and until overruled by a body

12   competent to do so."). Section 1252(f) is therefore no bar to the Bond Denial Class claims.

13        Nor does the Court find persuasive Defendants' argument that classwide declaratory

14   relief violates Rule 23(b)(2). Defendants contend that the declaratory relief sought by the Bond

15   Denial Class is "inappropriate because Rule 23 requires that any non-injunctive relief granted

16   must be 'corresponding declaratory relief,'" Dkt. 49 at 26 (quoting Rule 23(b)(2)), and "[a]ny

17   declaratory judgment here would be limited to stand-alone declaratory relief, which is not

18   contemplated by Rule 23(b)(2)." *Id.* at 27.

19        Rule 23(b)(2) "allows class treatment when 'the party opposing the class has acted or

20   refused to act on grounds that apply generally to the class, so that final injunctive relief or

21   corresponding declaratory relief is appropriate respecting the class as a whole.'" *Wal-Mart

22   Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (quoting Rule 23(b)(2)). In its prior ruling, this

23   Court directly addressed Defendants' argument that declaratory relief is unavailable under Rule

24   23(b)(2) when not paired with injunctive relief:

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS - 25

1
2
3
4
5
6
7

> Defendant's argument is foreclosed by existing caselaw. As noted above, Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The rule uses the word "or," not "and," indicating that a request for declaratory relief alone is adequate to satisfy the rule's requirements. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (the "word 'or' . . . is almost always disjunctive.") (citation omitted). And the Supreme Court has repeatedly described the rule as allowing class actions for both types of relief. *See Amchem*, 521 U.S. at 614 ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief"); *Dukes*, 564 U.S. at 360 ("[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive *or* declaratory remedy warranted—the notion that the conduct is such that it can be enjoined *or* declared unlawful only as to all of the class members or as to none of them.'") (emphasis added) (citation omitted).

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Dkt. 32 at 41. Defendants acknowledge that the Court has previously "rejected Defendants' argument," but they assert that the "caselaw indicates that this issue is not as well-settled, nor clear-cut, as the Court may have previously determined." Dkt. 49 at 26 n.5. But Defendants marshal only a single out-of-circuit district court decision and a Third Circuit dissent as authority for their position. *See id.* at 27–29 (first citing *Onosamba-Ohindo v. Searls*, 678 F. Supp. 3d 364 (W.D.N.Y. 2023); then citing *Alli v. Decker*, 650 F.3d 1007, 1020 (3d Cir. 2011) (Fuentes J., dissenting)). Neither of Defendants' citations overcome the weight of binding authority that allows the Bond Denial Class to seek standalone declaratory relief. *See, e.g.*, *Dukes*, 564 U.S. at 360; *Al Otro Lado*, 138 F.4th at 1123–24 (analyzing separately the availability of classwide declaratory and injunctive relief in case challenging immigration enforcement policy); *see also* § 1775 Class Actions for Injunctive or Declaratory Relief Under Rule 23(b)(2)—In General, 7AA Fed. Prac. & Proc. Civ. § 1775 (3d ed.) ("Because of the close nexus between injunctive and declaratory relief, it is quite common for parties seeking a declaration of their rights also to include a request for an injunction. But the rule does not require that both forms of relief be sought and a class action seeking solely declaratory relief may be certified under subdivision

(b)(2).""). Classwide declaratory relief is permitted by Rule 23(b)(2). Thus, Bond Denial Class

members' injuries are redressable, and they have standing.

Because the Court has jurisdiction to review the Bond Denial Class and Bond Appeal

Class claims on their merits, the Court denies Defendants' Rule 12(b)(1) motion.

**B.      Bond Appeal Class members have stated a plausible claim for relief.**

Defendants advance two bases to dismiss Plaintiffs' Bond Appeal Class claims under

Rule 12(b)(6). Dkt. 49 at 35. First, Defendants assert that the Complaint "fails to plead a

protected interest in the pace of adjudication of immigration bond appeals." *Id.* Second,

Defendants argue that Plaintiffs' complaint "cannot identify a constitutionally mandated

timeframe for bond appeals or that the current process is deficient." *Id.*

Defendants' first argument is plainly unsupported. In the introduction to the Complaint,

Plaintiffs allege that untimely adjudication of their bond denial appeals amounts to a violation of

their liberty interest:

> Rather than treat the custody appeals as cases involving *a person's core right to
> liberty under the Due Process Clause*, the BIA lets them languish for months, and
> in some cases, years. This practice stands in stark contrast to federal courts facing
> the similar context of pretrial detention. Both district judges and courts of appeals
> act within days, weeks, or at most a couple of months, of appeals from magistrate
> judge detention decisions. *By systematically delaying bond appeal determinations,
> the BIA fails to similarly acknowledge the serious liberty issues at stake* in these
> civil detention cases.

Dkt. 1 ¶ 8 (emphasis added).

Defendants acknowledge that the Complaint "references liberty in its introduction," but

contends that the Bond Appeal Class "fails to identify either interest or so much as outline its

legal basis in the barest terms." Dkt. 49 at 36. But Defendants' assertion is conclusory and

unsupported. Plaintiffs' Bond Appeal Class claim "incorporates by reference" factual allegations

including those in paragraph eight, Dkt. 1 ¶ 107, and connects the deprivation alleged to its

operative Due Process Claim, *id.*  ¶¶ 108–10 ("The Due Process Clause guarantees persons in

civil detention timely appellate review of the decision to detain. . . . By not adjudicating appeals

within sixty days of the filing of a notice of appeal, the BIA does not provide timely appellate

review of detention decisions. . . . This failure to provide timely appellate review violates the

Due Process Clause of the Fifth Amendment."). Plaintiffs need only "plead[] factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678. The Bond Appeal Class has done so, and the Court will not

warp Rule 12(b)(6)'s pleading requirements to construe factual allegations *against* the non-

moving Plaintiffs. *See Retail Prop. Tr.*, 768 F.3d at 945; *see also Urban Accessories, Inc. v. Iron

Age Design & Imp., LLC*, C14-1529JLR, 2015 WL 1510027, at *5 (W.D. Wash. Apr. 1, 2015)

("[Defendant's] critique suffers from an overly formalistic approach to reading the complaint. A

factual allegation does not cease to be such merely because it appears in a section of the

complaint with another title. Moreover, construing the complaint's well-pleaded allegations in

favor of [plaintiff] . . . the court has no trouble connecting the allegations that [defendant]

committed infringement[.]").

Defendants' second basis for dismissal—that the Bond Appeal Class "cannot plausibly

state a claim that the Due Process Clause requires the adjudication of bond appeals within 60

days"—conflates an argument about the proper remedy for an alleged deprivation of due process

rights with the absence of a claim alleging such a deprivation. *See* Dkt. 49 at 36.

