District Judge Tiffany M. Cartwright

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

Ramon RODRIGUEZ VAZQUEZ, et al.,

    Plaintiffs,

v.

Laura HERMOSILLO, et al.,

    Defendants.

Case No. 3:25-cv-05240-TMC

**DECLARATION OF CARLOS NAVARRO**

# DECLARATION OF CARLOS NAVARRO

I, Carlos Navarro, hereby declare:

1. My name is Carlos Navarro. I am an attorney licensed to practice in the State of Washington. I have practiced immigration law since 2013 and routinely represent clients before the Executive Office for Immigration Review (EOIR), including cases before the Tacoma Immigration Court, located within the Northwest ICE Processing Center ("NWIPC").

2. I reside and practice law in the State of Washington. I am licensed to practice immigration law in all 50 states. However, for practical reasons, I do not have the capability to actually represent detained clients outside of Washington. I do not have the time or the resources to be able to travel outside of Washington in order to meet with my clients in person. I understand that some facilities allow for video meetings with detainees, but the service is unreliable, limited, and challenging to secure confidential communication. It also takes up to several days to schedule such confidential video calls, and we do not have the luxury of time with these kind of preceedings because hearings are usually only reset for 1-2 weeks. Having the ability to meet with clients in person is crucial to providing proper representation and zealous advocacy before the Immigration Court. Additionally, I need to obtain their hand-written signatures for various reasons. Sending documents by mail is often too slow for the very restrictive deadlines that are imposed on us. Finally, I am only admitted and able to file cases before the Federal District Court in the Western District of Washington and the District of Utah. There are no immigration detention centers in Utah. Therefore, I would not be able to file any actions on my clients' behalf outside of Washington.

3. I currently represent 18 detained clients before the Tacoma EOIR, although this number fluctuates often as cases close, clients bond out, or the Department of Homeland Security (DHS) unexpectedly transfers my clients to detention centers in other states. I physically appear at the NWIPC on a near-daily basis for both client representation before the Court and to meet with current and potential clients. When I meet with clients, they often share their observations and experiences of living in the NWIPC and their interactions with DHS agents.

4. Since about October 2025, I have noticed an increase of detainee transfers out of state. From March of 2025, when I began my current practice, until about October 18, 2025, I had no NWIPC detained clients transferred to facilities outside of Washington. To the best of my recollection, the first of my detained clients to be transferred outside of Washington was on October 18, 2025. I was informed by my client's family members, who called me multiple times around 1 a.m. We had no warning or indication that DHS was planning on transferring him out of the NWIPC.

5. Since October 18, 2025, seven of my detained clients have been transferred out of the NWIPC. Five of these clients were *Rodriguez Vazquez* class members. Of these five *Rodriguez Vazquez* class members, I was only able to complete a bond hearing for one person before he was transferred away. This person was denied a bond on both jurisdictional grounds and flight risk concerns. I was in the process of preparing bond redetermination request pleadings and evidentiary packets for the remaining Four *Rodriguez Vazquez* class members, but I did not get a chance to file them before they were transferred away.

6. My clients that were *Rodriguez Vazquez* class members were transferred to detention centers in Louisiana and New Mexico. I do not have admission to practice before the U.S.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Ave., Ste. 400
Seattle, WA 98104
Telephone (206) 957- 8611

District Court for the District of New Mexico or the United States District Court for the Western District of Louisiana, which would be necessary to get them habeas relief. While I am able to represent clients in their bond proceedings through virtual appearance before the various immigration courts, it significantly limits the effectiveness of my representation. As I explained above, representation of my clients requires me to regularly meet with them at the detention center to prepare their cases, and also for me able to privately communicate with them before and during the hearings. As a result, it is ineffective, impractical, and too costly for me (and my clients) to continue representing most of my *Rodriguez Vazquez* class members.

7. Because of this, and acting in the best interests of my clients, to date, I have cancelled representation with all but one of the aforementioned *Rodriguez Vazquez* class members. The remaining person is actively seeking representation in New Mexico in order to file a habeas petition.