First, Defendants contend that the Bond Appeal Class's reliance on EOIR data that shows

average processing times for appeals of 204 days is "unpersuasive" because the Complaint "fails

to attach[] the full data set" for Fiscal Year ("FY") 2024[4] and "includes the processing times for

---

[4] Plaintiffs subsequently attached the full data set for FY 2024. *See* Dkt. 55-1.

those individuals who have been released from detention." *Id.* at 38–39. But Defendants again mistake the Court's role on a 12(b)(6) motion to dismiss, where it "must accept as true all factual allegations in the complaint." *Retail Prop. Tr.*, 768 F.3d at 945. The Court is required to accept as true the Bond Appeal Class's allegations about the BIA's processing time for appeals, including that between FY 2015 and FYI 2024, 200 bond appeal cases "took a year or longer to resolve." Dkt. 7 ¶¶ 4, 6; Dkt. 1 ¶ 57; Dkt. 55-2 (EOIR producing dataset to Plaintiffs). Defendants' complaint that the processing time allegations include cases where the appellant has been released from detention is similarly an attack on the substance of the underlying evidence that is outside the scope of a 12(b)(6) challenge. And rather than undercutting the Bond Appeal Class claims, the fact that BIA's average appeals processing time includes individuals who have been released from detention may make the data *more persuasive* because it incorporates shorter resolution times where the BIA never reached the merits. *See* Dkt. 50 at 8 (IJ order granting Rodriguez's "post-conclusion voluntary departure under INA § 240B(b)"); *id.* at 14 (BIA decision dismissing Rodriguez's appeal as moot).

Next, Defendants argue that because the INA does not prescribe a deadline for deciding an appeal, "there is no reason to conclude that Congress intended to restrict the Board's pace of adjudication." Dkt. 49 at 37. But as Defendants themselves acknowledge, there is an appeals timeline "laid out by regulation." *Id.*; 8 C.F.R. § 1003.1(e)(8) ("[A]fter completion of the record on appeal . . . the Board member or panel to which the case is assigned shall issue a decision on the merits as soon as practicable, with a priority for cases or custody appeals involving detained noncitizens."); § 1003.1(e)(8)(i) ("[T]he Board shall dispose of all cases assigned to a single Board member within 90 days of completion of the record, or within 180 days after a case is assigned to a three-member panel[.]"). Defendants point out that EOIR regulations only "aspire[] to adjudicate" Board appeals within 180 days. Dkt. 49 at 37; *see* 8 C.F.R. § 1003.1(e)(8)(vi)

("The provisions . . . establishing time limits for the adjudication of appeals reflect an internal management directive in favor of timely dispositions . . . and shall not be interpreted to create any substantive or procedural rights[.]"). Although Defendants are correct that timely appeals are not required by statute, the Bond Appeal Class brings a *constitutional* challenge that the agency's untimely adjudication of their appeals violates their due process rights. *See* Dkt. 1 ¶¶ 108–10; ¶ 60 ("These processing times defy the Due Process Clause."). And while "the mere failure of an agency to follow its regulations is not a violation of due process," the Bond Appeal Class may "still be able to state a constitutional claim based on the underlying governmental conduct." *Brown v. Holder*, 763 F.3d 1141, 1148–49 (9th Cir. 2014).

Finally, Defendants take issue with the Bond Appeal Class's use of criminal case precedent defining the rights of pretrial detainees to "timely adjudication" of trials and appeals. Dkt. 49 at 38. Defendants argue that this authority is "inapplicable to the instant case" and to the appeals timeframe that "applies in the civil immigration context." *Id*. But Defendants ignore that the Supreme Court has characterized its own pretrial criminal cases as a baseline from which to determine the scope of protections afforded to immigrant detainees under the Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 690–92 (2001). In *Zadvydas*, even when analyzing the government's justification for detaining noncitizens who had already been issued a final removal order, the Court repeatedly relied on precedent defining the rights of pretrial criminal detainees. *See, e.g.*, *id.* at 690 (citing *Jackson v. Indiana*, 406 U.S. 715 (1972), concerning detention of criminal defendant deemed incompetent to stand trial); *id.* at 690–91 ("[W]e have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections.") (citing *United States v. Salerno*, 481 U.S. 739 (1987), concerning detention of federal criminal defendants).

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS - 30

1    Although outside the immigration context, the Ninth Circuit has also analyzed liberty

2    protections afforded to criminal detainees, as well as to post-adjudication civil detainees, to

3    calibrate what protections pre-adjudication civil detainees are entitled to. *See Jones v. Blanas*,

4    393 F.3d 918, 932 (9th Cir. 2004) ("[I]t stands to reason that an individual detained awaiting

5    civil commitment proceedings is entitled to protections at least as great as those afforded to a

6    civilly committed individual and at least as great as those afforded to an individual accused but

7    not convicted of a crime."). And district courts in this circuit have also looked to precedent from

8    criminal cases to identify the liberty protections required of the government in immigration

9    detention. *See, e.g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019) ("Just as

10   people on preparole, parole, and probation status have a liberty interest, so too does Ortega have

11   a liberty interest in remaining out of custody on bond."). There is nothing inherently "inapposite"

12   about Plaintiffs' use of authorities outside the immigration context that articulate the scope of

13   due process rights to timely adjudications while detained. *See* Dkt. 57 at 14.

14        Plaintiffs have stated a "facially plausible" claim that the BIA's delayed adjudication of

15   their appeals, while Bond Appeal Class members remain detained, deprives them of their liberty

16   interests under the Due Process Clause. *See Boquist*, 32 F.4th at 773. Plaintiffs cite *Salerno*, 481

17   U.S. at 752, to support their claim that "*timely* appellate review is a key feature of any civil

18   detention scheme." Dkt. 1 ¶ 62–63 (emphasis in original). There, the Supreme Court upheld the

19   federal pretrial detention scheme under the Bail Reform Act against a facial due process

20   challenge. *Salerno*, 481 U.S. at 751–52. Among the Court's reasons for upholding the pretrial

21   detention scheme was the "immediate appellate review of the detention decision," which the

22   Court noted as one of the "extensive safeguards" sufficient to repel a due process challenge. *Id*.

23   at 752; *see Stack v. Boyle*, 342 U.S. 1, 4 (1951) (granting certiorari and overturning lower court's

24   pretrial bail determination in criminal case while noting that "[r]elief in this type of case must be

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS - 31

speedy if it is to be effective"); *see also Zadvydas*, 533 U.S. at 690–91 (citing *Salerno* multiple times to compare the "adequate procedural protections" upheld by the Court to their corollaries in the immigration detention context).

Plaintiffs also point to Ninth Circuit precedent that emphasizes the importance of timely appeals and appellate procedures, including in immigration cases. *See* Dkt. 1 ¶ 61, 63; Dkt. 54 at 27, 29. In *Fernandez-Alfonso*, the Ninth Circuit held that a district judge's failure to consider an appeal of a magistrate judge's detention order for thirty days violated the Bail Reform Act's promptness requirement. 813 F.2d at 1572–73 (9th Cir. 1987). Although nominally a statutory violation, the Ninth Circuit explained that the statute's "procedural safeguards serve the important purpose of protecting the liberty interests of presumably innocent pretrial detainees" and "effectiveness demands timeliness." *Id.* at 1572. And in *Singh v. Holder*, 638 F.3d 1196, 1209 (9th Cir. 2011), *abrogation recognized on other grounds Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022), the Ninth Circuit held that the Due Process Clause required EOIR to produce a "contemporaneous record" of bond hearings to adequately facilitate appeals.[5]

In sum, the Bond Appeal Class plausibly alleges that BIA processing times exceed (and in some cases, far surpass) its own guidelines, especially considering that adjudication of bond appeals is classified as a "priority." *See* 8 C.F.R. § 1003.1(e)(8) ("[A]fter completion of the