8. On Friday, November 7, 2025, at approximately 4:30 PM, I was informed by my assistant, David Ortiz, that we received calls from at least two of my clients' family members — Baltazar Lopez Mendez, and Juan Carlos Leon Figueroa — indicating that they believed that my clients had been or were in the process of being transferred from NWIPC to another facility or facilities outside of Washington. Both are Rodriguez Vazquez class members. Both have been granted alternative bond orders.

9. Our belief that my clients would be transferred was based on my clients' observation that their commissary balances had been reduced to $0.00 that day at around noon, which, in my experience (and is common knowledge among detainees), is a common indicator that DHS is beginning the processes of transferring detained individuals to other locations. I have witnessed the same pattern for other clients of mine who have been transferred to

other facilities outside of Washington, including in the states of Mississippi, Louisiana, New Mexico, and Texas.

10. My clients Baltazar Lopez Mendez and Juan Carlos Leon Figueroa were fortunate that they noticed the zeroing out of their commisary accounts. Thanks to the efforts of the Northwest Immigrant Rights Project, my clients were granted a Temporary Restraining Order enjoining DHS from transferring my clients out of Tacoma. Today, (November 19th) Mr. Baltazar Mendez was granted an alternative bond order for the amount of $9000. Mr. Leon Figueroa was granted an alternative bond order for $8000 on November 3, 2025.

11. In the case of Mr. Baltazar Lopez Mendez, appearing in person was crucial to our success. Ordinarily, a bond hearing is scheduled between three and five days after a bond redetermination request is filed with the Court. This morning, Mr. Lopez Mendez was only scheduled for a master calendar hearing, which is a preliminary hearing in the removal matter having nothing to do with bond proceedings. My pleadings for a bond determination request were not ready until this morning. Because I was present in the courtroom, I was able to negotiate with the Court and opposing counsel to both file my bond redetermination request and also hold the bond hearing this same morning. This is an example of the potential positive impact that being local counsel can have in a case. I was only able to accomplish this achievement because I was present in the Courtroom and I have an established working relationship with the clerk, the Immigration Judge, and DHS Counsel. I was able to make observations of the Court's remaining calendar and noticed that the court would be able to accommodate my client's bond hearing, which was an extraordinary request and benefit for my client.

12. On Monday, November 10, 2025, I spoke to my clients about their experience from November 7th. They both independently indicated that they had been taken out of their pods and were already in restraints to be transported when DHS received the Court's order enjoining their transfer. One of them told me that he had already been loaded onto a plane and was in restraints when they pulled him off the plane and took him back to the NWIPC.

13. I concluded that Baltazar Lopez Mendez and Juan Carlos Leon Figueroa are class members based on the following facts:

    a. Juan Carlos Leon Figueroa entered the United States in or about April 2007, and was not apprehended at the time of entry. To the best of my knowledge, he has not criminal history that would make him subject to INA § 236(c). He requested a bond and was denied under *Matter M-S & Matter of Q. Li*; 235(b)(1) and 235(b)(2), and *Matter of Yajure Hurtado*, 29 I&N Dec, 216 (BIA 2025). However, he was granted an alternative bond of $8,000.

    b. Baltazar Lopez Mendez A 221483806, entered the United States in or about 2005, and was not apprehended at the time of entry. He has no criminal history that would make him subject to INA § 236(c). Mr. Lopez was denied a bond under *Yajure* Hurtado, but received alternative bond order of $9000.

14. Unfortunately, I have other *Rodriguez Vazquez* class member clients who were not as lucky as Mr. Lopez Mendez or Mr. Leon Figueroa.

    a. I will identify the first client by his initials M.B.V. I have concluded that M.B.V. is a class member because entered the United States on or about July 7, 2005, and was not apprehended at the time of entry. He has no criminal history or allegations of criminal conduct that would make him subject to INA § 236(c).