---

[5] Defendants assert that *Singh* "has been largely abrogated or overruled" by *Jennings*. Dkt. 57 at 14 (citing *Rodriguez Diaz*, 53 F.4th at 1202). Plaintiffs contend that *Rodriguez Diaz* "overruled the statutory basis for the bond hearing in *Singh*, but did not disturb its constitutional holding regarding the necessity of certain procedures." Dkt. 54 at 27 n.7. In *Rodriguez Diaz*, the court both noted that *Singh* "relied on the Due Process Clause in determining the procedural rights available to" noncitizen detainees, but that it did so "in service of an implied statutory right to a bond hearing for persons detained under § 1226(c)—an implied right that the Supreme Court has now rejected." 53 F.4th at 1202. The Ninth Circuit declined to "address[] the potential applicability, if any, of *Singh's* holding absent that perceived statutory right[.]" *Id.*; *see also id.* n.4 ("[W]e have no occasion to decide whether *Singh* remains good law in any respect following *Jennings*."). This Court will (and must) continue to follow the portions of *Singh* that have not been overruled.

record on appeal . . . the Board member or panel to which the case is assigned shall issue a decision on the merits as soon as practicable, with a *priority for cases or custody appeals involving detained noncitizens*.") (emphasis added); Dkt. 55-1. While the regulations alone are not a sufficient basis for a due process challenge, Plaintiffs have also pointed to a line of Supreme Court and Ninth Circuit cases establishing the importance of timely appellate procedures to protect the liberty interests of detainees, particularly in pretrial settings. *See supra*. And the Supreme Court has recognized the relevance of precedent from criminal and civil detention cases when analyzing the constitutional sufficiency of protections afforded to immigrant detainees. *See Zadvydas*, 533 U.S. at 690–91. Therefore, drawing all reasonable inferences in Plaintiffs' favor, Bond Appeal Class members have stated a plausible claim that Defendants' current pace of processing appeals at the BIA violates their liberty interest in freedom from imprisonment without due process of law. *Zadvydas*, 533 U.S. at 690; *see Iqbal*, 556 U.S. at 678; Dkt. 1 ¶¶ 108–10. The Court thus denies Defendants' 12(b)(6) motion to dismiss Bond Appeal Class claims. *See* Dkt. 49 at 35.

## C. Bond Denial Class members are detained under section 1226(a) and are not subject to mandatory detention under section 1225(b)(2).

Plaintiffs move for partial summary judgment, asking the Court to "[d]eclare that Bond Denial Class members are detained under 8 U.S.C. § 1226(a) and are not subject to mandatory detention under § 1225(b)(2). . . . [and that] the Tacoma Immigration Court's practice of denying bond to Bond Denial Class members on the basis of § 1225(b)(2) violates the Immigration and Nationality Act." Dkt. 41-1 at 1; Dkt. 41 at 2. Defendants oppose summary judgment and contend that a plain text reading of section 1225 requires that Bond Denial Class members be detained pending the outcome of their removal proceedings. Dkt. 56 at 11–13. Defendants also argue that to the extent legislative history is relevant, it supports their reading of the statute, *id.* at

15–16, and that "[p]rior agency practices are not entitled to deference under *Loper Bright*." *Id.* at 16. Defendants make the same substantive arguments in their 12(b)(6) motion to dismiss. *See* Dkt. 49 at 30–33; Dkt. 57 at 11–13. Because the material facts are undisputed and whether Bond Denial Class members are governed under section 1226(a)'s discretionary detention scheme or subject to mandatory detention under section 1225(b)(2) "presents a purely legal question of statutory interpretation," the Court will consider the motions together. *See* Dkt. 53 at 4 (quoting *Rivera v. Holder*, 307 F.R.D. 539, 552 (W.D. Wash. 2015)).

At the outset, the Court recognizes that the INA provisions at issue do not present a straightforward answer as to which detention authority governs the Bond Denial Class. *See Torres v. Barr*, 976 F.3d 918, 923 (9th Cir. 2020) ("[D]ivining [the] meaning . . . of [t]he complex provisions of the INA . . . is ordinarily not for the faint of heart."). Yet even when a statute is ambiguous or internally contradictory, courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). The Court begins its analysis with the statute's plain text. *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 391 (2017) ("Our analysis begins with the language of the statute.") (citation omitted); *Shulman v. Kaplan*, 58 F.4th 404, 410 (9th Cir. 2023) ("As always, we begin with the statute.") (citation omitted).

*1.*  *The plain text of section 1226(a) applies to Bond Denial Class members.*

Section 1226(a) authorizes that "on a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). "Except as provided in subsection (c)," when a noncitizen is arrested under section 1226(a), the Attorney General may detain him or release him on bond or conditional parole. § 1226(a)(1)–(2). This process includes the right to a bond hearing before an immigration judge. *See* 8 C.F.R. § 1236.1(d). At that hearing, the noncitizen may present

evidence of their ties to the United States, lack of criminal history, and other factors that show they are not a flight risk or danger to the community. *See generally In re Guerra*, 24 I. & N. Dec. at 40; *see also Martinez v. Clark*, 124 F.4th 775, 783 (9th Cir. 2024) (discussing *Guerra* factors).

Section 1226(c) then "carves out a statutory category of aliens who may *not* be released under § 1226(a)." *Jennings*, 583 U.S. at 289 (emphasis in original). This subsection mandates detention for a noncitizen "who falls into one of several enumerated categories involving criminal offenses and terrorist activities." *Id.* Importantly, the plain text of section 1226(c) requires detention for certain noncitizens who are "deportable" (meaning they were previously admitted to the United States) *as well as* certain noncitizens deemed "inadmissible" (meaning they have not been admitted to the United States).[6] *See* §§ 1226(c)(1)(A)–(E). Relevant here, section 1226(c) requires detention for a noncitizen who is deemed inadmissible because he is "present in the United States without being admitted or paroled" under section 1182(a)(6)(A) *and* "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements" of certain crimes. § 1226(c)(1)(E)(i)–(ii).

A plain reading of this exception implies that the default discretionary bond procedures in section 1226(a) apply to noncitizens who, like Bond Denial Class members, are "present in the United States without being admitted or paroled" under section 1182(a)(6)(A) but *have not been* implicated in any crimes as set forth in section 1226(c). *See* § 1226(a) (Attorney General may release noncitizen on bond "except as provided in subsection (c)"). As the Supreme Court has recognized, when Congress creates "specific exceptions" to a statute's applicability, it "proves"

---

[6] Generally, grounds for "deportability" (found in 8 U.S.C. § 1227) apply to people who have previously been admitted, such as lawful permanent residents, while grounds of inadmissibility (found in 8 U.S.C. § 1182) apply to those who "have not previously been admitted" to the United States. *See Barton v. Barr*, 590 U.S. 222, 234 (2020).

that absent those exceptions, the statute generally applies. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010). This lends strong textual support that "inadmissible" noncitizens, including Bond Denial Class members who are "present in the United States without being admitted or paroled," are included within section 1226. *See id.*; Dkt. 41 at 13–15.

But this plain reading of section 1226 conflicts with the Tacoma IJs' and government's plain reading of section 1225. Section 1225(a)(1) states that a noncitizen "present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." Section 1225(b)(2)(A) then states that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." According to the Tacoma IJs, a plain reading of section 1225 requires that Bond Denial Class members, who are noncitizens "present in the United States who ha[ve] not been admitted," be subject to mandatory detention as "applicants for admission." *See, e.g.*, Dkt. 22 at 17 (section 1225(b)(2)(A) "is quite clear that anyone who meets the definition of an applicant for admission and is not covered under another provision of [section 1225] shall be detained") (internal quotation marks omitted). And as discussed above, the Tacoma IJs' interpretation has now been adopted by DHS. *See* Dkt. 61-6 at 2 ("An 'applicant for admission' is an alien present in the United States who has not been admitted or who arrives in the United States, whether or not at a designated port of arrival. INA § 235(a)(1). **Effective immediately, it is the position of DHS that such aliens are subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole**.").