        M.B.V was transferred to New Mexico. I completed a bond hearing for him over video conference and he was granted a bond in the amount of $10,000. M.B.V. was transferred out of Tacoma November 7th, the night they almost transferred Mr. Lopez Mendez or Mr. Leon Figueroa.

    b. My other client, J.M.R. was transferred to Louisiana. I have concluded that J.M.R. is a class member because entered the United States somtime before June 2007, as he formerly received Deferred Action for Childhood Arrivals (DACA), and was not apprehended at the time of entry. He has no criminal convictions make him subject to INA § 236(c). J.M.R was transferred out of Tacoma the weekend of November 7th.

    c. Prior to November 7, 2025, I had three other clients who were transferred to other states: J.A.S. who entered the U.S. in 2005; C.F.G. who entered the U.S. in 2006.; F.S.C. who entered the U.S. in 2012. All three entered without inspection. None of them were apprehended at the time of entry. None of them had any criminal convictions that would subject them to INA § 236(c).

15. Unlike in the cases of Mr. Lopez and Mr. Leon, I received no indication to suspect that M.B.V. or J.M.R were at risk of being transported. M.B.V.'s spouse discovered on the morning of Saturday November 8th that M.B.V. had been transported out of Tacoma earlier that morning, at approximately 2:45 A.M. I did not become aware that M.B.V. had been transferred to Otero County Processing Center in New Mexico until Monday November 10, 2025. Similarly, I was not aware that J.M.R. had been transferred until Monday morning.

16. Having my detained clients transferred to other states makes representation far more difficult, causes them to be in custody longer than they otherwise would, and makes it

even more expensive for my clients and their families. When DHS moves detainees around the country, it causes detainees to have to seek and pay for multiple attorneys in the various jurisdictions. My clients hire me to represent them, in part, because I am a local attorney who is able and willing to visit them and attend their hearings in person. Doing so gives clients the ability to better convey their often traumatic experiences to me (which is often the basis for their claims for relief), allows me to quickly review documents and obtain their signatures given our often tight deadlines, and gives me the ability to have side bar conversations with them before and during court proceedings.

17. On the other hand, I have had a very difficult time connecting with my clients who have been moved to other facilities. At the Tacoma facility, when I need my clients to call me, I call the facility and they reliably pass a message to my client to call me. Last week I tried doing the same thing with a client that was moved to Mississippi, but was never able to connect with him. This was very stressful for me because I was not certain that I understood my client's wishes on how to proceed in his case. This is a direct result of not having easily accessible direct communication with my client the way I would have had if he were still here in Tacoma. If he were still in Tacoma, I would have simply walked into the facility to meet with him in-person, in order to make sure that I understood how my client wanted to proceed.

18. Following the November 7th incident, I spoke with a GEO Group employee of the NWIPC regarding my suspicions of the commissary balances being an indicator that DHS is planning on transferring detainees to other facilities. The employee confirmed my suspicions. The employee informed me that before a detainee is "released" from NWIPC custody, be that a release from custody or a transfer to another facility, NWIPC employees are required to provide the detainee with the remainder of their commissary

account balance upon their check-out. I do not know in what form the funds are provided to the detainees. This process, in effect, zeros out their commissary account and makes their funds unavailable for their use while at NWIPC, even before they are notified that they will be transferred. The GEO Group employee told me that they are usually notified of a detainee's transfer several hours prior to transport so that they have adequate time to process detainees out of the facility, including their commissary accounting.

19. I have previously written and spoken to DHS agents to request that my clients, aside from those listed above, not be transferred to other facilities, but I have not received any written response from them, and at least one of my clients was transferred to another facility after and despite my request not to do so. During one in-person meeting I had with a DHS officer in October of this year, I was informed that if I made a request to DHS not to transport my clients, at most, they would make an annotation in the detainee's Alien File ("A-File") and that DHS would perhaps take it into consideration when deciding whom to transfer, but they could make no promises.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed in Seattle, Washington on

Dated this day November 19, 2025

_____

Carlos Navarro WSBA #59636