The Court's task, then, is to try and use other tools of statutory interpretation to resolve this potential conflict between the text of sections 1225 and 1226. The Bond Denial Class argues

1    that "seeking admission" in section 1225(b)(2)(A) should be read to narrow mandatory detention

2    to "only those who take affirmative acts, like submitting an 'application for admission,'" while

3    noncitizens arrested while "already present in the United States" continue to be governed under

4    the discretionary detention scheme in section 1226. Dkt. 41 at 17–18. In support of this

5    argument, Bond Denial Class members point to traditional canons of statutory construction, the

6    recent Laken Riley Act ("LRA") amendments to section 1226, the legislative history of the

7    Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), and the

8    longstanding practice of the agency. Dkt. 41 at 13–20. The government counters that canons of

9    statutory construction affirm its reading that Bond Denial Class members are subject to

10   mandatory detention; that redundancies in its interpretation presented by the LRA amendments

11   are "common"; that IIRIRA's legislative history supports its position that noncitizens already in

12   the country should not be treated differently than arriving noncitizens; and that past agency

13   interpretation is not afforded deference post-*Loper Bright*. Dkt. 56 at 11–16. Considering each of

14   these arguments, the Court concludes that Bond Denial Class members are subject to

15   discretionary detention under section 1226(a) rather than mandatory detention under section

16   1225(b)(2).

17       **2.**    *Canons of statutory construction support the Bond Denial Class's interpretation of sections 1226 and 1225.*

18       The Bond Denial Class members argue that their interpretation is supported by two

19   traditional canons of statutory construction: that statutes should be construed as a whole, giving

20   effect to all their provisions; and that recent amendments to a statute should be read in harmony

21   with an agency's longstanding construction. *See* Dkt. 41 at 13–18; Dkt. 3 at 10–13. The Court

22   agrees that both canons support applying section 1226 to the Bond Denial Class.

23

24

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION TO DISMISS - 37

*First*, if the Court were to adopt the reading of section 1225 advanced by the Tacoma IJs and the government, it would render significant portions of section 1226(c) meaningless. *See* Dkt. 22 at 20 (justifying named Plaintiff Rodriguez's bond denial based on the IJ's interpretation that section 1225 "applies to applicants for admission" and section 1226 "applies only to those who have been admitted"). Under "one of the most basic interpretive canons . . . [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation modified); *Shulman*, 58 F.4th at 410–11 ("[A] court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation modified). "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010).

Here, if the Tacoma IJs and government's interpretation is correct and section 1225, "rather than section [1226], is the applicable immigration detention authority for all applicants for admission," Dkt. 61-6 at 2, then it would render superfluous provisions of section 1226(c). *See* § 1226(c)(1)(A), (D), (E); *Shulman*, 58 F.4th at 410–11; *see also Torres*, 976 F.3d at 930 (noting in the context of interpreting inadmissibility grounds "that a contrary reading would render other provisions of the immigration code superfluous"). Put another way, section 1226(c)(1)(E)'s mandatory detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless since all noncitizens "present in the United States who ha[ve] not been admitted" would already be subject to mandatory detention under the government's reading. *See* § 1225(a)(1); § 1182(a)(6)(A)(i); Dkt. 61-6 at 2 ("An alien present in the United

States who has not been admitted or who arrives in the United States . . . [is] subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole.") (emphasis removed); Dkt. 5-2 at 2–3 (Tacoma IJ memo denying hearing for Bond Denial Class member because "the custody provision under INA § 235(b)(2)(A) mandates the detention of all inadmissible noncitizens" and "applies to all applicants for admission"). As the Supreme Court put it in *Corley*, the government's reading of section 1225(b) thus "seems clear . . . only until one reads" section 1226(c) and recognizes that if section 1225(b) means what the government says, portions of section 1226(c) "serve no purpose." 556 U.S. at 314, n.5.

*Second*, it is important that some of the exceptions in section 1226(c) that would be made superfluous by the Tacoma IJs and government's reading were enacted by Congress just months ago. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) (citations omitted) (giving effect to a congressional amendment of the INA). Congress passed the LRA in January 2025 amending several provisions of the INA, including sections 1226 and 1225. *See* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025). Relevant here, the LRA carved out an additional category of noncitizens from section 1226(a)'s discretionary detention scheme who now fall under section 1226(c)'s mandatory detention authority. *Id.*; *see Jennings*, 583 U.S. at 289. As described above, this category includes those noncitizens who are deemed inadmissible, including for being "present in the United States without being admitted or paroled," *and* who have been arrested, charged with, or convicted of certain crimes. § 1226(c)(1)(E); *see* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025); §1182(a)(6)(A)(i). These "specific exceptions" for a subset of inadmissible noncitizens logically leaves those *not* criminally implicated under section 1226(a)'s default rule for discretionary detention. *See Shady Grove Orthopedic Assocs., P.A.*, 559 U.S. at 400; *Jennings*, 583 U.S. at 289.

And as explained further below, *see infra* Sec. III.C.4, Congress enacted the LRA against the backdrop of longstanding agency practice applying section 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" a court "generally presumes the new provision should be understood to work in harmony with what has come before." *Monsalvo v. Bondi*, 604 U.S. ___, 145 S. Ct. 1232, 1242 (2025) (quoting *Haig v. Agee*, 453 U.S. 280, 297–98 (1981)). In *Monsalvo*, while recognizing that "[i]n truth, the statute is susceptible to both understandings," the Supreme Court interpreted a deadline expressed in terms of "days" in section 1229c of the INA to "extend deadlines falling on a weekend or legal holiday to the next business day," rather than counting "every calendar day." *Id.* at 1241. The Court adopted this interpretation because Congress enacted the relevant subsection "against the backdrop of [a] consistent, longstanding administrative construction" giving this specialized meaning to the term "day." *Id.* at 1242. Similarly, here, Congress adopted the new amendments to section 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under section 1226(a) to noncitizens inadmissible by virtue of being "present in the United States without being admitted or paroled," such as the Bond Denial Class members. It is therefore presumed that Congress intended "the same understanding." *See id.*

Nonetheless, Defendants' position is that Bond Denial Class members who are already present and have been residing in the United States for several years are subject to mandatory detention under section 1225(b). Dkt. 56 at 11–13. Defendants discount the importance of the LRA amendments and contend that traditional interpretive canons favor its reading of section 1225(b)(2) as the detention authority for Bond Denial Class members. *Id.* at 11, 15. But their arguments only reinforce that section 1226(a) lawfully governs the Bond Denial Class.

Defendants first minimize the significance of this year's LRA amendments, which require detention of inadmissible noncitizens implicated in certain crimes under section 1226. *Id.* at 15. Defendants posit that the amendments merely reflect a statutory redundancy and that "redundancies in statutory drafting are 'common . . . sometimes in a congressional effort to be doubly sure.'" *Id.* (quoting *Barton*, 590 U.S. at 239). But Defendants base their argument solely on isolated statements from individual House members who expressed outrage at the circumstances of Laken Riley's death. *See id.* at 15–16. When legislative history is even considered, the Supreme Court has "repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill" and has "eschewed reliance on the passing comments of one Member . . .  and casual statements from the floor debates." *Garcia v. United States*, 469 U.S. 70, 76 (1984). And even allowing for some redundancy in statutory drafting, it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (citing cases); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 643 (9th Cir. 2012) (same). Defendants' expansive reading of section 1225 that all noncitizens "present in the United States who ha[ve] not been admitted" are "subject to detention under [1225(b)] and may not be released from ICE custody" would render section 1226(c)(1)(E) "entirely redundant." *See id.*; Dkt. 61-6 at 2. "[T]he Court does not lightly assume Congress adopts two separate clauses in the same law to perform the same work," and this Court is not persuaded that Congress did so in passing the Laken Riley Act. *See United States v. Taylor*, 596 U.S. 845, 857 (2022).

Defendants next contend that the antisuperfluousness canon shows that its reading of the detention statutes is the better one because Plaintiffs' interpretation would make "applicant for admission" in section 1225(b)(2)(A) meaningless. *See* Dkt. 56 at 12–13. But rather than

resolving a conflict between the two provisions, Defendants' interpretation would introduce

another one by rendering the phrase "seeking admission" in section 1225(b)(2)(A) superfluous.

Defendants argue that "applicants for admission" are synonymous with those "seeking admission." *Id.* at 12 ("Applicants for admission are both those individuals present without admission and those who arrive in the United States. . . . Both are understood to be 'seeking admission' under §1225(a)(1)."). Defendants rely on a BIA case, *Matter of Lemus-Losa*, in which the Board stated that "many people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws." *Id.* (quoting 25 I. & N. Dec. 734, 743 (BIA 2012)) (emphasis in original). That case involved a noncitizen who initially entered the United States without inspection, departed, and then reentered the country. *Id.* at 735. As relevant here, the Board's discussion was in the context of the noncitizen who, while residing in the United States for the second time, had *affirmatively* applied for adjustment of status to be admitted as a lawful permanent resident. *Id.* And while it considered different statutory provisions than the ones at issue here, the Board distinguished the acts defining an "applicant for admission" from those "seeking admission." *Id.* at 744 ("[I]n some cases such an alien will have reentered the United States unlawfully, thereby making himself an 'applicant for admission' by operation of law, while *seeking 'admission' through adjustment of status.*") (emphasis added).

Rather than addressing how the "seeking admission" language supplements the "applicant for admission" phrase that Defendants assert gives them sweeping mandatory detention authority, they insist that the terms are coterminous by pointing to a separate provision of section 1225. *See* Dkt. 56 at 12. Defendants argue that section 1225(a)(3), which is subtitled "Inspection" and requires noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States" to be inspected by immigration

officers, supports their reading that the phrases are synonyms of each other. *See id.* ("The word 'or' here 'introduce[s] an appositive–a word or phrase that is synonymous with what precedes it[.]'") (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)).[7] But Defendants' example in this provision, like its argument concerning section 1225(b)(2), conflates *distinct* categories of noncitizens. In the same BIA case Defendants point to in arguing that the "seeking admission" language sweeps more broadly, the Board described the circumstances in which a noncitizen could "seek admission" without being present in the United States. *See Matter of Lemus-Losa*, 25 I. & N. Dec. at 741 (a noncitizen can "seek[] admission . . . without entering the United States unlawfully—for example, by applying for a visa at a consulate abroad"). Contrast that with an "applicant for admission," who must be physically present in the United States or right at its door. *See* § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States . . . ."). Thus, section 1225(a)(3)'s inspection protocol applies to two different categories of noncitizens: (1) those already present or arriving in the United States, in other words "applicant[s] for admission"; and (2) those who may "seek[] admission" from anywhere in the world. *See, e.g.*, 8 U.S.C. § 1225a(a) (requiring preinspection at certain foreign airports before such noncitizen "passengers . . . arrive from abroad"); 19 U.S.C. § 1629(a) (authorizing inspection of persons in foreign countries "prior to their arrival in . . . the United States").

---

[7] As another district court pointed out when it encountered the same argument and citation, "the case cited by the government to suggest that the word 'or' 'introduce[s] an appositive' actually says that the opposite is generally true." *Romero*, 2025 WL 2403827, at *10 n.31 (citation omitted); *see Woods*, 571 U.S. at 45 ("Moreover, the operative terms are connected by the conjunction 'or.' While that can *sometimes introduce an appositive*—a word or phrase that is synonymous with what precedes it . . . —*its ordinary use is almost always disjunctive*, that is, the words it connects are to be given separate meanings.") (citation modified) (emphasis added).

This distinction reaffirms that Congress chose to use different phrases to delineate separate categories of noncitizens in section 1225. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (applying another "well-settled canon[] of statutory interpretation," the meaningful-variation canon, in which courts presume that where Congress has "used one term in one place, and a materially different term in another, the different term denotes a different idea"). Giving separate meaning to these phrases in section 1225(a)(3) or the subsection at issue here, section 1225(b)(2), does not read out "applicant for admission," Dkt. 56 at 12–13, but rather gives effect to Congressional intent. *See Sw. Airlines Co.*, 596 U.S. at 457–58; *see also* Dkt. 58 at 7 (arguing that inclusion of "applicant for admission" language in section 1225(b)(2) "underscores that people who *were* admitted are not covered.") (emphasis in original).

Compare that with Defendants' approach equating "applicants for admission" with those "seeking admission," which robs the latter phrase of any meaning within the broader provision. Another district court that analyzed the government's interpretation of "seeking admission" summarized this effect succinctly:

> If, as Respondents argue, § 1225(b)(2)(A) were intended to apply to all "applicant[s] for admission," there would be no need to include the phrase "seeking admission" in the statute. That is, rather than stating that mandatory detention is required for any "applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted," § 1225(b)(2)(A) (emphasis added), the statute would instead provide for mandatory detention for any "applicant for admission, if the examining immigration officer determines that [the] alien ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted."

*Lopez Benitez v. Francis*, 25 CIV. 5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025) (emphasis in original); *see United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432, (2023) ("[E]very clause and word of a statute should have meaning.") (citation omitted). Here too, the Court concludes that adopting the Tacoma IJs and government's interpretation that mandatory detention applies to all "applicants for admission" would make the

"seeking admission" language entirely superfluous. *See id.*; *see also, e.g.*, *Martinez*, 2025 WL 2084238, at *6 (same); *Romero*, 2025 WL 2403827, at *9 (same); *Lopez-Campos*, 2025 WL 2496379, at *7 (similar); *Maldonado*, 2025 WL 2374411, at *12 ("[A]ccepting Respondents' one-size-fits-all application of § 1225(b)(2) to all aliens, with no distinctions, would violate fundamental canons of statutory construction.").

Defendants have not pointed to a single district court that has agreed with its construction of section 1225(b)(2). When asked for such authority at oral argument, Defendants referenced one case in Florida, but that case involved the court holding that noncitizens *arriving at the border* are detained under 1225(b)(2). *See* Dkt. 56 at 14 (citing *Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023)); Dkt. 57 at 7. There, Florida sued federal officials, arguing that they "were violating the statutory detention mandates in § 1225(b)(1) and (b)(2) by releasing aliens arriving at the Southwest Border into the country *en masse* through various 'non-detention policies.'" *Florida*, 660 F. Supp. 3d at 1248–49. The parties agreed that the "illegal border crossers" at issue in the case met "the statutory definition for applicants for admission and [were] subject to inspection under § 1225(a)." *Id.* at 1273. Nowhere in that decision did the court hold that "applicants for admission" who were *not* apprehended while arriving at the border, but rather were arrested while residing in the United States, were subject to mandatory detention under section 1225. *See generally id.*; *see* Dkt. 32 at 43 (Bond Denial Class consisting of noncitizens who, among other factors, "are not apprehended upon arrival"). In fact, when explaining that noncitizens "apprehended at the Southwest Border" could not be granted discretionary detention under section 1226(a), the court suggested that members of the Bond Denial Class may be among the noncitizens who *are* properly subject to section 1226(a). *See Florida*, 660 F. Supp. 3d at 1275 ("As the Supreme Court stated in *Jennings*, § 1226 applies to 'certain aliens *already in the country.*'") (quoting *Jennings*, 583 U.S. at 289).

Canons of statutory interpretation are, of course, interpretive aids for the statutory text and do not override the plain meaning when such language is unambiguous. *See Esquivel-Quintana*, 581 U.S. at 391. But even if there were no ambiguity within the detention provisions at issue—a position this Court does not adopt—the plain meaning of "seeking admission" further supports Plaintiffs' position that Bond Denial Class members are not encompassed by that phrase. Defendants' "interpretation of § 1225(b)(2)(A) simply ignores the statute's present-tense active language." *Lopez Benitez*, 2025 WL 2371588, at *6; *Martinez*, 2025 WL 2084238, at *6 ("[T]he phrase 'seeking admission' is undefined in the statute but necessarily implies some sort of present-tense action."); *Lopez-Campos*, 2025 WL 2496379, at *6 ("Respondents completely ignore the term 'seeking' when attempting to broaden what 'seeking admission' means. This implies action – something that is currently occurring[.]"). The Ninth Circuit has endorsed this approach when it recently interpreted similar present-tense language in section 1225(b). *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1011 (9th Cir. 2020) (finding that the phrase "*arriving* in the United States" and its "use of the present progressive, like use of the present participle . . . denotes an ongoing process") (citation omitted) (emphasis in original).

Defendants ignore the implication by section 1225(b)(2)(A) that a noncitizen must be engaged in an "ongoing process"—or any affirmative act for that matter—towards "admission" to trigger the provision's mandatory detention scheme. *See id.*; 8 U.S.C. § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Unless "seeking admission" is subsumed entirely by "applicant for admission," Defendants' interpretation of section 1225(b)(2) could only make sense if the Court presumed that Bond Denial Class members—many of whom have lived in the country for years and made no attempts to be admitted—were in a perpetual state of "seeking admission." But such an

interpretation defies the rule against surplusage, the everyday meaning of "seeking" and "admitted," and logic. *See Lopez Benitez*, 2025 WL 2371588, at *7 ("[S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as 'seeking admission' to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as 'seeking admission' (or 'seeking' 'lawful entry') at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there.").

Finally, Defendants argue that when there is "an irreconcilable conflict in two legal provisions," principles of statutory interpretation require that "the specific governs over the general." Dkt. 56 at 11 (quoting *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1015 (9th Cir. 2017)). Because Plaintiffs reference section 1226(a) as "the INA's default detention authority," *see* Dkt. 41 at 13, Defendants argue that section 1225's focus only on "applicants for admission" is narrower and thus "governs over the general authority found at § 1226(a)." Dkt. 56 at 11. But Defendants misconstrue Plaintiffs' argument—and by extension, the Supreme Court's explanation of section 1226. Plaintiffs' reference to section 1226(a) as the "default rule" arises from the Supreme Court's description of the provision in *Jennings. See* Dkt. 58 at 3 ("The correct analysis, however, begins with § 1226(a)'s 'default rule.'") (quoting *Jennings*, 583 U.S. at 288).

As another district court explained, "*Jennings* did not, as the government suggests, describe Section 1226 as the 'default' detention authority in federal immigration law writ large." *dos Santos, v. Noem, et al.*, 1:25-CV-12052-JEK, 2025 WL 2370988, at *8 (D. Mass. Aug. 14, 2025). Instead, the Supreme Court explained that in circumstances where section 1226 applies, "[s]ection 1226(a) sets out the default rule," referring to its discretionary detention scheme, with

section 1226(c)'s mandatory detention serving as the exception. *See Jennings*, 583 U.S. at 289 ("Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under § 1226(a).") (emphasis in original). Thus, section 1225 is not a "narrower" subset of section 1226's detention authority. Dkt. 56 at 11. If anything, Defendants' argument gives weight to Plaintiffs' interpretation that section 1226 governs the Bond Denial Class because this year's LRA amendments created a *specific* exception within section 1226's carveout. § 1226(c)(1)(E); *see* LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025).

Finally, although it does not directly address the question presented, the Supreme Court's opinion in *Jennings* makes clear that sections 1225 and 1226 apply in different circumstances, and it lends some support to Plaintiffs' proposal for harmonizing the different authorities. The Court framed its discussion of section 1225 as part of a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." 583 U.S. at 287. Then, when discussing section 1226, *Jennings* describes it as governing "the process of arresting and detaining" noncitizens who are living "inside the United States" but "may still be removed," including noncitizens "who were inadmissible at the time of entry." *Id.* at 288. The Court then summarizes the distinction as follows: "In sum, U.S. immigration law authorizes the Government to detain certain aliens *seeking* admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289 (emphasis added); *cf. Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (a noncitizen "who *tries to enter* the country illegally is treated as an applicant for admission," and a noncitizen "who is detained *shortly after unlawful entry* cannot be said to have effected an entry") (emphasis added) (citation modified); *Matter of Q. Li*, 29 I. & N. Dec. 66, 67–68 (BIA 2025) (treating an individual encountered by DHS

"approximately 5.4 miles away from a designated port of entry and 100 yards north of the border" as a noncitizen "who arrives in the United States" under section 1225 because they are "apprehended just inside the southern border, and not at a point of entry, on the same day they crossed into the United States") (citation modified). Plaintiffs' reading of the statute follows this distinction and is the most sensible way to harmonize the provisions of sections 1225 and 1226.

**3.** *Legislative history from IIRIRA supports the Bond Denial Class's interpretation of section 1226.*

The legislative history behind section 1226 also tends to support the Bond Denial Class's argument that it governs noncitizens like them who reside in the United States but previously entered without inspection.

Before IIRIRA's enactment, the predecessor statute to section 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability . . . any alien . . . may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the usual means of proceeding against an alien already physically in the United States[.]"). This predecessor statute, like section 1226(a), included discretionary release on bond. *See* § 1252(a)(1) (1994) ("[A]ny such alien taken into custody may, in the discretion of the Attorney General . . . be continued in custody . . . [or] be released under bond[.]"). Upon passing IIRIRA, Congress declared that the new section 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; *see also* H.R. Rep. No. 104-828, at 210 (same). Because noncitizens arrested while unlawfully residing in the United States were entitled to discretionary detention under section 1226(a)'s predecessor statute, and Congress declared its

scope unchanged by IIRIRA, this background supports the position that Bond Denial Class members too are subject to discretionary detention.

Defendants counter that to the extent legislative history is relevant to the analysis, it favors the government's view. Dkt. 57 at 13; Dkt. 56 at 15–16. They cite a Ninth Circuit decision, *Torres v. Barr*, to argue that "Congress passed IIRIRA to correct 'an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully.'" Dkt. 56 at 15 (quoting 976 F.3d at 928). Defendants point to language in the same House Report from IIRIRA's passage to argue Congress intended noncitizens to be treated the same whether they were living in the United States or encountered at the border. *See id.*; H.R. Rep. 104-469, pt. 1, at 225 ("[R]eplacing the definition of 'entry' with a definition for 'admission' and 'admitted' under section 1101(a)(13)(A) because IIRIRA was "intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry"). In Defendants' view then, Bond Denial Class members living in the United States cannot be afforded a bond hearing because other noncitizens arriving at or encountered near the border would be ineligible to receive one. *See* Dkt. 56 at 15.

The Court disagrees. As another district court in this circuit recently observed, the government "err[s] in its analysis by identifying *one* of Congress's concerns in enacting IIRIRA and then treating it as Congress's sole concern driving the statute." *Aceros, v. Kaiser, et al.,* 25-CV-06924-EMC, 2025 WL 2637503, at *11 (N.D. Cal. Sept. 12, 2025) (emphasis in original). Although Defendants correctly point out Congress's concern with the "entry doctrine anomaly," IIRIRA resolved this problem by placing noncitizens "on equal footing in *removal* proceedings under the INA." *Torres*, 976 F.3d at 928 (citation modified) (emphasis added). Thus, when the

Ninth Circuit discussed the legislative history surrounding "admission" and "applicant for admission," it applied this background to the greater burden of proof noncitizens living in the United States face in defending against removal after IIRIRA. *See id.* at 928 ("Now, in removal proceedings, the relevant distinction for procedural purposes is whether the immigrant has been lawfully admitted, regardless of actual physical presence."); *id.* (comparing noncitizen's burden of proof when considered an "applicant for admission" under section 1229a(c)(2)(A) with government's burden of proof when noncitizen has been admitted under section 1229a(c)(3)(A)); H.R. Rep. 104-469, pt. 1, at 225 ("[T]he pivotal factor in determining a alien's *status* will be whether or not the alien has been lawfully admitted.") (emphasis added). But creating a level playing field in removal proceedings "says nothing about detention pending the outcome of those proceedings." *Romero*, 2025 WL 2403827, at *12; 8 C.F.R. § 1003.19(d) (noting that an IJ's consideration of requests for "custody or bond . . . shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding").

Nor can Defendants enlarge Congress's stated concern that noncitizens living in the United States had an advantage during *removal* proceedings pre-IIRIRA to an unarticulated aim to mandate *detention* for all such noncitizens post-IIRIRA. It is easy to conceive of reasons Congress would distinguish between these concepts; for one, noncitizens who have lived for years in this country are more likely to be working in critical industries, parenting U.S. citizen children, or otherwise serving their communities. *See, e.g.*, Dkts. 9; 35; 43; 44; 45 (declarations of named Plaintiff and Bond Denial Class members). The mass detention of these individuals— without regard to flight risk or danger to the public—is far more disruptive to local American economies, families, and communities than the detention of noncitizens who have just crossed the border. And as discussed above, to the extent legislative history is a guide, Congress declared

1    its intention that noncitizens taken into custody while residing in the United States retain the

2    ability to secure release on bond. *See* § 1252(a)(1) (1994); H.R. Rep. No. 104-469, pt. 1, at 229.

3        If Congress had wished to enact the transformation of the immigration detention system

4    that Defendants contend it did—requiring the detention of millions of people currently living and

5    working in the United States—then it would have said so more clearly. *See Whitman v. Am.*

6    *Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the

7    fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not,

8    one might say, hide elephants in mouseholes."); *Torres*, 976 F.3d at 928 (holding that a separate

9    provision of the INA was not altered by a later law because "Congress would have made it plain

10   if the . . . provision, enacted some four decades later, altered the longstanding meaning"). As

11   another district court put it, "[r]ealistically speaking, if Congress's intention was so clear, why

12   did it take thirty years to notice?" *Romero*, 2025 WL 2403827, at *12.

13       **4.    *Longstanding agency practice supports the Bond Denial Class's interpretation of section 1226.***

14       Finally, the Court considers the weight that should be given to the interpretation of the

15   INA by executive branch agencies over time. In this case, for decades since the passage of

16   IRRIRA, the government and Plaintiffs generally agreed that noncitizens arrested while living in

17   the United States were detained under section 1226(a). The bond denial practices at the Tacoma

18   Immigration Court reaching the opposite conclusion were so aberrational that they led to this

19   lawsuit. *See* Dkt. 5 ¶ 3; Dkt. 6 ¶ 3. But in the few months this case has been pending, both DHS

20   and the BIA have changed course and concluded that noncitizens such as the Bond Denial Class

21   members are subject to mandatory detention. Dkt. 61-6 at 2–3 (DHS memo); *Matter of Hurtado*,

22   29 I. & N. Dec. 216 (BIA 2015).

23

24

As the Supreme Court has recently clarified, this Court is not required to give either interpretation any deference. *Loper Bright*, 603 U.S. at 412–13. While "the judgment of the Executive Branch may help inform" the Court's inquiry, *id*. at 413, it does so only to the extent of its "power to persuade*." Id*. at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, the previous longstanding practice of allowing bond hearings for noncitizens such as the Bond Denial Class members has some persuasive value, because it began contemporaneously with the statute's enactment and endured for many years. In contrast, the new interpretation advanced by DHS and the BIA adds little to the arguments the Court has already rejected.

DHS's previous "longstanding practice" of treating noncitizens arrested while living in the United States, including those who entered without inspection, as detained under section 1226(a) lends some additional support to Bond Denial Class members' position. *See Loper Bright*, 603 U.S. at 386. "[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id*. (citation modified). The Supreme Court has observed that respect for executive branch interpretations of federal statutes is "especially warranted when [it] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id*. (citing cases).

"DHS's longstanding practice of considering people like Plaintiffs as detained under [section] 1226(a)," the Bond Denial Class argues, supports their inclusion within its discretionary detention scheme rather than mandatory detention under section 1225(b)(2). Dkt. 41 at 19; *id.* at 3 ("For decades, people in this situation—people who have been residing in the United States, often for years—received bond hearings before an Immigration Judge[.]"). Plaintiffs point to contemporaneous executive branch regulations issued to interpret and apply IIRIRA. Dkt. 41 at 20. In a 1997 interim rule issued "to implement the provisions of [IIRIRA]," which had passed

six months earlier, the agencies charged with enforcing the Nation's immigration laws directly addressed the detention scheme noncitizens like Bond Denial Class members would be held under. *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). Under the heading of "Apprehension, Custody, and Detention of Aliens," the agencies first stated that IIRIRA dictated a new $1,500 minimum bond amount for "non-criminal aliens." *Id*; *see also* § 1226(a)(2) (directing that the Attorney General "may release the alien on . . . bond of at least $1,500"). Then in the following sentence, the agencies explained that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. at 10323; *see also* Dkt. 4-6 at 2 (Notice to Appear stating that named Plaintiff Rodriguez is a noncitizen "present in the United States who has not been admitted or paroled.").

Compare this with how the same implementing regulations, which have never changed since they were issued, define "arriving" noncitizens. 62 Fed. Reg. at 103212–13; 8 C.F.R. § 1.2. Under the regulations, an "arriving" noncitizen means "an applicant for admission coming or attempting to come into the United States." 8 C.F.R. § 1.2. In other words, an "arriving" noncitizen is an "applicant for admission" who takes an *affirmative act*: "coming or attempting to come into the United States." *See id.* As other district courts considering which detention provision applies to noncitizens residing in the United States have noted, the regulations "mirror[] the text of section 1225(b)(2)(A), which applies where an individual is an 'applicant' who is also *doing* something: 'seeking admission.'" *Martinez*, 2025 WL 2084238, at *6; *Lopez Benitez*, 2025 WL 2371588, at *7 (same); *see also supra* Sec. IV.C.2. While not subject to deference, this regulatory guidance—which reinforces the Court's own analysis of the text and canons of interpretation—and the agency's previous decades of unchanged practice is persuasive. *See Loper Bright*, 603 U.S. at 386.

ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO DISMISS - 54

Defendants mostly concede Plaintiffs' description of "longstanding agency practice," *see* Dkt. 49 at 33, but they maintained at oral argument that the government has not "always" interpreted section 1226(a) this way. Still, the government acknowledged that its position as to which detention authority applies to Bond Denial Class members was a recent change. *See also* Dkt. 61-6 at 2 ("DHS . . . has revisited its legal position on detention and release authorities[.]"). But Defendants argue in their briefing (and emphasized at oral argument) that the "asserted longstanding agency practice carries little, if any, weight under *Loper Bright*." Dkt. 56 at 16; Dkt. 49 at 33 ("The asserted 'longstanding' agency practice does not change the analysis."). They contend that under *Loper Bright*, an agency's "power to persuade" depends on the "thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements[.]" 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 140); Dkt. 49 at 33. Defendants assert that "the agency has provided little, if any, analysis to support its" earlier reasoning. Dkt. 49 at 33; Dkt. 56 at 16 (similar).

After oral argument, Defendants urged the Court to instead follow a new agency interpretation, in the form of a recent BIA decision "that provides additional support to Defendants' argument that Plaintiff and the Bond Denial Class are properly detained under 8 U.S.C. § 1225(b)(2)." Dkt. 63 at 1. In *Matter of Hurtado*, 29 I. & N. at 216, the BIA held on September 5, 2025 that IJs "lack authority to hear bond requests or to grant bond" to noncitizens "who are present in the United States without admission." Dkt. 63-1 at 11.

But the BIA decision does not alter the Court's previous analysis. As Defendants have pointed out, an agency's "power to persuade" rests at least in part on "its consistency with earlier and later pronouncements[.]" Dkt. 49 at 33 (quoting *Loper Bright*, 603 U.S. at 432–33). Here, the BIA's current position is inconsistent with its earlier pronouncements. *See id.* Prior to its September 5 decision, Plaintiffs provided evidence that the Board took the *opposite* position. *See*

Dkt. 4-1; Dkt. 4-2. In two unpublished decisions from 2023, the BIA overturned the Tacoma IJs'
denial of bond for noncitizens present in the United States without being admitted based on the
IJs' interpretation of section 1225. *See id.* In one of those decisions involving a noncitizen who
entered the United States "without being admitted or paroled," the BIA stated that it was
"unaware of any precedent stating that an Immigration Judge lacks authority to redetermine the
custody conditions of a respondent in removal proceedings under the circumstances here."
Dkt. 4-1 at 4.

       Nor was the BIA's position on the proper detention authority for noncitizens like Bond
Denial Class members confined to unpublished dispositions. In *Matter of Akhmedov*, 29 I. & N.
Dec. 166 (BIA 2025), the Board stated unequivocally that a noncitizen who had entered the
United States unlawfully three years earlier was subject to discretionary detention under section
1226(a). *See also Matter of Hurtado*, 29 I. & N. at 226 ("The Board's statement in that decision
[was] that the respondent's custody determination was governed by section 236(a) of the INA, 8
U.S.C.A. § 1226(a), even though the respondent was present in the United States without
inspection[.]"). As recently as August 4, 2025, the Attorney General designated the Board's
decision in *Matter of Akhmedov* "as precedent in all proceedings involving the same issue or
issues." 29 I. & N. at 166 n.1.[8]

       Under *Loper Bright*, the Court has no obligation to defer to the BIA. *Murillo-Chavez v.
Bondi*, 128 F.4th 1076, 1086–87 (9th Cir. 2025) (holding that after *Loper Bright*, BIA decisions
"have only that power [to persuade] and we 'need not and under the APA may not defer to an
agency interpretation of the law simply because a statute is ambiguous'") (quoting *Loper Bright*,

---

[8] In *Matter of Hurtado*, the BIA stated that *Matter of Akhmedov* did not "nullify" section
1225(b)(2) as the proper detention authority for noncitizens present in the United States without
inspection because it was "not [an] issue[] presented to the Board in that case." 29 I. & N. at 226.

603 U.S. at 413). This is especially true where, as here, the BIA's position has not "remained consistent over time." *Loper Bright*, 603 U.S. at 394; *cf. Biden v. Texas*, 597 U.S. at 805 (supporting its analysis of a subsection of section 1225(b)(2) by noting that "[s]ince IIRIRA's enactment 26 years ago, every Presidential administration has interpreted" it the same). In addition to its inconsistency, the Court disagrees with the "validity of [the Board's] reasoning" that all inadmissible noncitizens living in the United States are subject to mandatory detention under section 1225(b)(2). *See Loper Bright*, 603 U.S. at 388; Dkt. 63-1 at 2–15. In *Matter of Hurtado*, the BIA adopts many of Defendants' arguments on the text of section 1225, canons of interpretation, legislative history, and prior agency practice. *See* Dkt. 63-1 at 2–15. For the reasons already explained in this Order, the Court is not persuaded by the Board's analysis.

**D.     The Court will enter partial judgment under Rule 54(b).**

The Bond Denial Class has shown that the text of section 1226, canons of interpretation, legislative history, and longstanding agency practice demonstrate that they are governed by section 1226(a)'s "default" rule for discretionary detention. *See Jennings*, 583 U.S. at 289. The Court is persuaded that the detention of Bond Denial Class members under section 1225(b)(2)'s mandatory detention provision violates the INA. The Court therefore GRANTS Plaintiffs' motion for partial summary judgment (Dkt. 41) and GRANTS summary judgment to the Bond Denial Class. The Court DENIES Defendants' motion to dismiss (Dkt. 49).

Because the grant of summary judgment applies only to the Bond Denial Class, the claims of the Bond Appeal Class remain. The Court's decision therefore "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed. R. Civ. P. 54(b). Under that same rule, however, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." *Id.* Here there is no just reason for delay. The remaining claims apply only to

the Bond Appeal Class and concern different substantive arguments. *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). Entering final judgment now for the Bond Denial Class will also allow Defendants to seek prompt appellate review.

## V.    CONCLUSION

For the reasons explained above, the Court ORDERS as follows:

1.    Defendants' motion to dismiss (Dkt. 49) is DENIED.

2.    Plaintiffs' motion for partial summary judgment (Dkt. 41) is GRANTED.

3.    Summary judgment is GRANTED to the Bond Denial Class on their claims that their detention under 8 U.S.C. § 1225(b)(2) is unlawful. As set forth in the class certification order, the Bond Denial Class is defined as all noncitizens without lawful status detained at the Northwest ICE Processing Center who (1) have entered or will enter the United States without inspection, (2) are not apprehended upon arrival, (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

4.    The Court declares that Bond Denial Class members are detained under 8 U.S.C. § 1226(a) and are not subject to mandatory detention under 8 U.S.C. § 1225(b)(2). The Court further declares that the Tacoma Immigration Court's practice of denying bond to Bond Denial Class members on the basis of § 1225(b)(2) violates the Immigration and Nationality Act.

5.    The Court will enter final judgment in a separate document on the claims of the Bond Denial Class.

Dated this 30th day of September, 2025.

Tiffany M. Cartwright
United States District Judge